**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION**

| | |
|---|---|
| **STATE OF LOUISIANA,**<br>**STATE OF ALASKA,**<br>**STATE OF ARKANSAS,**<br>**COMMONWEALTH OF KENTUCKY,**<br>**STATE OF MISSISSIPPI,**<br>**STATE OF MISSOURI,**<br>**STATE OF MONTANA,**<br>**STATE OF OKLAHOMA,**<br>**STATE OF SOUTH CAROLINA,**<br>**STATE OF WEST VIRGINIA, AND**<br>**STATE OF WYOMING,**<br>**AMERICAN PETROLEUM INSTITUTE,**<br>**INTERSTATE NATURAL GAS**<br>**ASSOCIATION OF AMERICA, and**<br>**NATIONAL HYDROPOWER**<br>**ASSOCIATION**<br><br>   **Plaintiffs,**<br><br>   **v.**<br><br>**U.S. ENVIRONMENTAL PROTECTION**<br>**AGENCY and**<br>**MICHAEL REGAN, in his official capacity**<br>**as Administrator of the U.S.**<br>**Environmental Protection Agency,**<br><br>   **Defendants.** | **CIVIL ACTION NO.** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This suit challenges a rule that makes sweeping and unlawful changes to the federal regulations governing the process by which States issue "water quality certifications" under the federal Clean Water Act (CWA). 88 Fed. Reg. 66,558 (Sept. 27, 2023) ("2023 Water Quality Certification Rule" or "2023 Rule"). For projects that may result in a discharge into jurisdictional navigable waters (i.e., "the waters of the United States" or "WOTUS"), CWA Section 401 requires the project proponent to obtain certification from the State in which the discharge will occur that

the discharge will comply with specific requirements of the CWA found in Sections 301, 302, 303, 306, and 307. In the 2023 Rule, the Environmental Protection Agency (EPA) upends regulations adopted just three years ago and violates the reasonable statutory limits Congress placed on the scope and duration of the Section 401 certification process. These limits are necessary to ensure that the certifying authority does not inappropriately thwart nationally important projects or critical infrastructure.

The State of Louisiana, State of Alaska, State of Arkansas, Commonwealth of Kentucky, State of Mississippi, State of Montana, State of Oklahoma, State of South Carolina, State of West Virginia, and State of Wyoming (collectively, "State Plaintiffs"), American Petroleum Institute ("API"), Interstate Natural Gas Association of America ("INGAA"), and National Hydropower Association ("NHA") (collectively, "Plaintiffs") challenge the 2023 Water Quality Certification Rule because it is arbitrary and capricious, an abuse of discretion, exceeds the statutory authority on which it relies, and is otherwise contrary to law.

## I.    INTRODUCTION

1.    The CWA uses a "cooperative federalism" approach to achieve its aims. It carves out complementary roles for federal agencies, on the one hand, and States (and, in some cases, Tribes), on the other.[1] CWA Section 401 gives each State an important but limited say in the permitting of federal projects that could affect water quality. Specifically, federal agencies cannot authorize activities that may result in a discharge into WOTUS until the State whose waters would be affected by the discharge certifies that the activity will comply with Sections 301, 302, 303,

---

[1] Certain Tribes have been approved by EPA to administer the water quality certification program within their reservation boundaries.

306, and 307 of the CWA (or waives the Section 401 requirement, either affirmatively or through inaction).

2.      Vital infrastructure, including solar, wind, clean hydrogen, carbon capture, hydropower, and pipelines projects, often require federal permits that trigger section 401. Prominent examples include CWA Section 404 permits issued by the U.S. Army Corps of Engineers (Corps) for discharges of dredged or fill material into navigable waters and licenses issued by the Federal Energy Regulatory Commission (FERC) for pipeline and hydropower projects.

3.      Section 401 authority is powerful—when triggered, State certification or waiver is an essential requirement for the federally licensed activity to proceed. But to preserve the CWA's federal-state balance, that authority is also limited and circumscribed—Section 401 only authorizes States to address water quality, and only within reasonable time limits that can never exceed one year.

4.      Under earlier regulations, some States abused this authority by improperly using procedural gimmicks to extend the time the CWA gives them to make certification decisions. And they improperly relied on Section 401 to effectively deny projects based on non-water quality considerations, such as preferences regarding energy policy, extending well beyond what Congress envisioned when it enacted Section 401 of the CWA. These abuses of Section 401 acutely affected the Plaintiffs.

5.      To combat these abuses, in 2020, EPA undertook a "holistic analysis of the statutory text, legislative history, and relevant case law," and published a final rule that provided a comprehensive framework for implementation of Section 401. 85 Fed. Reg. 42,210 (July 13, 2020) ("2020 Water Quality Certification Rule" or "2020 Rule"). The 2020 Rule, which remained

in effect until November 26, 2023, clarified the limits Section 401 places on State action by giving effect to Congress's decision to limit the scope of State review to water quality determinations.

6.       But after the Administration changed, EPA sharply shifted course. The agency no longer stood by its interpretation of the CWA, legislative history, and relevant case law, and instead promulgated a rule that imposes mandatory requirements on States that exceed their statutory obligations under the CWA and disrupts the CWA's cooperative federalism framework.

7.       This action, brought pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 551, et seq., seeks review of the 2023 Rule.

8.       The 2023 Rule causes immediate injury and harm to State Plaintiffs by requiring them to conduct a water quality certification review that exceeds the statutory requirements of Section 401(a). Now, State Plaintiffs must regulate the entire "activity" proposed, including construction and operation of the project, not simply the discharges into navigable waters to determine whether it will comply with applicable water quality requirements. That assessment requires States to look beyond the enumerated sections of the CWA cited in Section 401(a) to assess compliance with "any other water quality-related requirement of state or tribal law," an exceedingly broad standard that plainly exceeds the scope of review allowed by Section 401(a). The 2023 Rule further requires States to impose conditions that may bear little relation to water quality to "assure" the activity will comply with applicable water quality requirements, or to deny the water quality certification.

9.       The requirements of the 2023 Rule apply retroactively to all certification requests pending as of November 27, 2023, unlawfully broadening the scope of ongoing Section 401 reviews. In addition, the 2023 Rule allows States to modify a previously granted certification (with

or without conditions) made under a prior rule, at any point until the expiration of the Federal license or permit.

10.     The 2023 Rule expands the workload of State Plaintiffs' environmental agencies, complicating and lengthening the Section 401 review process and making certification determinations more vulnerable to legal challenge. The 2023 Rule interferes with the State Plaintiffs' ability to define the legal scope of their review of applications for water quality certification. And it forces State Plaintiffs to defend in court why they did not consider every potential "water-quality related" impact of a project, a legal standard that exceeds Congressional intent.

11.     The 2023 Rule also imposes substantial additional and immediate burdens, including costs and delays on the Association Plaintiffs, their members, and, ultimately, U.S. consumers, by eliminating the clarity and consistency of the 2020 Rule. Where a State denies a water quality certification under Section 401, the federal agencies are prohibited from issuing the permit or license for the project, which would thwart the Association Plaintiffs' members' nationally important projects and impede the development of critical infrastructure necessary to modernize the nation's means of generating and supporting energy. The 2023 Rule also harms Association Plaintiffs and their members by imposing its requirements retroactively to certification requests they submitted under the 2020 Rule.

12.     As a remedy for Defendants' violations of law in adopting the 2023 Water Quality Certification Rule, Plaintiffs seek an order declaring that the 2023 Rule violates the CWA and the APA; vacating and setting aside the 2023 Rule; enjoining EPA from applying or enforcing the 2023 Rule; and any other relief this Court deems proper.

II.     **THE PARTIES**

A.     **The State Plaintiffs**

13.     Plaintiff State of Louisiana is a sovereign State of the United States of America. Louisiana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. Louisiana brings this suit by and through its Attorney General, Jeff Landry, who is authorized by Louisiana law to sue on Louisiana's behalf. La. Const. Art. IV, Section 8. His offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802.

14.     Plaintiff State of Alaska is a sovereign State of the United States of America, and there are 227 federally recognized tribes in Alaska. Alaska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. Alaska brings this suit by and through its Attorney General, Treg Taylor, who is authorized by Alaska law to sue on Alaska's behalf. Alaska Const. art. III, sec. 16; AS 44.23.020. His offices are located at 1031 West 4th Avenue, Suite 200, Anchorage, AK 99501-1994.

15.     Plaintiff State of Arkansas is a sovereign State of the United States of America. Arkansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. Arkansas brings this suit by and through its Attorney General, Tim Griffin, who is authorized by Arkansas law to sue on Arkansas's behalf. Ark. Code Ann. § 25-16-703. His offices are located at 323 Center Street, Suite 200, Little Rock, AR 72201.

16.     Plaintiff Commonwealth of Kentucky is a sovereign Commonwealth of the United States of America. Kentucky sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. Kentucky brings this suit by and through its Attorney General, Daniel Cameron, who is authorized by Kentucky law to sue on Kentucky's behalf.  His offices are located at 700 Capital Avenue, Suite 118, Frankfort, Kentucky 40601-3449.

17.     Plaintiff State of Mississippi is a sovereign State of the United States of America. Mississippi sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. Mississippi brings this suit by and through its Attorney General, Lynn Fitch, who is authorized by Mississippi law to sue on Mississippi's behalf. Miss. Const. art. VI, §173; Miss. Code Ann. §7-5-1; *see also Gandy v. Reserve Life Ins. Co.*, 279 So. 2d 648, 649 (Miss. 1973). Her office is located at 550 High Street, Suite 1200, Jackson, Mississippi 39201.

18.     Plaintiff State of Missouri is a sovereign State of the United States of America. Missouri sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. Missouri brings this suit by and through its Attorney General, Andrew Bailey, who is authorized by Missouri law to sue on Missouri's behalf. Mo. Rev. Stat. § 27.060. His offices are located at 207 W. High St., Jefferson City, MO 65102.

19.     Plaintiff State of Montana is a sovereign State of the United States of America. Montana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. Montana brings this suit by and through its Attorney General, Austin Knudsen. The Attorney General is the chief legal officer of the State of Montana and has the authority to represent Montana in federal court. His offices are located at 215 North Sanders, Helena, MT 59620-1401.

