**Exhibit A**

Comments of Thirteen States on Clean Water Act Section 401 Water Quality Certification
Improvement Rule, 87 Fed. Reg. 35,318 (June 9, 2022), Docket No. EPA-HQ-OW-2022-0128
(Aug. 8, 2023)



# State of Louisiana
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 94005
BATON ROUGE
70804-9005

Jeff Landry
Attorney General

August 8, 2022

***Via Electronic Submission***

Administrator Michael S. Regan
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Re:     **Clean Water Act Section 401 Water Quality Certification Improvement Rule**
        **87 Fed. Reg. 35,318 (June 9, 2022)**
        **Docket No. EPA-HQ-OW-2022-0128**

Administrator Reagan:

 We are the chief legal officers of thirteen states. Our States are committed to protecting the quality of our waters. At the same time, our States are committed to fairness to citizens seeking permits, economic progress, development of natural resources, and protecting our citizens rights' to transport their products without arbitrary blockages by other states. We accordingly provide the following comments in response to EPA's Clean Water Act Section 401 Water Quality Certification Improvement Rule, 87 Fed. Reg. 35,318 (June 9, 2022) ("Proposed Rule").

## I.     Background

### A.   The Clean Water Act

 Since 1970, "[a]ny applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters . . . shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate . . . ." Water Quality Improvement Act of 1970, Pub. L. 91-224, 84 Stat. 91, 108 (Apr. 3, 1970). In 1972, Congress enacted a "total restructuring" and "complete rewriting" of the nation's water pollution control laws, including the provision requiring certification. *City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981) (quoting legislative history); *see also* Federal Water Pollution Control Act Amendments of 1972, Pub. L. 92-500, 86 Stat. 816, 877 (Oct. 16, 1972) (codified at 33 U.S.C. § 1341). Of particular relevance here, Congress narrowed the requirement from a certification "that such *activity* will be conducted in a manner which will not violate applicable *water quality standards*," 84. Stat. at 108 (emphasis added), to a certification only "that any such *discharge* will comply with *the applicable provisions of sections 301, 302, 306, and 307 of this Act*," 86 Stat. at 877 (emphasis added).

### B.  Role of States and Tribes Under the Clean Water Act

For projects that may result in a discharge into jurisdictional navigable waters (i.e., waters of the United States, Clean Water Act ("CWA") Section 401 requires the proponent to obtain certification, from the State in which the discharge will occur that the discharge will comply with applicable state water quality standards. Vital infrastructure, such as highways, airports, and pipelines, often require federal permits that are potentially subject to Section 401 certification requirements, such as CWA Section 404 permits issued by the U.S. Army Corps of Engineers for discharges of dredged or fill material into navigable waters, and interstate natural gas pipeline licenses issued by the Federal Energy Regulatory Commission. Under Section 401, States have authority to grant, grant with conditions, or deny or waive water quality certification for federal licenses and permits for projects within their borders. If a State denies certification, the license or permit may not be issued. 33 U.S.C. § 1341(a)(1). States can waive their certification requirement, and, if they do not act within "a reasonable period of time (which shall not exceed one year) after receipt" of the request for the certification, waiver is automatic.  *Id.*

### C.  Certain States Abuse Their 401 Certification Authority

Despite the 1972 statutory change and as acknowledged in the Proposed Rule, the Environmental Protection Agency ("EPA") failed to revise the regulations governing the required certification, which is known as a 401 Certification. As a result, EPA's regulations were incongruent with the new statutory language. *Cf.* NPDES; Revision of Regulations, 44 Fed. Reg. 32,854, 32,856 (June 7, 1979) (indicating need for updated certification rules). Certain states began using the incongruity and ambiguities in EPA's regulations to abuse their certification authority for the purpose of delaying or denying certifications on non-water quality grounds. In February 2019, Louisiana and other States wrote to EPA Administrator Wheeler about that abuse and requested that EPA "clarif[y] . . . the process by which federal and state regulatory authorities are expected to implement [Section 401]." Exh. 1. That weighty request was bolstered when, on April 10, 2019, President Trump issued an Executive Order noting that "[o]utdated Federal guidance and regulations regarding section 401 of the Clean Water Act . . . are causing confusion and uncertainty and are hindering the development of energy infrastructure." EO 13868, 84 Fed. Reg. 15,494 (Apr. 15, 2019). President Trump directed Administrator Wheeler to review EPA's Section 401 regulations, "determine whether any provisions thereof should be clarified," and "publish for notice and comment proposed rules revising such regulations, as appropriate and consistent with law." *Id.* Louisiana and other States then submitted additional comments in response to EPA's request for Pre-Proposal Stakeholder Engagement. Exhs. 2, 7.

Louisiana identified the State of Washington's denial of certification for a proposed coal facility, the Millennium Bulk Terminal, as a paradigmatic example of abuse, Exh. 1, in which Washington effectively blockaded Montana and Wyoming for political reasons unrelated to water quality. The Governor of Wyoming later explained:

> Wyoming has been adversely impacted by the misapplication of other states' CWA Section 401 certifications. Our interest in a streamlined 401 certification process is founded by the fact that a large portion of Wyoming's economy depends on our ability to export our energy products to the markets that demand them, particularly markets located overseas in Asia. In the case of the Millennium Bulk Terminal, Washington State blocked the terminal's construction by inappropriately denying the State's

Section 401 certification on account of non-water quality related impacts -- an illegal maneuver based on alleged effects that are outside of the scope of Section 401.

Exh. 4. The permit applicant for the proposed Millennium Bulk Terminal elaborated:

> Millennium sought a Clean Water Act, Section 401 water quality certification from the Washington Department of Ecology ("Washington Ecology") for nearly six years. As part of the 401 certification process, Millennium has spent over $15 million to obtain an environmental impact statement ("EIS"), which originally began as a dual EIS under the National Environmental Policy Act ("NEPA") and the Washington State Environmental Policy Act ("SEPA"), with the US Army Corps of Engineers as the lead agency under NEPA and with the Washington Ecology and Cowlitz County as co-lead agencies under SEPA. In September 2013, the state and federal agencies agreed to separate and prepare both a federal EIS and a state EIS.
>
> The state EIS concluded with respect to the Project that "**There would be no unavoidable and significant adverse environmental impacts on water quality.**"
> \*   \*   \*   \*   \*
>
> Washington Governor Jay Inslee, and others in his administration, including Washington Ecology Director Bellon, have expressed their belief that no fossil fuel infrastructure projects should ever be built in the State of Washington. Denying Millennium's 401 water quality certification was the way that they could impose their own personal policy preferences to ensure that no permits would be issued for the Project and they could stop sister states from exporting their products into foreign commerce.

Exh. 8.

Other comments and judicial opinions made clear the Millennium Bulk Terminal denial was not an isolated abuse. *See, e.g.*, Exh. 9. Indeed, the State of Maryland went so far as to seek a multi-billion dollar "payment-in lieu" of imposing unachievable conditions unrelated to the discharge for which certification was sought – a demand that would ordinarily be considered extortion and which raises constitutional concerns. Ex. 10; *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987). The Federal Energy Regulatory Commission bluntly summarized the status quo: "[I]t is now commonplace for states to use Section 401 to hold federal licensing hostage." *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1104 (D.C. Cir. 2019).

### D.  EPA Adopts A Rule to Eliminate Ambiguity and Abuse

Citing the April 2019 Executive Order and Pre-Proposal Stakeholder Engagement, EPA published a proposed rule, Updating Regulations on Water Quality Certification, 84 Fed. Reg. 44,080 (Aug. 22, 2019), to, *inter alia*, limit the scope of 401 certification to water quality impacts from the discharge associated with the licensed or permitted project; interpret "receipt" and "certification request" as used in the CWA; reaffirm that certifying authorities are required by the CWA to act on a request for certification within a reasonable period of time, which shall not exceed one year; and specify the contents and effect of a certification or denial. Despite the short text of the proposed rule itself—less than four *Federal Register* pages—EPA provided a lengthy statutory and legal analysis.

Louisiana, joined by other states, provided extensive comments in support of the proposed rule. Exhs. 1-3. The Governor of Wyoming even testified before the Senate Committee on the Environment and Public Works in support of EPA's rule and parallel Congressional action. Thereafter, EPA published the final rule, Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. 42210 (July 13, 2020) ("2020 Rule"). The accompanying commentary acknowledged the Rule was driven by, *inter alia*, the 1972 statutory amendments, "litigation over the section 401 certifications for several high-profile projects," and "the need for the EPA to update its regulations to provide a common framework for consistency with CWA section 401 and to give project proponents, certifying authorities, and federal licensing and permitting agencies additional clarity and regulatory certainty." *Id.* at 42,211. The Rule went into effect on September 11, 2020.

### E. President Biden Issues Executive Order 13990 and EPA Announces Its Intent to Reconsider the Clean Water Act 401 Certification Rule

On January 20, 2021, newly-elected President Biden issued Executive Order 13990. 86 Fed. Reg. 7,037 (Jan. 25, 2021). Among other things, that order revoked Executive Order 13,868 and directed agency heads to "immediately review all existing regulations, orders, guidance documents, policies, and any other similar agency actions (agency actions) promulgated, issued, or adopted between January 20, 2017, and January 20, 2021, that are or may be inconsistent with, or present obstacles to, the policy set forth in section 1 of [that] order." *Id.* at 7,037. President Biden then directed that "[f]or any such actions identified by the agencies, the heads of agencies shall, as appropriate and consistent with applicable law, consider suspending, revising, or rescinding the agency actions." *Id.* A "Fact Sheet: List of Agency Actions for Review" posted that same day to whitehouse.gov identified the Clean Water Act Section 401 Certification Rule as an action for review under Executive Order 13990. Exh. 11. Neither Executive Order 13990 nor the Fact Sheet identified any specific problem with the Clean Water Act Section 401 Certification Rule. Nevertheless, on June 2, 2021, EPA announced its Notice of Intent to Reconsider and Revise the Clean Water Act 401 Certification Rule "in accordance with" Executive Order 13990. 86 Fed. Reg. at 29,541. Louisiana and other States responded with comments opposing reconsideration. Exh. 12. EPA is nevertheless proceeding with reconsideration and a Proposed Rule

## II. The Proposed Rule is Inconsistent with Its Stated Purpose, Fails to Consider Reliance Interests, and Fails to Consider Important Aspects of the Problem

As Louisiana explained in its August 2, 2021, letter, we are deeply troubled by EPA's reconsideration of a significant rule less than one year after it was finalized. Exh. 12. In its Notice of Intent to Reconsider, and again in its Proposed Rule, EPA offered only vague reasons for reconsideration: "[1] [t]he text of CWA Section 401; [2] Congressional intent and [3] the cooperative federalism framework of CWA Section 401; [4] [unspecified] concerns raised by [unidentified] stakeholders about the 401 Certification Rule, including [unspecified] implementation related feedback; [5] the principles outlined in the Executive Order; and [6] [unspecified] issues raised in ongoing litigation challenges to the 401 Certification Rule." 86 Fed. Reg. at 29542. Of course, "the text of CWA 401," "Congressional intent," and the "cooperative federalism" framework of CWA Section 401 were extensively addressed in connection with the 2020 Rule, *e.g.*, 85 Fed. Reg. at 42,215-17, 42,226, and EPA expressly "determined that the final rule implements the fundamental statutory objectives of the CWA," 85 Fed. Reg. at 42,212. With respect to "implementation related feedback,"

4

we question whether any stakeholder had sufficient experience implementing a rule that had been in effect less than nine months to provide feedback warranting revision.

What remains are Executive Order 13990 and "issues raised in litigation" that has not reached the merits, and that the Supreme Court found so off-mark as to warrant a stay of the judgment. Neither provides a basis for reconsideration. EPA thus falls back on a claim of "inherent authority to reconsider past decisions" and an assertion that "such a revised decision need not be based upon a change of facts or circumstances." 86 Fed. Reg. at 29542; *but see, e.g., California v. Bernhardt*, 472 F. Supp. 3d 573, 600-01 (N.D. Cal. 2020) ("While the Executive branch holds the power to issue executive orders, an agency cannot flip-flop regulations on the whims of each new administration. The APA requires reasoning, deliberation, and process. These requirements exist, in part, because markets and industries rely on stable regulations."). Tellingly, EPA's Notice of Intent to Reconsider made no mention of the well-documented abuses that preceded the Clean Water Act 401 Certification Rule or EPA's determination that "some certifying authorities [had] implemented water quality certification programs that exceed the boundaries set by Congress in section 401." 85 Fed. Reg. at 42,215. EPA nevertheless proceeded with its Proposed Rule, again referencing "the principles outlined in Executive Order 13,990" and "inherent authority to reconsider past decisions and to revise, replace, or repeal a decision to the extent permitted by law and supported by a reasoned explanation." 87 Fed. Reg. at 35,325.

The stated purpose of the Proposed Rule is "to foster a more efficient and predictable certification process." 87 Fed. Reg. at 35,326. Yet much of the Proposed Rule is inconsistent with efficiency and predictability. Indeed, it expressly rejects the certainty of the 2020 Rule in favor of proceeding by litigation, differing requirements by 50+ certifying authorities, and not taking a position on core issues that underlay the 2020 Rule. Indeed, the Proposed Rule fails to grapple with the abuses that preceded the 2020 Rule, or address project proponents' and states' reliance on the 2020 Rule.

## III. __The Proposed Rule fails to provide adequate notice and opportunity to comment.__

The Proposed Rule includes numerous requests for comment about regulatory options, many of which may interact if adopted. It is therefore difficult for interested parties to comment on the Proposed Rule given this "choose your own adventure" rulemaking approach, involving numerous possible combinations of provisions. EPA should provide another round of comments after it has a more firm proposed rule in mind.

## IV. Specific Comments

### 1.    1971 Rule

We appreciate and agree with EPA's acknowledgement that "the 1971 Rule did not … reflect the current statutory language." 87 Fed. Reg. at 35,319.

### 2.    Pre-filing meeting requests

We note the short period of time the "pre-filing meeting request" requirement has been in effect and the certifying authority's discretion whether to hold such a meeting. *Cf.* 86 Fed. Reg. at 29,544 ("EPA is interested in . . . whether any major projects are anticipated *in the next few years* that could benefit for or be encumbered by the 401 Certification Rule's procedural requirements."). We question whether anyone has sufficient experience with this requirement to provide meaningful support for any substantive change.

EPA nevertheless requests comment on whether it should define "applicable submission procedures" in the regulatory text, the timeline between submission of a pre-filing meeting request and a certification request, whether certain project types should be excluded from prefiling meeting request requirement, and whether there should be a process for the proponent to ask the certifying authority to waive the pre-filing meeting request requirement. 87 Fed. Reg. at 35,330. Consistent with the Proposed Rule's stated purpose of "fostering a more efficient and predictable certification process," 87 Fed. Reg. at 35,326, we believe EPA should define "applicable submission procedures" in the regulatory text for all certifying authorities so as to avoid vagueness and a Kafka-esque requirement that proponents comply with unspecified procedures. We believe the 30 day pre-certification request period under the 2020 Rule is reasonable, and we agree that certain types of simple or routine projects should be excludable from the pre-filing meeting request requirement by regulation. We are concerned, however, that unbounded discretion for certifying authorities to add requirements for certification requests combined with unbounded discretion to exclude certain categories of projects may result in abuses targeting disfavored categories of projects. For projects that are not excluded by regulation, we believe a project proponent's request for a waiver of the pre-filing meeting requirement is sufficiently straight-forward that no formal process should be required. We agree with EPA's proposal of requiring certifying authorities to provide a written acknowledgement and determination of need for a pre-filing meeting within 5 days of receipt.

### 3.  Request for Certification and Receipt

The 2020 Rule defines a certification request as "a written, signed, and dated communications that satisfies the requirements of [40 C.F.R.] 121.5(b) or (c)." 40 C.F.R. 121.1(c). Those sections in turn specify information that must be included in a certification request.

To the extent additional information is necessary, certifying authorities can request information from applicants. If the applicant fails to provide that information, the certifying authority can issue a denial. The check on such a denial is the 2020 Rule's requirement that "the denial must describe the specific water quality data or information, if any that would be needed to assure the discharge from the proposed project will comply with water quality requirements" or "that would be needed to assure that the range of discharges will comply with water quality requirements." 40 C.F.R. 121.7(e)(1)(iii), (2)(iii). In short, rational project proponents are unlikely to refuse to provide

information requested by a certifying authority if withholding that information will only result in a denial. The Proposed Rule appears to be a politically-driven change where there is no underlying problem, and which will indeed cause problems.[1]

We disagree that EPA can require a project proponent to obtain a draft federal license or permit on an unknown timeline before filing a request for certification. 87 Fed. Reg. 35,332. As an initial matter, is unclear how federal agencies could issue draft permits and if these drafts would be subject to public comment. This ambiguity for a process that does not currently exist in other agencies adds an unnecessary step in the process. This requirement would also alter the timeline for permit reviews, given that project proponents generally submit requests for water quality certification when they submit permit applications.  Under the proposal, the federal agency must be far enough along in its review to issue a draft permit the applicant can include in its request for certification.  This requirement could add significant delays to the permitting process. Indeed, the requirement for pre-request draft permits is nakedly at odds with Congress's focus on a one year timeline. EPA should revise the current definition to remove the requirement that a draft or final federal permit be included in the applicant's certification request. To the extent EPA insists on detailed information regarding the license or permit—it should not—EPA's alternative approach of having a project proponent submit its license or permit application, 87 Fed. Reg. at 35,333, is relatively more consistent with Congress's statutory timeline.

We disagree that EPA can delegate to certifying authorities the ability to determine whether the certifying authority has received a request for certification or a "complete" request for certification, or to define their own additional requirements for a certification request. *See* 87 Fed. Reg. 35,331, 35,334. Congress gave EPA—not other certifying authorities—a measure of regulatory power in connection with the CWA, and whatever deference is owed is to EPA, not certifying authorities. More broadly, allowing a certifying authority to determine when it has received sufficient information to begin the waiver clock provides essentially no limitation on the period for review. *Cf.* Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court."). Adequacy of the complete information package is a separate question from whether a certification request has been submitted. Congress made clear that the permitting process should not take more than one year, and the maximum time set by statute is keyed to receipt of a request for certification, not detailed information. *See* 85 Fed. Reg. at 42,235 (citing, *inter alia*, 33 U.S.C. 1341). On this point, the Proposed Rule appears to be contrary to Congress' clear intent, implicates Due Process concerns, and would dramatically hinder the permitting process. Pragmatically, without a uniform definition, States will create a patchwork of definitions. This will enable States to establish requirements that frustrate infrastructure development by forcing the production of unnecessary or irrelevant information before even considering a request or adding additional ambiguity into the process.

---

[1] The only purported problem with the 2020 Rule that EPA identifies is "an increase in denials" in one state. 87 Fed. Reg. at 35,334. Given certain States' history of using repeated data requests to manipulate the regulatory process and deter politically disfavored projects by stringing out the certification process beyond the one year statutory period, an increase in judicially reviewable merits denials may reflect the 2020 Rule working as intended.

To the extent certifying authorities can be delegated such power, Due Process and basic fairness require that the required contents be clearly and authoritatively published. *See* 87 Fed. Reg. at 35,378 (proposed 40 C.F.R. 121.5(b)). EPA acknowledges that such content requirements, submission procedures, and the like may not be publicly available. 87 Fed. Reg. at 35,337. Consistent with Due Process and EPA's stated goal of promoting certainty, EPA should clarify that content requirements and receipt timing must not tied to requirements and procedures that are not formally adopted and published as regulations. Further, EPA should have clear, minimal requirements for what must be included in a certification request to initiate the waiver period.

More broadly, there appears to be no rationale for a change. Louisiana and other undersigned States advocated for the existing limits on an open-ended time period to determine whether an application was complete. EPA agreed and revised the certification process; it now provides a system by which certifying authorities receive notice of a request before that request is filed, have the ability to seek information from a project proponent, have a definite period of time to act on that information, and – consistent with Due Process – must identify specific missing information if a denial is due to insufficient information. *See, e.g., Goldberg v. Kelly,* 397 U.S. 254, 271 (1970) ("[T]he decision maker should state the reasons for his determination and indicate the evidence he relied on."). The process set forth in the Rule helps prevent the abuses and arbitrary denials that led Undersigned States to urge EPA to adopt the Rule. *See, e.g.,* Henry J. Friendly, "Some Kind of Hearing," 123 Univ. Pa. Law Rev. 1267 1292 (1975) ("A written statement of reasons, almost essential if there is to be judicial review, is desirable on many other grounds. The necessity for justification is a powerful preventive of wrong decisions. The requirement also tends to effectuate intra-agency uniformity . . . ."). And, with regard to projects that cross state lines (like pipelines or interstates) or that serve broader geographical regions (like solar farms or wind farms), it prevents one state from using bureaucratic games to effectively veto a project that has significant economic effects across an entire region.

### 4. Reasonable period of time

**a.** Congress specified that "[i]f the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application." 33 U.S.C. 1341(a)(1). The 2020 Rule accordingly provides that "[t]he Federal agency shall establish the reasonable period of time either categorically or on a case-by-case basis" which "shall not exceed one year from receipt," 40 C.F.R. 121.6, *i.e.,* one year from "the date a certifying request is document as received by a certifying authority, 40 C.F.R. 121.1(m). The 2020 Rule then identifies broad factors the Federal agency "shall consider" in establishing the reasonable period of time: "(1) the complexity of the proposed project; (2) the nature of any potential discharge; and (3) the potential need for additional study or evaluation of water quality effects from the discharge." 40 C.F.R. 121.6(c).

**b.** EPA has expressed concern that the 2020 Rule does not allow certifying authorities a sufficient role in setting the timeline for review and limits the factors agencies can use to determine reasonable period of time. In fact, the Undersigned States have the *opposite* concern – that allowing all 50 States (and other certifying authorities) to establish different timeliness for review increases instability and inefficiency. Further, where additional time is demonstrably necessary, the 2020 Rule provides as a safety valve that that "[t]he Federal agency may extend the reasonable period of time at the request of a certifying authority or a project proponent." 40 C.F.R. 121.6(d).

Notably, both EPA and the Army Corps of Engineers have determined that a reasonable period of time should generally be less than one year. *See* 33 CFR 325.2(b)(1)(ii) (60 days); 40 C.F.R. § 121.16(b) (6 months); 40 C.F.R. § 124.53(c)(3) (60 days). Having a Federal agency set the reasonable period of time serves to minimize the arbitrary delays and bureaucratic gamesmanship that were at the heart of the Undersigned States' concerns. EPA should continue to have Federal agencies establish the reasonable period of time, as they have done for decades consistent with judicial and administrative precedent. *See, e.g.*, *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1104 (D.C. Cir. 2019) ("Thus, while a full year is the absolute maximum, it does not preclude a finding of waiver prior to the passage of a full year."); *Constitution Pipeline Company, LLC*, 164 FERC P 61029 (F.E.R.C.), 2018 WL 3498274 (2018) ("[T]o the extent that Congress left it to federal licensing and permitting agencies, here the Commission, to determine the reasonable period of time for action by a state certifying agency, bounded on the outside at one year, we have concluded that a period up to one year is reasonable.").