20.     Plaintiff State of Oklahoma is a sovereign State of the United States of America. Oklahoma sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. Oklahoma brings this suit by and through its Attorney General, Gentner Drummond, who is authorized by Oklahoma law to sue on Oklahoma's behalf. OKLA. STAT. tit. 74, § 18b(A)(2)-(3). His offices are located at 313 Northeast 21st Street, Oklahoma City, Oklahoma, 73105.

21.     Plaintiff State of South Carolina is a sovereign State of the United States of America. South Carolina sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

South Carolina brings this suit by and through its Attorney General, Alan Wilson, who is authorized by South Carolina law to sue on South Carolina's behalf.  His offices are located at 1000 Assembly Street, Room 519, Columbia, SC 29201.

22.     Plaintiff State of West Virginia is a sovereign State of the United States of America. West Virginia sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. West Virginia brings this suit by and through its Attorney General, Patrick Morrisey, who is authorized by West Virginia law to sue on West Virginia's behalf.  His offices are located at the State Capitol Complex, Bldg. 1, Room E-26, Charleston, West Virginia 25305.

23.     Plaintiff State of Wyoming is a sovereign State of the United States of America. Wyoming sues to protect its sovereign interests. Wyoming brings suit by and through its Attorney General, Bridget Hill, who is authorized by Wyoming law to sue on Wyoming's behalf. Wyo. Stat. Ann. § 9-1-603. Her offices are located at 109 State Capitol, 200 West 24th Street, Cheyenne, Wyoming 82002.

24.     The 2023 Water Quality Certification Rule directly harms the States' interests, including, but not limited to, financial harms that flow from implementing EPA's radical shifts in policy, harm to the scope of the States' power and duty to regulate use of sovereign lands and waters within their borders, and the States' sovereign right to develop their natural resources without interference from other States or Tribes.

25.     Many of the State Plaintiffs filed comments on EPA's proposed rule. *Clean Water Act Section 401 Water Quality Certification Improvement Rule*, 87 Fed. Reg. 35,318 (June 9, 2022) (Docket ID No. EPA-HQ-OW-2022-0128-0123) (August 8, 2022) ("Exhibit A"). The comments explained that the proposed rule would improperly delegate to certifying authorities the ability to determine whether the certifying authority has received a request for certification or a complete

request for certification. This allows certifying authorities to establish requirements that frustrate infrastructure development by forcing the production of unnecessary or irrelevant information before even considering a request for certification, resulting in the same abuses that motivated the 2020 Water Quality Certification Rule.

26.     The States' comment letter also explained that EPA's proposal to define the scope of certification to include the "activity as a whole" is inconsistent with the text of Section 401, which limits the scope of review to the discharge(s) associated with a project. Further, the comments explained that EPA improperly interpreted the scope of Section 401 review and conditions as applying to impacts to all potentially affected state waters, not just WOTUS, the scope of federal jurisdiction under the CWA.

**B.      The State Plaintiffs Have Substantial Interests In, and Are Immediately Harmed By, the 2023 Water Quality Certification Rule.**

27.     The 2023 Rule harms the sovereign, economic and proprietary interests of the State Plaintiffs.

28.     The States' respective jurisdictions encompass a substantial portion of the United States. The States have a fundamental obligation to protect the waters within their boundaries, including within national parks located within their borders, and protect their States' economic interests.

29.     Consistent with the 2020 Water Quality Certification Rule, when evaluating requests for Section 401 certification, the States have reviewed the "discharges" from the proposed activity to assess project impacts on water quality.

30.     The 2023 Rule, however, dictates that Plaintiff States must undertake a broad review of the entire "activity," not just the project's discharges and whether they comply with specific enumerated provisions of the CWA. This impacts the States' propriety and economic

interests by forcing them to expend significant resources, including hiring additional personnel, to process requests for Section 401 certifications to comply with the additional procedures established by the 2023 Rule.

31.    The State Plaintiffs will incur costs related to the expensive and time-consuming process of revising their laws and regulations to conform to the 2023 Rule. These changes to state laws and regulations require investment of the same regulatory resources required to review and process Section 401 certifications.

32.    States may be forced to deny certifications where they cannot "assure" compliance with EPA's interpretation of Section 401 under the new rule, leading to administrative inefficiencies, unnecessary litigation, and the loss or delayed benefits of projects within the State. 40 C.F.R. § 121.3(b).

33.    States that were previously responsible for issuing 401 water quality certifications within the national parks specified in the 2023 Water Quality Certification Rule, which are located within their respective state boundaries, will lose their ability to protect state waters within those parks through the 401 certification process under the new rule. States will no longer be able to ensure that discharges that originate within those specified parks comply with the respective State's water quality standards promulgated pursuant to section 303 of the CWA.

### C.    The American Petroleum Institute

34.    API is a nationwide, non-profit trade association that represents all facets of the natural gas and oil industry, which supports 10.3 million U.S. jobs and nearly 8 percent of the U.S. economy. API's more than 600 member companies include large integrated companies, as well as exploration and production, refining, marketing, pipeline and marine businesses, and service and supply firms. API was formed in 1919 as a standards-setting organization, and API has developed

more than 700 standards to enhance operational and environmental safety, efficiency, and sustainability.

35.     API and its members are committed to the safe transportation of natural gas, crude oil and petroleum products, and support sound science and risk-based regulations, legislation, and industry practices that have demonstrated safety benefits. API members engage in exploration, production, and construction projects that routinely involve both state and federal water permitting and are, and will continue to be, affected by CWA Section 401.

36.     API filed comments on EPA's proposal as part of a coalition of trade associations. Clean Water Act Section 401 Water Quality Certification Improvement Rule, 87 Fed. Reg. 35,318 (June 9, 2022) (Docket ID Nos. EPA-HQ-OW-2022-0128-0136 (August 8, 2022) ("Exhibit B"). The comments explained that the proposed rule would eliminate the clarity and consistency that the 2020 Rule afforded project proponents and certifying authorities. It also explained that the proposed rule would delay nationally important infrastructure projects or critical infrastructure, including those needed to modernize our nation's means of generating and transporting energy. Further, the comments explained that the proposed rule overlooked many of the procedural abuses that justified the 2020 Rule's revisions and invites certifying authorities to resurrect many of the same misapplications of Section 401 that led to the adoption of the 2020 Rule.

37.     API members have pending Section 401 water quality certification requests with State agencies across the country. As of November 27, 2023, these requests will be processed in accordance with the 2023 Rule.

38.     API members also have plans to undertake projects in the future that will require water quality certifications under the 2023 Water Quality Certification Rule.

39.     For example, an API member submitted a water quality certification request to the Louisiana Department of Environmental Quality (LDEQ) on November 16, 2023. The prefiling meeting request for this project was submitted in August, 2023. The project involves modifying a Corps dredging permit to allow deeper dredging around docks. The Corps individual permit that authorizes this work was issued in 2017 and remains in effect through 2027. The project received a water quality certification that remains in effect through 2025. The Corps requested the API member obtain a new water quality certification due to additional impacts from the increased dredge depth and because the current water quality certification will expire before the Corps permit expiration date. The new certification request will be processed under the 2023 Rule, even though it was submitted prior to the effective date of the 2023 Rule.

### D.     The Interstate Natural Gas Association of America

40.     INGAA is a non-profit trade association that advocates for regulatory and legislative positions of importance to the interstate natural gas pipeline industry in the United States. INGAA's 26 member companies transport the vast majority of the nation's natural gas through a network of nearly 200,000 miles of pipelines.

41.     The interstate pipeline network serves as an indispensable link between natural gas producers and the American homes and businesses that use the fuel for heating, cooking, generating electricity, and manufacturing a wide variety of U.S. goods, ranging from plastics to paint to medicines and fertilizer.

42.     Natural gas plays an important role in American society, both as a foundational fuel and with respect to the nation's ongoing transition to clean energy. INGAA members build pipelines in response to demonstrated public need for the delivery of natural gas, typically requiring infrastructure that spans multiple state boundaries. In addition, INGAA members undertake a wide range of activities to maintain and develop the United States' modern and reliable

pipeline system, which complements the growing number of renewable energy resources and displaces higher emitting fuels.

43.     These activities often require authorization from the Corps under CWA Section 404, as well as compliance with multiple federal statutes designed to protect the environment, such as the Clean Air Act and the Endangered Species Act. Because INGAA members' projects can span multiple state borders, these activities may also require multiple Section 401 water quality certifications.

44.     INGAA members' interstate natural gas pipeline projects are regulated by FERC under the NGA. Congress enacted the NGA of 1938 to provide a statutory framework for construction and operation of interstate natural gas pipelines. 15 U.S.C. § 717. Specifically, under Section 7(c) of the NGA, "a natural gas company must obtain from the Federal Energy Regulatory Commission, a 'certificate of public convenience and necessity' before it constructs, extends, acquires, or operates any facility for the transportation or sale of natural gas in interstate commerce." 15 U.S.C. § 717f(c)(1)(A). This review is complex and comprehensive, often spanning years, and ensures that interstate natural gas pipeline projects only proceed if they serve the public interest.

45.     FERC's authority under the NGA is exclusive: "Congress occupied the field of matters relating to wholesale sales and transportation of natural gas in interstate commerce." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 305 (1988) ("*Schneidewind*"). "FERC's exclusive purview" includes regulating "facilities [that] are a critical part of the transportation of natural gas and sale for resale in interstate commerce." *Id.* at 308. In this "exclusively federal domain," States may not regulate. *Id.* at 305. But the NGA expressly carves out rights reserved to States under the CWA.