**c.** Given Congress's clear focus on a one-year timeframe, we disagree that "the reasonable period of time" can permissibly "not commence until after the Federal licensing or permitting agency prepares a draft license or permit." 87 Fed. Reg. 35,339. We note that EPA provides no timeline for such drafts and no assurances that other agencies will make draft licenses or permits available.

**d.** Under the CWA, a state must act within a reasonable period of time, not to exceed one year, or the request will be deemed waived. The waiver provision was adopted to prevent delays that could "kill" a project.[2] Certain States' practice of asking project proponents to withdraw and resubmit requests for certification to restart the one-year waiver clock has been subject to litigation. EPA's proposal does not take a position on the legality of withdrawing and resubmitting a certification request, but instead indicates EPA will defer to the courts and states to make case-specific decisions or issue their own regulations on this point.  87 Fed. Reg. at 35,341-42. The resulting uncertainty and delay is inconsistent with the stated purpose of the Proposed Rule. EPA should clarify that in all cases states need to make certification decisions in a timely and expeditious manner. The CWA is clear on this point.  "If the State . . . fails or refuses to act on a request for certification, *within a reasonable period of time (which shall not exceed one year) after receipt of such request*, the certification requirements of this subsection shall be waived with respect to such Federal application."  33 U.S.C. § 1341(a)(1) (emphasis added). EPA should also clarify that any attempt by a certifying authority to delay the commencement or conclusion of its time period for review without following the proposed process for an extension, would violate the Clean Water Act.

We disagree with EPA's taking no position on the legality of withdrawing and   resubmitting a certification request. 87 Fed. Reg. 35,341. The Proposed Rule notes that certain state and tribal

---

[2] The waiver language first appeared in an amendment offered by Congressman Edmondson and approved by the House of Representatives in 1969. *See* 115 Cong. Rec. at 9,259 (starting debate on H.R. 4148, Water Quality Improvement Act of 1969), 9,264–65 (amendment offered and discussed), and 9,269 (amendment accepted) (Apr. 16, 1969). Congressman Edmondson observed that the purpose of the amendment was "to do away with dalliance or unreasonable delay and require a 'yes' or 'no,'" from affected states. *Id.* at 9,264. The only other speaker to address this language observed that it "guards against a situation where the water pollution control authority in the State in which the activity is to be located . . . simply sits on its hands and does nothing. Any such dalliance could kill a project just effectively as an outright determination on the merits not to issue the required certification." *Id.* at 9,265 (remarks by Congressman Holifield).

stakeholders specifically desired more flexibility, notwithstanding Congress's clear focus on a one year timeline. In short, EPA appears to be providing a path to restart the abuses that led to the 2020 Rule. And EPA implicitly acknowledges withdrawal and resubmission is not one of the options for certifying authorities. *See* 87 Fed. Reg. at 35,350. Regarding EPA's request for comment on "specifically authorizing withdrawals and resubmissions," we do not believe EPA has such authority, and it would be plainly contrary to the statutory one-year time period. EPA should not leave open the possibility that states will pressure project proponents to withdraw and resubmit their request to extend the one-year review/waiver period.

**e.** EPA implicitly raises the question of when does a certifying authority waive certification. The Rule recognizes clear, bright lines, *i.e.*, the certification request review period has a clear beginning, a definite end, and a tangible consequence for a certifying authority's failure to act. The 2020 Rule is thus consistent with Congress imposition of a clear time limit. *See* 33 U.S.C. § 1341(a)(1). Congress did not qualify the statutory language to allow the certifying authority to delay the commencement of, toll, extend, or otherwise alter or modify that timeframe after the request is received. *See N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d 450, 455–56 (2d. Cir. 2018) ("The plain language of Section 401 outlines a bright-line rule regarding the beginning of review . . . . It does not specify that this time limit applies only for 'complete' applications.").

### 5. Scope of Certification

**a.** Undersigned states agree that "the 1971 Rule did not fully reflect the current statutory language [after the 1972 amendments to the CWA]" on the scope of certification. 87 Fed. Reg. at 35319. We further agree with EPA's acknowledgment that the Supreme Court in *PUD No. 1* appeared to be "unaware" of the statutory change and the divergence between the statutory language and the regulatory text. 87 Fed. Reg. at 35,344; *see also* 87 Fed. Reg. at 35,346.

**b.** The 2020 Rule makes clear that "[t]he scope of a Clean Water Act section 401 certification is limited to assuring that a discharge . . . will comply with water quality requirements," 40 C.F.R. 121.3, which are in turn defined as "applicable provisions of §§ 301, 302, 303, 306, and 307 of the Clean Water Act, and state or tribal regulatory requirements for point source discharges into waters of the United States," 40 C.F.R. 121.1(n). The scope of certification defined in the 2020 Rule is reasonable and is consistent with the Clean Water Act.

The interpretation of the statute in the 2020 Rule is correct; is consistent with the *ejusdem generis*, and *noscitur a sociis* canons; is consistent with the presumption that statutory amendments are intended to have real and substantial effect, *Stone v. INS*, 514 U.S. 386, 397 (1995); and was permissible under *PUD No. 1 of Jefferson County v. Washington Dep't of Ecology*, 511 U.S. 700 (1994). Indeed, as the Supreme Court noted in one of the cases on which EPA relies, "when Congress fine-tunes its statutory definitions, it tends to do so with a purpose in mind." *S.D. Warren v. Maine Bd. of Environmental Protection*, 547 U.S. 370, 384 (2006). Rejecting such a core canon of statutory construction as "not dispositive, or even persuasive" is an insufficient basis to reject giving meaning to a clear statutory change.

**c.** We disagree with EPA's returning to the "activity as a whole" scope of certification. EPA appears to begin its statutory analysis with that result in mind, stating that the statutory terms "create enough ambiguity" to reach its desired result, rather than first finding ambiguity that the agency resolves. 87 Fed. Reg. at 35,344. We also disagree with EPA's broadening the term "other appropriate

requirements of State law." 87 Fed. Reg. at 35,342. In doing so, EPA essentially ignores the statutory term "appropriate," and it fails to grapple with the abuses on this very point that underlay the 2020 Rule. EPA explains that "activity as a whole" is intended to capture "any aspect of the project activity with the potential to affect water quality." That is a substantial broadening over the 2020 Rule. And EPA appears to further interpret the scope of section 401 review and conditions as applying to impacts to all potentially affected state waters, not just the waters of the United States ("WOTUS") within the state. This interpretation exceeds the authority granted to states by Congress, which is limited to potential discharges to "navigable waters," *i.e.* WOTUS.

We believe EPA should limit the scope of review to the discharge(s) associated with a project. If EPA moves forward with its interpretation that the scope of review should include the "activity as a whole," EPA should provide additional guidance defining the boundaries of such a review and show a clear statement from Congress that authorizes this expansion. In particular, EPA should limit the jurisdictional scope of the rule to consideration of impacts to waters over which EPA and the states have CWA authority under 401 (i.e., WOTUS).

**d.** We are deeply troubled by EPA's reliance on the 1989 Guidance, which appears to have been prepared — at least in part — by an activist. *See* 87 Fed. Reg. at 35,345. Outsourcing guidance to activists (or even low-level employees) is improper. Moreover, such "guidance" can hardly be taken as reflect the <u>agency's</u> opinion or practice.

**e.** Although we disagree with EPA's change to the scope of certification, if such change is to occur, we support EPA specifically defining the term "activity" to mean "only those activities at the project site that are specifically authorized by the Federal license or permit in question." 87 Fed. Reg. at 35,346. As EPA notes, Congress does not "hide elephants in mouseholes," and the CWA cannot be read to expand licensing or permitting power under other statutes. EPA's request for comment on "whether and how federal licensing or permitting agencies could effectively implement a certification with conditions addressed to impacts from the 'activity as a whole' if it has authority over only a small part of a larger project" highlights the weak legal foundation for EPA's expansive scope of certification. It also shows that EPA's Proposed Rule is likely impermissible under the major questions doctrine.

**f.** Undersigned States note that any interpretation that allows certifying authorities to make certification decisions based on matters unrelated to water quality (*e.g.* greenhouse gas emissions, transportation impacts, project need, etc.) would not only be an unreasonable interpretation of the statute, but would create boundless discretion and inject ambiguity. While States value their right to be "incubators of democracy" in the development of their own laws and policies, the objectives of the Clean Water Act are not well-served by ambiguity and state-by-state policy. Notably, EPA does not mention the 2020 Rule's justification that "some certifying authorities have included conditions in a certification that have nothing to do with effluent limitations, monitoring requirements, water quality, or even the CWA," "such as requirements for biking and hiking trails to be constructed, one time and recurring payments to State agencies for improvements or enhancements that are unrelated to the proposed . . . project, and public access," or its well-founded conclusion that such actions are not authorized by Section 401. 85 Fed. Reg. at 42,256-257. We appreciate and agree that "that it would be inconsistent with the purpose of CWA section 401 to deny or condition a section 401 certification based on potential air quality, traffic, noise, or economic impacts that have no connection to water quality." 87 Fed. Reg. at 35343.

### 6. Certification Actions

As EPA notes, the 2020 Rule provides that certifying authorities may take one of four actions on a certification request: grant certification, grant certification with conditions, deny certification, or waive certification. EPA seeks input as to "whether there is any utility in requiring specific components and information for certifications with conditions or denials." 86 Fed. Reg. at 29543. As noted above, a decision maker's stating "the reasons for his determination and . . . the evidence he relied on" are basic requirements of Due Process. *Goldberg*, 397 U.S. at 271. Such information is also essential for judicial review and is a powerful preventive of wrong decisions. Friendly, "Some Kind of Hearing," 123 UNIV. PA. LAW REV. at 1292. And particularly in the case of denials, a complete statement of the basis for denial facilitates a proponent being able to traverse the denial via a new certification request. The 2020 Rule thus properly requires information regarding conditions and denials to be included in a certifying authority's action on a certification request. 40 C.F.R. 121.7.

EPA previously expressed concern "that a federal agency's review may result in a state or tribe's certification or conditions being permanently waived as a result of nonsubstantive or easily fixed procedural concerns identified by the federal agency." 86 Fed. Reg. at 29,543. The 2020 Rule provides for waiver on "failure or refusal to satisfy the requirements" of certain provisions. 40 C.F.R. 121.9. "Refusal to comply" implies that any "failure" may be timely corrected. This requirement serves to police certifying authorities compliance with EPA's procedural rules via a mechanism that is quicker and less costly than judicial review.

EPA now asserts that Section 401(a)(1) "clearly indicates Congress's intent to limit constructive waivers to situations where a certifying authority did not act." 87 Fed. Reg. at 35,351. Yet that seems inconsistent with Congress's broader focus on a one-year timeframe.

EPA also appears to be deleting the requirements that the certifying authority explain the necessity of each condition and provide a citation to an applicable Federal, state, or tribal law, 40 C.F.R. 121.7(d), and that denials identify any water quality requirements with which the discharge will not comply, including why and any specific information that would explain a denial based on insufficient information, 40 C.F.R. 121.7(e). 87 Fed. Reg. at 35,352-54. As noted above, such stated reasoning is a basic requirement of Due Process. That some certifying authorities complained that identifying such basic information about the rationale for their decisions "delayed . . . the certification process" strongly suggests those certifying authorities previously operated (and desire to do so again) in an arbitrary and unlawful manner. 87 Fed. Reg. at 35,352. If the certifying authority struggles to specifically identify the "water quality requirements" warranting a condition, for example, that suggests they are unable to do so or that the causal chain is speculative.

### 7. Neighboring Jurisdictions

CWA Section 401(a)(2) establishes a process for "neighboring jurisdictions" to participate in the federal licensing or permitting process where the discharge "may affect" their water quality. Under Section 401(a)(2), EPA determines whether the discharge may affect the water quality of a neighboring state.  If the discharge may affect a neighboring state, then EPA must notify the state and provide the state with an opportunity to determine whether the discharge will violate the water quality requirements of the state.

The 2020 Rule gave EPA discretion to determine whether to make a "may affect" determination. It was not mandatory. EPA's proposal, however, mandates that EPA "shall determine whether a discharge from the certified or waived project may affect water quality in a neighboring jurisdiction." 87 Fed. Reg. at 35,380 (proposed 40 C.F.R. 121.13(a)). Smaller projects and projects internal to a state will not impact neighboring jurisdictions, such that this requirement would be a significant waste of EPA's limited resources. EPA should not require its staff to make a "may affect" determination for every certification application.

### 8. Federal Review

The 2020 Rule provides federal agencies with greater authority to review certifications. For example, if a State does not include support to justify a denial or a condition, federal permitting agencies can find that a state waived its certification authority, or waived its authority with regard to a specific condition. The Proposed Rule limits the authority provided by the 2020 Rule. Under the Proposed Rule, federal agencies may only review a certification decision to determine (1) whether the decision clearly indicates the nature of the decision (i.e., is it a grant, grant with conditions, denial, or express waiver), (2) whether the proper certifying authority issued the decision, (3) whether public notice was provided, and (4) whether the decision was issued within the reasonable period of time. Importantly, if the federal agency determines that a certification was not issued within the reasonable period of time, the federal agency may determine that a waiver has occurred (or alternatively, may extend the reasonable period of time up to the one year statutory maximum). We believe EPA should continue to provide federal agencies with the authority to determine when waiver has occurred, an important aspect of the certification process.

### 9. Enforcement

EPA requests comment on whether it should propose regulatory text to address state or tribal enforcement authority with respect to the CWA's citizen suit provision. We note that the citizen suit provision expressly recognizes that it is limited by the States' sovereign immunity. *See* 33 U.S.C. § 1365.

### 10. Regulatory Flexibility Act

We respectfully submit that EPA's claim that the Proposed Rule will not have a significant economic impact on a substantial number of small entities is incredible. 87 Fed. Reg. at 35,375. The Proposed Rule repeatedly replaces the single-rule regulatory certainty of the 2020 Rule with regulation by 50+ certifying authorities and regulation by litigation. The requirement for a draft permit or license also implicates costly delay. Even if EPA is unable to quantify the impacts of the Proposed Rule on small entities, EPA should at least provide a qualitative analysis and discuss the impact of various features of the Proposed Rule.

### 11. Federalism

In view of the well-documented history of certain States abusing their CWA authority to effectively block projects in other States for non water-quality reasons, EPA's determination that the Proposed Rule does not have federalism implications is misplaced. For example, EO 13132 requires EPA to "closely examine the constitutional and statutory authority supporting any action that would limit the policymaking discretion of the States and shall carefully assess the necessity for such action."

13

The abusive use of CWA certifying authority to block projects in other States on non-water quality reasons inherently limits the policymaking discretion of the State in which the blocked project would be located. The Proposed Rule increases the ability of States to abuse their CWA certifying authority in comparison to the 2020 Rule. EPA should acknowledge as much and perform the appropriate analysis under EO 13132.

* * * * *

Please don't hesitate to contact me with any questions or concerns. The point of contact for this matter is Deputy Solicitor General Scott St. John, stjohnj@ag.louisiana.gov, 225-485-2458.

With kind regards,

Jeff Landry
  Louisiana Attorney General

Steve Marshall
Alabama Attorney General

Austin Knudsen
Montana Attorney General

Treg Taylor
Alaska Attorney General

Doug Peterson
Nebraska Attorney General

Leslie Rutledge
Arkansas Attorney General

Alan Wilson
South Carolina Attorney General

14

Todd Rokita
Indiana Attorney General

Ken Paxton
Texas Attorney General

Daniel Cameron
Kentucky Attorney General

Patrick Morrisey
West Virginia Attorney General

Lynn Fitch
Mississippi Attorney General

Bridget Hill
Wyoming Attorney General

Eric Schmitt
Missouri Attorney General

EXHIBIT 1



**State of Louisiana**
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 94005
BATON ROUGE
70804-9005

Jeff Landry
Attorney General

February 26, 2019

The Honorable Andrew Wheeler
Acting Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460
Wheeler.andrew@Epa.gov

Dear Acting Administrator Wheeler:

States are on the front line of protecting the environment, public health, and the welfare of citizens within our respective borders. The cooperative federalism principles that are central to many of our nation's environmental statutes recognize the critical role states play and, when implemented appropriately, encourage partnership between states and the federal government.

Unfortunately, the cooperative federalism principles of the Clean Water Act are sometimes coopted to advance the political agendas of certain state actors. In particular, Section 401 of the Clean Water Act has been manipulated to block infrastructure projects that are in the public interest of other states and the nation generally. This tactic has been implemented to delay or to block vital oil and gas pipeline projects, coal projects, LNG terminal projects, and other fossil energy projects. The actions of individual state actors are disruptions to interstate commerce and negate the intent of providing the consistent and reliable permitting process envisioned by the Clean Water Act.

For example, in 2017, the State of New York unilaterally blocked the approximately $500 million interstate pipeline Northern Access Project when it denied a Water Quality Certificate for the project, notwithstanding the Pennsylvania Department of Environmental Conservation's prior issuance of a Water Quality Certificate and the FERC's prior approval of the project. Similarly, in 2017, the Washington Department of Ecology opaquely denied "with prejudice" a Water Quality Certificate for another project, the Millennium Bulk Terminal, just three business days after receiving 240 pages of additional information it requested. Without these Water Quality Certificates, these projects cannot go forward regardless of their importance to the nation. Individual state actors should not be allowed to unilaterally and negatively impact the economies of multiple other states and the nation as a whole under the guise of implementing federal law.

While the cooperative federalism principles of Section 401 may can be maintained through clarification of the process by which federal and state regulatory authorities are expected to implement the law, this clarification should recognize and preserve the states' primary

responsibility over and rights concerning water quality.  Congress intended Section 401 as an opportunity for states to evaluate water quality impacts from federally-permitted projects. Instruction from EPA on the respective roles of state and federal authority within the bounds intended by the statute is needed to ensure that Section 401 is used for its intended purpose to protect water quality, to minimize its potential for misuse, and to provide predictability in permitting energy infrastructure.

As Attorneys General, we support an effort by EPA to maintain cooperative federalism and the rule of law to the Section 401 process.

Sincerely,

Jeff Landry
Louisiana Attorney General

Alan Wilson
South Carolina Attorney General

Steve Marshall
Alabama Attorney General

Ken Paxton
Texas Attorney General

Tim Fox
Montana Attorney General

Patrick Morrisey
West Virginia Attorney General

Doug Peterson
Nebraska Attorney General

# EXHIBIT 2



**State of Louisiana**
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 94005
BATON ROUGE
70804-9005

Jeff Landry
Attorney General

May 24, 2019

The Honorable Andrew Wheeler
Administrator
Environmental Protection Agency
1200 Pennsylvania Avenue
Mail Code 1101A
Washington, D.C. 20460

RE:     Pre-proposal recommendation letter
        Docket ID: EPA-HQ-OW-2018-0855

Dear Administrator Wheeler:

    We write today to support the EPA's rule-making effort in response to the President's Executive Order on Energy Infrastructure and Economic Growth. As states hold the primary responsibility of evaluating and maintaining healthy water quality within our borders, we understand the need for an effective, workable system that enhances cooperative federalism. But without proper checks on centralized programs like the Clean Water Act, the incentive for misuse exists. Section 401 of the Clean Water Act has been manipulated to block infrastructure projects that are in the public interest of individual states and the nation as a whole. Using WQC approvals as a delay tactic to block vital energy infrastructure projects in abuse of the power committed to the States and inconsistent with our shared obligations under the program. These disruptions burden interstate commerce and negate the CWA's intent of providing the consistent and reliable permitting process.

    It is encouraging that the President and EPA's calls for action echo the concerns raised in the February 26th letter from a group of Attorneys General. With the stated goals of promoting efficient permitting processes, reducing regulatory uncertainties, and promoting timely Federal-State cooperation, the Executive Order prompting this review provides a clear indication of the problems to be addressed and the solutions employed.[1]

    Many of these problems are evidenced in the February 26th letter, which spoke to specific actions obstructing energy infrastructure projects. These actions divert state and federal resources from other important priorities. For example, since that letter was issued, a federal district court

---

[1] Exec. Order 13868, *Promoting Energy Infrastructure and Economic Growth* (April, 10 2019).

Page 2
May 24, 2019

stayed the aggrieved applicant's challenge to Washington State's WQC denial until state proceedings conclude.[2] The applicant appealed to the U.S. Ninth Circuit Court of Appeals in the interim.[3] New York denied a WQC for the $500 million Northern Access Pipeline Project, but that action was subsequently vacated by the Second Circuit.[4] However, the Federal Energy Regulatory Commission (FERC) may have subsequently mooted the case by ruling the State failed to act on the WQC request within the statutory one-year timeframe.[5] The net effect of these orders is unclear at this time. Additionally, New York just denied yet another WQC[6] for the $927 million Northeast Supply Enhancement (NESE) project, would supply improved natural gas to a market that currently faces new gas connection moratoria due to supply shortages.[7] And while applicants for both this project and the $7.5 billion Jordan Cove project Oregon recently denied [8]can resubmit their applications,  these resubmissions represent unnecessary regulatory delays that could also be mitigated by improved regulatory clarity.