46.     INGAA filed comments on EPA's proposal on August 8, 2022. *Clean Water Act Section 401 Water Quality Certification Improvement Rule*, 87 Fed. Reg. 35,318 (June 9, 2022) (Docket ID No. EPA-HQ-OW-2022-0128-0122) (August 8, 2022) ("Exhibit C"). The comments explained that EPA's proposed rule improperly delegated authority to administer the CWA to certifying authorities and undermines the CWA's policies of minimizing paperwork and interagency decision procedures and preventing needless duplication and delays. Further, the comments explained that the proposed rule allows certifying authorities to get around the requirement that the certifying authority act on certification within a reasonable period of time, not to exceed one year by requiring additional submissions. INGAA also explained that Section 401 does not allow the certifying authority to consider, certify, and condition the "activity as whole," as EPA proposed, rather than only the "discharge."

47.     By allowing consideration of non-CWA State laws (which are preempted by the NGA) under the umbrella of the CWA and forcing those non-CWA authorities to be evaluated in the Section 401 context, States may deny water quality certifications or impose conditions based on non-CWA authorities. Compounding this problem, the 2023 Rule also allows States to condition or deny a water quality certification based on whether waters of the State comply with non-CWA State laws. The 2023 Rule thus allows States to circumvent NGA preemption and block INGAA members' energy infrastructures for non-CWA reasons, causing substantial harm to INGAA members and their customers.

48.     INGAA members have pending Section 401 water quality certification requests with State agencies across the country, including in Louisiana, South Carolina, North Carolina, Kentucky, Tennessee, and New York. As of November 27, 2023, these requests will be processed in accordance with the 2023 Rule. Other INGAA members are currently planning projects for 2024

in South Carolina and New York, which will require water quality certifications under the 2023 Water Quality Certification Rule.

49.     An INGAA member has pending water quality certifications in Kentucky and New York. The Kentucky project requires restoration of coverage on an exposed portion of a  30-inch diameter pipeline, and construction is anticipated to begin in May, 2024. Delays in these projects would have cost implications, pose risks to the assets, and could result in the loss of contractors lined up to perform the work.

50.     Another INGAA member has submitted a request for an individual water quality certification in Tennessee. The proposed project involves replacement of two existing 26-inch diameter pipelines and one existing 30-inch diameter pipeline. A majority of the replacement work will be conducted within the existing right-of-way. But because there are temporary impacts to jurisdictional waters, a 404 permit and water quality certification from the State are needed. The water quality certification request will be subject to the 2023 Water Quality Certification Rule. The project is proposed to begin in the second quarter of 2024.

E.     **The National Hydropower Association**

51.     NHA is a nonprofit national association dedicated to promoting the growth of clean, affordable U.S. hydropower. NHA represents more than 330 hydropower-industry companies in North America, including public- and investor-owned utilities and independent power producers. Its members are involved in projects throughout the United States, including both federal and non-federal hydroelectric facilities. In fact, NHA members own and operate the majority of the non-federal waterpower-generating facilities in the United States.

52.     For over a century, hydropower has generated clean, affordable, and renewable energy. Today, hydropower provides energy to over 30 million American homes. In 2019, hydroelectricity "accounted for about 6.6% of total U.S. utility-scale electricity generation and

38% of total utility-scale renewable electricity generation." Hydropower also enables other energy sources, such as wind and solar, greater integration into the power grid, remaining ready to produce power during periods of lower production.

53.     At present, hydropower developments face a complex web of regulatory regimes and a comprehensive regulatory approval process that involves the FERC, federal and state resource agencies, and water quality certification under Section 401 of the CWA. While such regimes and processes offer important safeguards, they can also contain redundancies and inefficiencies that unnecessarily slow the deployment of clean, renewable hydropower and delay the much-needed environmental enhancements and benefits that it brings. For these reasons, NHA and its members—as the regulated community subject to EPA's rule—have substantial and direct financial interest in the EPA's rulemaking and interpretations of the CWA.

54.     Additionally, multiple members of NHA have submitted Section 401 certification requests after the effective date of the 2020 Rule, but before the effective date of the 2023 Rule, and such requests remain pending before the relevant certifying authorities. At EPA's instruction, States will evaluate those pending requests under the 2023 Rule and its expanded, more stringent scope.

55.     For example, an NHA member (through wholly owned subsidiaries) has three ongoing hydroelectric projects with pending water quality certification requests submitted to States after the effective date of the 2020 Rule, but before the effective date of the 2023 Rule. Given that this member submitted its Section 401 certification request while the 2020 Rule was legally operative, this member appropriately tailored its requests to that rule, expending significant resources to complete and submit these requests. Now, however, the certifying States must evaluate the requests under the 2023 Rule, which will significantly harm this member by subjecting

its requests to a more stringent standard than the one under which this NHA member submitted its requests; by significantly undermining its prospects of obtaining approval of the requests; and by imposing significant, additional unrecoverable compliance costs on this member.

56.     NHA also filed comments on the proposed rule. *Clean Water Act Section 401 Water Quality Certification Improvement Rule*, 87 Fed. Reg. 35,318 (June 9, 2022) (Docket ID No. EPA-HQ-OW-2022-0128-0115) (August 5, 2022) ("Exhibit D"). Among other things, the comments explain that the proposed rule contained provisions that undermine Section 401's balance of federal and state authority. *See id.* at 18-19. Specifically, the scope of Section 401 certification should be limited to the discharges that triggered the need for certification, and the proposed rule would improperly authorize certifying authorities to dictate the information that must accompany a request or the manner of its submission.

**F.     The Association Plaintiffs Have Substantial Interests In, and Are Immediately Harmed By, the 2023 Water Quality Certification Rule.**

57.     The activities of Plaintiffs API, INGAA, and NHA (collectively, "the Association Plaintiffs") and their members are subject to regulation under the actions challenged in this Complaint. INGAA members construct and operate interstate natural gas pipelines that sometimes must unavoidably cross WOTUS regulated by the CWA. Where a proposed pipeline project may result in a discharge into WOTUS, CWA section 401 requires the project applicant to provide the federal agency with the certification of the state that the discharges in the state comply with applicable water quality standards. API's members engage in exploration, production, construction, operation, and maintenance projects that routinely involve federal permits or licenses that require state water quality certification under CWA Section 401. NHA's members—which members include both public- and investor-owned hydropower utilities, as well as independent power producers—are involved in hydropower projects throughout the North American

hydropower industry, and these members must frequently obtain Section 401 certifications from States under the CWA in order to secure the requisite federal licenses or relicenses to build or operate their hydropower projects.

58.     The Association Plaintiffs have a substantial interest in ensuring that the CWA Section 401 certification process preserves the important role of States in protecting water quality, while at the same time providing appropriate limits against some States' use of their certification authority to achieve policy goals or outcomes unrelated to water quality. Plaintiffs also have an interest in the consistent application of the Section 401 certification process.

59.     Plaintiffs' members are harmed by the 2023 Rule because, among other things, it allows States to claim broad authority to regulate the proposed activity, rather than focus on the "discharge" that may result from the federally permitted activity. The 2023 Rule expands the scope of certification to require States to evaluate whether the "activity" will comply with "applicable water quality requirements," which are defined under the 2023 Rule to include, not only those specific enumerated provisions of the CWA contained in Section 401(a), but also "any …state or Tribal laws or regulations implementing those sections, and any other water quality-related requirement of state or Tribal law." This requirement exceeds the CWA, by extending the State's review beyond water quality impacts from the discharge to jurisdictional waters, to encompass the activity's construction and operation, impacts to state and Tribal waters, and nonpoint source discharges. The unlawful evaluation required by the 2023 Rule will harm Plaintiffs' members who seek to undertake critical and time-sensitive projects.

60.     The 2023 Rule also harms Plaintiffs because it ignores the limits of federal CWA jurisdiction set by the Supreme Court's decision in *Sackett v. EPA*, by reclaiming broad authority to regulate waters under Section 401.

61.     Plaintiffs' members have in the past and will in the future undertake important development and infrastructure projects that require federal permits or licenses and thus trigger Section 401 certification. The water quality certification process immediately imposes burdens on Plaintiffs' members due to the expense and time required to apply for certification, the delay and costs associated with being unable to proceed with a project until certification is granted, the potential for imposition of additional conditions with only tenuous connection to water quality, and litigation risk. As a result of the 2023 Rule, Plaintiffs' members will suffer unreasonable delay in permitting projects.

62.     Substantial delays in construction or completion of construction would harm API, INGAA, and NHA member projects. For example, any delay could affect capturing API and INGAA member projects in potential rate cases, and members' ability to meet regulatory deadlines imposed by the Pipeline and Hazardous Materials Safety Administration. In addition, certain construction activities may be subject to regional time of year restrictions. Where permitting delays impede commencement of construction within the appropriate window, the work would be pushed out by as much as one year.

63.     Because of the importance of these issues to Plaintiffs, Plaintiffs have invested significant time and resources in litigating these issues. The State and Association Plaintiffs participated as intervenors in defense of EPA's 2020 Rule, "Clean Water Act Section 401 Certification Rule," 85 Fed. Reg. 42,210 (July 13, 2020) in four cases—three of which were consolidated. *California, et al. v. Wheeler*, No. 3:20-cv-04869 (N.D. Cal.); *Suquamish Tribe, et al. v. Wheeler*, 3:20-cv-06137 (N.D. Cal.); *American Rivers v. Wheeler*, 3:20-cv-04636 (N.D. Cal.); *Delaware Riverkeeper Network, et al. v. United States Envtl. Prot. Agency et al.*, 2:20-cv-03412 (E.D. Pa.). No court has issued a decision on the merits of the 2020 Rule.

64.     The Association Plaintiffs also filed an *amici curiae* brief in *Constitution Pipeline Co., LLC v. New York State Dep't of Envtl. Conservation*, 868 F.3d 87 (2d Cir. 2017), and an *amici* brief in support of Constitution Pipeline Co.'s petition for *writ of certiorari*, which was ultimately denied by the U.S. Supreme Court. *Constitution Pipeline Co., LLC v. New York State Dep't of Envtl. Conservation*, 138 S. Ct. 1697 (2018).

65.     The injuries Plaintiffs face as a result of the promulgation of the unlawful 2023 Rule can be redressed by this Court's order declaring that EPA exceeded its authority under the CWA and violated the APA in promulgating the 2023 Water Quality Certification Rule.