A few areas are particularly ripe for EPA guidance. First, EPA should update guidance to emphasize the appropriate review standard of "reasonable assurance" to deter states from setting prohibitively higher, standards.[9] EPA should also undertake a substantive review of the CWA's implementing regulations, as many of these have not been updated in nearly four decades.[10] Another area of concern is the tolling provision applied to a presumed waiver of state certification, under which states waive certification if they fail to act on a certification request within one year of receipt.[11] Both the Northern Access and Jordan Cove denials mentioned above were in some way influenced by recent federal interpretation of this provision. Federal appellate courts and the FERC have ruled that this provision has a bright line trigger upon receipt of the application as opposed to the agency's subjective determination of when a "complete" application is submitted.[12] In accordance with the President's Executive Order to restore consistency to the 401 process, EPA should update its guidance to reflect this interpretive clarification.[13]

---

[2] *Lighthouse Resources Inc, et al. v. Jay Inslee, et al.*, 3:18-cv-05005 (W.D. Wash) (order granting motion to stay).
[3] *Id.* (notice of appeal).
[4] *Nat'l Fuel Gas Supply Corp. v. N.Y. State Dep't of Envtl. Conservation*, 17-1164-cv (2d. Cir. 3/29/19) ("[T]he Denial Letter here insufficiently explains any rational connection between facts found and choices made." *See also* n.2 "…the agency appears to have considered a separate application in formulating its decision, or possibly used a boilerplate denial but failed to delete portions that do not relate to the instant application.").
[5] *Federal Energy Guidelines*, *FERC Reports*, 167 FERC ¶ 61,007 (April 2, 2019).
[6] Press Release, N. Y. State Dep't of Env't Conservation, *DEC Statement on Water Quality Certification for Proposed Northeast Supply Enhancement Pipeline Project* (May 15, 2019)
[7] George Lobsenz, *Despite Asserted Gas Shortages in State, New York Blocks New Pipe*, The Energy Daily (May 17, 2019).
[8] Or. Dep't of Env't Quality, Press Release, *DEQ Issues a Decision on Jordan Cove's Application for 401 Water Quality Certificate* (May 06, 2019).
[9] 33 U.S.C. 1341 (a)(3), (4)
[10] Deidre Duncan and Clare Ellis, *Clean Water Act Section 401: Balancing States' Rights and the Nation's Need for Energy Infrastructure*, 25 Hastings Environmental L.J. 235, at 258 (2019).
[11] 33 U.S.C. 1341.
[12] *Constitution Pipeline Co. v. New York State Department of Environmental Conservation*, 868 F.3d 87 (2d Cir. 2017); *New York Dept. of Env'l Conserv. v. FERC*, 884 F. 3d 450; *Federal Energy Guidelines*, *see* n 6; *see also Hoopa Valley Tribe v. FERC*, 913 F.3d 1099 (agreement between certifying agency and applicant to withdraw and refile the application constituted impermissible end-run around Congressionally imposed statutory limit.).
[13] *See* U.S. Env't Prot. Agency, *Clean Water Act Section 401 Water Quality Certification: A Water Quality Protection Tool For States and Tribes*, Section 201 Interim Guidance (April 2010).

Page 3
May 24, 2019

Without further clarification, WQC abuse will continue delaying projects of great national importance. Individual state actors should be disallowed from unilaterally imposing extra-statutory requirements on applicants to the detriment of other states and the nation as a whole under the guise of implementing federal law. To be clear, any clarification should recognize and preserve the states' primary responsibility over and rights concerning water quality.  However, Congress intended Section 401 as an opportunity for states to evaluate water quality impacts from federally-permitted projects, not an opportunity to unilaterally veto those projects.

I support the EPA in its work to streamline and unburden this important program.


Sincerely,


Jeff Landry
Attorney General

Alan Wilson
South Carolina Attorney General


Steve Marshall
Alabama Attorney General

Ken Paxton
Texas Attorney General


Tim Fox
Montana Attorney General

Patrick Morrisey
West Virginia Attorney General


Doug Peterson
Nebraska Attorney General

EXHIBIT 3



**State of Louisiana**
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 94005
BATON ROUGE
70804-9005

Jeff Landry
Attorney General

October 21, 2019

Administrator Andrew Wheeler
Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, NW
Washington, DC 20460

*Via regulations.gov*: EPA-HQ-OW-2019-0405-0025

Dear Administrator Wheeler:

This comment provides support and further recommendations to the proposed changes[1] of the Environmental Protection Agency's regulations related to state water quality certifications required under Section 401 of the Federal Water Pollution Control Act, commonly known as the Clean Water Act (CWA).[2] Water quality certifications allow states to evaluate and limit potential impacts to water quality that may result from discharges associated with federally permitted or licensed activities.[3] As part of the State water quality certification scheme, Congress granted State regulators with the authority to veto a proposed project if the applicant fails to demonstrate the project's compliance with applicable water quality standards and effluent limitations.[4] States that fail to provide a certification within a reasonable period, not to exceed one year, waive their certification authority.[5] Projects that fail to obtain State certification or waiver are not eligible to receive a permit.[6]

The sections covered by the certification and the entirety of the CWA seek to preserve the water quality of the nation's navigable waters by curtailing the discharge of pollutants into those

---

[1] EPA-HQ-OW-2019-0405-0025.
[2] 33 U.S.C. § 1341(a)(1).
[3] 33 U.S.C. § 1341(a)(1).
[4] S. Rep. No. 95-370, at 72-73 (1977).
[5] 33 U.S.C. § 1341(a)(1).
[6] *Id.*

waters.[7] "Pollutants" include chemical and radiological pollutants,[8] physical particulate pollutants like dredge materials,[9] and thermal properties like heat discharge.[10] When unqualified, as in the state certification provisions, the term "discharge" is defined to specifically mean the discharge of pollutants.[11] While the parameters of these certifications seem well bounded, ambiguity exists and has been improperly abused by states wishing to expand their authority under the CWA.

    1.   <u>The proposed changes would remedy problems arising from statutory ambiguity.</u>

       While many states effectively and appropriately discharge their duties as co-regulators under the CWA, ambiguities within the statutory language lead some states to push the limits of their federally recognized authority and even the limits of Congress' commerce authority. This hijacking of the CWA unreasonably increases regulatory burdens, frustrates economic and national security, and, in some cases, thwarts the express will of Congress. Courts have also relied on erroneous, under-supported interpretations of these ambiguities to condone overreach by some state actors.[12] Many of the proposed regulatory changes will restore the proper structure and paradigm to the 401 certification process while encouraging meaningful cooperation amongst all interested parties.

       *a.   Certain states improperly elongate the period of review.*

       Some states have improperly manipulated the one-year period for review, which is an upper-bound limit expressly provided by Congress.[13] Two tactics of particular favor to these state regulators are: (1) classifying an application as "incomplete" and (2) encouraging improper withdrawal and resubmission agreements to re-start the one-year time period.[14] These tactics have recently been rebuked by courts and federal agencies alike. For instance, when considering whether the New York Department of Environmental Conservation waived its certification authority, the United States Court Appeals for the Second Circuit stated:

> The plain language of Section 401 outlines a bright-line rule regarding the beginning of review: the timeline for a state's action regarding a request for certification "shall not exceed one year" after "receipt of such request." It does not specify that this time limit applies only for "complete" applications. If the statute required "complete" applications, states could blur this bright-line rule into a subjective standard, dictating that applications are "complete" only when state agencies decide that they have all the information they need. The state agencies could thus theoretically request supplemental information indefinitely.[15]

Before this ruling, states relied on improper guidance issued nearly a decade prior for the proposition that they could determine "what constitutes a 'complete application' that starts the

[7] 33 U.S.C. § 1251(a).

[8] 33 U.S.C. § 1362(6); s*ee also* 33 U.S.C. § 1342.

[9] *See* 33 U.S.C. § 1344.

[10] 33 U.S.C. § 1362(6).

[11] *Id.* at § 1362(16).

[12] *PUD No. 1 of Jefferson County v. Wash. Dep't of Ecology*, 511 U.S. 700, 712-13, 715-19, 114 S. Ct. 1900, 1909, 1911-13, 128 L. Ed. 2d 716, 728, 730-33 (1994) (instances where court cites EPA interpretation in support of their reasonable reading); *see also Id.* at 724, 728-29, 731 (Thomas, J. dissenting) (Justice Thomas' observation of same).

[13] 33 U.S.C. § 1341(a)(1).

[14] *Hoopa Valley Tribe, infra* note 20.

[15] *New York State Dep't of Envtl. Cons. v. FERC*, 884 F.3d 450, 455-56 (2nd Cir. 2018).

timeframe clock…."[16] While rescinding this erroneous guidance was an important step in the right direction, further clarification through regulatory changes is appropriate.

States have also improperly circumvented Congressional intent by encouraging withdrawal-and-resubmission schemes with project proponents in an attempt to reset the certification timeframe. The FERC and the U.S. Second Circuit have viewed this scheme as legally valid.[17] However, the United States Court of Appeals for the D.C. Circuit took at different view in *Hoopa Valley Tribe*.[18] Therein, the D.C. Circuit rejected both FERC's and the Second Circuit's blessing of such withdrawal-and-resubmission schemes, stating:

> Section 401 requires state action within a reasonable period of time, not to exceed one year. California and Oregon's deliberate and contractual idleness defies this requirement. By shelving water quality certifications, the states usurp FERC's control over whether and when a federal license will issue. Thus, if allowed, the withdrawal-and-resubmission scheme could be used to indefinitely delay federal licensing proceedings and undermine FERC's jurisdiction to regulate such matters. . . . There is no legal basis for recognition of an exception for an individual request made pursuant to a coordinated withdrawal-and-resubmission scheme, and we decline to recognize one that would so readily consume Congress's generally applicable statutory limit.[19]

In our view, the Court of Appeals for the D.C. Circuit has the right perspective on the matter. Allowing states to extend their time for review by requesting withdrawal-and-resubmission of the same application stands directly in the way of Congressional intent and poses an unacceptable form of regulatory obstructionism.[20] It is clear from these examples that ambiguity as to the tolling provision of this review period exists and has been acted upon to the detriment of otherwise beneficial infrastructure projects.

Avoiding the certification limbo created by the withdrawal-and-resubmission scheme, under the proposed rule, certifying authorities will be required to make a final agency action within a reasonable time not to exceed one year. In lieu of the withdrawal-and-resubmission scheme,

---

[16] OFFICE OF WETLANDS, OCEANS, AND WATERSHEDS, U.S. ENVTL. PROT. AGENCY, CLEAN WATER ACT SECTION 401 WATER QUALITY CERTIFICATION: A WATER QUALITY PROTECTION TOOL FOR STATES AND TRIBES 11 (2010) (citing *City of Fredericksburg v. Fed. Energy Regulatory Comm'n*, 876 F.2d 1109, 1112 (4th Cir. 1989); 33 USC 1341(a)(1); CWA §401(a)(1); *Del Ackels v. U.S. Envtl. Prot. Agency*, 7 F.3d 862, 867 (9th Cir. 1993)) (replaced by U.S. ENVTL. PROT. AGENCY, CLEAN WATER ACT SECTION 401 GUIDANCE FOR FEDERAL AGENCIES, STATES AND AUTHORIZED TRIBES (2019)).

[17] *Constitution Pipeline Co.*, 162 F.E.R.C. ¶ 61,014 (2018) ("We reiterate that once an application is withdrawn, no matter how formulaic or perfunctory the process of withdrawal and resubmission is, the refiling of an application restarts the one-year waiver period under section 401(a)(1). *We continue to be concerned, however, that states and project sponsors that engage in repeated withdrawal and refiling of applications for water quality certifications are acting, in many cases, contrary to the public interest and to the spirit of the Clean Water Act by failing to provide reasonably expeditious state decisions*") (emphasis added); *New York State Dep't of Envtl. Cons. v. FERC*, *supra* note 17, at 456 ("If a state deems an application incomplete, it can simply deny the application without prejudice—which would constitute "acting" on the request under the language of Section 401. It could also request that the applicant withdraw and resubmit the application.").

[18] *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099 (D.C. Cir. 2019).

[19] *Id.* at 1104, 1105.

[20] *Id.* at 1104 ("According to FERC, it is now commonplace for states to use Section 401 to hold federal licensing hostage. At the time of briefing, twenty-seven of the forty-three licensing applications before FERC were awaiting a state's water quality certification, and four of those had been pending for *more than a decade*.") (emphasis in original).

certification denials will likely increase. With the likely increase in denials, we ask that EPA amend the proposed rule to acknowledge that a certifying authority' denial of Section 401 certification may be made with or without prejudice. In other words, due to time constraints and information limitations, a certifying authority may feel the need to deny the certification at that time but may be willing to grant the certification after reviewing additional information. Allowing certifying authorities to signal their willingness to consider additional information through subsequent requests will likely avoid unnecessary litigation. Allowing denials without prejudice will maximize the opportunity for cooperation between the certifying authority, the applicant, and the federal agency, but it will also allow the applicant to immediately challenge an arbitrary or capricious denial. This framework will constitute a vast improvement over the withdrawal-and-resubmission scheme while salvaging opportunities for regulatory cooperation.

      *b.  In conjunction with effective information sharing among regulating agencies, the proposed definitions of "certification request" and "receipt" will effectively curtail timing manipulation.*

Rules for how additional information can be requested will help to cure abuse of the certification process.[21] By defining the terms "certification request" and "receipt", EPA will hold certifying authorities accountable to the terms prescribed by Congress. The proposed definition of "certification request" standardizes the request process, and the specific statement requesting certification action removes any ambiguity as to the intent of the request. However, EPA should consider input from state regulatory agencies as well as the specific needs of federal licensing and permitting agencies when formulating the final criteria for "certifying requests". It may come to light that establishing these requirements as a baseline to be built upon is the preferable option. In any event, this information should be considered in light of a more robust information sharing format between federal and state or tribal regulators. Encouraging and facilitating the exchange of relevant, necessary information between regulating parties furthers the goal of establishing an effective standard for certifying requests.

    Specifying that a "receipt" occurs on "the date that a certification request is documented as received by a certifying authority in accordance with applicable submission procedures" establishes an intuitive standard for tolling. EPA should also consider requiring project proponents to provide notice and attestation to the lead federal agency that they have submitted their certification requests to the certifying agency in accordance with applicable submission procedures. This requirement will ensure the lead federal agency is notified of the submission and of the proponents' attestation that applicable procedures were followed. Overall, the proposed regulatory changes will significantly curtail the ability of states to misuse or circumvent Congress' explicit directive that certification actions are to be taken within the one-year reasonable period.

      *c.  Without properly defining the scope of certification authority, Congress left ambiguous what conditions or applicable laws are appropriately enforced under state certifications.*

As noted above, State certifications under Section 401 are an important piece of Congress' plan to address pollution of the nation's waters through cooperative federalism. However, when read in isolation, state certifications could be seen as including a much broader scope of review than just water quality. Indeed, some certifications greatly overstep the reasonable bounds of the

---

[21] 33 U.S.C. § 1341(a)(1).

Page 5

CWA.[22] EPA's historic interpretation of language found in Section 401(d) found that lead certifying agencies were without authority to question or consider specific limitations or conditions contained in a state certification.[23] However, while questioning the expertise and judgment of state regulators is inappropriate when considering the best methods of protecting state water quality standards,[24] it is within EPA's purview, as the agency empowered to enforce the CWA through rulemaking, to properly clarify ambiguities left by Congress.[25] Further, as the Supreme Court's holdings in both *PUD No. 1*[26] and *S.D. Warren*[27] drew upon EPA's interpretation for support of their "most reasonable reading" of Section 401, it follows that the plain language of the statute is not sufficiently exact to foreclose a different, reasonable interpretation to supplant the Court's previous interpretation.[28] This is supported by the Supreme Court's ruling in *National Cable & Telecommunications Ass'n v. Brand X Internet Services*.[29] Therein, Justice Thomas wrote for the Court, stating in pertinent part:

> In *Chevron,* this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts. If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of

---

[22] *Town of Summersville*, 60 F.E.R.C. ¶ 61291, at 61990. Speaking to the requirement that the applicant build recreation facilities, the Commission commented: "We believe that these conditions are beyond the scope of Section 401, and that states should not use their water quality certification authority to impose conditions that are unrelated to water quality. However, since pursuant to Section 401(d) of the Clean Water Act all of the conditions in the water quality certification must become conditions in the license, review of the appropriateness of the conditions is within the purview of state courts and not the Commission. The only alternatives available to the Commission are either to issue a license with the conditions included or to deny Summersville's application, and we do not believe it is in the public interest to deny the application."

[23] *Roosevelt Campobello Int'l Park Comm'n v. Envtl. Prot. Agency, et al*, 684 F.2d 1041 (1st Cir. 1982), "'EPA has no authority to ignore State certification or to determine whether limitations certified by the State are more stringent than required to meet the requirements of State law.'" (quoting Envtl. Prot. Agency, Decision of the General Counsel No. 58 (March 29, 1977).

[24] *See Sierra Club v. US Army Corps of Engineers*, 909 F.3d 635 (4th Cir. 2018), citing *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1201 (9th Cir. 2008) (for the proposition that any additional license conditions imposed by a federal agency must allow for compliance with a coordinate state condition).

[25] *U.S. v. Mead Corp.*, 533 U.S. 218, 121 S. Ct. 2146, 150 L. Ed. 2d 292 (2001) (determining which agencies are due deference under *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L. Ed. 2d 694 (1984)).

[26] *PUD No. 1*, *supra* note 14.

[27] *S.D. Warren Co. v. Me. Bd. of Envt'l Prot., et al.*, 547 U.S. 370, 126 S. Ct. 1843, 164 L. Ed. 2d 625 (2006).

[28] *P.U.D No. 1*, *supra* note 14, at 728 ("Our view of the statute is consistent with EPA's regulations implementing §401."; "EPA's conclusion that *activities* – not merely discharges – must comply with state water quality standards is a reasonable interpretation of §401, and is entitled to deference."; "This interpretation is consistent with EPA's view of the statute.") (emphasis in original); *S.D. Warren*, *supra* note 29, at 377 ("In resort to common usage under § 401, this Court has not been alone, for the Environmental Protection Agency (EPA) and FERC have each regularly read "discharge" as having its plain meaning and thus covering releases from hydroelectric dams. Warren is, of course, entire correct in cautioning us that because neither EPA nor FERC has formally settled the definition, or even set out agency reasoning, these expressions of agency understanding do not command deference from this Court. But even so, the administrative usage of 'discharge' in this way confirms our understanding of the everyday sense of the term.") (Internal citations and quotations omitted).

[29] *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 125 S. Ct. 2688, 162 L. Ed. 2d 820 (2005).

Page 6

the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.

\*\*\*\*

Some of the respondents dispute this conclusion, on the ground that the Commission's interpretation is inconsistent with its past practice. We reject this argument. Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework. Unexplained inconsistency is, at most, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act. For if the agency adequately explains the reasons for a reversal of policy, "change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." "An initial agency interpretation is not instantly carved in stone. On the contrary, the agency ... must consider varying interpretations and the wisdom of its policy on a continuing basis," for example, in response to changed factual circumstances, or a change in administrations.[30]

Thus, EPA is well within its Congressional mandate to redefine ambiguous terms, even when that redefinition presents and effects a different interpretation.

EPA's intent to "increase the predictability and timeliness of section 401 certification"[31] is evident in the proposed changes, including the timing provisions discussed previously.

> d. *While Section 401 alone does not properly define the scope of certification review, its purpose and placement within the CWA clearly limit its scope to discharges affecting water quality.*

As noted above, the CWA's aims to protect our nation's waters by prohibiting the unlawful discharge of pollutants is a cooperative endeavor between states and the federal government. A clear statement of the appropriate scope and criteria states consider under their role as certifying authorities is an important piece of maintaining program integrity. As stated in Section 401(a), a state's role is to certify that a "discharge" will comply with section 301, 302, 303, 306, and 307 of the CWA. However, the term "discharge" is not defined in the Act. The agency's proposed definition of "discharge" as those originating from point sources reflects the holistic approach EPA took with this rulemaking effort. As noted by the Senate report on the 1972 amendments were made "to assure consistency with the bill's changed emphasis from water quality standards to effluent limitations based on the elimination of any discharge of pollutants."[32] The United States Court of Appeals for the Ninth Circuit considered this when evaluating which discharges trigger the need for 401 certification. In *Oregon Natural Desert Association v. Dombeck*,[33] the court considered whether Section 401 review is triggered by pollutants discharged into the John Day River from federally permitted cattle grazing. In deciding that the discharge did not trigger a

---

[30] *Id.* at 980-82 (internal citations omitted).
[31] 84 Fed. Reg. at 44,080.
[32] S. Rep. N0. 414, at 69 (1971).
[33] 172 F.3d 1092, (9th Cir. 07/22/1998).

Section 401 review, the court considered Section 401 within the entirety of the CWA and the 1972 amendments. Specifically, the court found "[t]he term 'discharge' in §1341 is limited to discharges from point sources. All of the sections cross-referenced in §1341 relate to the regulation of point sources." EPA's proposal to define discharges as those originating from point sources is consistent with this reasonable reading of the Section 401. Further, specifying that any potential discharge by a federally licensed or permitted project triggers Section 401 review reinforces the states' roles as cooperative regulators. Taken together, these definitions provide a determinable, expanded trigger for Section 401 review.

While the proposed changes concerning discharges will result in a net expansion of state certification opportunities, the changes concerning the scope of a state review will provide appropriate bounds that are consistent with a logical reading of the section and the Administration's goal of streamlining federal permitting processes. EPA's acknowledgement that Congress intended Section 401 to focus on protection of water quality is the proper starting point for defining the scope of state certifications.[34] From that understanding springs many of the changes that will be most effective in curtailing the more egregious instances of obstructionism.

For instance, Section 401(d) provides that the conditions and requirements contained in a state's certification will become conditions in any Federal license or permit, including "any other appropriate requirement of State law." The term "appropriate requirement of state law" is ambiguous and unique to not only this section, but this paragraph. As noted above,[35] states have used this ambiguity to impose conditions unrelated to water quality through water quality certificates, sometimes with judicial approval.[36] This places the lead federal permitting or licensing agency in the precarious position of either forcing improper terms on applicants or denying a project otherwise in the best interests of the United States, a clear imbalance of federalism. And while these ambiguities are ideally addressed by Congress,[37] the EPA's proposed rule would effectively guard against the most unreasonable conditions on certification. Defining "appropriate requirement" as provisions of EPA-approved CWA regulatory provisions that control discharges comports with the structure and purpose of the Act. It also follows Justice Thomas' opinion in *P.U.D. No. 1*, which we believe is the more logical and internally consistent reading of this provision within both Section 401 and the CWA as a whole.[38]

EPA's proposal to enact a definition of the proper scope of Section 401 is also an important development to prevent states' abuse of Section 401, which some have wielded to push improper political stances. Some states have denied certifications based on the downstream effects on

---

[34] 84 Fed. Reg. 44,103.

[35] *See, supra* note 24.

[36] *P.U.D. No. 1*, *supra* 511 U.S. 711.

[37] The need to address abuses of the 401 process is noted by Senator John Barrasso of Wyoming, who introduced the "Water Quality Certificate Improvement Act of 2019", S. 1087, 116th Cong. (2019). Representative David McKinley of West Virginia has also introduced a similar instrument in the House of Representatives. H.R. 2205, 116th Cong. (2019).