### G.     Defendants EPA and Administrator Regan

66.     The EPA is responsible for issuing the challenged 2023 Rule, which replaces the 2020 Rule.

67.     Michael S. Regan, in his official capacity as Administrator of the EPA is responsible for the 2023 Rule and for the associated violations of the CWA and the APA as alleged in this Complaint.

## III.     JURISDICTION AND VENUE

68.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Judicial review of this final agency action is authorized by the APA. 5 U.S.C. §§ 702, 704, and 706. 28 U.S.C. §§ 2201-2202 and Federal Rule of Civil Procedure 57 authorize the declaratory relief requested. Injunctive relief is authorized by 28 U.S.C. § 2202.

69.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1)(C) and 5 U.S.C. § 703 because Plaintiff State of Louisiana resides within the District, and this action seeks relief against Federal agencies and officials acting in their official capacities. Additionally, one or more CWA Section 401 certifications are pending for projects in this District, including for one or more projects in Calcasieu Parish.

IV.    **BACKGROUND**

    A.    **Statutory Background**

        i.    **Clean Water Act**

70.    Congress enacted the CWA, 33 U.S.C. §§ 1251 et seq., with the objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," *id*. § 1251(a), while declaring its policy to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." *Id.* § 1251(b).

71.    The CWA uses a "cooperative federalism" approach to achieve its aims, carving out complementary roles for federal agencies, on the one hand, and States and Tribes, on the other. *See PUD No. 1 of Jefferson Cty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 704 (1994) ("*PUD No. 1*").

72.    The Act prohibits "the discharge of any pollutant by any person," *id*. § 1311(a), except in compliance with the Act, to a subset of the nation's waters identified as "navigable waters," which "means the waters of the United States." *Id*. § 1362(7).

73.    Congress originally created the water quality certification requirement in the Water Quality Improvement Act of 1970. At that time, "[a]ny applicant for a Federal license or permit to conduct any activity … which may result in any discharge into the navigable waters [was required to] provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate" that the activity will not violate water quality standards. Water Quality Improvement Act of 1970, Pub. L. 91-224, 84 Stat. 91, 108 (Apr. 3, 1970); 33 U.S.C. § 1341(a)(1).

74.    In 1972, Congress enacted the CWA, a "total restructuring" and "complete rewriting" of the nation's water pollution control laws to focus on the regulation of point source discharges. *City of Milwaukee v. Ill. & Mich.*, 451 U.S. 304, 317 (1981) (quoting legislative

history); *see also* Federal Water Pollution Control Act Amendments of 1972, Pub. L. 92-500, 86 Stat. 816, 877 (Oct. 16, 1972) (codified at 33 U.S.C. § 1341).

75.     Of particular relevance here, in the 1972 CWA amendments, Congress placed the water quality certification requirement in Section 401, and narrowed the water quality certification requirement from "*activity* [that] will not violate applicable *water quality standards,*" 84 Stat. at 108 (emphases added), to a certification "that any such *discharge* will comply with the applicable provisions of section 301, 302, 306, 307 of [the CWA]." 86 Stat. at 877 (emphasis added).

76.     The scope of the sections of the CWA enumerated in Section 401 all focus on regulating discharges to WOTUS: Section 301 (prohibiting the discharge of any pollutant except in compliance with the Act); Section 302 (establishing effluent limitations on point source discharges); Section 303 (requiring the establishment of water quality standards, which are primarily used to establish numeric limits in point source discharge permits); Section 306 (setting national performance standards for the control of discharges); and Section 307 (setting toxic pretreatment effluent standards).

77.     Congress also created a prominent role for States in implementing this program. 33 U.S.C. § 1251(b). States under CWA section 401 have authority to grant, grant with conditions, deny, or waive water quality certifications for every federal license or permit issued within their borders, including within national parts located within a State's boundary, which may result in a discharge into WOTUS. *Id.* at § 1341. In addition, States retain authority to manage the use of those waters that are not WOTUS under the CWA.

78.     Accordingly, for projects that may result in a discharge into WOTUS and thus require federal permit or license, Section 401 requires the applicant to obtain certification from the

State in which the discharge will occur, that the discharge will comply with the applicable enumerated provisions of the CWA and state water quality standards. 33 U.S.C. § 1341(a)(1).

79.     Examples of federal permits or licenses upon which Plaintiffs' members may rely that are potentially subject to Section 401 water quality certification requirements include: Section 402 permits in States where EPA administers the permitting program; section 404 CWA permits and Rivers and Harbors Act Section 10 permits issued by the Corps; and hydropower and pipeline licenses issued by FERC.

80.     Upon a request from a prospective federal permittee or licensee, under Section 401, a certifying authority may grant, grant with conditions, deny, or waive certification. A certification shall state "that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1316, and 1317 [of the CWA]." *Id*. Certifying authorities may add to a certification "any effluent limitations and other limitations, and monitoring requirements" necessary to assure compliance. 33 U.S.C. § 1341(d). These additional provisions become conditions of the federal license or permit should it be issued by the federal agency. *Id*.

81.     A certifying authority may deny certification if it determines that the discharge from the proposed activity will not comply with the applicable sections of the CWA and state water quality standards. *Id*. § 1341(a)(1). If a certifying authority denies certification, the federal license or permit shall not issue. *Id*.

82.     If the State "fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived." *Id*.

### B.    Regulatory Background

83.    Section 501 of the CWA gives the EPA Administrator the authority to adopt rules "as are necessary to carry out his functions under this chapter." 33 U.S.C. § 1361(a). Section 101(d) of the CWA expressly provides that the Administrator shall administer the CWA. *Id.* § 1251(d).

### i.    1971 Regulations

84.    EPA first issued regulations relating to water quality certifications in 1971, pursuant to Section 21(b) of the Federal Water Pollution Control Act of 1948, as amended, Pub. L. No. 91-224, 84 Stat. 91, 108-10 (1970). 36 Fed. Reg. at 22,369, 22,487 (Nov. 25, 1971) (subsequently codified at 40 C.F.R. pt. 121); *see also* 85 Fed. Reg. at 42,211.

85.    Despite the statutory changes to the CWA in 1972, which created Section 401 among other things, EPA failed to revise its 1971 regulations governing the certification process for nearly fifty years. During that time, EPA's regulations were incongruent with the new statutory language. Cf. NPDES; Revision of Regulations, 44 Fed. Reg. 38,854, 32,856 (June 7, 1979) (indicating the need for updated certification rules).

86.    Some States used the incongruity and ambiguities in EPA's 1971 regulations to deny projects based on non-water quality considerations.

87.    For example, in November 2015, an INGAA member submitted a certification request to the New York State Department of Environmental Conservation (NYSDEC) for the Millennium Valley Lateral Project, a 7.8-mile pipeline connecting a natural gas mainline to a new natural gas-fueled combined cycle electric generation facility in New York. In August, 2017, NYSDEC denied certification on the grounds that FERC's environmental review of the project lacked an adequate analysis of the potential downstream greenhouse gas emissions, not water quality concerns.

88.     States also used the regulatory ambiguity to extend the amount of time the State has to complete the water quality certification.

89.     For example, on August 22, 2013, one of INGAA's members submitted a certification request for the Constitution Pipeline, a $683 million, 124-mile natural gas pipeline designed to connect natural gas production in Pennsylvania to demand in northeastern markets. NYSDEC requested additional information and deemed the request complete in December 2014. In April 2015, NYSDEC requested that the INGAA member withdraw and resubmit its request in order to restart the statutory certification period. In April 2016, nearly three years after the project's initial request for certification, NYSDEC denied water quality certification. Following litigation over NYSDEC's determination, FERC determined in August 2019 that NYSDEC had waived its Section 401 authority. Nevertheless, after years of delay, the project's sponsor halted investment in the pipeline and cancelled the project in February 2020.

90.     A coalition of States led by Louisiana petitioned EPA for an update to the 1971 regulations to conform them to the 1972 CWA amendments and to provide clarity and transparency. On April 10, 2019, the President signed Executive Order 13,868, Promoting Energy Infrastructure and Economic Growth, which required EPA to engage with States, tribes, and federal agencies to update EPA's outdated guidance and regulations, including the 1971 regulatory certification framework. 84 Fed. Reg. 15,495.

### ii.     2020 Water Quality Certification Rule

91.     To provide long-overdue clarification of the important, yet limited, authority of States under the CWA when participating in the issuance of federal permits and licenses, EPA issued a proposed rule to revise the 1971 regulations on August 8, 2019, and sought public comment. *Updating Regulations on Water Quality Certifications*, 84 Fed. Reg. 44,080 (Aug. 22, 2019).

92.     After a 60-day comment period and review and consideration of those comments, EPA issued the 2020 Water Quality Certification Rule, which became effective on September 11, 2020 and remained in effect until the 2023 Rule took effect on November 27, 2023. *Clean Water Act Section 401 Certification Rule,* 85 Fed. Reg. 42,210 (July 13, 2020).

93.     The 2020 Rule addressed abuses of the Section 401 certification process by some States by clarifying the appropriate process for and scope of CWA certifications, while still assuring that certifying authorities retained their important role in providing timely reviews regarding the water quality impacts of proposed discharges, as Congress intended.

94.     Among other things and as relevant to Plaintiffs' challenge to the 2023 Rule, based on the text, structure, and purpose of the CWA, the 1972 amendments, relevant legislative history, and case law, in the 2020 Rule, EPA concluded that a certifying authority's review and action under Section 401 is limited to water quality impacts to WOTUS resulting from a potential point source discharge or potential point source discharges from proposed federally licensed or permitted projects. *See* 85 Fed. Reg. at 42,234-35. The 2020 Rule provided that "[t]he scope of a Clean Water Act section 401 certification is limited to assuring that a discharge from a federally licensed or permitted activity will comply with water quality requirements," 40 C.F.R. § 121.3, which the preamble noted reflects a reasonable interpretation of the scope of certification under Section 401. *See* 85 Fed. Reg. at 42,224–25, 42,229 (citing *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Serv.*, 545 U.S. 967 (2005)).

95.     The 2020 Water Quality Certification Rule used the term "water quality requirements" to define the universe of federal or state law provisions that certifying authorities may consider under Section 401.