[38] *P.U.D. No. 1*, *supra* 511 U.S. 711 (Thomas, J. dissent) ("The final term on the list -- "appropriate requirement[s] of State law" – appears to be more general in scope. Because this reference follows a list of more limited provisions that specifically address discharges, however, the principle *ejusdem generis* would suggest that the general reference to "appropriate" requirements of state law is most reasonably construed to extend only to provisions that, like the other provisions in the list, impose discharge-related restrictions.").

climate by increased fossil fuel usage[39] or opposition to expanded use of fossil fuels generally.[40] As noted in the proposed rulemaking, none of these stances are within the ambit of the CWA.[41] By defining the scope of certifications as "limited to assuring that a discharge from a Federally licensed or permitted activity will comply with water quality requirements[,]" EPA establishes an appropriate framing based on Section 401 and the CWA in its entirety. And while "water quality requirements" were considered in the context of state regulations during legislative deliberations on the program,[42] it is a term that does not appear in Section 401 and is ripe for definition. Its definition as "applicable provisions of 301, 302, 303. 306, and 307 of the Clean Water Act and EPA-approved state or tribal Clean Water Act regulatory program provisions" accomplishes two goals. First, it supports EPA's goal of enacting CWA regulations that are based on a reasonable, holistic interpretation of the Act. Second, it embraces the more logical reading of "appropriate requirement of state law[,]" which decreases the opportunity for abuse. This is also consistent with EPA's proposed definition of "condition", which would require any condition imposed through a state certificate be within the proper scope of Section 401. In all, the definitions embrace the proper scope for certifications and conditions allowable thereunder, which create a bulwark against the most egregious and harmful abuses of Section 401 certifications.

e. *Lead federal agency review of state certification conditions should respect the sovereignty and expertise of states while upholding the needed boundaries this proposed rulemaking would set.*

The proposed rulemaking solicits comment on what information or justification is necessary or appropriate to evaluate whether conditions in state certifications are consistent with the proposed scope of 401 certification. While comment on this area is best left to state water quality regulators, we submit comment on the proper boundaries lead federal agencies should respect when evaluating these conditions. First, lead federal agencies should not be required to review certification conditions, especially in view of the timing strains the above-mentioned clarifications to proper state review periods will alleviate. This review should be discretionary and invoked as the lead agency sees fit. Further, lead agencies should not substantively review the specific requirements of a condition once that condition is determined to be within the scope of Section 401. As noted by multiple courts, the efficacy of conditions to protect water quality are beyond the purview of federal agencies[43] and determining whether a certification meets state water quality standards is a question within the purview of state courts.[44] Any review of a state certification condition should be limited to its validity under the proposed changes to the CWA. Any further substantive analysis would improperly curtail a state's proper authority as a co-regulator under the CWA. Additionally, the inclusion of a condition beyond the scope of Section 401 certification should not be fatal to the entire certification or other properly imposed conditions.

---

[39] Letter from Thomas S. Berkman, Deputy Comm'r and Gen. Counsel, N.Y. State Dep't of Envtl. Conservation, Re: 3-3399-0071/00001 – Valley Lateral Project Notice of Decision, to Georgia Carter, Vice President and Gen. Counsel, Millennium Pipeline Co. (Aug. 30, 2017).

[40] See Tom Johnson, Move in Congress to Weaken Clean Water Act Could Have Impact in New Jersey, NJ SPOTLIGHT, Aug. 16, 2018 ("' If this bill happens, it will make it extremely difficult to fight these dangerous projects,' said Jeff Tittel, director of the New Jersey Sierra Club. 'It (the Section 401 review) is probably the most effective tool we have to fight these projects.'").

[41] 84 Fed. Reg. 44094.

[42] *See, supra* note 42.

[43] *See*, *supra* note 25.

[44] *Ackels v. EPA*, 7 F.3d 862 (10/14/1993).

Page 9

This would unnecessarily thwart valid state enforcement authority while inevitably leading to additional delays in project licensing or permitting. While EPA should empower federal agencies to review conditions in the scope of CWA certification, it should also do so in a manner that respects proper limits of state sovereignty.

2.  <u>Conclusion</u>

Section 401 certifications are an important component of the cooperative federalism envisioned by the CWA. Unfortunately, ambiguity in the statutory language has left this program ripe for abuse by some states. The proposed updates reflect a holistic reinterpretation and modernize a program that has not seen a meaningful revision in decades. By properly defining the period for review, the proper scope of the act, and the conditions appropriately included, EPA has proposed effective means of curtailing abuses of Section 401. This proposal to restore a proper balance among sovereigns brings Section 401 in line with Congressional intent and the Administration's goal of streamlining federal permitting and licensing programs. We support the EPA in its rulemaking effort, and look forward to providing further comment on the final rule.

Sincerely,

Jeff Landry
Louisiana Attorney General

Patrick Morrisey
West Virginia Attorney General

Leslie Rutledge
Arkansas Attorney General

Tim Fox
Montana Attorney General

Phil Bryant
Mississippi Governor

# EXHIBIT 4



October 21, 2019

United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Dear Administrator Wheeler,

Thank you for the opportunity to provide pre-proposal recommendations for updates to the
United States Environmental Protection Agency's (EPA) proposed final guidance pertaining to
Section 401 certification under the Clean Water Act (CWA). As the EPA has stated in its
proposal, "Over the last several years litigation over the section 401 certifications for several
high profile infrastructure projects have highlighted the need for the EPA to update its
regulations to provide a common framework for consistency with Section 401 and to give project
proponents, certifying authorities and federal licensing and permitting agencies additional clarity
and regulatory certainty."

In May of this year, I submitted comments to the EPA that detailed Wyoming's interest in a
clearer, more modernized approach to Section 401 guidance and implementation. As I have
pointed out, Wyoming has been adversely impacted by the misapplication of other states' CWA
Section 401 certifications. Our interest in a streamlined 401 certification process is founded by
the fact that a large portion of Wyoming's economy depends on our ability to export our energy
products to the markets that demand them, particularly markets located overseas in Asia. In the
case of the Millennium Bulk Terminal, Washington State blocked the terminal's construction by
inappropriately denying the State's Section 401 certification on account of non-water quality
related impacts -- an illegal maneuver based on alleged effects that are outside of the scope of
Section 401.

My review of the proposed rule is conducted with an eye toward ensuring that no other state's
economic vitality is put at risk by the agenda of another. In so doing, I agree that the most
challenging aspects of Section 401 guidance concern the scope of review, action on a
certification request, and the amount of time available for a certifying authority to act. States,
tribes, federal agencies, and project proponents will benefit by knowing what is required and
what to expect during a Section 401 certification process. A modernized approach to Section 401
will reduce uncertainty and prevent misuse.

200 WEST 24TH STREET
CHEYENNE, WY 82002-0010

**MARK GORDON**
GOVERNOR OF WYOMING

307.777.7434 · GOVERNOR@WYO.GOV
HTTP://GOVERNOR.WYO.GOV

Section 401 certification should be focused, be efficient, and appropriately balance the federal government's jurisdiction with state autonomy. I applaud the EPA's intent to update its guidance with these goals in mind. However, there still is some work to do. This letter details recommendations on behalf of the State of Wyoming; please also refer to detailed comments submitted separately by the Wyoming Department of Environmental Quality and other Wyoming organizations.

### *Scope of review* -- *Limit Section 401 review to considerations of water quality*
There is no risk of overstating the importance of the Congressional purpose of the CWA: to protect and maintain water quality. Certifying authorities have previously interpreted the scope of Section 401 in a way that resulted in the incorporation of non-water quality related considerations into their certification review processes. Washington Department of Ecology's decision to employ the State's discretionary, policy-based denial of the Millennium Bulk Terminal Section 401 certification is one such example.

In the proposed rule, the EPA concludes that the scope of a Section 401 review or action "must be limited to considerations of water quality impacts from the potential discharge associated with a proposed federally licensed or permitted project." Wyoming adamantly supports this approach. Wyoming also supports the EPA's proposal to tie water quality requirements to "CWA and the EPA-approved state or tribal CWA regulatory programs provisions."

### *Certification processes* -- *Conditions and basis for denials*
As I previously stated in my May 24, 2019 letter to the EPA, I support advance coordination between states and federal agencies to streamline federal permitting actions. Thank you for taking this approach into consideration in the proposed draft rule. Additional recommendations concern two key aspects of certification processes:

#### *Conditions*
I support the EPA's proposal to define certification conditions as "a specific requirement included in a certification that is within the scope of certification." This guidance appropriately ties certification approvals back to the purview of Section 401 as previously discussed: water quality requirements.

#### *Denials*
Certification denials are a major basis for Wyoming's interest in the EPA's modernization of Section 401 guidance. Again, Washington Department of Ecology's

denial of the Millennium Bulk Terminal Section 401 certification was discretionary and solely policy-based with loose, if not absent, connection to impacts on water quality.

The EPA's proposed rule recommends that a certifying authority may choose to deny a certification if it is "unable to certify that the proposed activity would be consistent with applicable water quality requirements." Wyoming supports this approach as long as the proponent is granted proper channels to supply necessary information. Wyoming also suggests that the EPA consider terms that preclude the use of denials "with prejudice." Such as in the case of the Millennium Bulk Terminal, the Washington Department of Ecology denied the project proponent's 401 certification application "with prejudice," meaning that the proponent could never reapply. It is likely that most certifying authorities would opt to approve certifications with conditions in cases where information is insufficient or design modifications need to be made in order to meet water quality requirements. However, Wyoming is keenly aware that some states may opt instead to use certification denial "with prejudice" as a tool to hamper projects from being implemented. This must be prevented.

Additionally, the proposed rule considers whether or not the EPA could invoke conditions or veto authority under language in Section 401(d). I wholeheartedly support the EPA's general interpretation that the EPA must recognize and preserve state authority over land and water resources within their borders. However, I do not support additional means under which the EPA may elect to overturn a state's certification denial or condition a project after the certifying authority has performed its due diligence. Neither the EPA nor a federal permitting or licensing agency has the authority to directly overturn a state's certification denial. The final determination on whether the state certification denial is within the scope of water quality certification is properly decided through state judicial procedures.

### *Timeline for review*
The CWA and relevant case law articulate that certifying authorities must act on a Section 401 certification within a reasonable period of time, which must not exceed one year. Section 401 certification decisions in Wyoming are entirely water quality-based and easily achieved within one year of receipt of certification requests. I support the one-year maximum time limit, as originally intended under the CWA, to ensure regulatory certainty. In order to guarantee that the required timeline for review is met, the EPA should also consider setting enforcement requirements for the one-year turnaround into its final rule. Please refer to the Wyoming Department of Environmental Quality's comment letter for additional details concerning the reasonable period of time to act on a certification and time extension requests.

Moreover, Wyoming underscores the value of conducting pre-application meetings in order to assure an efficient, timely certification process. However, the process and format for these pre-application meetings should be left up to state discretion.

***Overarching comments***

The EPA poses several questions in its proposed rule that merit further discussion:

*Additional guidance*

The EPA requests if there should be additional guidance upon completion of this rulemaking. From a regulatory process point of view, it would be appropriate for the EPA to provide guidance after the final rulemaking and thereby rescind or revise the previous guidance. However, this will depend on how clearly the final rule reads. I suggest that the EPA solicit feedback on the merits for additional guidance after the final rule is issued.

*State authority and commerce*

The EPA questions if the proposed regulations appropriately balance the scope of state authority under 401 with Congress' goal of facilitating commerce on interstate navigable waters. Wyoming contends that this can be achieved through a better-defined approach to 401 certifications that narrows the scope to keep Section 401 reviews to what Congress intended. The proposed rule, with modifications pursuant to Wyoming's requests, would achieve this goal.

In closing, one last consideration: Wyoming maintains a positive, cooperative working relationship with the EPA national, regional and local personnel. Although Wyoming does not foresee any issues upon implementation of the new Section 401 rule, in the off chance that states and the EPA do not see eye-to-eye on certification decisions, I suggest that the EPA consider building dispute resolution processes into the final rule.

Thank you for taking a hard look at states' positions and taking great care to address the substantive and constructive feedback Wyoming has provided. I look forward to seeing the final rule. Please reach out to Beth Callaway (beth.callaway@wyo.gov; 307-777-8204) in my office should you have any questions in the meantime.

Sincerely,

Mark Gordon
Governor

United States Environmental Protection Agency
Administrator Wheeler
Re: CWA 401 Proposed Final Guidance Comment
Page 5

cc:     The Honorable Mike Enzi, U.S. Senate
        The Honorable John Barrasso, U.S. Senate
        The Honorable Liz Cheney, U.S. House of Representatives
        Leslie Rutledge, Arkansas Attorney General
        Steve Landry, Louisiana Attorney General
        Kevin Stitt, Oklahoma Governor
        Doug Burgum, North Dakota Governor
        Dr. Troy Thompson, President, Wyoming County Commissioners Association
        Bobbie Frank, Executive Director, Wyoming Association of Conservation Districts
        Todd Parfitt, Director, Wyoming Department of Environmental Quality

EXHIBITS 5 AND 6

INTENTIONALLY

OMITTED

# EXHIBIT 7



**E. Scott Pruitt**
**Administrator**

**TO:**      Assistant Administrators
            Regional Administrators
            Office of General Counsel

**FROM:**    E. Scott Pruitt
            Administrator

**DATE:**    October 16, 2017

**SUBJECT:** Adhering to the Fundamental Principles of Due Process, Rule of Law, and Cooperative
            Federalism in Consent Decrees and Settlement Agreements

In the past, the U.S. Environmental Protection Agency has sought to resolve litigation through consent decrees and settlement agreements that appear to be the result of collusion with outside groups.[1] Behind closed doors, EPA and the outside groups agreed that EPA would take an action with a certain end in mind, relinquishing some of its discretion over the Agency's priorities and duties and handing them over to special interests and the courts.[2] When negotiating these agreements, EPA excluded intervenors, interested stakeholders, and affected states from those discussions. Some of these agreements even reduced Congress's ability to influence policy.[3] The days of this regulation through litigation are terminated.

"Sue and settle," as this tactic has been called, undermines the fundamental principles of government that I outlined on my first day: (1) the importance of process, (2) adherence to the rule of law, and (3) the applicability of cooperative federalism. The process by which EPA adopts regulations sends an important message to the public: EPA values the comments that it receives from the public and strives to make informed decisions on regulations that impact the lives and livelihoods of the American people. The rule of law requires EPA to act only within the confines of the statutory authority that Congress has conferred to the Agency, and thereby avoid the uncertainty of litigation and ultimately achieve better outcomes.

---

[1] When litigants enter into a consent decree, they agree to resolve the litigation through a judicially enforceable court order; if one party fails to abide by the terms of a consent decree, that party risks being held in contempt of court. A settlement agreement generally resolves legal disputes without a court order; if one party fails to abide by the terms of a settlement agreement, the aggrieved party must petition a court for a judicial remedy.

[2] These outside groups often file lawsuits in federal district courts that the litigants believe will give them the best chance of prevailing – not necessarily in the forum where the agency action at issue is most applicable – and ask the court to enjoin the agency action on a nationwide basis. Nationwide injunctions, in general, raise serious concerns about the validity and propriety of these district court actions.

[3] The sue-and-settle phenomenon results in part from statutes that empower these outside groups to file a lawsuit against a federal agency when that agency fails to meet a statutory deadline and then reward these individuals by allowing them to recover attorney's fees for "successful" lawsuits.

This paper is printed with vegetable-oil-based inks and is 100-percent postconsumer recycled material, chlorine-free-processed and recyclable.



E. SCOTT PRUITT
ADMINISTRATOR

Finally, EPA must honor the vital role of the states in protecting the public health and welfare under the principle of cooperative federalism as prescribed by the Constitution and statutory mandate.

*       *       *

This memorandum explains the sue-and-settle directive that I established within the Agency and also describes how the past practice of regulation through litigation has harmed the American public.

**Regulation Through Litigation Violates Due Process, the Rule of Law, and Cooperative Federalism**

When an agency promulgates a new regulation or issues a decision, the agency should take that action consistent with the processes and substantive authority that the law permits. An agency, therefore, should ordinarily zealously defend its action when facing a lawsuit challenging that action. If an agency agrees to resolve that litigation through a consent decree or settlement agreement, however, questions will necessarily arise about the propriety of the government's determination not to defend the underlying regulation or decision. Indeed, sue and settle has been adopted to resolve lawsuits through consent decrees in a way that bound the agency to judicially enforceable actions and timelines that curtailed careful agency consideration. This violates due process, the rule of law, and cooperative federalism.

**A.      The Importance of Process**

EPA risks bypassing the transparency and due process safeguards enshrined in the Administrative Procedure Act[4] and other statutes[5] when it uses a consent decree or a settlement agreement to bind the Agency to proceed with a rulemaking with a certain end in mind on a schedule negotiated with the litigants. Congress enacted the Administrative Procedure Act to provide the American public with notice of a potential agency action, to encourage public participation in the rulemaking process, and to afford federal agencies with the framework to perform careful consideration of all the associated issues before taking final agency action. Following the legal processes for agency action provides predictability for all stakeholders, ensures that the agency will receive input from all interested parties, and increases the defensibility of an action when facing a procedural challenge.

---

[4] Pursuant to the Administrative Procedure Act, an agency must publish a general notice of proposed rulemaking in the Federal Register and include the following information: "(1) a statement of the time, place, and nature of public rulemaking proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). Additionally, the agency "shall give interested persons an opportunity to participate in the rulemaking through a submission of written data, views, or arguments with or without opportunity for oral presentation." *Id.* § 553(c).

[5] The statutes include the Paperwork Reduction Act (44 U.S.C. § 3506), the Regulatory Flexibility Act (5 U.S.C. § 603), and the Unfunded Mandates Reform Act (2 U.S.C. § 1535).

1200 PENNSYLVANIA AVE. NW • MAIL CODE 1101A • WASHINGTON, DC 20460 • (202) 564-1700 • FAX: (202) 501-1450

2

This paper is printed with vegetable-oil-based inks and is 100-percent postconsumer recycled material, chlorine-free-processed and recyclable.



E. SCOTT PRUITT
ADMINISTRATOR

A sue-and-settle agreement, however, undermines these safeguards. Using this tactic, the agency and the party that filed the legal challenge agree in principle on the terms of a consent decree or settlement before the public has the opportunity to review the terms of the agreement.[6]  An agency can also use consent decrees and settlement agreements as an end-run around certain procedural protections of the rulemaking process.  Even when an agency attempts to comply with these procedural safeguards, the agency typically agrees to an expedited rulemaking process that can inhibit meaningful public participation.  This rushed rulemaking process can lead to technical errors by the agency, insufficient time for stakeholders to submit rigorous studies that assess the proposal, the inability of the agency to provide meaningful consideration of all the evidence submitted to the agency, a lack of time for the agency to reconsider its initial proposal and issue a revised version, and the failure to take into account the full range of potential issues related to the proposed rule.

Sue and settle, therefore, interferes with the rights of the American people to provide their views on proposed regulatory decisions and have the agency thoughtfully consider those views before making a final decision.  By using sue and settle to avoid the normal rulemaking processes and protections, an agency empowers special-interests at the expense of the public and parties that could have used their powers of persuasion to convince the agency to take an alternative action that could better serve the American people.[7]

**B.      Adherence to the Rule of Law**

As an agency in the executive branch of the United States, EPA must faithfully administer the laws of the land and take actions that are tethered to the governing statutes.  The authority that Congress has granted to EPA is our *only* authority.  EPA must respect the rule of law.  The Agency must strive to meet the directives and deadlines that Congress set forth in our governing environmental statutes.  But we must not

---

[6] In certain circumstances, the Agency must permit the public to comment on the proposed settlement. *See, e.g.,* Clean Air Act Section 113(g), 42 U.S.C. § 7413(g) (requiring that "[a]t least 30 days before a consent decree or settlement agreement of any kind under [the Clean Air Act] to which the United States is a party (other than enforcement actions) . . . is final or filed with a court, the Administrator shall provide a reasonable opportunity by notice in the *Federal Register* to persons who are not named as parties or intervenors to the action or matter to comment in writing").  While the Agency has made changes to proposed consent decrees in response to comments receiving during this process, the Agency understands that numerous stakeholders lack faith in the effectiveness of this comment opportunity because the Agency and the settling litigants have already agreed in principle to the proposed settlement.

[7] "The greatest evil of government by consent decree . . . comes from its potential to freeze the regulatory processes of representative democracy.  At best, even with the most principled and fair-minded courts, the device adds friction. . . .  As a policy device, then, government by consent decree serves no necessary end.  It opens the door to unforeseeable mischief; it degrades the institutions of representative democracy and augments the power of special interest groups.  It does all of this in a society that hardly needs new devices that emasculate representative democracy and strengthen the power of special interests." *Citizens for a Better Env't v. Gorsuch,* 718 F.2d 1117, 1136-37 (D.C. Cir. 1983) (Wilkey, J., dissenting).

1200 PENNSYLVANIA AVE., NW  •  MAIL CODE 1101A  •  WASHINGTON, DC 20460  •  (202) 564-1700  •  FAX: (202) 501-1450

3

♻ This paper is printed with vegetable-oil-based inks and is 100-percent postconsumer recycled material, chlorine-free-processed and recyclable.



## E. SCOTT PRUITT
### ADMINISTRATOR

surrender the powers that we receive from Congress to another branch of government – lest we risk upsetting the balance of powers that our founders enshrined in the Constitution.[8]  Sue and settle disrespects the rule of law and improperly elevates the powers of the federal judiciary to the detriment of the executive and legislative branches.[9]

In the past, outside groups have sued EPA for failing to act by a deadline prescribed under the law.  EPA would then sign a consent decree agreeing to take a particular action ahead of other Agency actions that the public and other public officials considered to be higher priorities.  We should not readily cede our authority and discretion by letting the federal judiciary dictate the priorities of the Administration and the Agency.

Taken to its extreme, the sue-and-settle strategy can allow executive branch officials to avoid political accountability by voluntarily yielding their discretionary authority to the courts, thereby insulating agency

---

[8] In The Federalist Number 47, James Madison wrote:

> One of the principal objections inculcated by the more respectable adversaries to the constitution, is its supposed violation of the political maxim, that the legislative, executive and judiciary departments ought to be separate and distinct.  In the structure of the federal government, no regard, it is said, seems to have been paid to this essential precaution in favor of liberty.  The several departments of power are distributed and blended in such a manner, as at once to destroy all symmetry and beauty of form; and to expose some of the essential parts of the edifice to the danger of being crushed by the disproportionate weight of other parts.

> No political truth is certainly of greater intrinsic value or is stamped with the authority of more enlightened patrons of liberty than that on which the objection is founded. *The accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny.*  Were the federal constitution therefore really chargeable with this accumulation of power or with a mixture of powers having a dangerous tendency to such an accumulation, no further arguments would be necessary to inspire a universal reprobation of the system.  I persuade myself however, that it will be made apparent to every one, that the charge cannot be supported, and that the maxim on which it relies, has been totally misconceived and misapplied.  *In order to form correct ideas on this important subject, it will be proper to investigate the sense, in which the preservation of liberty requires, that the three great departments of power should be separate and distinct.*

The Federalist No. 47 (James Madison) (emphasis added).