96.     EPA defined the term "other appropriate requirements of State law," under Section 401(d) as limited to "state or tribal regulatory requirements for point source discharges into waters of the United States." 40 CFR 121.1(n), 121.3 (2020); *see also* 85 Fed. Reg. 42,250.

97.     EPA concluded that harmonizing Sections 401(a) and 401(d) leads to the conclusion that "other appropriate" requirements of state law must address the protection of water quality from point source discharges into WOTUS, including provisions more stringent than federal law. 85 Fed. Reg. at 42,231. EPA explained that the text and structure of Section 401 show that Congress intended certifications to ensure compliance with "water quality requirements" only. Congress' choice to reference specific CWA water quality requirements multiple times in 401(a) and (d) underscores the focused intent of this provision on the protection of water quality from point source discharges.

98.     EPA stated that it agreed with Justice Thomas's dissent in *PUD No. 1*, where he concluded that "the general reference to 'appropriate' requirements of State law is most reasonably construed to extend only to provisions that, like the other provisions in the list, impose discharge-related restrictions." *PUD No. 1*, 511 U.S. at 728 (Thomas, J., dissenting).

99.     The 2020 Water Quality Certification Rule also defined the terms "request for certification" and "receipt" as used in Section 401 and clarified the components that must be present to trigger the "reasonable period of time" for review by certifying authorities. Section 121.5(b) and (c) of the 2020 regulations listed the required components of a "certification request." 85 Fed. Reg. at 42,235. The 2020 Rule defined "receipt" as the "date that a certification request is documented as received by a certifying authority in accordance with applicable submission procedures," 40 C.F.R. § 121.1, and made clear that "the reasonable period of time shall not exceed one year from receipt," *id*. § 121.6(a).

100.    After a change in administrations, President Biden signed Executive Order 13,990, "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis," on January 20, 2021, directing Federal agencies to review certain actions promulgated during the prior 4 years that conflict with his Administration's objectives, including the 2020 Certification Rule. 86 Fed. Reg. 7,037 (Jan. 25, 2021).

### iii.    2023 Water Quality Certification Rule

101.    In response to the Executive Order, EPA announced its intent to revise the 2020 Rule, and published a proposed rule on June 9, 2022, opening a 60-day public comment period. 87 Fed. Reg. 35,318 (June 9, 2022).

102.    Plaintiffs filed detailed comments on the proposed rule. Exs. A, B, C, D. Among other things, Plaintiffs explained that the proposed rule improperly allows States to delay the start of the CWA's waiver clock by requiring additional minimum contents in a certification request; improperly expands the scope of Section 401 certification to include "the activity as a whole," not only the discharges that triggered the need for certification; and would delay nationally important infrastructure projects or critical infrastructure.

103.    EPA published a final rule on September 27, 2023, which became effective on November 27, 2023, as to all pending and future water quality certifications. 88 Fed. Reg. at 66,558.

104.    EPA asserts that the final rule "updates the existing regulations to better align with the statutory text and purpose of the CWA" and is intended to "support an efficient and predictable certification process that is consistent with the water quality protection and cooperative federalism principles central to CWA section 401." *Id*. The Rule, however, conflicts with the CWA's text, structure, purpose and intent, and will cause confusion and uncertainty while the States, federal agencies, and project proponents attempt to implement and comply with the new requirements.

## V.      FACTUAL ALLEGATIONS

### A.      The 2023 Rule Allows States and Tribes To Require Additional Contents in a Request for Certification Causing Delay, Uncertainty, and Impeding the Predictability of the Certification Process.

105.    Section 401 certification requirements are triggered when a project proponent applies for a federal license or permit to conduct an activity that may result in a discharge into a WOTUS. 33 U.S.C. § 1341(a)(1). Under the 2023 Rule, a point source discharge into WOTUS, or potential for a point source discharge into WOTUS, is required to trigger Section 401. 88 Fed. Reg. at 66,568.

106.    Once Section 401 is triggered, the project proponent must submit a "request for certification," defined under the 2023 Rule to mean a request that contains the specified contents required by the final rule, *and any additional State or Tribal requirements identified prior to the request for certification*. 88 Fed. Reg. at 66,576.

107.    The minimum contents for an individual Federal license or permit include a copy of the application submitted to the federal agency and any associated "readily available water quality-related materials."

108.    States and Tribes, however, may choose to require additional contents necessary in a certification request, including those "that did not necessarily 'inform the development' of the application or draft Federal license or permit (e.g., section 402 permit factsheets, permit description presentations, etc.)" *Id.* Where a certifying authority "has identified additional required contents of a request for certification beyond [EPA's] minimum contents," the developer "must include those additional required contents" in its certification request. *Id.* at 66,574.

109.    For example, a State may require a developer to provide a copy of the draft Federal license or individual permit as part of the required contents of a request for certification.

110.    In the proposed rule, EPA included a requirement that *all* requests for certification include a copy of the draft Federal license or permit. *Id.* at 66,575. Plaintiff INGAA explained in its comments on the proposed rule why requiring submission of a draft Federal license or permit for the proposed project as part of the request for certification is unnecessary and would be unworkable. Exhibit C at 7. INGAA explained that many federal agencies, including FERC, do not issue draft licenses or permits, and it is unclear how they could do so consistent with the CWA's policies.

111.    Indeed, EPA acknowledges in the preamble that "[m]any commenters opposed this approach for various reasons, including but not limited to … concerns over how the proposed approach would work in instances where a Federal agency does not develop a draft license or permit." 88 Fed. Reg. at 66,575. As a result, in the final rule, "EPA decided to partially change the requirement," by allowing certifying agencies (rather than EPA) to include submission of a draft Federal license or permit as part of the additional minimum contents for requests for certification. Although EPA "recognizes that with respect to general Federal licenses and permits, there often is no formal 'application," and "for that reason … allows the Federal agencies issuing …general Federal licenses and permits to submit the draft general Federal license or permit to the certifying agency," EPA does not explain why the concerns INGAA and others raised with respect to requiring a draft individual permit are ameliorated by EPA shifting this requirement to one that States may add to the minimum contents, rather than it being required by EPA.

112.    Under the CWA, a State must act within a "reasonable period of time," not to exceed one year, or the request will be deemed waived. The reasonable period of time begins on the date a State receives a certification request with any additional components identified by the State, and in accordance with the State's applicable submission procedures. 40 C.F.R. § 121.6(a).

113.     If a State requires a draft Federal license or permit as part of the additional minimal contents for a request for certification, the Association Plaintiffs' members' projects may be unreasonably delayed or even halted if the federal agency cannot provide a draft permit or license to begin the State certification review.

**B.     The 2023 Rule Exceeds the CWA By Requiring the Certifying Authority to Undertake an Activity-Based Scope of Review.**

114.     Section 401(a) of the CWA provides that the certifying authority, described as "the State in which the discharge originates or will originate," must certify that "any such *discharge* will comply with the applicable provisions" of the CWA. 33 U.S.C. § 1341(a) (emphasis added). The text of Section 401(a) therefore directs authorities to certify that the *discharge resulting from the proposed federally licensed project* will comply with the applicable provisions of the CWA.

115.     When Congress enacted the 1972 CWA amendments, it chose not to carry forward the term "activity" from the 1970 Federal Water Pollution Control Act. Instead, Congress altered the text to require certification that a "discharge" would comply with applicable standards. 33 U.S.C. § 1341(a). Under basic canons of statutory construction, this Court must presume that Congress chose its words intentionally. *See, e.g., Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.").

116.     The 2020 Rule adopted a scope of review, consistent with the statute and legislative history, which focused on assuring that the "discharge" from the permitted activity would comply with water quality requirements.

117.     In the 2023 Rule, however, EPA abandons the statute's focus on the "discharge," and instead requires certifying authorities to undertake a broad scope of certification review that encompasses the entire *activity subject to the Federal license or permit*:  "When a certifying

31

authority reviews a request for certification, the certifying authority *shall* evaluate whether the *activity* will comply with applicable water quality requirements." 88 Fed. Reg. at 66,662; 40 C.F.R. § 121.3(a) (emphases added).

118.    Accordingly, under the 2023 Rule, once there is the potential for a point source discharge into WOTUS, the certifying authority has a mandatory obligation ("shall") to evaluate the entire activity, to assure compliance with the applicable water quality requirements. This imposes a duty on State Plaintiffs that is inconsistent with the CWA's plain language and intent, which focus on the discharge, not the activity.

### i.     The 2023 Rule Defines "Water Quality Requirements" to Include Provisions from Section 401(d), Which Address Certification Conditions, Not Certification Review.

119.    The 2023 Rule further broadens the required scope of certification review by defining "water quality requirements" as: (1) "any limitation, standard, or other requirement under the provisions enumerated in section 401(a)(1)"; (2) "any Federal and state or Tribal laws or regulations implementing the enumerated provisions, and" (3) "any other water quality-related requirement of state or Tribal law" regardless of whether they apply to point or nonpoint source discharges. 40 C.F.R. § 121.1(j); 88 Fed. Reg. at 66,602.

120.    The definition of water quality requirements, therefore, requires the State's scope of review for a water quality certification to be based on the enumerated provisions in Section 401(a) ("any limitation, standard, or other requirement under the provisions enumerated in section 401(a)(1)"), any Federal, State or Tribal laws implementing those enumerated provisions, and "any other water quality-related requirement of state or Tribal law," a clause imported from Section 401(d), which focuses on certification conditions. *Id.*

121.    Section 401(d) requires the certifying authority to "set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any *applicant* for a

Federal license or permit will comply with any applicable" requirements and "*with any other appropriate requirement of State law*...." 33 U.S.C. §1341(d) (emphases added). The 2023 Rule wrongly incorporates requirements from 401(d) into the definition of "water quality requirements," contrary to the statute and case law.

122.    In the 2023 Rule's preamble, EPA takes the position that including the entire activity within the scope of review—not the "discharge only"— "is the best reading of the text and follows the Supreme Court's authoritative interpretation in *PUD No. 1*." 88 Fed. Reg. at 66,596. But *PUD No. 1* does not support EPA's approach.