[9] "*The leading principle of our Constitution is the independence of the Legislature, Executive and Judiciary of each other.*"  Thomas Jefferson to George Hay, 1807. FE 9:59 (emphasis added).  "*The Constitution intended that the three great branches of the government should be co-ordinate and independent of each other.*  As to acts, therefore, which are to be done by either, it has given no control to another branch. . . .  Where different branches have to act in their respective lines, finally and without appeal, under any law, they may give to it different and opposite constructions. . . . *From these different constructions of the same act by different branches, less mischief arises than from giving to any one of them a control over the others.*"  Thomas Jefferson to George Hay, 1807. ME 11:213 (emphasis added).

1200 PENNSYLVANIA AVE. NW • MAIL CODE 1101A • WASHINGTON, DC 20460 • (202) 564-4700 • FAX: (202) 501-1450

4

This paper is printed with vegetable-oil-based inks and is 100-percent postconsumer recycled material, chlorine-free-processed and recyclable.



E. SCOTT PRUITT
ADMINISTRATOR

officials from criticisms of unpopular actions. Equally troubling, sue and settle can deprive Congress of its ability to influence agency policy through oversight and the power of the purse. Sue-and-settle agreements can also prevent subsequent administrations from modifying a particular policy priority, approach, or timeline.[10] The founders of our nation did not envision such an imbalance of power among the federal branches of government.

EPA must always respect the rule of law and defend the prerogatives of its separate powers. EPA, therefore, shall avoid inappropriately limiting the discretion that Congress authorized the Agency, abide by the procedural safeguards enumerated in the law, and resist the temptation to reduce the amount of time necessary for careful Agency action.

## C.    Embracing Cooperative Federalism

Many environmental statutes empower the states to serve as stewards of their lands and environments.[11] Embracing federalism, EPA can work cooperatively with states to encourage regulations instead of compelling them and to respect the separation of powers.[12] Past sue-and-settle tactics, however, undermined this principle of cooperative federalism by excluding the states from meaningfully participating in procedural and substantive Agency actions.

When considering a consent decree or settlement agreement to end litigation against the Agency, EPA should welcome the participation of the affected states and tribes, regulated communities, and other interested stakeholders. This should include engagement even before lodging the decree or agreement, where appropriate. These additional participants to the negotiations can voice their concerns that the

---

[10] "The separation of powers inside a government – and each official's concern that he may be replaced by someone with a different agenda – creates incentives to use the judicial process to obtain an advantage. The consent decree is an important element in the strategy. . . . It is impossible for an agency to promulgate a regulation containing a clause such as 'My successor cannot amend this regulation.' But if the clause appears in a consent decree, perhaps the administrator gets his wish to dictate the policies of his successor." Frank Easterbrook, *Justice and Contract in Consent Judgments*, 1987 U. Chi. L. Forum 19, 33-34 (1987).

[11] Both the Clean Air Act and the Clean Water Act contain specific provisions that enlist the states to take primary responsibility of environmental protection.

[12] In Federalist Number 51, James Madison wrote:

> *In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself.* Second. It is of great importance in a republic not only to guard the society against the oppression of its rulers, but to guard one part of the society against the injustice of the other part. Different interests necessarily exist in different classes of citizens. If a majority be united by a common interest, the rights of the minority will be insecure.

The Federalist No. 51 (James Madison) (emphasis added).

1200 PENNSYLVANIA AVE. NW • MAIL CODE 1101A • WASHINGTON, DC 20460 • (202) 564-1700 • FAX: (202) 501-1450

5

♻ This paper is printed with vegetable-oil-based inks and is 100-percent postconsumer recycled material, chlorine-free-processed and recyclable.



E. SCOTT PRUITT
ADMINISTRATOR

agreed-upon deadlines will be reasonable and fair, permitting adequate time for meaningful public participation and thoughtful Agency consideration of comments received.  EPA must also seek to collaborate with the states and remain flexible when ensuring compliance with environmental protections.

## Conclusion

By emphasizing the importance of process, adhering to the rule of law, and embracing cooperative federalism, EPA increases the quality of, and public confidence in, its regulations.  Through transparency and public participation, EPA can reassure the American public that the rules that apply to them have been deliberated upon and determined in a forum open to all.  Finally, the federal government must continue to improve engagement with the states, tribes, interested stakeholders, and regulated communities, especially when resolving litigation.  The steps outlined in my directive today will help us achieve these noble goals and continue to improve us as an Agency.

1200 PENNSYLVANIA AVE. NW • MAIL CODE 1101A • WASHINGTON, DC 20460 • (202) 564-4700 • FAX: (202) 501-1450

6

This paper is printed with vegetable-oil-based inks and is 100-percent postconsumer recycled material, chlorine-free-processed and recyclable.

# EXHIBIT 8



October 21, 2019

Submitted electronically at http://www.regulations.gov

Ms. Lauren Kasparek
Oceans, Wetlands, and Communities Division
Office of Water (4504-T)
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, DC  20460

**RE: Docket ID No. EPA-HQ-OW-2019-0405 --- Updating Regulations on Water Quality Certification**

Lighthouse Resources Inc. ("LRI") and its indirect, wholly-owned subsidiary Millennium Bulk Terminals-Longview, LLC ("Millennium") (collectively, "Lighthouse") jointly submit these comments on EPA's proposed rule: Updating Regulations on Water Quality Certification (Federal Register / Vol. 84, No. 163 / Thursday, Aug. 22, 2019 / Proposed Rules) (the "Proposed Rule").

LRI is a privately held company headquartered in Salt Lake City, Utah.  LRI and its subsidiaries own and operate two coal mines, one in Montana and one in Wyoming.

Millennium operates an existing bulk products marine terminal in Longview, Washington on the Columbia River.  Millennium has proposed to build a coal export terminal at the bulk terminals site to receive coal from inland coal mines for loading and shipment to customers in northeast Asia—primarily Japan and South Korea (the "Project").

To receive its permits, Millennium sought a Clean Water Act, Section 401 water quality certification from the Washington Department of Ecology ("Washington Ecology") for nearly six years.  As part of the 401 certification process,, Millennium has spent over $15 million to obtain an environmental impact statement ("EIS"), which originally began as a dual EIS under the National Environmental Policy Act ("NEPA") and the Washington State Environmental Policy Act ("SEPA"), with the US Army Corps of Engineers as the lead agency under NEPA and with the Washington Ecology and Cowlitz County as co-lead agencies under SEPA. In September 2013, the state and federal agencies agreed to separate and prepare both a federal EIS and a state EIS.

The state EIS concluded with respect to the Project that "**There would be no unavoidable and significant adverse environmental impacts on water quality.**"[1]  Lighthouse submits these comments because its experience with Washington Ecology and the Section 401 process has cost tens of millions of dollars, and hundreds of millions of dollars in lost revenues for its export terminal.  Millennium's experience with Washington Ecology and the Clean Water Act Section 401 process demonstrates precisely why the Proposed Rule is necessary and should be promulgated in full.

---

[1] State Environmental Policy Act, Final Environmental Impact Statement, dated April 28, 2017, Section 4.5.8 (emphasis added).

1

Washington Ecology has horribly abused the cooperative federalism afforded the State of Washington by Congress in the Clean Water Act by completely ignoring these water quality findings with respect to the Project.  Lighthouse believes that by sharing our experience in trying to obtain a 401 water quality certification from Washington Ecology, the Environmental Protection Agency ("EPA") will see an example of a rogue agency using the 401 process as a weapon against disfavored projects.  Lighthouse encourages the EPA to promulgate all aspects of the Proposed Rule.

Notwithstanding the unambiguous conclusion on water quality, five months later, Maia Bellon, Director of Washington Ecology denied Millennium's Section 401 water quality certification, "***with prejudice***."[2] Washington Ecology has never before, nor ever since, denied a water quality certification with prejudice.

On Washington Ecology's website discussing the Project, in its Frequently Asked Questions section, it poses and answers the following question: "What does it mean to deny the permit with prejudice?  We denied the water quality permit with prejudice – a legal term that means that the decision is final and the applicant cannot reapply."[3]  The Proposed Rule would not afford Washington Ecology the authority to grant itself the power to deny a 401 certification with prejudice.

The Section 401 Denial Order is wholly inconsistent with the analysis and conclusions set forth in the EIS.  Instead of focusing on water quality for the 401 certification denial, Washington Ecology focused on nine non-water quality impacts, mostly relating to rail transportation. None of these Project impacts relates to water quality.

Washington Ecology's decision to deny the 401 certification was "surprising" to its SEPA co-lead agency, Cowlitz County.  "Ecology's decision to deny the 401 water quality certification request was especially surprising to [Cowlitz County officials and staff] because the FEIS unequivocally found no unavoidable and significant adverse impacts—potential or otherwise—on water quality.  Based on the FEIS, there is no question the company can satisfy all local and state water quality standards.  That is what the FEIS concluded."[4]  Instead, Washington Ecology used the Clean Water Act process to kill the Project because it was a fossil fuel infrastructure project.

The co-lead agency for the SEPA EIS, Cowlitz County concluded that Washington Ecology issued the 401 Denial Order in order to further certain policy objectives.  "Based on [Cowlitz County's] experience working on the FEIS, [we] can only conclude that those aspects of the 401 Denial relying on the FEIS are pretext, and that the real reason for the permit denial is to further unstated State policy preferences.  I am unaware of any other instance in which Ecology or another state agency denied a permit based on potential impacts similar to those outlined in the FEIS.  I believe that if these indirect impacts were truly significant and not mitigable, then state and local agencies would be forced to deny all manner of port, shipping, and transportation permits."[5]

---

[2] Order #15417, Corps Reference #NWS-2010-1225, Millennium Bulk Terminals-Longview, LLC Coal Export Terminal – Columbia River at River Mile 63, near Longview, Cowlitz County, Washington, dated September 26, 2017 ("401 Denial Order").

[3] https://ecology.wa.gov/Regulations-Permits/SEPA/Environmental-review/SEPA-at-Ecology/Millennium

[4] Sworn Declaration of Elaine Placido, Director of Community Services, Cowlitz County, filed March 8, 2019.

[5] *Id.*

Said differently, Washington Ecology abused the principles of cooperative federalism established in the Clean Water Act to stop a project that is perfectly legal to build—a project that could meet all water quality standards and requirements.  Washington Governor Jay Inslee, and others in his administration, including Washington Ecology Director Bellon, have expressed their belief that no fossil fuel infrastructure projects should ever be built in the State of Washington.  Denying Millennium's 401 water quality certification was the way that they could impose their own personal policy preferences to ensure that no permits would be issued for the Project and they could stop sister states from exporting their products into foreign commerce.

Washington officials just wanted to stop the project and thought that they were successful by denying the 401 water quality certification.  After denying the 401 certification with prejudice, Millennium continued working with local, state and federal agencies on other permits for the Project, confident that it would eventually secure those permits and the 401 certification.  However, when Millennium's consultants engaged Washington Ecology staff, asking for technical assistance and for their cooperation with other regulatory agencies that continued to process Millennium's permit applications, Director Bellon wrote Millennium that its "staff will not be spending time on permit preparation related to Millennium's additional applications for the [Project]."[6]

Director Bellon's letter undermined Millennium's permitting efforts across the board for the Project because much of the requested technical assistance related to permits from other agencies besides Washington Ecology.  Washington Ecology refused to provide assistance to these other agencies in an effort to ensure that the Project died.  Instead, Washington Ecology told Millennium to direct "questions regarding future permit applications" to the Washington Attorney General's office.  This direction was a not-so-veiled message to Millennium that the Project was not going to ever be built, at least with any cooperation from the State of Washington.

Not content with issuing the 401 Denial Order, Washington Ecology even sought to prevent the US Army Corps of Engineers from continuing its work on the NEPA EIS.  In September 2018, Director Bellon sent a letter to the Army Corps asking them to shut down its separate federal environmental review process.  She twice expressed "deep concern" over the Army Corps' decision to "work on the federal permitting process . . ."[7], especially after Washington Ecology had already done everything in its power to stop the Project.

Washington Ecology's 401 Denial Order with prejudice was remarkable for a number of reasons in that nearly every aspect of the denial is unprecedented.  Washington Ecology had never before, and has never since:

- Denied a 401 water quality certification for non-water quality reasons, including any reason resembling those cited in the 401 Denial Order;
- Denied a Section 401 water quality certification with prejudice;
- Denied any permit or certification of any kind based on SEPA's substantive authority to deny permits;
- Issued a denial order signed by the director;
- Required the volume or type of water quality information for a 401 certification application; and

---

[6] Letter from Maia Bellon to Millennium, October 23, 2017.

[7] Letter from Maia Bellon to Colonel Mark Geraldi, U.S. Army Corps of Engineers, September 10, 2018.

- Told a project proponent that it would not provide any further assistance on a project moving forward, and to contact the state attorney general's office for further questions.

The 401 certification process should not be abused.  Accordingly, Lighthouse encourages EPA to promulgate the Proposed Rule in full, in order to keep the 401 certification process consistent with the Clean Water Act.

19080 South Jordan Gateway   |   South Jordan, UT 84   |   801.539.3788   |   lighthouseresourcesinc.com

# EXHIBIT 9

# United States Senate

COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS

WASHINGTON, DC 20510-6175

October 21, 2019

The Honorable Andrew R. Wheeler
Administrator
U.S. Environmental Protection Agency (EPA)
1200 Pennsylvania Avenue N.W.
Washington, DC 20460

Dear Administrator Wheeler,

We are writing to express our strong support for EPA's commitment to improve implementation of Section 401 of the Clean Water Act. Just over a year ago, we wrote the attached letter asking you to withdraw draft, inaccurate guidance issued in 2010 to implement Section 401. We also asked that "EPA – as the lead federal agency – work with other federal agencies to determine what government-wide direction is needed, including the need for new clarifying guidance or regulations." We appreciate your and President Trump's commitment to prioritizing our request for Section 401 reform under Executive Order 13868, the April 2019 Executive Order titled "Promoting Energy Infrastructure and Economic Growth."

Modernization of the Clean Water Act Section 401 water quality certification process remains a top priority for us. The regulations that you propose to revise are forty-eight years old. As you have noted, the 1971 regulations predate Section 401 itself, which was created through the 1972 amendments to the Federal Water Pollution Control Act of 1948. The long unaddressed need for a rulemaking has only grown more acute since our October 2018 letter. Coastal states opposed to American energy production and use at home and abroad continue to weaponize Section 401. They attempt to wield Section 401 to block large energy projects from moving forward.

Coastal states have denied water quality certifications under Section 401 that prevent the transmission of natural gas and the export of American coal and liquefied natural gas. These states' actions hurt other states' sovereign interests. As state officials have observed, "the actions of individual state actors are disruptions to interstate commerce and negate the intent of providing the consistent and reliable permitting process envisioned by the Clean Water Act."[1]

The economic harm caused by crippling energy projects is real. As the Wall Street Journal reported in July, utilities around New York City will not link up new customers because the State of New York is blocking new natural gas pipelines.[2] As the Journal reported, "With limited

---

[1] Letter from the Attorneys General of Louisiana, South Carolina, Alabama, Texas, Montana, West Virginia, and Nebraska to Acting Administrator Wheeler (February 26, 2019), https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0855-0011

[2] Stephanie Yang & Ryan Dezember, "The U.S. Is Overflowing with Natural Gas. Not Everyone Can Get It," Wall Street Journal (July 8, 2019), https://www.wsj.com/articles/the-u-s-is-overflowing-with-natural-gas-not-everyone-can-get-it-11562518355.

PRINTED ON RECYCLED PAPER

pipelines to smooth the distribution of gas around the country, price spikes have become wild. In 2018, natural gas prices in New York City surged as high as $175 during a snowstorm that spurred record heating demand. A week later, they returned to about $3."

Continued abuses of Section 401 will hurt not only American energy consumers, but also hardworking Americans and communities whose livelihoods depend on energy production. The Environment and Public Works Committee held a hearing on Section 401 in August 2018. Brent Booker, Secretary-Treasurer of North America's Building Trades Unions, testified about the Constitution Pipeline in New York— just one of the pipelines for which New York has denied a Section 401 certification. He stated:

> [A] safe, modern, and affordable solution, the Constitution pipeline, was delayed from being built after already receiving [Federal Energy Regulatory Commission] approval. This permit denial is still delaying about 2,400 direct and indirect jobs from the pipeline construction generating $130 million in labor income and economic activity for the region. The decision continues to cost local governments approximately $13 million in annual property tax revenue.

CJ Stewart, a Crow Tribal member and Board Member and Co-Founder of the National Tribal Energy Association, testified about the State of Washington's denial of Section 401 certification for a coal export terminal. He testified:

> The U.S. holds more of the world's coal reserves than any other country, and the coal mined by the Crow Nation is preferred by high efficiency, low emission power plants that are in operation and being built around the world. However, even though our coal resources provide a critical component of U.S. export trade, our ability to get our coal to fast-growing Asian markets is being hindered by states on the West Coast who continue to refuse to grant needed approvals to build state of the art export facilities for political – not water quality – reasons.

We stand ready to support you as your agency moves forward in this rulemaking. This work is critical to America's prosperity and to our standing as an energy leader in the world. Global energy usage is going to grow across all sectors – renewables, petroleum, natural gas, and coal – between now and 2050.[3] Section 401 cannot continue to be used to block America's ability to deliver on that demand. Section 401 of the Clean Water Act must be implemented as Congress intended – a careful scalpel to protect water quality, not a bludgeon for select states to kill critically important projects.

---

[3] Energy Information Administration (EIA), "EIA projects nearly 50% increase in world energy usage by 2050, led by growth in Asia" (Sept. 24, 2019), https://www.eia.gov/todayinenergy/detail.php?id=41433.

Sincerely,

John Barrasso, M.D.
Chairman
Committee on Environment & Public Works

Shelley Moore Capito
United States Senator

Michael B. Enzi
United States Senator

James M. Inhofe
United States Senator

Kevin Cramer
United States Senator

Steve Daines
United States Senator

*Enclosures*

3

EXHIBIT 10



**Joel Beauvais**
Vice President &
Deputy General
Counsel – Environment,
Health & Safety

101 Constitution Avenue, N.W.
Suite 400 East
Washington, DC  20001
(202) 347-7500
(202) 347-7501 Fax
joel.beauvais@exeloncorp.com

October 21, 2019

## VIA REGULATIONS.GOV

The Honorable Andrew Wheeler
Administrator
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

RE:    **Updating Regulations on Water Quality Certification**
         Comments of Exelon Generation Co., LLC
         Docket ID No. EPA-HQ-OW-2019-0405

## EXECUTIVE SUMMARY

On August 22, 2019, the Environmental Protection Agency ("EPA") published in the *Federal Register* a notice of proposed rulemaking to revise EPA's water quality certification regulations in 40 C.F.R. Part 121. *Updating Regulations on Water Quality Certification*, Proposed Rule, 84 Fed. Reg. 44080 (Aug. 22, 2019) (the "Proposed Rule"). Exelon Generation Company, LLC—one of the nation's leading energy companies—strongly supports the Proposed Rule and applauds EPA's efforts to update its implementing regulations for Section 401 of the Clean Water Act ("CWA"), 33 U.S.C. § 1341.

While the Proposed Rule takes important steps to make EPA's regulations consistent with the underlying statute and to clarify implementation of Section 401 for States and regulated parties, Exelon recommends several changes to make the Part 121 regulations more effective. Specifically, as explained in detail below, Exelon recommends that the Proposed Rule (including the regulatory text) be revised to:

1. clarify that a certification condition is permissible only when it directly addresses a water quality effect caused by the licensee's "activity," and that the burden of establishing the necessity of such a condition rests at all times with the State;

2. encourage States to adopt procedural requirements similar to those that will apply when the Administrator receives a certification request;

3. confirm that States may not use their water quality certification request "submission procedures" to evade Section 401's one-year clock;

4. confirm that Federal licensing or permitting agencies have sole responsibility for enforcement of certification conditions; and

5. expressly state that any modification to a certification—including a modification made pursuant to a so-called "reopener" condition—has no legal effect unless and until it is approved by the relevant Federal licensing or permitting agency pursuant to that agency's own regulations.

## **BACKGROUND**

Exelon Generation Company, LLC is a subsidiary of Exelon Corporation, a Fortune 100 energy company with the largest number of electricity and natural gas customers in the United States.  Exelon Corporation does business in 48 States, the District of Columbia, and Canada. Exelon Corporation serves approximately 10 million customers in Delaware, the District of Columbia, Illinois, Maryland, New Jersey, and Pennsylvania through its Atlantic City Electric, BGE, ComEd, Delmarva Power, PECO, and Pepco subsidiaries.  Exelon is one of the largest competitive U.S. power generators, with more than 32,000 megawatts of nuclear, gas, wind, solar, and hydroelectric generating capacity comprising one of the nation's cleanest and lowest-cost power generation fleets.  Exelon routinely seeks licenses and permits from Federal agencies and water quality certifications from State agencies in connection with the construction and operation of its nuclear, hydroelectric, and natural-gas-fired electric generating assets.

Exelon's views on EPA's Section 401 regulations are informed by its recent efforts to relicense the Conowingo Hydroelectric Project ("Conowingo" or the "Project"), a hydroelectric generating facility on the lower Susquehanna River, about ten miles upstream from the River's confluence with the Chesapeake Bay.  With a generating capacity of 500 megawatts, the Project is by far the largest source of renewable energy in Maryland.  In 2014, Exelon requested a water quality certification from the Maryland Department of the Environment ("MDE") in connection with its efforts to renew the Project's Federal license.  In 2018, MDE issued a purported certification for the Project (the "Certification").  MDE attached conditions to the Certification that vastly exceeded the scope of State authority under CWA Section 401.  For example, MDE's Certification requires Exelon to remove pollutants from the Susquehanna River that were released into the water through upstream agricultural runoff, wastewater treatment facilities, and other sources of pollution in New York, Pennsylvania, and a small portion of Maryland. Although it is undisputed that Exelon itself does not introduce these pollutants into the River, the Certification purported to require Exelon to remove 6,000,000 pounds of nitrogen and 260,000 pounds of phosphorus from the River every year for the entire term of the Project's Federal license.  The Certification includes a "payment in lieu" provision that would allow the Project to satisfy its obligations by instead paying MDE a fee exceeding $172 million annually, or more than *$7 billion* over the term of the Federal license.  This amount is orders of magnitude greater than the Project's economic value as an operating asset, and thus Exelon would be forced to abandon the Federal license and discontinue the Project's operation absent a substantial change in the Certification's terms.  Exelon and MDE are presently engaged in an ongoing dispute over the legality of the Certification, and that dispute implicates multiple issues discussed in the Proposed Rule.