123.    In *PUD No. 1*, the Court analyzed the use of different terms in Sections 401(a) and 401(d) to inform the scope of a Section 401 certification. The Supreme Court recognized the tension between the use of "discharge" in Section 401(a) and applicant in section 401(d), stating:

> Section 401(a)(1) identifies the categor[ies] of activities subject to certification – namely, those with discharges. And § 401(d) is most reasonably read as authorizing additional conditions and limitations on the activity as a whole once the threshold condition, the existence of a discharge, is satisfied.

511 U.S. at 711-12.

124.    The Court thus distinguished the two subsections, explaining that Section 401(a)(1) addresses the scope of certification, requiring the certifying authority to certify that the *discharge* from a proposed federally licensed or permitted project will comply with enumerated CWA provisions, while Section 401(d) addresses the scope of conditions and allows the certifying authority to include conditions to assure that the *applicant* will comply enumerated CWA provisions and "any other appropriate" state law requirements. 511 U.S. at 700.

125.    Although EPA interprets *PUD No. 1* broadly in the 2023 Rule to expand State authority under Section 401, *PUD No. 1* is best read as not straying from the bedrock principles

33

that a Section 401 certification must address water quality and that appropriate conditions include those necessary to assure compliance with the State's water quality standards.

   ii. **By Broadly Defining the Activity Subject to Certification, the 2023 Rule Unlawfully Expands the Scope of Waters and Types of Discharges to Which the CWA Applies.**

 126. The "activity" subject to the State's evaluation for compliance with water quality requirements is expansively defined in the 2023 Rule, and exceeds the limits set forth in the CWA.

 127. First, the 2023 Rule requires the certifying authority evaluate the "activity's construction and operation," regardless of whether the federal license or permit covers both aspects of the activity, and "even though the operation may be subject to a different Federal license or permit." 88 Fed. Reg. at 66,599-600.

 128. Second, the Rule allows the certifying authority to address "adverse impacts *contributed to* by a federally licensed or permitted activity," not just the "adverse water quality impacts *caused* exclusively by the federally licensed or permitted activity." *Id.* at 66,600. For example, according to EPA, a certifying authority may deny or condition an activity that will contribute to ongoing noncompliance with water quality requirements. *Id.* This is contrary to basic causation principles.

 129. And third, the Rule requires the certifying authority evaluate compliance with "any other water quality-related requirement of state or Tribal law," regardless of whether they apply to point or nonpoint source discharges. 40 C.F.R. § 121.1(j); 88 Fed. Reg. at 66,602.

 130. When a certifying agency reviews a request for certification, it is limited to considering impacts from discharges to "navigable waters" when certifying compliance with the CWA. 33 U.S.C. § 1341(a). But EPA claims that the certifying authority is "not so limited when certifying compliance with requirements of state or Tribal law that otherwise apply to waters of the State or Tribe beyond navigable waters." 88 Fed. Reg. at 66,604.

131.    EPA asserts that "[t]he best reading of section 401 is that it authorizes a state or Tribe to apply state law or Tribal law to all impacted state or Tribal waters, rather than limiting states and Tribes to considering only a subset of impacted waters." *Id.* at 66,605.

132.    Accordingly, under the 2023 Rule, States are unlawfully empowered to review whether a proposed activity's effects on all impacted waters complies with the requirements of the State law that otherwise apply to waters of the State, for both point and nonpoint sources – a far broader standard than allowed under the CWA. *Id.* at 66,602, 66,604. Pursuant to these provisions of the 2023 Rule, some States will engage in the same types of abuses of Section 401 authority that occurred under the 1971 regulations.

133.    Courts have confirmed that the scope of a certifying agency's Section 401 review is limited. In *PUD No. 1*, the Supreme Court noted that a State's authority to condition a certification "is not unbounded" and States "can only ensure that the project complies with 'any applicable effluent limitations and other limitations, under [33 U.S.C. 1311, 1312]' or certain other provisions of the Act, 'and with any other appropriate requirements of State Law.'" 511 U.S. at 712. In addition, Section 401 certification is not required for nonpoint source discharges. *Oregon Natural Desert Association v. Dombeck*, 172 F.3d 1092, 1099 (9th Cir. 1998).

134.    The 2023 Water Quality Certification Rule is unbounded and requires States to undertake a scope of review that exceeds the statute's limits, case law, and Congressional intent.

**C.    The 2023 Rule Allows for Imposition of Broad Conditions that May Have Little Direct Connection to Water Quality.**

135.    Under the 2023 Rule, the same "activity" standard that applies for the scope of review of a certification request applies for the scope of permissible conditions:

(b) Consistent with the scope of review identified in paragraph (a) of this section, a certifying authority *shall include any conditions in a grant of certification necessary to assure that the activity will comply with applicable water quality requirements*.

88 Fed. Reg. at 66,592; 40 C.F.R. § 121.3(b) (emphasis added).

136.    EPA states that it "has consistently interpreted water quality impacts broadly," and these impacts "can encompass impacts that adversely affect the chemical, physical, and biological integrity of waters, which could include, for example, changes in water flow that might affect aquatic habitat." *Id.* at 66,601-02.

137.    Although EPA maintains the position that it would be inconsistent with the purpose of CWA Section 401 to deny or condition a Section 401 water quality certification based solely on potential air quality, traffic, noise, or economic impacts that have no connection to water quality, *id.* at 66,601, the 2023 Rule does not establish any clear limits on the "required degree of causality between the activity and the impact to water quality." *Id.* at 66,592. EPA "finds it unnecessary to establish in this rulemaking how indirect or certain the impacts of the activity may be to water quality." *Id.* at 66,600.

138.    Rather, the Agency places the onus on certifying authorities "to develop a record to support its determination that an activity will or will not comply with applicable water quality requirements." *Id.*

139.    EPA "declines to explicitly identify which conditions would be within or outside the scope of section 401 certification because, subject to a case-by-case review of the particular facts presented by each certification, a wide variety of conditions could be appropriate as necessary to prevent adverse impacts to a state's or Tribe's water quality." 88 Fed. Reg. at 66,606. But "for potentially qualifying conditions, it is appropriate for the certifying authority to consider all potential adverse water quality impacts." *Id.*

140.    The text and structure of Section 401 show that Congress intended certifications to ensure compliance with "water quality requirements" only. Congress' choice to reference specific CWA water quality requirements multiple times in 401(a) and (d) underscores the focused intent

of this provision on the protection of water quality from *point source discharges*. See 33 U.S.C.
§§ 1341(a), (d).

141.     The 2023 Rule, however, ignores the statute's focus on discharges, and instead
relying on the "activity" scope of certification would allow certifying authorities to impose broad
conditions that may have only a tenuous connection to the permitted discharge. EPA provides an
example of a hydropower project where

> the 'activity' scope allows a certifying authority to consider water quality-related
> impacts *beyond the discharges from the tailrace or powerhouse*. Depending on the
> activity specifics, such consideration could result in certification conditions that
> could include building or maintaining fish passage or habitat restoration related to
> water quality protection.

88 Fed. Reg. at 66,598 (emphasis added).

142.     Other conditions that EPA says may be appropriate to include in a certification
include "monitoring, reporting, and adaptive management in response to the *non-discharge-
related water quality impacts of the activity*, such as temperature, flow, riparian buffer conditions,
and species impacts." *Id.* (emphasis added).

143.     In addition, EPA encourages certifying authorities to develop "adaptive
management conditions," which could require developers to take remedial actions if certain
conditions are met in the future 88 Fed. Reg. at 66,615.

144.     For example, if a certifying authority is concerned about future downstream,
climate change-related impacts on aquatic species due to increased reservoir temperatures during
the lifespan of a hydropower dam license, EPA states that the certifying authority might develop
a condition that would require a project proponent to take subsequent, remedial action in response
to reservoir temperature increases (e.g., conditions that might require monitoring and, as necessary,
a change in reservoir withdrawal location in the water column, a change in the timing of releases,

etc.). *Id.* EPA views adaptive management conditions as an important tool to assure that the project will comply with water quality activities over the life of the project. *Id.*

145.    The 2023 Rule also requires Plaintiff States to consider aspects of the activity that may occur after the permit expires. While "any certification conditions incorporated into the Federal license or permit" expire upon expiration of the license of permit, when "consider[ing] whether to grant or deny certification," certifying agencies are *not limited* to "considering only those aspects of the activity that will occur *before the expiration of the Federal license or permit*." 88 Fed. Reg. at 66,600 (emphasis added). If the certifying authority "determines that no conditions could assure that the activity, including post-expiration aspects of the activity, will comply with water quality requirements, denial of certification would be appropriate." *Id.*

146.    The imposition of conditions that may have only a tenuous connection to water quality, are non-discharge-related water quality impacts of the activity, or address post-expiration aspects of the activity exceed the scope of the CWA generally and Section 401 specifically. The 2023 Rule is arbitrary and capricious, an abuse of discretion, and exceeds statutory authority by allowing certifying authorities to rely on a broad scope of certification review, including state laws, to impose virtually limitless conditions in a water quality certification.

## D.    Certification Decisions.

147.    States may grant, grant with conditions, deny, or waive certification. If the certifying authority fails to take one of these actions (i.e., "act") within the reasonable period of time, the certification may be deemed waived. 88 Fed. Reg. at 66,608.

148.    The scope of certification review is the same for a grant of certification, a grant of certification with conditions, and a denial. Thus, the same "activity" standard applies to each action.

149.    A grant of certification shall be in writing, and a grant of certifications with conditions shall "include any conditions … necessary to assure that the activity will comply with applicable water quality requirements."  40 C.F.R. § 121.3(b).

150.    The certifying authority may deny certification, or be forced to deny certification, if it cannot "certify that the activity will comply with water quality requirements." *Id.* § 121.7(e)(3). If the certifying authority "determines that no conditions could assure that the activity, including post-expiration aspects of the activity, will comply with water quality requirements, denial of certification would be appropriate." 88 Fed. Reg. at 66,600.

### E.    The 2023 Rule Is Unlawfully Retroactive As it Applies to Pending Certification Requests, and Modifications of Certifications Made Under the 2020 Rule.