Following President Trump's issuance of Executive Order 13868 in April 2019,[1] EPA requested pre-proposal recommendations concerning the scope and content of its new regulations and guidance.[2]  Exelon submitted comments[3] encouraging EPA to promulgate a rule codifying the D.C. Circuit's recent opinion in *Hoopa Valley Tribe v. FERC*,[4] which confirmed that States waive their opportunity to issue a Section 401 certification when they engage in a "coordinated withdrawal-and-resubmission scheme."[5]  Exelon also urged EPA to clarify that certification conditions are permissible under Section 401 only if they relate directly to the licensee's "activity."[6]

On August 22, 2019, EPA published the Proposed Rule in the *Federal Register*.  Exelon supports the Proposed Rule and appreciates this opportunity to provide comments, including recommended changes that would further improve EPA's proposed revisions.

<u>**DISCUSSION**</u>

The remainder of these comments focuses on Exelon's recommendations with respect to the issues discussed in the Proposed Rule, including (1) the permissible scope of water quality certification conditions; (2) the procedures governing the process for requesting a certification; (3) the timeline by which States must act on requests for certifications; (4) the proper roles for State and Federal agencies in enforcing certifications; and (5) the rules governing modification or "reopening" of such certifications.

## 1.    Scope of Water Quality Certification Conditions

Exelon strongly supports the portions of the Proposed Rule that clarify the permissible scope of conditions on Section 401 certifications, making the regulations more consistent with statutory text and Congressional intent.  As explained below, Exelon requests that EPA adopt several additional requirements related to the scope of certifications.

The Proposed Rule includes a new provision defining the term "condition" to mean "a specific requirement included in a certification that is within the scope of certification." Proposed Rule § 121.1(f), 84 Fed. Reg. 44120.  The Rule goes on to state that "[t]he scope of a Clean Water Act section 401 certification is limited to assuring that a discharge from a Federally licensed or permitted activity will comply with water quality requirements."  Proposed Rule § 121.3, 84 Fed. Reg. 44120.  The proposed regulations also require at Section 121.5(d) that any conditions imposed in the certification must be accompanied by an explanation of "why the condition is necessary to assure that the discharge from the proposed project will comply with water quality requirements," *id.* § 121.5(d)(1); a citation to the relevant "federal, state, or tribal

---

[1] *See* Executive Order 13868, 84 Fed. Reg. 15495 (Apr. 10, 2019).
[2] *See* Memorandum from Lauren Kasparek, Office of Wetlands, Oceans and Watersheds, Envt'l Protection Agency (Docket ID No. EPA-HQ-OW-2018-0855) (Apr. 15, 2019).
[3] *See* Comments of Exelon Generation Co., LLC, Docket No. EPA-HQ-OW-2018-0855 (May 24, 2019) ("*Exelon May 2019 Comments*").
[4] 913 F.3d 1099 (D.C. Cir. 2019).
[5] *Id.* at 1103; *see Exelon May 2019 Comments* at 4–6.
[6] *Exelon May 2019 Comments* at 9–10.

3

law that authorizes the condition," *id.* § 121.5(d)(2); and a "statement of whether and to what extent a less stringent condition could satisfy applicable water quality requirements," *id.* § 121.5(d)(3). *See* 84 Fed. Reg. 44120. Finally, the Proposed Rule clearly states that a Federal agency "shall not" incorporate any condition from a Section 401 certification unless it determines that that the condition "satisf[ies] the definition [of 'condition'] in § 121.1(f) and meets the requirements of § 121.5(d)." Proposed Rule § 121.8(a)(1), 84 Fed. Reg. 44121.

Exelon strongly supports this revised framework, which effectively implements the statutory text and makes clear that States cannot use purported "conditions" as vehicles to impose requirements that exceed States' authority under the CWA. As Exelon explained in its prior comments,[7] States have for years attempted to use certification conditions as a means to achieve general policy goals that, in many instances, bear little or no relation to the actual water quality effects caused by the project at issue. The discussion of this problem in the Proposed Rule's preamble resonates especially strongly with Exelon's experience relating to Conowingo: "EPA is also aware of certification conditions that purport to require project proponents to address pollutants that are not discharged from the construction or operation of a federally licensed or permitted project. Using the certification process to yield facility improvements or payments from project proponents that are unrelated to water quality impacts from the proposed federally licensed or permitted project is inconsistent with the authority provided by Congress." 84 Fed. Reg. 44105. EPA's Proposed Rule, when finalized, will help to eliminate such actions and ensure that the text of Section 401—and not unrelated policy objectives of State administrators—serves as the standard against which new certification conditions are judged.

In addition to the changes in the Proposed Rule, which Exelon supports, we recommend four modifications to strengthen protections against use of the certification process to impose conditions beyond States' proper authority under Section 401.

First and most important, EPA should modify the Proposed Rule to clarify that Section 401 conditions are permissible ***only if they directly address* water quality effects *caused by the licensee's or permittee's "activity."*** In numerous contexts—including both pipelines and hydroelectric facilities—States recently have sought to use Section 401 conditions to address water quality concerns caused by entities or activities other than those that are the subject of the certification. EPA should take this opportunity to confirm that these efforts are not permitted by the CWA and violate EPA regulations.

The guiding principle for courts tasked with determining the propriety of Section 401 certification conditions in diverse contexts—including ballast-water discharges,[8] construction projects affecting adjacent waterways,[9] and wetland development[10]—has been whether the

---

[7] *See Exelon May 2019 Comments* at 3–4, 9–10.

[8] *See, e.g.*, *Port of Oswego Auth. v. Grannis*, 897 N.Y.S.2d 736, 738 (N.Y. 3d Dep't 2010) (approving Section 401 conditions addressing discharge of ballast water because conditions were necessary to prevent introduction of invasive species and pathogens into waterways); *In re 401 Water Quality Certification*, 822 N.W.2d 676, 678, 689 (Minn. Ct. App. 2012) (approving conditions directly addressing an activity of shipping vessels that involved discharge of ballast water).

[9] *See, e.g.*, *Friends of the Earth v. U.S. Navy*, 841 F.2d 927, 929 (9th Cir. 1988) (affirming decision that conditioned Navy's Section 401 permit to construct a port on acquiring a State shoreline management

condition was designed to directly address water quality effects caused by the licensee's or permittee's activity.  Courts have emphasized that State agencies evaluating requests for Section 401 certifications may not consider the effects of activities other than those being licensed.  In *Delaware Riverkeeper Network v. Secretary of the Pennsylvania Department of Environmental Protection*, for example, the Third Circuit held that a State agency correctly declined to assess the impacts of "tree clearing activities" before issuing a certification for construction related to a pipeline expansion because there was not a sufficient nexus between the "construction activity" being licensed and the "pre-construction activity" of tree-clearing.[11]  A fortiori, water quality effects that are caused by entities and activities entirely distinct from the licensee/permittee are not properly within the scope of Section 401 conditions.

When a certification condition falls on the wrong side of the line—that is, when it does not directly address a water quality effect caused by a licensee's or permittee's activity—courts have not hesitated to invalidate the condition.[12]  In *Port of Seattle v. Pollution Control Hearings Board*, for example, the Washington Supreme Court considered a number of conditions that a State agency imposed in a Section 401 certification for construction of an airport runway on wetlands.[13]  Although the court approved many of those conditions, it overturned a streamflow condition that would have "required that the Port do more than offset the impact of the third runway."[14]  The court explained that the "actual impact" of the runway would be a reduction in stream flow of 0.08 cubic feet per second ("cfs") in the Des Moines Creek, and thus agreed with the Port that the State agency "erred when it required the Port to mitigate low flows … anytime flows fall below 1.0 cfs because this condition requires [the Port] to augment low flows beyond the 0.08 cfs impact of the … runway project."[15]  The Federal Energy Regulatory Commission ("FERC") has also confirmed that conditions not directly addressing a water quality effect caused by the licensee's "activity" are improper under Section 401.  Indeed, FERC has often noted its opinion that conditions "unrelated" to a project's activities are not proper Section 401 limitations.[16]  This principle is not limited to the hydropower context, and States have also sought to use Section 401 to impose unwarranted conditions on pipelines.[17]

---

permit that addressed the port's effects on water quality and aquatic life); *Interstate Props. v. Schregardus*, No. 99AP-249, 1999 WL 1267309, at *2 (Ohio Ct. App. Dec. 30, 1999) (approving Section 401 conditions for modification of a waterway that were designed to mitigate effects of construction on erosion and nearby trees).

[10] *Family Dev., Ltd. v. Steuben Cty. Waste Watchers, Inc.*, 749 N.E.2d 1243, 1246, 1260 (Ind. Ct. App. 2001) (approving Section 401 conditions for the construction of landfill that directly addressed mitigation of damages to nearby wetlands); *O'Hagan v. State*, No. 28897–4–II, 2003 WL 22962168 (Wash Ct. App. Dec. 16, 2003) (discussing Section 401 conditions for development of cranberry bog that were designed "to mitigate wetland loss").

[11] 833 F.3d 360, 386 (3d Cir. 2016).

[12] *See Exelon May 2019 Comments* at 8–10.

[13] 90 P.3d 659 (Wash. 2004).

[14] *Id.* at 681.

[15] *Id.*; *see* 17 A.L.R. FED. 2D 309 § 23 (2007) (discussing *Port of Seattle* and noting that conditions are impermissible when they more than "offset[] the expected impact of the project"); *id.* §§ 19, 21, 26 (cataloging other inappropriate conditions).

[16] *See, e.g.*, Order Issuing New License, *Portland Gen. Elec. Co.*, Project No. 2195-011, 133 FERC 62281, at 64620 ¶ 57, 2010 WL 11404139 (FERC Dec. 21, 2010); Order Issuing New License, *Pub. Utility Dist. No. 1 of Snohomish Cty., Wash.*, Project No. 2157-188, 136 FERC 62188, at 64488 ¶ 92,

In the particular context of hydropower, Section 401 does not authorize conditions to regulate pollutants that were not added to navigable waters by the applicant.  Put differently, an effect caused by the presence of pollutants in water discharged through a hydroelectric facility, where the presence of those pollutants is not attributable to the federally licensed or permitted activity, falls outside the scope of certification.

The Proposed Rule takes a step in the right direction by stating that conditions are only appropriate if they are "within the scope of certification," Proposed Rule § 121.1(f), 84 Fed. Reg. 44120, and that conditions must be "necessary to assure that the discharge from the proposed project will comply with water quality requirements," *id.* § 121.5(d)(1).  Exelon commends the additions in Section 121.8(a)(1), which clarify that a Federal agency may not incorporate conditions into a Federal license or permit if those conditions do not satisfy the new Sections 121.1(f) and 121.5.d.  Moreover, Exelon strongly supports EPA's clarification that Congress did not intend for States to be able to impose "one-time and recurring payments to state agencies for improvements or enhancements that are unrelated to the proposed [project]."  84 Fed. Reg. at 44094.[18]

To better implement the clear text of Section 401, however, Exelon respectfully recommends that EPA revise the text of Proposed Rule Section 121.5(d) to read as follows, with suggested modifications underlined:  "Any grant of certification with conditions shall be in writing.  Any condition must directly address a water quality effect caused by the particular activity for which the applicant is seeking a license or permit.  Any grant of certification with conditions shall for each condition include, at a minimum . . . . "

<u>Second</u>, EPA should modify the Proposed Rule to clarify that the certifying authority— not the applicant—bears the burden of establishing that any conditions are necessary to assure compliance with water quality requirements.  As Exelon explained in its prior comments,[19] the States' power under Section 401 is a narrow exception in a federally occupied field, and thus the burden of showing that a Section 401 condition is "necessary to assure" compliance with water quality standards necessarily rests at all times with the State.[20]  This principle follows from the

---

2011 WL 13045891 (FERC Sept. 2, 2011); Order Issuing New License, *Pub. Utility Dist. No. 1 of Douglas Cty., Wash.*, Project No. 2149-152, 141 FERC 62104, at 64270 ¶ 53, 2012 WL 12372998 (FERC Nov. 9, 2012); *see also Mitchell Cty. Conservation Bd., Project No. 11530-000—Iowa*, 77 FERC 6202, 64458 n.4 (FERC Dec. 27, 1996) (refusing to require a hydropower licensee to spend project revenues on improvements at county parks that were "unrelated to the project" being licensed).

[17] *See, e.g.*, *Delaware Riverkeeper Network*, 833 F.3d at 386.

[18] Exelon also believes that Section 121.13(b) of the Proposed Rule—which applies only to certifications made by the Administrator—correctly recognizes that it would be inappropriate for the Administrator to request additional information from an applicant unless that information is "directly related to the discharge from the proposed project and its potential effect on the receiving waters."  84 Fed. Reg. at 44122.

[19] *See also Exelon May 2019 Comments* at 7.

[20] *See, e.g.*, *California v. FERC*, 495 U.S. 490, 506 (1990); *First Iowa Hydro-Elec. Coop.*, 328 U.S. 152, 180 (1946) (Federal Power Act establishes "a complete scheme of national regulation" to "promote the comprehensive development of the water resources of the Nation"); *see also PUD No. 1 of Jefferson Cty.*

fact that, when Congress has preempted a field (as Congress did with hydropower regulation in the Federal Power Act), the burden to show that some State action should be permissible under a purported exception to Federal preemption rests with the party seeking to establish the exception.[21]  To implement this recommendation, Exelon respectfully suggests that EPA modify the existing text of Section 121.5(d)(1) of the Proposed Rule to state that the writing articulating the certification conditions must include "[a] statement explaining why the certifying authority has carried its burden to demonstrate that the condition is necessary to assure that the discharge from the proposed project will comply with water quality requirements" (suggested modification underlined).

Third, EPA should further clarify that, if a less stringent condition could satisfy the applicable water quality requirements, a more stringent condition is—by definition—not "necessary to assure" compliance.  33 U.S.C. § 1341(d).  Therefore, the more stringent condition should not be included in the Federal license or permit.  This conclusion is already implied by Section 121.5(d)(3), which requires a "statement of whether and to what extent a less stringent condition could satisfy applicable water quality requirements."  84 Fed. Reg. 44120.  But the Proposed Rule should take the next step, by concluding that if a less stringent condition in fact would satisfy applicable water quality requirements, the more stringent condition cannot be imposed on the project proponent.

Fourth, EPA should clarify that a Federal licensing or permitting agency need not incorporate or enforce conditions in a State certification that the Federal agency, after due consideration, concludes are unlawful because they violate **any** provision of the CWA, of EPA's CWA regulations, or of a statute the agency is charged with implementing (or its implementing regulations).  As noted above, Exelon applauds the addition of Proposed Rule Section 121.8(a)(1), which clarifies that a Federal agency shall not incorporate license or permit conditions if those conditions do not satisfy the new Sections 121.1(f) and 121.5(d).  That said, the existing language in Section 121.8(a) may be read to suggest that Federal agencies would be required to incorporate certification conditions that they believe are unlawful under any provision of the CWA or its implementing regulations **other than** Sections 121.1(f) or 121.5(d) of the Proposed Rule.

To implement this suggestion, Exelon respectfully requests that EPA modify the text of Proposed Rule Section 121.8(a)(1) to read:  "If the Federal agency determines that a condition does not satisfy the definition of § 121.1(f), does not meet the requirements of § 121.5(d), or otherwise fails to comply with any provision of the Clean Water Act, of regulations promulgated pursuant to the Clean Water Act, or of any Federal law that the Federal agency is charged with

---

v. Wash. Dep't of Ecology, 511 U.S. 700, 722 (1994) (noting State's inability to impose conditions on a Federal hydroelectric license "pursuant to state law").

[21] See, e.g., Tran Enters., LLC v. DHL Exp. (USA), Inc., 627 F.3d 1004, 1009–10 (5th Cir. 2010) (holding that "the party asserting … an exception" to a Federal statute's preemptive scope would "bear the burden of proof at trial"); see also New England Health Care Employees Union, Dist. 1199, SEIU/AFL-CIO v. Rowland, 204 F. Supp. 2d 336, 343 n.7 (D. Conn. 2002) (noting that, when there exists a "rebuttable presumption that Congress intended to preempt state law," "the defendants have the burden of production for any exception to preemption or evidence of congressional intent not to preempt").

administering, such condition shall not be incorporated into the license or permit" (suggested modifications underlined).

## 2.     Certification Request and Receipt

Exelon supports the Proposed Rule's clarification of the process for requesting a water quality certification from a certifying authority.  However, as explained below, Exelon suggests that EPA consider stronger incentives for States to adopt clear *ex ante* rules governing what information is required to support approval of a certification request and what procedures apply to any subsequent information requests by the State, to help ensure that certification requests can be approved within one year or less after receipt.

Section 121.4 of the Proposed Rule provides that, when a State agency is the certifying authority, the proponent of the project will begin the application process by submitting a certification request to the State and then contacting the Federal licensing or permitting agency to provide notice of the request, which triggers the Federal agency's duty to provide the certifying State the "applicable reasonable period of time to act on the certification request."  Proposed Rule § 121.4(b)–(c), 84 Fed. Reg. at 44120.  The Proposed Rule states that the Federal agency may not establish a "reasonable period of time" that "exceed[s] one year from receipt" of the request, and in turn defines "receipt" to mean "the date that a certification request is documented as received by a certifying authority."  Proposed Rule §§ 121.4(e), 121.1(o), 84 Fed. Reg. at 44120.

A separate provision of the Proposed Rule at Subpart D governs certifications made by the Administrator rather than by a State.  The Proposed Rule requires that the project proponent request a pre-filing meeting with the Administrator at least 30 days prior to submitting the certification request, *see id.* § 121.12(a); that the Administrator must hold such a meeting and "discuss the nature of the proposed project and potential water quality effects" with the applicant, *id.* § 121.12(b)–(c); that the Administrator may request additional information from the applicant within 30 days of receiving the request, *see id.* § 121.13(a); that the Administrator "shall only request additional information that is within the scope of certification" and "that can be collected or generated within the established reasonable period of time," *id.* § 121.13(b)–(c); and that the Administrator must provide public notice of the certification request within 20 days and may schedule a public hearing in his or her discretion, *see id.* § 121.14(a)–(b).

Exelon commends EPA's efforts to bring clarity to the process through which applicants request certifications and certifying authorities receive them.  Exelon is particularly supportive of the provisions of the Proposed Rule that govern certification by the Administrator.  *See* Proposed Rule Subpart D, 84 Fed. Reg. 44122.  Those provisions contemplate a timely and efficient process and recognize that it would be unfair to an applicant, and inconsistent with the statute, to require studies or other information that cannot be completed or generated within the established "reasonable period of time" (or even within the year following the submittal of the request).  Proposed Rule § 121.13(c), 84 Fed. Reg. 44122.

To ensure that regulated parties can benefit from the transparent and effective process contemplated by Subpart D of the Proposed Rule, Exelon recommends that EPA encourage the

States to adopt procedural requirements for their certification processes that are similar to Subpart D's process governing certifications by the Administrator.  Moreover, Exelon respectfully suggests that EPA establish stronger incentives for States to adopt clear procedural rules that (1) provide that requests for additional information from applicants can be made only pursuant to regulations or policies adopted by the States *in advance of the certification process*; and (2) clearly identify in advance what information applicants should provide in support of a request.  Clear *ex ante* rules would avoid placing an unfair burden on the applicants to guess what must be included, to allow the State to approve a request within one year.[22]  Absent such rules, there is an appreciable risk that States will take the position that additional information is required to evaluate a certification that cannot be provided within one year, and that States will seek to deny certification requests on this basis.  EPA should underscore in its final rule preamble that denial of certification based on inadequate information—where the state did not clearly identify the need for such information through *ex ante* regulations—is likely to be vulnerable to reversal on judicial review.

The recommendations outlined above could be implemented by adding a provision at the end of Section 121.5 of the Proposed Rule—designated Section 121.5(g)—providing:

> Each certifying authority should adopt fair and clear procedural rules for the process governing requests for certifications, including rules governing pre-request consultations, requests for additional information made by the certifying authority after the request is received, and the provision of public notice and hearings.  Such rules should clearly identify the specific information applicants must provide in support of their requests.  States may at their election model their procedural rules on EPA's rules governing certification by the Administrator, *see* 40 C.F.R. Part 121, Subpart D.

In the alternative, EPA could promulgate guidance including similar language or otherwise providing States with a list of "best practices" that should be followed in the certification process.

## 3.      Timeframe and Waiver

Exelon strongly supports EPA's proposal to codify the D.C. Circuit's recent holding in *Hoopa Valley* that "the withdrawal-and-resubmission of water quality certification requests does not trigger new statutory periods of review."[23]  Section 121.4(f) of the Proposed Rule clearly states that the "certifying authority is not authorized to request the project proponent to withdraw a certification request or to take any other action for the purpose of modifying or restarting the established reasonable period of time."  84 Fed. Reg. 44120.[24]  Section 121.4(e) of the Proposed

---

[22] *See Exelon May 2019 Comments* at 5.

[23] 913 F.3d at 1103; *see Exelon May 2019 Comments* at 4–6.

[24] Similarly, Section 121.7(a)(2) provides that the certification requirement will be waived upon the certifying authority's "failure or refusal to act on a certification request."  84 Fed. Reg. 44121.  The phrase "[f]ail or refuse to act" is defined in the Proposed Rule to mean that the "the certifying authority actually or constructively fails or refuses to grant or deny certification, or waive the certification requirement, within the scope of certification and within the reasonable period of time."  Proposed Rule

Rule defines the time limit for action on a request as being no longer than "one year from receipt." *Id.* And Section 121.1(o) in turn defines the term "receipt" as "the date that a certification request is documented as received by a certifying authority in accordance with applicable submission procedures." *Id.*

As Exelon explained in its prior comments,[25] EPA's approach is consistent with recent decisions from courts and Federal agencies that have rejected the notion that the one-year clock begins to run when the State says it is ready to process the request, rather than when it receives the request from the applicant.

That said, Exelon recommends one change to further clarify these requirements. Specifically, Section 121.1(o) and the preamble should further clarify that States may not use their "applicable submission procedures" to introduce an unreasonable delay between the time that an agency receives a request and the time that the request is deemed "received." The phrase "applicable submission procedures" in the Proposed Rule could be interpreted by States to allow them to adopt "submission procedures" under which a request is not deemed "received" even though it is in the State's possession—*e.g.*, by specifying that a State will take six months to consider the request before deeming it received (or some other similar rule) or by deeming an application not "received" if it does not meet certain completeness criteria. States have tried that approach before, as by deeming received requests "incomplete" to avoid triggering the one-year clock Congress mandated in Section 401(a).[26]

To implement this recommendation, Exelon suggests that EPA modify Section 121.1(o) to provide simply that "*Receipt* means the date that a certification request is received by a certifying authority." Alternatively, at a minimum, EPA should include language in the final Rule preamble confirming that its reference to "applicable [State] submission procedures" refers only to ministerial procedures, not substantive or "completeness" criteria, and may not be read as an invitation for States to adopt rules that would prevent the one-year clock from beginning to run as soon as the request is in the certifying agency's possession.