151.    As of November 27, 2023, all actions taken as part of the Section 401 certification process must follow the 2023 Rule. 88 Fed. Reg. at 66,655. If a certifying authority received a request for certification prior to November 27, 2023, and the certifying authority has not acted on the request for certification as of that date, any decision issued by the certifying authority after November 27, 2023, must comply with the requirements in the 2023 Rule. *Id.*

152.    EPA acknowledges that the 2023 Rule's applicability to pending requests might prompt additional data requests from certifying authorities, as well as extensions of the reasonable period of time to reach a certification decision. *Id.*

153.    EPA has no statutory authority under the CWA or otherwise to promulgate retroactive regulations. Thus, the application of the 2023 Rule to pending water quality certification requests submitted after the effective date of the 2020 Rule, but before the effective date of 2023 Rule is unlawful.

154.    Further, the retroactive application of the 2023 Rule to pending water quality certification requests submitted after the effective date of the 2020 Rule, but before the effective

date of 2023 Rule, will have a significant and harmful impact on Association Plaintiffs' members with pending water quality certification requests.

155.    For example, many of NHA's members submitted Section 401 certification requests after the effective date of the 2020 Rule, but before the effective date of the 2023 Rule, and such requests remain pending before the relevant certifying authorities. In particular, and as stated above, an NHA member (through wholly owned subsidiaries) has three ongoing hydroelectric projects with pending water quality certification requests submitted to States after the effective date of the 2020 Rule, but before the effective date of the 2023 Rule.

156.    Given that this NHA member submitted its Section 401 certification requests while the 2020 Rule was legally operative, it tailored those requests to that rule. Now, however, the States must evaluate the Section 401 certification requests under the 2023 Rule, which will significantly harm the NHA member by subjecting the requests to an unlawful standard that is more expansive than the one under which it submitted the requests; by significantly undermining the prospects of obtaining approval of the request (including timely approval); and by imposing significant, additional unrecoverable compliance costs on them.

157.    Specifically, the NHA member demonstrated in the requests how the *discharge* into navigable waters from its project would not violate applicable water quality standards. 40 C.F.R. § 121.3 (2020). Yet, under the 2023 Rule, the States must analyze how the entire "*activity* subject to the Federal license or permit," complies with the new broad definition of applicable water-quality requirements.  88 Fed. Reg. at 66,592 (emphases added); *see also* 40 C.F.R. § 121.3(a) (2023). That greatly expanded scope of review significantly changes the applicable requirements and subjects the requests to a standard that exceeds EPA's authority, which significantly prejudices

the NHA member, given the expenditure of substantial resources to prepare the requests in reliance on the prior 2020 Rule.

158.    In addition, the 2023 Certification Rule—which exceeds EPA's statutory authority—also adversely affects the NHA member by undermining the prospects for success in obtaining certification. If the States deny the request on these grounds, the NHA member will have to request a new certification tailored to the 2023 Rule, requiring significant unrecoverable expenditures. And because the State is required to evaluate the requests under the 2023 Rule, if new information is required by the State to evaluate those requests, the NHA member will need to submit that additional information now for evaluation of the pending certification requests.

159.    Further, the NHA member analyzed in its requests only "discharge[s] from [ ] point source[s] into a water of the United States" with its project, consistent with the 2020 Rule.  40 C.F.R. § 121.1(f) (2020). However, under the 2023 Rule, the States may now "evaluate and place conditions on the 'activity,' which includes consideration of water quality-related impacts from both point sources *and nonpoint sources*."  88 Fed. Reg. at 66,569 (emphasis added). That changed legal landscape adversely affects the NHA member by imposing a standard that exceeds EPA's statutory authority, which significantly prejudices the NHA member, given its expenditure of substantial resources to prepare its request in reliance on the 2020 Rule. Separately, application of the 2023 adversely affects the NHA member's prospects for securing approval of the requests from the States. And should the States reject the requests, requiring resubmittal, that will again require the expenditure of significant unrecoverable costs, including because nonpoint sources are numerous and more technologically difficult to regulate.

160.    Finally, under the 2020 Rule, the States could only impose conditions on these NHA members' Section 401 certification related to provisions of state law that contain

requirements for point source discharges into waters of the United States. This significantly limited the universe of conditions that these NHA members expected the States to be able to impose on their certifications, meaning that any approved certification that these NHA members received would likely not be unduly burdensome. Under the 2023 Rule, however, the universe of conditions that the State may impose is significantly broader, extending to "any other *water quality-related* requirement of state or Tribal law," even those that related to non-United States waters. 40 C.F.R. § 121.1(j) (2023) (emphasis added).

161.    Additionally, another NHA member (through indirect subsidiaries) also has submitted water quality certification requests with New Hampshire and Maine after the effective date of the 2020 Rule, but prior to the effective date of the 2023 Rule, with those requests still pending.  As with the other NHA member's pending certification requests, discussed above, the States must evaluate this NHA member's certification requests under the 2023 Rule.  And as with the other NHA member, such application will significantly harm this NHA member by subjecting the requests to a standard that exceeds EPA's statutory authority and imposes more expansive requirements upon the States in evaluating the requests than the one under which it submitted the requests; by significantly undermining its prospects of obtaining approval of the requests (including timely approval); and by imposing significant, additional unrecoverable compliance costs on it.

162.    In addition, now that the 2023 Rule is in effect, "a certifying authority and Federal agency can apply the final rule's modification process … to any certification decision, even if that decision was provided while a prior rule (e.g., 1971 Rule or 2020 Rule) was in effect." 88 Fed. Reg. at 66,655.

163.   The 2023 Rule allows a State to modify a previously granted certification (with or without conditions) at any point after certification issuance, until the expiration of the Federal license or permit, provided the federal agency and certifying authority agree in writing prior to modifying the grant of certification. 40 C.F.R. § 121.10(a).

164.   The State only needs Federal agency agreement over the portions of the certification to be modified, not the modified language itself. 88 Fed. Reg. at 66,628.

165.   EPA does not have an oversight role in this process, and the project proponent does not have a formal role in the modification process; however, EPA "recommends that certifying authorities engage with the stakeholders who will be impacted by a modification to the certification" and notes that "some certifying authorities may even be required under their regulations to make any proposed modifications to their certification decisions available for public notice and comment." *Id.* at 66,631.

**F.**   **The 2023 Rule Usurps State Authority to Issue 401 Water Quality Certifications for Discharges Originating from Within Specified National Parks.**

166.   Section 401 of the CWA provides States with authority to issue section 401 water quality certifications for discharges originating within the boundaries of a State, including within national parks located within the boundaries of the State. The 2023 Water Quality Certification Rule exceeds EPA's statutory authority by requiring the EPA to issue section 401 certifications for certain national parks specified in the 2023 Rule, to include Yellowstone National Park. 88 Fed. Reg. at 66,625.

167.   States, such as Wyoming, have a longstanding history of issuing 401 certifications for discharges originating within national parks located within the state's boundaries, including the national parks specified in the 2023 Rule. Wyoming, for example, has issued 401 certifications

in Yellowstone National Park since 1973 when Congress specifically gave States the authority to issue certifications within state boundaries.

168.    In 1973, Wyoming enacted its Environmental Quality Act to carry out the enforcement of the CWA and has since carried out the provisions of sections 301, 302, 303, 306 and 307 of the CWA within the State. *See* Wyo. Stat. Ann. §§ 35-11-101 et seq. Accordingly, Wyoming promulgated water quality standards for all waters within the boundaries of the State, including Yellowstone National Park, pursuant to section 303 of the CWA. *See Rules, Wyo. Dep't of Envtl. Quality, Water Quality,* Ch. 1, Appendix A.

169.    Some of the national parks impacted by the 2023 Rule comprise large expanses of lands located within state boundaries. For example, Yellowstone National Park covers approximately 3,472 square miles of land, ninety-six percent of which is located within the boundaries of Wyoming. *See* https://www.nps.gov/yell/planyourvisit/parkfacts.htm, Geography (last visited December 3, 2023). Five percent of that land is covered by water. *Id.*

### G.    The 2023 Water Quality Certification Rule Violates the Notice and Comment Rulemaking Procedures Required by the APA.

170.    In adopting the 2023 Rule, EPA violated the notice and comment rulemaking procedures established by the APA.

171.    Under the arbitrary and capricious standard, an agency must "consider all relevant factors raised by the public comments and provide a response to significant points within." *Chamber of Com. of United States v. United States Sec. & Exch. Comm'n*, 85 F.4th 760, 774 (5th Cir. 2023). "Comments the agency must respond to include those that 'can be thought to challenge a fundamental premise underlying the proposed agency decision,'" *id.* (quoting *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019)), "or include points that 'if true and adopted would require a change in an agency's proposed rule,'" *id.* (quoting *Mexican Gulf Fishing Co. v.*

*U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023)). The agency's response must allow the court to see "why the agency reacted to [the issues raised] as it did." *Carlson*, 938 F.3d at 344.

172.   EPA did not meaningfully or adequately address Plaintiffs' concerns that the 2023 Rule would exceed its statutory authority.

173.   For example, EPA failed to meaningfully respond to INGAA's concerns about the requirement to include a draft Federal permit or license in the certification request. In the proposed rule, EPA included a requirement that *all* requests for certification include a copy of the draft Federal license or permit. 88 Fed. Reg. at 66,575. INGAA explained that many federal agencies, including FERC, do not issue draft licenses or permits for natural gas infrastructure projects and would have to change their internal operating procedures to do so. Exhibit C at 7. In the Final Rule, EPA acknowledged "concerns over how the proposed approach would work in instances where a Federal agency does not develop a draft license or permit, particularly for individual Federal licenses or permits." 88 Fed. Reg. at 66,575.

174.   As a result, in the final rule, "EPA decided to partially change the requirement," by allowing certifying agencies (rather than EPA) to include submission of a draft Federal license or permit as part of the additional minimum contents for requests for certification. But EPA does not explain why the concerns INGAA and others raised with respect to requiring a draft individual permit are ameliorated by EPA shifting this requirement to one that States may add to the minimum contents, rather than it being required by EPA.