## 4.       Enforcement

The preamble to the Proposed Rule correctly notes that Section 401 "does not provide an independent regulatory enforcement role for certifying authorities for conditions included in federal licenses or permits." 84 Fed. Reg. 44116. EPA has also recognized that Section 401 "does not provide an . . . ongoing role for certifying authorities to enforce certification conditions under federal law" and that this "role is reserved to the federal agency issuing the federal license

---

§ 121.1(h), 84 Fed. Reg. 44120. Likewise, Section 121.2 of the Proposed Rule should be revised to acknowledge the possibility of waiver: "Any applicant for a license or permit to conduct any activity which may result in a discharge shall provide the Federal agency either a certification from the certifying authority in accordance with this part <u>or a written notice that the certification requirement has been waived</u>" (suggested modifications underlined). 84 Fed. Reg. 44120; *see also* Proposed Rule 121.7(c), 84 Fed. Reg. 44121 ("A written notice of waiver from the Federal agency shall satisfy the project proponent's requirement to obtain a certification.").

[25] *See Exelon May 2019 Comments* at 7.

[26] *See id.* (discussing *City of Fredericksburg v. FERC*, 876 F.2d 1109, 1111–12 (4th Cir. 1999)).

or permit." *Id.* EPA has sought comment on "whether clarification on this point may be appropriate to include in the regulatory text." *Id.* The text of the Proposed Rule states that "[t]he Federal agency shall be responsible for enforcing certification conditions that are incorporated into a federal license or permit," but does not otherwise comment on State enforcement authority. Proposed Rule § 121.9(c), 84 Fed. Reg. 44121.

Exelon encourages EPA to include a provision within the text of the Proposed Rule itself that confirms the agency's conclusions concerning the scope of State enforcement authority. That could be accomplished by modifying the text of Section 121.9(c) of the Proposed Rule to read as follows (with suggested modifications underlined):

> (c) The Federal agency shall be <u>solely</u> responsible for enforcing certification conditions that are incorporated into a federal license or permit. <u>A certifying authority has no independent enforcement role with respect to any condition included in a federal license or permit and has no ongoing role in enforcing any certification condition under federal law once the condition has been incorporated into a federal license or permit.</u>

**5.   Modification**

The Proposed Rule seeks comment on potential modifications to the regulation currently codified at 40 C.F.R. § 121.2(b), which provides that "[t]he certifying agency may modify the certification in such manner as may be agreed upon by the certifying agency, the licensing or permitting agency, and the Regional Administrator." EPA has proposed "to remove this provision from the regulatory text as it is inconsistent with [EPA's] role for new certifications." 84 Fed. Reg. 44117. EPA requests comment on whether it should maintain this oversight provision or serve some other "more involved oversight role." 84 Fed. Reg. 44117. EPA also requests comment on the related issue of so-called "reopener" provisions, which are certification "conditions that authorize certifications to be re-opened." 84 Fed. Reg. 44107. As EPA has correctly recognized, reopener provisions "may create regulatory uncertainty." *Id.*

Exelon appreciates EPA's approach to the issue of modifications and reopeners, and respects EPA's efforts to recognize the limits on its own authority under Section 401. Exelon agrees with EPA that the portion of Section 121.2(b) that requires the Regional Administrator to approve modifications to certifications should be deleted, as it is not grounded in the text of Section 401.

Exelon respectfully suggests that, rather than deleting 40 C.F.R. § 121.2(b) outright, this provision be revised to clarify that any modification of a certification—including any modification made pursuant to a reopener condition in an existing certification—has no effect unless and until it is approved by the Federal licensing or permitting agency pursuant to its own regulations. As one State Supreme Court explained, States do "not have statutory, regulatory, or federal authority to suspend or revoke a 401 Certification after it has been granted."[27] Based on

---

[27] *Triska v. Dep't of Health & Envt'l Control*, 355 S.E.2d 531, 533–34 (S.C. 1987); *see also Exelon May 2019 Comments* at 6.

Exelon's experience, an express provision of this nature would help clarify existing limits on States' authority and avoid potential abuses.

To implement these changes, Exelon respectfully requests that EPA add a new provision to the Proposed Rule, which would be designated Section 121.8(c).  That subsection would provide as follows (with modifications against the existing 40 C.F.R. § 121.2(b) underlined):

> The certifying agency may modify the certification in such manner as may be agreed upon by the certifying agency <u>and</u> the licensing or permitting agency<u>, but no modification of a certification will take effect or be enforceable unless and until it is approved by the licensing or permitting agency pursuant to its own regulations.</u>

The proposed final clause is necessary because, absent such a clarification, the proposed subsection could be read as suggesting that State certifying authorities retain unilateral discretion to modify certification conditions without seeking sign-off from the appropriate Federal agency. This would make little sense, given that the licensing or permitting agency would have had the opportunity to assess the lawfulness of the modification had it been added to the certification during the initial certification process and that the licensing or permitting agency has sole responsibility for the enforcement of certification conditions.  Indeed, the rules currently codified at 40 C.F.R. Sections 121.25 and 121.28 may be misread to suggest that Section 401 authorizes a State to engage in ongoing oversight, for the entire term of the license or permit, rather than serving a one-time "gating" function at the point when a Federal license or permit is first being sought or is being renewed.  The language suggested above would confirm for States and regulated parties that this is not the case.

## **CONCLUSION**

Exelon appreciates EPA's careful work in crafting the Proposed Rule and believes that the changes proposed by the agency will better align implementation of Section 401 of the CWA with the text of the statute and Congressional intent.  As explained above, Exelon recommends that EPA adopt several specific changes, which it believes would make the revised regulations even more effective.  Exelon would be glad to discuss these changes with you in additional detail or to provide any further assistance that EPA may find useful as it works to finalize revisions to its Part 121 regulations.

Respectfully submitted,

*/s/ Joel Beauvais*

Joel Beauvais

Vice President & Deputy General Counsel – Environment, Health & Safety

# EXHIBIT 11

**BRIEFING ROOM**

# Fact Sheet: List of Agency Actions for Review

JANUARY 20, 2021 • STATEMENTS AND RELEASES

*Actions Address the COVID-19 Pandemic, Provide Economic Relief, Tackle Climate Change, and Advance Racial Equity*

This is a non-exclusive list of agency actions that heads of the relevant agencies will review in accordance with the Executive Order: "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis." Additional agency actions also will be reviewed to determine consistency with Section 1 of the Executive Order. *Note that actions published in the January 20 Federal Register will be added to this list.*

**COUNCIL ON ENVIRONMENTAL QUALITY**

1. "Guidance Document Procedures," 86 Fed. Reg. 1279 (January 8, 2021).

2. "Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act," 85 Fed. Reg. 43304 (July 16, 2020).

**U.S. DEPARTMENT OF AGRICULTURE**

1. "Special Areas; Roadless Area Conservation; National Forest System Lands in Alaska," 85 Fed. Reg. 68688 (October 29, 2020).

**U.S. DEPARTMENT OF COMMERCE**

1. "Taking and Importing Marine Mammals; Taking Marine Mammals Incidental to Geophysical Surveys Related to Oil and Gas Activities in the Gulf of Mexico," 86 Fed. Reg. 5322 (January 19, 2021).

2. "Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat," 85 Fed. Reg. 81411 (December 16, 2020).

3. National Oceanic and Atmospheric Administration, Biological Opinion on Long Term Operation of the Central Valley Project and the State Water Project    (October 21, 2019).

4. "Endangered and Threatened Wildlife and Plants; Regulations for Listing Species and Designating Critical Habitat," 84 Fed. Reg. 45020 (August 27, 2019).

5. "Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation," 84 Fed. Reg. 44976 (August 27, 2019).

**U.S. DEPARTMENT OF DEFENSE**

1. "Reissuance and Modification of Nationwide Permits," 86 Fed. Reg. 2744 (January 13, 2021).

2. "The Navigable Waters Protection Rule: Definition of 'Waters of the United States,'" 85 Fed. Reg. 22250 (April 21, 2020).

**U.S. DEPARTMENT OF ENERGY**

1. "Energy Conservation Program: Energy Conservation Standards for Small Electric Motors," 86 Fed. Reg. 4885 (January 19, 2021).

2. "Energy Conservation Program: Establishment of New Product Classes for Residential Clothes Washers and Consumer Clothes Dryers," 85 Fed. Reg. 81359 (December 16, 2020).

3. "Test Procedure Interim Waiver Process," 85 Fed. Reg. 79802 (December 11, 2020).

4. "Energy Conservation Program: Establishment of a New Product Class for Residential Dishwashers," 85 Fed. Reg. 68723 (October 30, 2020).

5. "Energy Conservation Program for Appliance Standards: Procedures for Evaluating Statutory Factors for Use in New or Revised Energy Conservation Standards," 85 Fed. Reg. 50937 (August 19, 2020).

6. "Energy Conservation Program for Appliance Standards: Procedures for Use in New or Revised Energy Conservation Standards and Test Procedures for Consumer Products and Commercial/Industrial Equipment," 85 Fed. Reg. 8626 (February 14, 2020).

7. "Energy Conservation Program: Energy Conservation Standards," 85 Fed. Reg. 1378 (January 10, 2020).

8. "Energy Conservation Program: Energy Conservation Standards for General Service Incandescent Lamps," 84 Fed. Reg. 71626 (December 27, 2019).

9. "Final Determination Regarding Energy Efficiency Improvements in the 2018 International Energy Conservation Code (IECC)," 84 Fed. Reg. 67435 (December 10, 2019).

10. "Final Determination Regarding Energy Efficiency Improvements in ANSI/ASHRAE/IES Standard 90.1–2016: Energy Standard for Buildings, Except Low-Rise Residential Buildings," 83 Fed. Reg. 8463 (February 27, 2018).

## U.S. ENVIRONMENTAL PROTECTION AGENCY

1. "Standards of Performance for Volatile Organic Liquid Storage Vessels (Including Petroleum Liquid Storage Vessels) for Which Construction, Reconstruction, or Modification Commenced After July 23, 1984," 86 Fed. Reg. 5013 (January 19, 2021).

2. "National Primary Drinking Water Regulations: Lead and Copper Rule Revisions," 86 Fed. Reg. 4198 (January 15, 2021).

3. "Pollutant-Specific Significant Contribution Finding for Greenhouse Gas Emissions From New, Modified, and Reconstructed Stationary Sources: Electric Utility Generating Units, and Process for Determining

Significance of Other New Source Performance Standards Source Categories," 86 Fed. Reg. 2542 (January 13, 2021).

4. "Control of Air Pollution From Airplanes and Airplane Engines: GHG Emission Standards and Test Procedures," 86 Fed. Reg. 2136 (January 11, 2021).

5. "Review of Dust-Lead Post Abatement Clearance Levels," 86 Fed. Reg. 983 (January 7, 2021).

6. "Hexachlorobutadiene (HCBD); Regulation of Persistent, Bioaccumulative, and Toxic Chemicals Under TSCA Section 6(h)," 86 Fed. Reg. 922 (January 6, 2021).

7. "Pentachlorothiophenol (PCTP); Regulation of Persistent, Bioaccumulative, and Toxic Chemicals Under TSCA Section 6(h)," 86 Fed. Reg. 911 (January 6, 2021).

8. "Phenol, Isopropylated Phosphate (3:1) (PIP 3:1); Regulation of Persistent, Bioaccumulative, and Toxic Chemicals Under TSCA Section 6 (h)," 86 Fed. Reg. 894 (January 6, 2021).

9. "Decabromodiphenyl Ether (DecaBDE); Regulation of Persistent, Bioaccumulative, and Toxic Chemicals Under TSCA Section 6(h)," 86 Fed. Reg. 880 (January 6, 2021).

10. "2,4,6-tris(tert-butyl)phenol (2,4,6-TTBP); Regulation of Persistent, Bioaccumulative, and Toxic Chemicals Under TSCA Section 6(h)," 86 Fed. Reg. 866 (January 6, 2021).

11. "Strengthening Transparency in Pivotal Science Underlying Significant Regulatory Actions and Influential Scientific Information," 86 Fed. Reg. 469 (January 6, 2021).

12. "Review of the Ozone National Ambient Air Quality Standards," 85 Fed. Reg. 87256 (December 31, 2020).

13. "Increasing Consistency and Transparency in Considering Benefits and Costs in the Clean Air Act Rulemaking Process," 85 Fed. Reg. 84130 (December 23, 2020).

14. "Review of the National Ambient Air Quality Standards for Particulate Matter," 85 Fed. Reg. 82684 (December 18, 2020).

15. "Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act," 85 Fed. Reg. 73854 (November 19, 2020).

16. "Hazardous and Solid Waste Management System: Disposal of CCR; A Holistic Approach to Closure Part B: Alternate Demonstration for Unlined Surface Impoundments," 85 Fed. Reg. 72506 (November 12, 2020).

17. "NPDES Electronic Reporting Rule—Phase 2 Extension," 85 Fed. Reg. 69189 (November 2, 2020).

18. "Pesticides; Agricultural Worker Protection Standard; Revision of the Application Exclusion Zone Requirements," 85 Fed. Reg. 68760 (October 30, 2020).

19. "EPA Guidance; Administrative Procedures for Issuance and Public Petitions," 85 Fed. Reg. 66230 (October 19, 2020).

20. "Steam Electric Reconsideration Rule," 85 Fed. Reg. 64650 (October 13, 2020).

21. U.S. Environmental Protection Agency, Memorandum Regarding Inclusion of Provisions Governing Periods of Startup, Shutdown, and Malfunctions in State Implementation Plans     (October 9, 2020).

22. "Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Reconsideration," 85 Fed. Reg. 57398 (September 15, 2020).

23. "Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Review," 85 Fed. Reg. 57018 (September 14, 2020).

24. "Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals From Electric Utilities; A Holistic Approach to Closure Part A: Deadline To Initiate Closure," 85 Fed. Reg. 53516 (August 28, 2020).

25. "Streamlining Procedures for Permit Appeals," 85 Fed. Reg. 51650 (August 21, 2020).

26. "Drinking Water: Final Action on Perchlorate," 85 Fed. Reg. 43990 (July 21, 2020).

27. "Clean Water Act Section 401 Certification Rule," 85 Fed. Reg. 42210 (July 13, 2020).

28. "Methylene Chloride (MC); Final Toxic Substances Control Act (TSCA) Risk Evaluation; Notice of Availability," 85 Fed. Reg. 37942 (June 24, 2020).

29. "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units—Reconsideration of Supplemental Finding and Residual Risk and Technology Review," 85 Fed. Reg. 31286 (May 22, 2020).

30. "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks," 85 Fed. Reg. 24174 (April 30, 2020).

31. "The Navigable Waters Protection Rule: Definition of 'Waters of the United States,'" 85 Fed. Reg. 22250 (April 21, 2020).

32. "Air Plan Approval; Texas; Dallas-Fort Worth Area Redesignation and Maintenance Plan for Revoked Ozone National Ambient Air Quality Standards," 85 Fed. Reg. 19096 (April 6, 2020).

33. "Protection of Stratospheric Ozone: Revisions to the Refrigerant Management Program's Extension to Substitutes," 85 Fed. Reg. 14150 (March 11, 2020).

34. "On-Site Civil Inspection Procedures," 85 Fed. Reg. 12224 (March 2, 2020).

35. "Air Plan Approval; Texas; Houston-Galveston-Brazoria Area Redesignation and Maintenance Plan for Revoked Ozone National Ambient Air Quality Standards; Section 185 Fee Program," 85 Fed. Reg. 8411 (February 14, 2020).

36. "Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act," 84 Fed. Reg. 69834 (December 19, 2019).

37. U.S. Environmental Protection Agency, Evaluation of Maryland's Phase III Watershed Implementation Plan (WIP)   (December 19, 2019).

38. "Findings of Failure To Submit a Clean Air Act Section 110 State Implementation Plan for Interstate Transport for the 2015 Ozone National Ambient Air Quality Standards (NAAQS)," 84 Fed. Reg. 66612 (December 5, 2019).

39. "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program," 84 Fed. Reg. 51310 (September 27, 2019).

40. "Adopting Requirements in Emission Guidelines for Municipal Solid Waste Landfills," 84 Fed. Reg. 44547 (August 26, 2019).

41. "Regulation of Persistent, Bioaccumulative, and Toxic Chemicals Under TSCA Section 6(h)," 84 Fed. Reg. 36728 (July 29, 2019).

42. "Chlorpyrifos; Final Order Denying Objections to March 2017 Petition Denial Order," 84 Fed. Reg. 35555 (July 24, 2019).

43. "Review of the Dust-Lead Hazard Standards and the Definition of Lead-Based Paint," 84 Fed. Reg. 32632 (July 9, 2019).

44. "Repeal of the Clean Power Plan; Emission Guidelines for Greenhouse Gas Emissions From Existing Electric Utility Generating Units; Revisions to Emission Guidelines Implementing Regulations," 84 Fed. Reg. 32520 (July 8, 2019).

45. "Methylene Chloride; Regulation of Paint and Coating Removal for Consumer Use Under TSCA Section 6(a)," 84 Fed. Reg. 11420 (March 27, 2019).

46. "Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals From Electric Utilities; Amendments to the National Minimum Criteria (Phase One, Part One)," 83 Fed. Reg. 36435 (July 30, 2018).

47. "Financial Responsibility Requirements Under CERCLA Section 108(b) for Classes of Facilities in the Hardrock Mining Industry," 83 Fed. Reg. 7556 (February 21, 2018).

48. "Procedures for Chemical Risk Evaluation Under the Amended Toxic Substances Control Act," 82 Fed. Reg. 33726 (July 20, 2017).

## U.S. DEPARTMENT OF JUSTICE

1. "Prohibition on Settlement Payments to Non-Governmental Third Parties," 85 Fed. Reg. 81409 (December 16, 2020).

## U.S. DEPARTMENT OF THE INTERIOR

1. "Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Northern Spotted Owl," 86 Fed. Reg. 4820 (January 15, 2021).

2. U.S. Department of the Interior, National Greater Sage-Grouse Land Use Planning Page   (NEPA No. DOI-BLM-WO-WO2100-2017-0003-RMP-EIS) (last updated January 11, 2021).

3. "Regulations Governing Take of Migratory Birds," 86 Fed. Reg. 1134 (January 7, 2021).

4. "Endangered and Threatened Wildlife and Plants; Regulations for Designating Critical Habitat," 85 Fed. Reg. 82376 (December 18, 2020).

5. "Forest Management Decision Protest Process and Timber Sale Administration," 85 Fed. Reg 82359 (December 18, 2020).

6. "Endangered and Threatened Wildlife and Plants; 12-Month Finding for the Monarch Butterfly," 85 Fed. Reg. 81813 (December 17, 2020).

7. "Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat," 85 Fed. Reg. 81411 (December 16, 2020).

8.  "Notice of Availability of the Proposed Resource Management Plan and Final Environmental Impact Statement for the Bering Sea-Western Interior Planning Area, Alaska," 85 Fed. Reg. 78350 (December 4, 2020).

9.  "Endangered and Threatened Wildlife and Plants; Eleven Species Not Warranted for Listing as Endangered or Threatened Species," 85 Fed. Reg. 78029 (December 3, 2020).

10. "Endangered and Threatened Wildlife and Plants; Removing the Gray Wolf (Canis lupus) From the List of Endangered and Threatened Wildlife," 85 Fed. Reg 69778 (November 3, 2020).

11. "Notice of Availability of the Record of Decision for the Proposed Willow Master Development Plan Project, Alaska," 85 Fed. Reg. 69351 (November 2, 2020).

12. "Procedures for Issuing Guidance Documents," 85 Fed. Reg. 67666 (October 26, 2020).

13. "Alaska; Hunting and Trapping in National Preserves," 85 Fed. Reg. 35181 (June 9, 2020).

14. U.S. Department of the Interior, M-37056: Status of Mineral Ownership Underlying the Missouri River within the Boundaries of the Fort Berthold Indian Reservation   (North Dakota) (May 26, 2020).

15. "National Environmental Policy Act Implementing Procedures for the Bureau of Land Management (516 DM 11)," 85 Fed. Reg. 25472 (May 1, 2020).

16. U.S. Department of the Interior, M-37055: Withdrawal of Solicitor's Opinion M-37029, "The Meaning of 'Under Federal Jurisdiction' for Purposes of the Indian Reorganization Act"   (March 9, 2020).

17. U.S. Department of the Interior, Guidance Regarding Application of the Coastal Barrier Resources Act to Non-Structural Projects for Shoreline Stabilization   (November 4, 2019).

18. U.S. Fish and Wildlife Service, Biological Opinion for the Reinitiation of Consultation on the Coordinated Operations of the Central Valley Project and State Water Project (October 21, 2019).

19. "Endangered and Threatened Wildlife and Plants; Regulations for Listing Species and Designating Critical Habitat," 84 Fed. Reg. 45020 (August 27, 2019).

20. "Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation," 84 Fed. Reg. 44976 (August 27, 2019).

21. "Oil and Gas and Sulfur Operations in the Outer Continental Shelf—Blowout Preventer Systems and Well Control Revisions," 84 Fed. Reg. 21908 (May 15, 2019).

22. "Notice of Availability of Record of Decision and Approved Resource Management Plan Amendment for Greater Sage-Grouse Conservation, Northwest Colorado," 84 Fed. Reg. 10327 (March 20, 2019).

23. "Notice of Availability of Record of Decision and Approved Resource Management Plan Amendment for Greater Sage-Grouse Conservation, Idaho," 84 Fed. Reg. 10325 (March 20, 2019).

24. "Notice of Availability of Record of Decision and Approved Resource Management Plan Amendment for Greater Sage-Grouse Conservation, Oregon," 84 Fed. Reg. 10324 (March 20, 2019).

25. "Notice of Availability of Record of Decision and Approved Resource Management Plan Amendment for Greater Sage-Grouse Conservation, Nevada and Northeastern California," 84 Fed. Reg. 10323 (March 20, 2019).

26. "Notice of Availability of Record of Decision and Approved Resource Management Plan Amendment for Greater Sage-Grouse Conservation, Wyoming," 84 Fed. Reg. 10322 (March 20, 2019).

27. "Waste Prevention, Production Subject to Royalties, and Resource Conservation; Rescission or Revision of Certain Requirements," 83 Fed. Reg. 49184 (September 28, 2018).

28. U.S. Department of the Interior, Instruction Memorandum No. 2018-034: Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews   (January 31, 2018).

29. "Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands; Rescission of a 2015 Rule," 82 Fed. Reg. 61924 (December 29, 2017).

30. U.S. Department of the Interior, M-37050: The Migratory Bird Treaty Act Does Not Prohibit Incidental Take   (December 22, 2017).

31. U.S. Department of the Interior, Order No. 3348: Concerning the Federal Coal Moratorium   (March 29, 2017).

## U.S. DEPARTMENT OF LABOR

1. "Financial Factors in Selecting Plan Investments," 85 Fed. Reg. 72846 (November 13, 2020).