175.   EPA also failed to respond to API's concern that requiring draft or final permit could unreasonably lengthen the certification process as the length of time between applying for a permit and receiving a draft or final permit can be months or years. Exhibit B at 3.

176.     In addition, EPA failed to meaningfully address API's concern that the proposed rule would fail to prohibit certifying authorities from extending their statutory review period by compelling project proponents to withdraw and resubmit their certification requests. Exhibit B at 41. EPA said it was not addressing the issue because it "is not confident that it can create regulatory 'bright lines' that adequately and fairly address each situation." 88 Fed. Reg. at 66,590. But EPA does not explain what options it considered and how it determined that they will not work indicating that EPA simply deemed the issue too complex and ignored it.

177.     EPA also failed to respond to INGAA's concern that a federal licensing or permitting agency would be unable to implement a certification with conditions addressed to impacts from the "activity as a whole" when it has authority over only a small part of a large project. Exhibit B at 15. EPA raised this question in its proposed rule, asking commenters "whether and how the Federal licensing or permitting agency could effectively implement a certification" in such situation. 88 Fed. Reg. at 35,346. Yet, EPA responds with a non-sequitur, pointing only to Federal agencies' experience "delineating the 'activity' based on the facts of each situation." . That does not respond to how the agency can implement conditions that address matters beyond the scope of its authority.

178.     When changing course, an agency "is obligated to supply a reasoned analysis for the change." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42 (1983).

179.     EPA failed to provide a reasoned explanation for changing course here. For example, EPA fails to provide a basis for abandoning its prior interpretation of the scope of the certification review under the 2020 Rule. Instead, EPA acknowledges that there is ambiguity regarding the proper scope of section 401 review and conditions, but states that in adopting the

new rule, EPA "is following the Supreme Court's authoritative interpretation of the statute while also exercising its authority granted by Congress to construe, interpret, and implement the CWA." 88 Fed. Reg. at 66,596.

180.    Finally, EPA failed to provide notice of its intent to retroactively apply the 2023 Rule. In the proposal, EPA failed to indicate that, as of its effective date, the new rule would apply retroactively to all pending water quality certification requests.

## CLAIMS FOR RELIEF

### Count One
### The 2023 Water Quality Certification Rule Is Arbitrary, Capricious, and an Abuse of Discretion, Exceeds EPA's Statutory Authority, and Is Otherwise Contrary to Law

181.    Plaintiffs incorporate by reference, as if fully set forth here, each and every allegation set forth in paragraphs 1 through 179 above.

182.    The CWA sets important statutory limits on the scope of the certifying authorities review under Section 401. The 2023 Water Quality Certification Rule exceeds EPA's statutory authority under the CWA because it requires certifying authorities to evaluate whether the "activity" will comply with applicable water quality requirements, rather than focusing on the potential discharge associated with a proposed federally licensed or permitted project. The 2023 Rule requires States to look beyond the enumerated sections of the CWA cited in Section 401(a) to assess compliance with "any other water quality-related requirement of state or tribal law," and to impose conditions that bear little relation to water quality to assure the activity will comply with applicable water quality requirements. The Rule also usurps State authority to conduct Section 401 certifications for discharges originating within specified national parks located within a State's boundaries. And the 2023 Rule requires States to apply this new regime retroactively to pending requests, unlawfully expanding the scope of ongoing Section 401 reviews beyond statutory requirements.

183.    The Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of 5 U.S.C. § 706(2)(A) because, among other things, it exceeds EPA's CWA authority, is unsupported by the law, and is inconsistent with the plain language of the CWA.

**Count Two**
**The 2023 Rule Violates the APA's Notice and Comment Rulemaking Procedures**

184.    Plaintiffs incorporate by reference, as if fully set forth here, each and every allegation set forth in paragraphs 1 through 83 above.

185.    The APA provides that an agency give notice of a proposed rule setting forth "either the terms or substance of the proposed rule or a description of the subject and issues involved," 5 U.S.C. § 553(b)(3), and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ." *Id.* § 553(c).

186.    The APA requires administrative agencies to engage in "reasoned decisionmaking." The agencies "must examine the relevant data and articulate a satisfactory explanation for its action including a rationale connection between the facts found and the choice made." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).

187.    The Rule was promulgated "without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(D) because, among other things, the Rule fails to provide meaningful responses to Plaintiffs' comments, explain the changes made in the Rule, or provide guidance for consistent application of the Rule in a manner that complies with the CWA's statutory requirements. The Rule is thus "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request this Court to

1. Declare that the 2023 Water Quality Certification Rule is unlawful and violates the APA and CWA;

2. Vacate and set aside the 2023 Rule in its entirety;

3. Enjoin EPA from enforcing or otherwise acting pursuant to the 2023 Water Quality Certification Rule; and

4. Grant such other and further relief as the Court deems just and proper.

Date:  December 4, 2023            Respectfully submitted,

JEFF LANDRY
ATTORNEY GENERAL OF LOUISIANA

/s/ Joseph S. St. John
Elizabeth B. Murrill (LSB 20685)
  *Solicitor General*
Joseph S. St. John (LSB 36682)
  *Deputy Solicitor General*
Tracy Short (LSB 23940)
  *Assistant Attorney General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
(225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
shortt@ag.louisiana.gov
*Counsel for State of Louisiana*

TREG R. TAYLOR
  ATTORNEY GENERAL OF ALASKA

/s/ Cameron Jimmo
Cameron Jimmo*
  *Senior Assistant Attorney General*
ALASKA DEPARTMENT OF LAW
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
(907) 269-6457
cameron.jimmo@alaska.gov
*Counsel for State of Alaska*

TIM GRIFFIN
  ARKANSAS ATTORNEY GENERAL

/s/ Michael A. Cantrell
Michael A. Cantrell*
  *Assistant Solicitor General*
OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2401
Michael.Cantrell@ArkansasAG.gov
*Counsel for the State of Arkansas*

DANIEL CAMERON
ATTORNEY GENERAL OF KENTUCKY

/s/ Lindsey Keiser
Lindsey Keiser*
  *Assistant Attorney General*
KENTUCKY OFFICE OF THE ATTORNEY
GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky
(502) 696-5517
*Counsel for the Commonwealth of Kentucky*

AUSTIN KNUDSEN
  ATTORNEY GENERAL OF MONTANA

/s/ Christian B. Corrigan
Christian B. Corrigan*
  *Solicitor General*
Peter M. Torstensen, Jr.
  *Deputy Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov
*Counsel for State of Montana*

GENTNER DRUMMOND
  ATTORNEY GENERAL OF OKLAHOMA

/s/Garry M. Gaskins, II
Garry M. Gaskins, II*
  *Solicitor General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Garry.Gaskins@oag.ok.gov
*Counsel for State of Oklahoma*

ALAN WILSON
  ATTORNEY GENERAL OF SOUTH CAROLINA

/s/ Thomas T. Hydrick
Thomas T. Hydrick*
  *Assistant Deputy Solicitor General*
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov
*Counsel for the State of South Carolina*

LYNN FITCH
  ATTORNEY GENERAL OF MISSISSIPPI

/s/ Justin Matheny
Justin L. Matheny*
 *Deputy Solicitor General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205
Justin.Matheny@ago.ms.gov
*Counsel for State of Mississippi*


ANDREW BAILEY
  ATTORNEY GENERAL OF MISSOURI

/s/ Josh Divine
Josh Divine*
 *Solicitor General*
MISSOURI ATTORNEY
  GENERAL'S OFFICE
207 West High St.
Jefferson City, MO 65101
(573) 751-8870
Josh.Divine@ago.mo.gov
*Counsel for State of Missouri*

PATRICK MORRISEY
  ATTORNEY GENERAL OF WEST VIRGINIA

/s/ Michael R. Williams
Lindsay See*
 *Solicitor General*
Michael R. Williams*
 *Principal Deputy Solicitor General*
OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov
*Counsel for State of West Virginia*


BRIDGET HILL
  ATTORNEY GENERAL OF WYOMING

s/ Abigail Boudewyns
Abigail Boudewyns*
 *Senior Assistant Attorney General*
Travis Jordan*
 *Senior Assistant Attorney General*
WYOMING ATTORNEY
  GENERAL'S OFFICE
109 State Capitol
200 West 24th Street
Cheyenne, WY 82002
(307) 777-6946
abigail.boudewyns@wyo.gov
travis.jordan@wyo.gov
*Counsel for State of Wyoming*

/s/ Jeremy T. Grabill
Jeremy T. Grabill (Bar #34924)
Margaret Manning (Bar #39268)
PHELPS DUNBAR LLP
Canal Place, 365 Canal Street, Suite 2000
New Orleans, LA 70130
(504) 566-1311
jeremy.grabill@phelps.com
margaret.manning@phelps.com
*Counsel for American Petroleum Institute,
Interstate Natural Gas Association of
America, and National Hydropower
Association*

Misha Tseytlin*
Kevin M. Leroy*
TROUTMAN PEPPER HAMILTON
SANDERS LLP
227 W. Monroe Street, Suite 3900
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com

Charles R. Sensiba*
TROUTMAN PEPPER HAMILTON
SANDERS LLP
401 Ninth Street, NW, Suite 1000
Washington, DC 20004
(202) 274-2850
charles.sensiba@troutman.com

Abbey M. Thornhill*
TROUTMAN PEPPER HAMILTON
SANDERS LLP
1001 Haxall Point, 15th Floor
Richmond, VA 23219
(804) 697-1209
abbey.thornhill@troutman.com
*Counsel for National Hydropower
Association*

George P. (Trey) Sibley, III (Va. Bar No.
48773)*
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
(804) 788-8262
gsibley@hunton.com

Deidre G. Duncan (DC Bar No. 461548)*
Karma B. Brown (DC Bar No. 479774)*
Erica Peterson (DC Bar No. 1686244)*
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1500
dduncan@hunton.com
kbbrown@hunton.com
epeterson@hunton.com
*Counsel for American Petroleum Institute and
Interstate Natural Gas Association of
America*

* To be admitted *pro hac vice*