## U.S. DEPARTMENT OF TRANSPORTATION

1. "Hazardous Materials: Liquefied Natural Gas by Rail," 85 Fed. Reg. 44994 (July 24, 2020).

2. "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks," 85 Fed. Reg. 24174 (April 30, 2020).

3. "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program," 84 Fed. Reg. 51310 (September 27, 2019).

EXHIBIT 12



**State of Louisiana**
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 94005
BATON ROUGE
70804-9005

Jeff Landry
Attorney General

August 2, 2021

<u>*Via Electronic Submission*</u>

Administrator Michael S. Regan
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Re:   **Notice of Intention to Reconsider and Revise the Clean Water Act
Section 401 Certification Rule, 86 Fed. Reg. 29,541 (June 2, 2021)
Docket No. EPA-HQ-OW-2021-0302**

Administrator Reagan:

As the chief legal officers of Louisiana, Alaska, Arkansas, Indiana, Kansas, Kentucky, Mississippi, Missouri, Montana, Nebraska, South Carolina and West Virginia . Our States are committed to protecting the quality of our waters. At the same time, our States are committed to fairness to citizens seeking permits, economic progress, development of natural resources, and our citizens rights to transport their products without arbitrary blockages by other states. We accordingly provide the following comments in response to EPA's Notice of Intention to Reconsider and Revise the Clean Water Act Section 401 Certification Rule, 86 Fed. Reg. 29,541 (June 2, 2021).

I.   <u>**Background**</u>

A.   **The Clean Water Act**

Since 1970, "[a]ny applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters . . . shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate . . . ." Water Quality Improvement Act of 1970, Pub. L. 91-224, 84 Stat. 91, 108 (Apr. 3, 1970). In 1972, Congress enacted a "total restructuring" and "complete rewriting" of the nation's water pollution control laws, including the provision requiring certification. *City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981) (quoting legislative history); *see also* Federal Water Pollution Control Act Amendments of 1972, Pub. L. 92-500, 86 Stat. 816, 877 (Oct. 16, 1972) (codified at 33 U.S.C. § 1341). Of particular relevance here, Congress narrowed the requirement from a certification "that such *activity* will be conducted in a manner which will not violate applicable *water quality standards*," 84. Stat. at 108 (emphasis added), to a certification only "that any such *discharge* will comply with *the applicable provisions of sections 301, 302, 306, and 307 of this Act,*" 86 Stat. at 877 (emphasis added).

**B.  Certain States Abuse Their 401 Certification Authority**

Despite the statutory change, the Environmental Protection Agency ("EPA") failed to revise the regulations governing the required certification, which is known as a 401 Certification. As a result, EPA's regulations are incongruent with the new statutory language. *Cf.* NPDES; Revision of Regulations, 44 Fed. Reg. 32,854, 32,856 (June 7, 1979) (indicating need for updated certification rules). Certain states began using the incongruity and ambiguities in EPA's regulations to abuse their certification authority for the purpose of delaying or denying certifications on non-water quality grounds. In February 2019, Louisiana and other States wrote to EPA Administrator Wheeler about that abuse and requested that EPA "clarif[y] . . . the process by which federal and state regulatory authorities are expected to implement [Section 401]." Exh. 1. That weighty request was bolstered when, on April 10, 2019, President Trump issued an Executive Order noting that "[o]utdated Federal guidance and regulations regarding section 401 of the Clean Water Act . . . are causing confusion and uncertainty and are hindering the development of energy infrastructure." EO 13868, 84 Fed. Reg. 15,494 (Apr. 15, 2019). The President directed Administrator Wheeler to review EPA's Section 401 regulations, "determine whether any provisions thereof should be clarified," and "publish for notice and comment proposed rules revising such regulations, as appropriate and consistent with law." *Id.* Louisiana and other States then submitted additional comments in response to EPA's request for Pre-Proposal Stakeholder Engagement. Exhs. 2, 7.

Louisiana identified the State of Washington's denial of certification for a proposed coal facility, the Millennium Bulk Terminal, as a paradigmatic example of abuse. Exh. 1.  The Governor of Wyoming later explained:

> Wyoming has been adversely impacted by the misapplication of other states' CWA Section 401 certifications. Our interest in a streamlined 401 certification process is founded by the fact that a large portion of Wyoming's economy depends on our ability to export our energy products to the markets that demand them, particularly markets located overseas in Asia. In the case of the Millennium Bulk Terminal, Washington State blocked the terminal's construction by inappropriately denying the State's Section 401 certification on account of non-water quality related impacts -- an illegal maneuver based on alleged effects that are outside of the scope of Section 401.

Exh. 4. The permit applicant for the proposed Millennium Bulk Terminal elaborated:

> Millennium sought a Clean Water Act, Section 401 water quality certification from the Washington Department of Ecology ("Washington Ecology") for nearly six years. As part of the 401 certification process, Millennium has spent over $15 million to obtain an environmental impact statement ("EIS"), which originally began as a dual EIS under the National Environmental Policy Act ("NEPA") and the Washington State Environmental Policy Act ("SEPA"), with the US Army Corps of Engineers as the lead agency under NEPA and with the Washington Ecology and Cowlitz County as co-lead agencies under SEPA. In September 2013, the state and federal agencies agreed to separate and prepare both a federal EIS and a state EIS.

> The state EIS concluded with respect to the Project that "**There would be no unavoidable and significant adverse environmental impacts on water quality.**"
>
> *   *   *   *   *

2

Washington Governor Jay Inslee, and others in his administration, including Washington Ecology Director Bellon, have expressed their belief that no fossil fuel infrastructure projects should ever be built in the State of Washington. Denying Millennium's 401 water quality certification was the way that they could impose their own personal policy preferences to ensure that no permits would be issued for the Project and they could stop sister states from exporting their products into foreign commerce.

Exh. 8.

Montana also objected to Washington's abuse of its discretion, and the dispute led to costly litigation when Wyoming and Montana sued the State of Washington. Other comments and judicial opinions made clear the Millennium Bulk Terminal denial was not an isolated abuse. *See, e.g.,* Exh. 9. Indeed, the State of Maryland went so far as to seek a multi-billion dollar "payment-in lieu" of imposing unachievable conditions unrelated to the discharge for which certification was sought – a demand that would ordinarily be considered extortion and which raises constitutional concerns. Ex. 10; *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987). The Federal Energy Regulatory Commission bluntly summarized the status quo: "[I]t is now commonplace for states to use Section 401 to hold federal licensing hostage." *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1104 (D.C. Cir. 2019).

### C.  EPA Adopts A Rule to Eliminate Ambiguity and Abuse

Citing the April 2019 Executive Order and Pre-Proposal Stakeholder Engagement, EPA published a proposed rule, Updating Regulations on Water Quality Certification, 84 Fed. Reg. 44,080 (Aug. 22, 2019), to, *inter alia*, limit the scope of 401 certification to water quality impacts from the discharge associated with the licensed or permitted project; interpret "receipt" and "certification request" as used in the CWA; reaffirm that certifying authorities are required by the CWA to act on a request for certification within a reasonable period of time, which shall not exceed one year; and specify the contents and effect of a certification or denial. Despite the short text of the proposed rule itself—less than four *Federal Register* pages—EPA provided a lengthy statutory and legal analysis.

Louisiana, joined by other states, provided extensive comments in support of the proposed rule. Exhs. 1-3. The Governor of Wyoming even testified before the Senate Committee on the Environment and Public Works in support of EPA's rule and parallel Congressional action. Thereafter, EPA published the final rule, Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. 42210 (July 13, 2020) ("Rule"). The accompanying commentary acknowledged the Rule was driven by, *inter alia*, the 1972 statutory amendments, "litigation over the section 401 certifications for several high-profile projects," and "the need for the EPA to update its regulations to provide a common framework for consistency with CWA section 401 and to give project proponents, certifying authorities, and federal licensing and permitting agencies additional clarity and regulatory certainty." *Id.* at 42,211. The Rule went into effect on September 11, 2020.

### D.  President Biden Issues Executive Order 13990 and EPA Announces Its Intent to Reconsider the Clean Water Act 401 Certification Rule

On January 20, 2021, newly-elected President Biden issued Executive Order 13990. 86 Fed. Reg. 7,037 (Jan. 25, 2021). Among other things, that order revoked Executive Order 13868 and directed agency heads to "immediately review all existing regulations, orders, guidance documents,

policies, and any other similar agency actions (agency actions) promulgated, issued, or adopted between January 20, 2017, and January 20, 2021, that are or may be inconsistent with, or present obstacles to, the policy set forth in section 1 of [that] order." *Id.* at 7,037. President Biden then directed that "[f]or any such actions identified by the agencies, the heads of agencies shall, as appropriate and consistent with applicable law, consider suspending, revising, or rescinding the agency actions." *Id.* A "Fact Sheet: List of Agency Actions for Review" posted that same day to whitehouse.gov identified the Clean Water Act Section 401 Certification Rule as an action for review under Executive Order 13990. Exh. 11. Neither Executive Order 13990 nor the Fact Sheet identified any specific problem with the Clean Water Act Section 401 Certification Rule. Nevertheless, on June 2, 2021, EPA announced its Notice of Intent to Reconsider and Revise the Clean Water Act 401 Certification Rule "in accordance with" Executive Order 13990. 86 Fed. Reg. at 29,541.

## II.  **General Comment**

We are deeply troubled by EPA's reconsideration of a significant rule adopted less than one year ago. EPA offers only vague reasons for reconsideration: "[1] [t]he text of CWA Section 401; [2] Congressional intent and [3] the cooperative federalism framework of CWA Section 401; [4] [unspecified] concerns raised by [unidentified] stakeholders about the 401 Certification Rule, including [unspecified] implementation related feedback; [5] the principles outlined in the Executive Order; and [6] [unspecified] issues raised in ongoing litigation challenges to the 401 Certification Rule." 86 Fed. Reg. at 29542. Of course, "the text of CWA 401," "Congressional intent," and the "cooperative federalism" framework of CWA Section 401 were extensively addressed in connection with the Clean Water Act 401 Certification Rule, *e.g.*, 85 Fed. Reg. at 42,215-17, 42,226, and EPA expressly "determined that the final rule implements the fundamental statutory objectives of the CWA," 85 Fed. Reg. at 42,212. With respect to "implementation related feedback," we question whether any stakeholder has sufficient experience implementing a rule that has been in effect less than nine months to provide feedback warranting revision.

What remains are Executive Order 13990 and "issues raised in litigation" that has not yet seen briefing on the merits.[1] Neither provides a basis for reconsideration. EPA thus falls back on a dubious claim of "inherent authority to reconsider past decisions" and an assertion that "such a revised decision need not be based upon a change of facts or circumstances." 86 Fed. Reg. at 29542; *but see, e.g.*, *California v. Bernhardt*, 472 F. Supp. 3d 573, 600-01 (N.D. Cal. 2020) ("While the Executive branch holds the power to issue executive orders, an agency cannot flip-flop regulations on the whims of each new administration. The APA requires reasoning, deliberation, and process. These requirements exist, in part, because markets and industries rely on stable regulations."). Tellingly, EPA's Notice of Intent to Reconsider makes no mention of the well-documented abuses that preceded the Clean Water Act 401 Certification Rule or EPA's determination that "some certifying authorities [had] implemented water quality certification programs that exceed the boundaries set by Congress in section 401." 85 Fed. Reg. at 42,215.

We note the difficulty in providing detailed comments given the vagueness of EPA's rationales for reconsideration, EPA's failure to address the reasons supporting the Clean Water Act 401 Certification Rule, and the absence of proposed revisions.

---

[1] EPA has already sought remand without vacatur in each of the litigations challenging the 401 Certification Rule. That suggests EPA is merely undertaking a variation of its well-known practice of entering politically-driven resolutions of lawsuits filed by friendly activists. *See* Exh. 7.

## III.   Responses to Specific Requests for Comments

### 1.   Pre-filing meeting requests

We note the short period of time the "pre-filing meeting request" requirement has been in effect and the certifying authority's discretion whether to hold such a meeting. *Cf.* 86 Fed. Reg. at 29,544 ("EPA is interested in . . . whether any major projects are anticipated *in the next few years* that could benefit for or be encumbered by the 401 Certification Rule's procedural requirements.").

### 2.   Definition of "certification request"

The Rule defines a certification request as "a written, signed, and dated communications that satisfies the requirements of [40 C.F.R.] 121.5(b) or (c)." 40 C.F.R. 121.1(c). Those sections in turn specify information that must be included in a certification request.

Soliciting input on these topics, the EPA expresses its concern that the Rule may "limit[] state and tribal ability to get information they may need before the CWA Section 401 review process begins," 86 Fed. Reg. at 29,543, and the waiver clock starts to run. We believe the existing definition appropriately balances a certifying authority's need for adequate information to evaluate the request and the project proponent's ability to obtain and submit the information. To the extent additional information is necessary, a certifying authority can request that information from a project proponent.

EPA suggests revisions to the definition could allow a certifying authority to determine when it has received sufficient information to begin the waiver clock, providing essentially no limitation on the period for review. *Cf.* Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court."). Adequacy of the complete information package is a separate question from whether a certification request has been submitted. Congress made clear that the permitting process should not take more than one year, and the maximum time set by statute is keyed to receipt of a request for certification, not detailed information. *See* 85 Fed. Reg. at 42,235 (citing, *inter alia*, 33 U.S.C. 1341). Revision on this point would be contrary to Congress' clear intent, implicate Due Process, and would dramatically hinder the permitting process.

There appears to be no rationale for a change. Certifying authorities can request information from applicants. If the applicant fails to provide that information, the certifying authority can issue a denial. The check on such a denial is the Rule's requirement that "the denial must describe the specific water quality data or information, if any that would be needed to assure the discharge from the proposed project will comply with water quality requirements" or "that would be needed to assure that the range of discharges will comply with water quality requirements." 40 C.F.R. 121.7(e)(1)(iii), (2)(iii). In short, rational project proponents are unlikely to refuse to provide information requested by a certifying authority if withholding that information will only result in a denial.

The Undersigned States advocated for the existing limits on an open-ended time period to determine whether an application is complete. EPA agreed and revised the certification process; it now provides a system by which certifying authorities receive notice of a request before that request is filed, have the ability to seek information from a project proponent, have a definite period of time to act on that information, and – consistent with Due Process – must identify specific missing

information if a denial is due to insufficient information. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970) ("[T]he decision maker should state the reasons for his determination and indicate the evidence he relied on."). The process set forth in the Rule helps prevent the abuses and arbitrary denials that led some of the Undersigned States to urge EPA to adopt the Rule in the first place. *See, e.g.*, Henry J. Friendly, "Some Kind of Hearing," 123 UNIV. PA. LAW REV. 1267 1292 (1975) ("A written statement of reasons, almost essential if there is to be judicial review, is desirable on many other grounds. The necessity for justification is a powerful preventive of wrong decisions. The requirement also tends to effectuate intra-agency uniformity . . . ."). And, with regard to projects that cross state lines (like pipelines or interstates) or that serve broader geographical regions (like solar farms or wind farms), the Rule prevents one state from using bureaucratic games to effectively veto a project that has significant economic effects across an entire region.

### 3. Reasonable period of time

Congress specified that "[i]f the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application." 33 U.S.C. 1341(a)(1). The Rule accordingly provides that "[t]he Federal agency shall establish the reasonable period of time either categorically or on a case-by-case basis" which "shall not exceed one year from receipt, 40 C.F.R. 121.6, *i.e.*, one year from "the date a certifying request is document as received by a certifying authority, 40 C.F.R. 121.1(m). The Rule then identifies broad factors the Federal agency "shall consider" in establishing the reasonable period of time: "(1) the complexity of the proposed project; (2) the nature of any potential discharge; and (3) the potential need for additional study or evaluation of water quality effects from the discharge." 40 C.F.R. 121.6(c).

EPA expresses concern that the Rule does not allow certifying authorities a sufficient role in setting the timeline for review and limits the factors agencies can use to determine reasonable period of time. In fact, the Undersigned States have expressed the *opposite* concern – that allowing all 50 States (and other certifying authorities) to establish different timeliness for review increases instability and inefficiency. Further, where additional time is demonstrably necessary, the Rule provides as a safety valve that "[t]he Federal agency may extend the reasonable period of time at the request of a certifying authority or a project proponent." 40 C.F.R. 121.6(d).

Notably, both EPA and the Army Corps of Engineers have determined that a reasonable period of time should generally be less than one year. *See* 33 CFR 325.2(b)(1)(ii) (60 days); 40 C.F.R. § 121.16(b) (6 months); 40 C.F.R. § 124.53(c)(3) (60 days). Having a Federal agency set the reasonable period of time serves to minimize the arbitrary delays and bureaucratic gamesmanship that were at the heart of the Undersigned States' concerns. EPA should continue to have Federal agencies establish the reasonable period of time, as they have done for decades consistent with judicial and administrative precedent. *See, e.g.*, *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1104 (D.C. Cir. 2019) ("Thus, while a full year is the absolute maximum, it does not preclude a finding of waiver prior to the passage of a full year."); *Constitution Pipeline Company, LLC,* 164 FERC P 61029 (F.E.R.C.), 2018 WL 3498274 (2018) ("[T]o the extent that Congress left it to federal licensing and permitting agencies, here the Commission, to determine the reasonable period of time for action by a state certifying agency, bounded on the outside at one year, we have concluded that a period up to one year is reasonable.").

EPA implicitly raises the question of when does a certifying authority waive certification. The Rule recognizes clear, bright lines, *i.e.*, the certification request review period has a clear beginning, a definite end, and a tangible consequence for a certifying authority's failure to act. The Rule is thus consistent with Congress imposition of a clear time limit. *See* 33 U.S.C. § 1341(a)(1). Congress did not qualify the statutory language to allow the certifying authority to delay the commencement of, toll, extend, or otherwise alter or modify that timeframe after the request is received. *See N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d 450, 455–56 (2d. Cir. 2018) ("The plain language of Section 401 outlines a bright-line rule regarding the beginning of review . . . . It does not specify that this time limit applies only for 'complete' applications."). EPA should ensure that any revisions to the 401 Certification Rule affirm the statute's "bright-line" waiver rule.

### 4.  Scope of Certification

The Rule makes clear that "[t]he scope of a Clean Water Act section 401 certification is limited to assuring that a discharge . . . will comply with water quality requirements," 40 C.F.R. 121.3, which are in turn defined as "applicable provisions of §§ 301, 302, 303, 306, and 307 of the Clean Water Act, and state or tribal regulatory requirements for point source discharges into waters of the United States," 40 C.F.R. 121.1(n). The scope of certification defined in the 401 Certification Rule is reasonable and is consistent with the Clean Water Act.

EPA seeks input on the Rule's interpretation of the scope of certification and conditions, and the definition of "water quality requirements" as it relates to the statutory phrase "other appropriate requirements of state law," including but not limited to, whether the agency should revise its interpretation of scope to include potential impacts to water quality not only from the "discharge" but also from the "*activity as a whole.*" EPA further expresses concern that the "narrow scope" of certification may prevent state and tribal authorities from adequately protecting their water quality.

The interpretation of the statute in the Rule is correct; is consistent with the *ejusdem generis;* and *noscitur a sociis* canons; is consistent with the presumption that statutory amendments are intended to have real and substantial effect, *Stone v. INS*, 514 U.S. 386, 397 (1995); and is permissible under *PUD No. 1 of Jefferson County v. Washington Dep't of Ecology*, 511 U.S. 700 (1994). Undersigned States note that any interpretation that allows certifying authorities to make certification decisions based on matters unrelated to water quality (*e.g.*, greenhouse gas emissions, transportation impacts, project need, etc.) would not only be an unreasonable interpretation of the statute, but would create boundless discretion and inject ambiguity. While States value their right to be "incubators of democracy" in the development of their own laws and policies, the objectives of the Clean Water Act are not well-served by ambiguity and state-by-state policy. Notably, EPA does not mention the Rule's justification that "some certifying authorities have included conditions in a certification that have nothing to do with effluent limitations, monitoring requirements, water quality, or even the CWA," "such as requirements for biking and hiking trails to be constructed, one time and recurring payments to State agencies for improvements or enhancements that are unrelated to the proposed . . . project, and public access," or its well-founded conclusion that such actions are not authorized by Section 401. 85 Fed. Reg. at 42,256-257.

### 5. Certification Actions and Federal Agency Review

As EPA notes, the Rule provides that certifying authorities may take one of four actions on a certification request: grant certification, grant certification with conditions, deny certification, or waive certification. EPA seeks input as to "whether there is any utility in requiring specific components and information for certifications with conditions or denials." 86 Fed. Reg. at 29543. As noted above, a decision maker's stating "the reasons for his determination and . . . the evidence he relied on" are basic requirements of Due Process. *Goldberg*, 397 U.S. at 271. Such information is also essential for judicial review and is a powerful preventive of wrong decisions. Friendly, "Some Kind of Hearing," 123 UNIV. PA. LAW REV. at 1292. And particularly in the case of denials, a complete statement of the basis for denial facilitates a proponent being able to traverse the denial via a new certification request. The Rule thus properly requires information regarding conditions and denials to be included in a certifying authority's action on a certification request. 40 C.F.R. 121.7.

EPA expresses concern "that a federal agency's review may result in a state or tribe's certification or conditions being permanently waived as a result of nonsubstantive or easily fixed procedural concerns identified by the federal agency." 86 Fed. Reg. at 29,543. The Rule provides for waiver on "failure or refusal to satisfy the requirements" of certain provisions. 40 C.F.R. 121.9. The phrase "refusal to satisfy" implies that any "failure" may be timely corrected. This requirement serves to police certifying authorities compliance with EPA's procedural rules via a mechanism that is quicker and less costly than judicial review.

### 6. Enforcement

EPA provides no legal analysis for its suggestion that the CWA citizen suit provision may apply to section 401. We are thus left blind as to EPA's theory. We note, however, that the citizen suit provision expressly recognizes that it is limited by the States' sovereign immunity. *See* 33 U.S.C. § 1365.

\* \* \* \* \*

Please don't hesitate to contact me with any questions or concerns. The point of contact for this matter is Deputy Solicitor General Scott St. John, stjohnj@ag.louisiana.gov, 225-485-2458.

With kind regards,

Patrick Morrisey
West Virginia Attorney General

Jeff Landry
Louisiana Attorney General

8

Treg Taylor
Alaska Attorney General

Lynn Fitch
Mississippi Attorney General

Leslie Rutledge
Arkansas Attorney General

Eric S. Schmitt
Missouri Attorney General

Todd Rokita
Indiana Attorney General

Austin Knudsen
Montana Attorney General

Derek Schmidt
Kansas Attorney General

Doug Peterson
Nebraska Attorney General

Daniel Cameron
Kentucky Attorney General

Alan Wilson
South Carolina Attorney General