**Exhibit B**

Comments from the Alaska Oil and Gas Association, the American Exploration and Production Council, American Fuel & Petrochemical Manufacturers, the American Petroleum Institute, the American Public Gas Association, the Independent Petroleum Association of America, and the Petroleum Alliance of Oklahoma in response to the U.S. Environmental Protection Agency's request for comment on its proposed "Clean Water Act Section 401 Water Quality Certification Improvement Rule" (EPA-HQ-OW-2022-0128), 87 Fed. Reg. 35,318 (June 9, 2022) (Aug. 8, 2023)

     

August 8, 2022

*__Via Regulations.gov__*

Water Docket
U.S. Environmental Protection Agency
EPA West, Room 3334
1301 Constitution Ave., NW
Washington, DC 20004

Re:     Comments from the Alaska Oil and Gas Association, the American Exploration and Production Council, American Fuel & Petrochemical Manufacturers, the American Petroleum Institute, the American Public Gas Association, the Independent Petroleum Association of America, and the Petroleum Alliance of Oklahoma in response to the U.S. Environmental Protection Agency's request for comment on its proposed "Clean Water Act Section 401 Water Quality Certification Improvement Rule."
(EPA-HQ-OW-2022-0128)
87 Fed. Reg. 35,318 (June 9, 2022)

To Whom It May Concern:

This letter provides comments from the Alaska Oil and Gas Association ("AOGA"), the American Exploration and Production Council ("AXPC"), American Fuel & Petrochemical Manufacturers ("AFPM"), the American Petroleum Institute ("API"), the American Public Gas Association ("APGA"), the Independent Petroleum Association of America ('IPAA"), and the Petroleum Alliance of Oklahoma ("The Alliance") (collectively, "the Associations") in response to the U.S. Environmental Protection Agency's ("EPA's" or "the Agency's") proposed rule revising and replacing the Agency's 2020 Clean Water Act Section 401 Certification regulations[1] ("2020 Rule").[2]  As explained in more detail below, the 2020 Rule provided long-overdue clarification on the role of states and other certifying authorities under Section 401 of the Clean Water Act ("CWA" or "the Act"). The proposed rule would eliminate the clarity and consistency that the 2020 Rule afforded project proponents and certifying authorities alike, while needlessly delaying nationally important projects or critical infrastructure such as those to modernize our nation's means of generating and transporting energy, as well as our commitment to directing investment to the infrastructure needs of underserved communities.

The clarifications furnished in the 2020 Rule were also necessary to address some states' misuse of Section 401 certification procedures in pursuit of policy goals wholly distinct from

_____

[1] 85 Fed. Reg. 42,210 (July 13, 2020).
[2] 86 Fed. Reg. 29,541 (June 2, 2021).

considerations of potential water quality impacts.  Indeed, the 2020 Rule was also necessary to incorporate a growing body of case law interpreting Section 401 of the Act consistent with Congress's intent to preserve for states a highly circumscribed role in evaluating a proposed project's potential impacts on certain enumerated CWA provisions. The proposed rule largely overlooks the procedural abuses that justified many of the 2020 Rule's revisions and seemingly invites some certifying authorities to resurrect many of same misapplications of Section 401 processes that they employed in pursuit of unrelated policy objectives prior to the 2020 revisions.

The Associations therefore recommend EPA either rescind the proposed rule or change the proposal so that it is better aligned with congressional intent, conforms to relevant current and pending court decisions, and restrains known and reasonably anticipated misuse of Section 401 certification procedures.  Indeed, as EPA considers comments on the Agency's proposed revisions to its Section 401 regulations, we are optimistic that the Agency will recognize that Congress did not intend CWA Section 401 to allow a single state and other certifying authorities to wield disproportionate power over projects of national importance, and will further recognize that the imposition of reasonable limits on the disproportionate use of Section 401 certification authority is consistent with the principles of cooperative federalism.

To that end, and the interest of constructively engaging with EPA in this reconsideration process, the Associations provide the following comments.  Because of the length of this letter, we have included a table of contents below.

## TABLE OF CONTENTS

**Page**

I.   SUMMARY ...................................................................................................5

II.   THE ASSOCIATIONS AND THEIR INTERESTS ............................................7

III.   GUIDELINES FOR INTERPRETING CWA SECTION 401 ...........................9

   a.   Consideration of the context for, and role of, CWA Section 401 certifications ................9

      1.   Natural Gas Act of 1936 ..................................................................10

      2.   National Environmental Policy Act .................................................12

      3.   Other federal statutes with impact reviews and opportunities for stakeholder engagement ...................................................................13

      4.   EPA must implement CWA Section 401 in accordance with Congress's intent to assert exclusive federal jurisdiction through statutes like the NGA and in

the context of more comprehensive environmental review processes Congress established through NEPA and other statutes ...................................................15

b.   Reasonable limits on the Section 401 certification process are consistent with principles of cooperative federalism......................................................................................17

c.   The legislative history of the CWA illustrates the reasonable limits Congress intended for the Section 401 certification process .................................................................19

d.   EPA's proposed regulatory revisions must comply with the Administrative Procedure Act...................................................................................................................23

IV.   RESPONSES TO EPA'S QUESTIONS FOR CONSIDERATION ................................25

a.   When 401 Certification is Required  ..................................................................25

b.   Pre-filing Meeting Requests  .............................................................................28

c.   Request for Certification.....................................................................................29

1.   Proposed Contents of a Request for Certification ............................30

2.   Proposed Definition of "Receipt" .....................................................34

d.   Reasonable Period of Time ................................................................................37

1.   Certifying authorities should not set their own review deadlines...................39

2.   EPA must retain its regulatory prohibitions on certifying authorities' ability to artificially extend timeframes by stopping and restarting the certification process ...............................................................................................41

e.   Scope of Certification .........................................................................................43

1.   Discharge v. Activity ........................................................................44

2.   Water Quality Requirements..............................................................48

f.   Certification Decisions .......................................................................................52

1.   EPA should not rescind modest requirements that certifying authorities explain and document their certification decisions..........................................53

2.   EPA cannot prohibit federal agency review and oversight over certification decisions...............................................................................................55

g. Modifications ................................................................................................57

h. Enforcement and Inspections ......................................................................59

i. Neighboring jurisdictions............................................................................61

j. Obtaining "Treatment as State" for Section 401 .........................................63

V. CONCLUSION..............................................................................................64

## I.     SUMMARY

The Associations urge EPA to refrain from substantially revising the Agency's Section 401 implementing regulations, and particularly those provisions recently added or revised by EPA's 2020 Rule.[3]  The 2020 Rule provided a long-overdue and increasingly necessary clarification of the role of states and other certifying authorities under Section 401 of the Act.

It is important to the Associations and our members that Section 401 certification proceedings be efficient, reasonably predictable, and appropriately focused on potential water quality impacts. Our members are on the forefront of a transformational era typified by an increased need to develop domestic natural gas and oil resources and a continued desire to accelerate the development of renewable energy infrastructure.

As the atrocities of Russia's unprovoked invasion of Ukraine have shown, the responsible production of our domestic natural gas and oil resources is key to maintaining global stability, addressing supply shortages and inflation, promoting economic growth, and supporting our allies. Safely developing and bringing these critical resources to consumers, refineries, processing plants, and export facilities requires infrastructure investment and policies to ensure that nationally important projects can be efficiently vetted and approved.

To those opposed to any natural gas or oil development, America's energy infrastructure needs are viewed as convenient opportunities to deploy regulatory strategies designed to delay needed projects and sever resources from markets.  And when the opponents of the oil and natural gas industry are states or other certifying authorities, the misuse of the Section 401 certification process has been favored tactic for delaying, constraining, or altogether killing nationally important energy projects.

While the Associations' interest in preserving the 2020 Rule's reasonable limits on the Section 401 certification process is necessarily focused on energy infrastructure, the need for an efficient and appropriately regulated certification process extends well beyond our industry.   In his statement supporting the Inflation Reduction Act of 2022 ("IRA"), President Biden called it "the most important investment — not hyperbole — the most important investment that we've ever made in our energy security, and developing cost savings and job-creating clean energy solutions for the future."[4]  According to President Biden, the IRA will promote environmental justice and create thousands of good-paying jobs "on clean energy construction projects, solar projects, wind projects, clean hydrogen projects, carbon capture projects, and more."[5]  Many of these types of projects require federal licensing or permitting actions that will trigger Section 401 certification proceedings.

---

[3] 85 Fed. Reg. 42,210 (July 13, 2020).

[4] *See* July 28, 2022 remarks by President Biden at https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/07/28/remarks-by-president-biden-on-the-inflation-reduction-act-of-2022/.

[5] *See* July 28, 2022 remarks by President Biden at https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/07/28/remarks-by-president-biden-on-the-inflation-reduction-act-of-2022/.

The Associations therefore urge EPA to continue to interpret Section 401 in a manner that reasonably limits the ability of single state or certifying authority to wield disproportionate power over interstate projects of national importance.  The efficient permitting of essential infrastructure projects requires the collaboration of state and federal authorities and the consideration of state and national interests.  In enacting Section 401, Congress preserved an important role for states and other certifying authorities in evaluating the water quality impacts of federal infrastructure projects, but it did not prescribe that role without limit or to the detriment of federal licensing or permitting authorities.

More specifically, Section 401 preserves for states the highly circumscribed role of evaluating a proposed project's potential impacts on certain enumerated CWA provisions. CWA Section 401 does not empower a state or other certifying authority to deny a certification request based on generalized objections about hydrocarbon development, or concerns about the continued role of fossil fuels in product manufacturing and power generation.  Nor does CWA Section 401 allow states to deny or condition certification based on potential environmental impacts of the proposed project other than potential point source discharges to waters of the United States that can result in possible violations of water quality standards.[6]

The text, structure, and history of Section 401 reflect Congress's recognition that certain projects of national importance could not be subjected to the parochial interests of a single state or other certifying authority.   And yet, as acknowledged by the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") prior to promulgation of the 2020 Rule, "it is now commonplace for states to use Section 401 to hold federal licensing hostage."[7]  Using Section 401 "to hold federal licensing hostage,"[8] or basing certification decisions on policy considerations that cannot realistically be construed as credible concerns over water quality impacts is impermissible under the CWA and conflicts with several other statutes through which Congress tasked federal agencies with decision-making authority.

The Associations therefore urge EPA to ensure that the Agency's regulations adhere to Congress's readily discernable intent that Section 401 be implemented to provide states and other authorities certification authority that is limited in time and scope.  We believe that the Agency must, at a minimum, retain those provisions of the 2020 Rule necessary to curb the well documented tactics a handful of states have utilized to artificially extend their review deadlines and improperly expand the scope of their certification and conditioning authority.  EPA's regulations implementing Section 401 can and should be appropriately tailored to curtail the known avenues for state misuse of Section 401, while preserving the important but highly circumscribed role Congress intended.

In Section III, the Associations provide interpretive guidelines that we believe EPA must consider in evaluating whether to finalize the Agency's proposed changes to its existing Section 401

---

[6] 40 C.F.R. § 121.2(a)(3).

[7] *Hoopa Valley Tribe* v. *FERC ("Hoopa Valley")*, 913 F. 3d. 1099, 1104 (D.C. Cir. 2019).

[8] *Hoopa Valley*, 913 F. 3d. at 1104.

regulations.  These guidelines interpret Section 401 utilizing the text and structure of the CWA, extensive analysis of case law, and a detailed legislative history of the Act and its key amendments.

Section III also describes the natural gas pipeline permitting process to illustrate the comprehensive review and approval process within which Section 401 certification is but one part. Natural gas permitting is only one example of the types of federal actions that can trigger Section 401 certifications, but it is a good example because it helps provide context necessary to understand why Congress limited the scope and duration of the Section 401 certification process.  Section III also explains why reasonable limits on Section 401 certification processes comport with principles of cooperative federalism and are necessary to ensure that one state or other certifying authority cannot inappropriately wield its Section 401 authority to the detriment of other states or the nation as a whole.

In Section IV, the Associations respond to each of the Agency's proposed revisions.  We supported the revisions promulgated in the 2020 Rule because they provided needed clarity and certainty regarding the role of states and other certifying authorities under Section 401.  These reforms and regulatory updates were long overdue, and given the misuse of Section 401 certification procedures by some states, were necessary.

The 2020 Rule's revisions were appropriately tailored to address those aspects of Section 401 that are most often misconstrued and/or misused by states and other certification authorities while respectfully adhering to the principles of cooperative federalism that Congress required in the CWA and other statutes.  The Associations therefore urge EPA to refrain from finalizing many of the substantial revisions that the Agency has herein proposed.  We do not believe these revisions are necessary, sufficiently explained, or rationally justified by EPA's rulemaking record.

## II.      THE ASSOCIATIONS AND THEIR INTERESTS

AOGA is a professional trade association whose mission is to foster the long-term viability of the oil and gas industry for the benefit of all Alaskans.  We represent the majority of companies that are exploring, developing, producing, transporting, refining, or marketing oil and gas on the North Slope, in the Cook Inlet, and in the offshore areas of Alaska.  AOGA's members have a well-established history of safe, prudent, and environmentally responsible oil and gas activities.

AFPM is a national trade association representing most U.S. refining and petrochemical manufacturing capacity. AFPM's member companies produce the gasoline, diesel, and jet fuel that drive the modern economy, as well as the chemical building blocks that are used to make the millions of products that make modern life possible.  To produce these essential goods, AFPM members depend on all modes of transportation to move their products to and from refineries and petrochemical facilities and have made significant infrastructure investments to support and improve the safety and efficiency of the transportation system.  AFPM supports robust analyses of

infrastructure projects that balance an efficient review with careful consideration of the environmental impacts.

API is a nationwide, non-profit trade association that represents all facets of the natural gas and oil industry, which supports 10.3 million U.S. jobs and nearly 8 percent of the U.S. economy. API's more than 600 member companies include large integrated companies, as well as exploration and production, refining, marketing, pipeline and marine businesses, and service and supply firms.  API was formed in 1919 as a standards-setting organization, and API has developed more than 700 standards to enhance operational and environmental safety, efficiency, and sustainability.  API and its members are committed to the safe transportation of natural gas, crude oil and petroleum products, and support sound science and risk-based regulations, legislation, and industry practices that have demonstrated safety benefits.  API members engage in exploration, production, and construction projects that routinely involve both state and federal water permitting and are, and will continue to be, affected by CWA Section 401.

The AXPC is a national trade association representing 29 of America's largest and most active independent natural gas and crude oil exploration and production companies. The AXPC's members are "independent" in that their operations are limited to the exploration for and production of natural gas and crude oil.  Moreover, its members operate autonomously, unlike their fully integrated counterparts which operate in different segments of the energy industry, such as refining and marketing. The AXPC's members are leaders in developing and applying the innovative and advanced technologies necessary to explore for and produce the natural gas and crude oil that allows our nation to add reasonably priced domestic energy reserves in environmentally responsible ways.

The IPAA represents the thousands of independent oil and natural gas explorers and producers, as well as the service and supply industries that support their efforts, that will most directly be impacted by federal regulatory policies. Independent producers develop about 91 percent of American oil and natural gas wells, produce about 83 percent of American oil, and produce more than 90 percent of American natural gas and natural gas liquids.  The IPAA is dedicated to ensuring a strong, viable American oil and natural gas industry, recognizing that an adequate and secure supply of energy is essential to the national economy.

The Petroleum Alliance of Oklahoma represents more than 1,400 individuals and member companies and their tens of thousands of employees in the upstream, midstream, and downstream sectors and ventures ranging from small, family-owned businesses to large, publicly traded corporations. Our members produce, transport, process and refine the bulk of Oklahoma's crude oil and natural gas.

### III.   GUIDELINES FOR INTERPRETING CWA SECTION 401

The Associations' comments on the specific changes EPA has proposed[9] follow in Section IV below.  But because the Associations' position on each of these proposed changes is informed by our analysis of the congressionally intended scope and function of Section 401 and the known instances of misuse of the Section 401 process, this section describes the analyses and interpretive guidelines on which we based our comments on the specific elements of EPA's proposed rule.  In addition to more efficiently explaining the Associations' positions, we hope these interpretative guidelines will be useful to EPA as it considers whether to finalize its proposed revisions to the Agency's Section 401 regulations.

The Associations' members have a substantial interest in ensuring that the CWA Section 401 certification process preserves the important role of states and other certifying authorities in protecting water quality, while at the same time providing appropriate limits where states and other certifying authorities use their certification authority to achieve policy goals or outcomes unrelated to water quality.  Therefore, the Associations provide interpretive guidelines that EPA should use to reasonably interpret important provisions of CWA Section 401.  These interpretive guidelines follow from the text and structure of the Act, relevant case law, and—where necessary to ascertain congressional intent—the legislative history of the Act and its key amendments.

The Association's framework was also informed by the way Congress structured the Act to promote cooperative federalism.  Finally, our framework examines the Section 401 certification process in the context of other federal statutes that assign the federal government exclusive jurisdiction over certain projects and/or provide alternate mechanisms for state review of federally permitted projects.

### a.    Consideration of the context for, and role of, CWA Section 401 certifications

Under Section 401 of the CWA, "[a]ny applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters" must seek "a certification from the State in which the discharge originates . . . that any such discharge will comply with the applicable provisions" of the CWA.[10]  Section 401 further provides that "[n]o license or permit shall be granted if certification has been *denied* by the State," but, if a state "*fails or refuses to act* on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived."[11]

The limited scope and authority of states and other certifying authorities under Section 401 is therefore evident from the text of Section 401 itself.  However, when state certification authority under CWA Section 401 is read in the context of the exclusive jurisdiction preserved for the federal

---

[9] In Section V.A. through V.M. of the proposed rule.

[10] 33 U.S.C. § 1341(a)(1).

[11] 33 U.S.C. § 1341(a)(1) (emphasis added).

government in issuing certain permits and licenses, the narrow role of certifying authorities under the CWA Section 401 program becomes even more apparent.

While natural gas pipeline permitting under Natural Gas Act of 1938 ("NGA") is but one of several types of federal approvals that can trigger state certification requirements under Section 401,[12] the NGA is an example of a statute that preserves exclusive jurisdiction for the federal government, and it is relevant to many of the Associations' members.  Indeed, the NGA illustrates that Section 401 review is intended to be a substantively and temporally limited component in a much larger, and more complex, interstate approval process that is inherently federal in nature.

1.    Natural Gas Act of 1938 (NGA)

Companies seeking to build interstate natural gas pipelines must first obtain federal approval.  The NGA provides the statutory framework for this process.[13]  Congress passed the NGA to ensure patch-work state-by-state regulatory regimes would not impede interstate commerce. Specifically, under Section 7(c) of the NGA, "a natural gas company must obtain from the Federal Energy Regulatory Commission ("FERC") a 'certificate of public convenience and necessity' before it constructs, extends, acquires, or operates any facility for the transportation or sale of natural gas in interstate commerce."[14]  In assessing "public convenience and necessity," FERC considers "all factors bearing on the public interest,"[15] including potential environmental impacts.[16]  "FERC will grant the certificate only if it finds the company able and willing to undertake the project in compliance with the rules and regulations of the federal regulatory scheme."[17]

FERC's authority under the NGA is exclusive: "Congress occupied the field of matters relating to wholesale sales and transportation of natural gas in interstate commerce."[18]  "FERC's exclusive purview" includes regulating "facilities [that] are a critical part of the transportation of natural gas and sale for resale in interstate commerce."[19]  In this "exclusively federal domain," states may not regulate.[20]

---

[12] The Associations' members are also routinely subject to Section 401 reviews in the context of Section 404 permitting and in permitting oil pipelines.

[13] 15 U.S.C. § 717.

[14] *Schneidewind v. ANR Pipeline Co.("Schneidewind")*, 485 U.S. 293, 302 (1988); *See also* 15 U.S.C. § 717f(c)(1)(A).

[15] *See Office of Consumers' Counsel v. FERC*, 655 F.2d 1132, 1146 (D.C. Cir. 1980).

[16] *See e.g.*, *Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960, 967–68 (D.C. Cir. 2000).

[17] *Schneidewind*, 485 U.S. at 302.

[18] *Schneidewind* 485 U.S. at 305.

[19] *Schneidewind*, 485 U.S. at 308.

[20] *Schneidewind*, 485 U.S. at 305; *See, e.g., N. Natural Gas Co. v.  Iowa Utils. Bd.*, 377 F.3d 817, 819–20, 822–24 (8th Cir. 2004) (NGA preempted state-law environmental provisions); *E. End Prop. Co. No. 1, LLC* v. *Kessel*, 851 N.Y.S.2d 565, 571 (N.Y. App. Div. 2007); *No Tanks Inc.* v. *Pub. Utils. Comm'n*, 697 A.2d 1313, 1315 (Me. 1997).

Pipeline routing is the definitive example of an issue committed to FERC's exclusive authority.[21] Nor could it be otherwise. Determining an interstate pipeline's route—including which states it will cross, where it will do so, and how far it will travel within their borders—is a task that must be completed by a centralized body with the entire nation's public interest in mind, not by local "agencies with only local constituencies."[22] Otherwise, each state could say, "not in my backyard," thereby depriving other states and the nation of the pipeline's benefits and undermining the NGA's purpose of "ensur[ing] that natural gas consumers have access to an adequate supply of natural gas at 'just and reasonable rates.'"[23]

Thus, the NGA vests FERC with exclusive authority over all salient aspects of the natural gas pipeline permitting process to facilitate the nation's collective interest in promoting the safe movement of natural gas in interstate commerce. And while the NGA is necessarily limited to natural gas pipeline permitting, we believe it demonstrates why EPA must implement CWA Section 401 to prevent a single state or other certifying authority from using its Section 401 certification authority to commandeer the exclusive jurisdiction that Congress provided to the federal government for projects of national importance.

The NGA also illustrates the important but highly circumscribed role of Section 401 reviews in light of the far more comprehensive federal environmental review process. Indeed, FERC has primary authority to consider a pipeline construction project's potential environmental impacts, which includes considering routes that could reduce environmental impacts.

Under the NGA, FERC is "the lead agency . . . for the purposes of complying with" the National Environmental Policy Act ("NEPA").[24] Thus, "FERC undertakes its own environmental analysis pursuant to the requirements of" NEPA, "which . . . FERC considers in reaching its ultimate routing determination."[25] Like the authority to issue certificates of public convenience and necessity, the authority to conduct this broader environmental analysis and to make routing and

---

[21] See Wash. Gas Light Co. v. Prince George's Cty. Council, 711 F.3d 412, 423 (4th Cir. 2013) ("the NGA gives FERC jurisdiction over the siting of natural gas facilities"); See also, e.g., Guardian Pipeline, LLC v. 529.42 Acres of Land, 210 F. Supp. 2d 971, 975 (N.D. Ill. 2002) (where "FERC has approved the route … [a]ny objections to the condemnation of public land for the construction of a natural gas pipeline [are] preempted"); Skyview Acres Co-op., Inc. v. Pub. Serv. Comm'n, 558 N.Y.S.2d 972, 975 (N.Y. App. Div. 1990) (State's "authority [was] preempted … to the extent that it purported to approve the route of an interstate gas pipeline"); No Tanks, 697 A.2d at 1315 ("[State] review of safety and environmental issues surrounding the siting of the [natural gas] tank would be an attempt to regulate matters within FERC's exclusive jurisdiction").

[22] Schneidewind, 485 U.S. at 316.

[23] Wash. Gas, 711 F.3d at 422–23.

[24] 15 U.S.C. § 717n(b)(1).

[25] Skyview Acres, 558 N.Y.S.2d at 975.

11

numerous other decisions based on that analysis is exclusively within FERC's purview, except as to the narrow question of water-quality compliance under Section 401.[26]

## 2.    National Environmental Policy Act (NEPA)

For any "major Federal action[] significantly affecting the quality of the human environment," NEPA requires federal agencies to prepare "a detailed statement," known as an Environmental Impact Statement ("EIS"), on "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] (iii) alternatives to the proposed action."[27]

Preparing an EIS has three basic stages.  First, the agency must "determin[e] the scope of issues to be addressed," with the input of (among many others) "affected Federal, State, and local agencies."[28]  Second, the agency prepares a draft EIS, which must "disclose and discuss . . . all major points of view on the environmental impacts of the alternatives including the proposed action."[29]  The agency must then obtain comments from any other federal agency with relevant jurisdiction or expertise, "[a]ppropriate State and local agencies," and the public.[30]  Finally, the agency must prepare a final EIS that "respond[s] to comments," "discuss[es] . . . any responsible opposing view," and "indicate[s] the agency's response to the issues raised."[31]

These "'action-forcing' procedures" serve to ensure "that agencies take a 'hard look' at environmental consequences."[32]  Affected parties - including states - can challenge the adequacy of an agency's NEPA review and its consideration of an EIS by seeking judicial review of the final agency determination.[33]  The courts carefully review an agency's NEPA compliance to ensure that its "duty . . . to consider environmental factors not be shunted aside in the bureaucratic shuffle."[34]  "NEPA itself does not mandate particular results," however; "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."[35]

---

[26] 15 U.S.C. § 717b(d)(3); The NGA also preserves States' authority under the Coastal Zone Management Act and the Clean Air Act, 15 U.S.C. § 717b(d)(1) - (2), which are not at issue here.

[27] 42 U.S.C. § 4332(c). Agencies typically begin by preparing an Environmental Assessment, or EA, which must "provide sufficient evidence and analysis for determining whether" the project will have a "significant impact." 40 C.F.R. § 1508.9(a). If so, an EIS must be prepared. If not, the EA's thorough assessment helps ensure NEPA compliance.  40 C.F.R. § 1508.9(a).

[28] 40 C.F.R. § 1501.7(a)(1).

[29] *Id.* § 1502.9(a).

[30] *Id.* § 1503.1(a).

[31] *Id.* § 1502.9(b).

[32] *Robertson* v. *Methow Valley Citizens Council ("Robertson")*, 490 U.S. 332, 350 (1989).

[33] *Robertson*, 490 U.S.  at 345–46.

[34] *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.,* 426 U.S. 776, 787 (1976).

[35] *Robertson*, 490 U.S. at 350.

As relevant to the Association's members, there are numerous aspects of the pipeline construction and permitting process that can trigger NEPA review procedures.  Because few states and tribes have been delegated permitting authority under CWA Section 404, permits to discharge dredged or fill material require permits from the U.S. Army Corps of Engineers ("Army Corps") that are considered federal actions subject to NEPA review.  Similarly, whether authorized on an individual regional, or nationwide basis, Army Corps' permits for water crossing or other activities with potential impacts on aquatic resources are reviewed under NEPA.

Additionally, in the  natural gas pipeline permitting context, FERC's regulations require preparation of an EIS for "[m]ajor pipeline construction projects . . . using rights-of-way in which there is no existing natural gas pipeline."[36]  A FERC EIS must comply with the NEPA regulations and also summarize the project's "significant environmental impacts;" any "alternative . . . that would have a less severe environmental impact," which includes alternative routes; any potential "mitigation measures" and impacts that cannot be mitigated; and studies that might provide useful data.[37]

FERC's "public convenience and necessity" analysis carefully accounts for these environmental impacts, alternatives, and potential mitigation measures.  Based on this comprehensive process, FERC may deny approval, or it may require the adoption of alternatives or mitigation measures.[38]  FERC's "environmental assessment . . . is not subject to modification" by state agencies; instead, they can submit comments to FERC or intervene in the FERC proceedings to offer their input and then, if necessary, seek judicial review.[39]  And with good reason: "Allowing all the sites and all the specifics to be regulated by agencies with only local constituencies would delay or prevent construction that has won approval after federal consideration of environmental factors and interstate needs."[40]

3.      Other federal statutes with impact reviews and opportunities for stakeholder engagement

Importantly, while the NEPA review process provides meaningful opportunities for states and other stakeholders to engage with federal agencies on the potential impacts of a proposed federal action, the NEPA review process is far from the only avenue for state and local engagement. Numerous other statutes and regulations provide mechanisms for state and stakeholder engagement on a wide variety of potential impacts from proposed federal projects:

---

[36] 18 C.F.R. § 380.6(a)(3).

[37] 18 C.F.R. § 380.7.

[38] *See e.g., Midcoast Interstate*, 198 F.3d at 966, 968.

[39] *Skyview Acres*, 558 N.Y.S.2d at 975; *See also* 18 C.F.R. § 385.214(c)(1); 15 U.S.C. § 717r(a).

[40] *No Tanks*, 697 A.2d at 1316.

- Endangered Species Act ("ESA")[41] - Section 7 of the ESA requires that federal agencies consult with the ESA administering services to ensure that any projects authorized, funded, or carried out by them are not likely to jeopardize the continued existence of any endangered species or threatened species, or result in the destruction or adverse modification of critical habitat of such species.

- National Historic Preservation Act ("NHPA")[42] - Section 106 of the NHPA and implementing regulations require federal agencies, before issuing a license (permit), to adopt measures when feasible to mitigate potential adverse effects of the licensed activity and properties listed or eligible for listing in the National Register of Historic Places. The Act's requirements are to be implemented in cooperation with state historic preservation officers.

- Coastal Zone Management Act ("CZMA")[43] – Under CZMA Section 307, applicants for federal licenses or permits must obtain from potentially impacted coastal states certification that the proposed project complies with the states' coastal zone management plan.

- Essential Fish Habitat Provisions ("EFH") of the Magnuson-Stevens Act – The EFH provisions promote the protection of essential fish habitat in the review of projects conducted under federal permits, licenses, or other authorities that affect or have the potential to affect such habitat.  EFH requires that federal agencies consult with the National Marine Fisheries Service for any permits which may adversely affect essential fish habitat identified under the Magnuson-Stevens Act.

These are just a few of the statutory and regulatory provisions through which states and other stakeholders can engage with agencies like FERC, raise concerns about potential impacts from proposed federally licensed or permitted projects, and request consideration of alternatives.[44]  They are an important part of the cooperative federalism approach through which Congress apportioned jurisdiction between the federal government and the states.  These statutory provisions, and others like them, demonstrate that states have multiple opportunities outside of Section 401 to provide input on proposed federal projects.  They also provide context for the narrow but important jurisdiction conferred to states and other authorities by Section 401.  In light of all these other meaningful engagement and review opportunities, one recognizes that the statutory requirement for states and other certifying authorities to focus their Section 401 reviews on water quality furthers, rather than undermines, cooperative federalism.

---

[41] 16 U.S.C. § 1531 *et seq.*
[42] 16 U.S.C. § 470 *et seq.*
[43] 16 U.S.C. § 1451 *et seq.*
[44] Indeed, these are just a few of the examples of statutory provisions through which federal projects are reviewed and state feedback is solicited and considered.  For a large pipeline project that would traverse federal, state, and tribal lands, the statutory authorities under which the project is reviewed are far more numerous.

14

Further, the statutory provisions cited above do not represent the full extent of states' and other certifying authorities' ability to address environmental impacts from the operation of federally licensed or permitted projects.  States and other certifying authorities can and often do regulate the operation of federally licensed or permitted projects pursuant to authority delegated under the Clean Air Act ("CAA"),[45] the CWA,[46] as well as other statutes.  Section 401 does not constrain states' authority under these statutes to issue and enforce environmental permits on the operation of federally licensed or permitted projects.  Section 401 only limits states' and other certifying authorities' roles in reviewing the potential impacts from certain projects that require federal licenses or permits.

4.  EPA must implement CWA Section 401 in accordance with Congress's intent to assert exclusive federal jurisdiction through statutes like the NGA and in the context of more comprehensive environmental review processes Congress established through NEPA and other statutes

In this subsection, the Associations discuss Section 401 for natural gas pipeline permitting.[47]  By examining Section 401 in the context of other statutes, like the NGA and NEPA, one appreciates that Section 401 certification is but one part of a larger federal process.

As noted above, the NGA vests FERC with exclusive authority over all salient aspects of the natural gas pipeline permitting process, which facilitates the safe movement of natural gas in interstate commerce.  The rigorous process by which FERC analyzes the "public convenience and necessity" of a natural gas pipeline requires an extensive and meticulous review of potential environmental impacts, including consideration of potential impacts to water quality, drinking water resources, and aquatic species.  It is from this comprehensive analytical framework that CWA Section 401 carves out a carefully cabined exception to FERC's exclusive authority in this area by permitting states to certify whether potential discharges from a federally licensed project will comply with water-quality standards.[48]

Embedded within the text of CWA Section 401 are meaningful limits on the requirements to obtain a certification.  Most significantly, applicants are only required to obtain certification from states where a project could result in a *point source* discharge *to "navigable waters,"* defined in the statute as "waters of the United States" ("WOTUS.")[49]  Potential nonpoint discharges or other diffuse releases to groundwater do not trigger the need for Section 401 reviews.  Nor is Section 401

---

[45] *See* 42 U.S.C. §§ 7411(d); 7412.

[46] *See* 33 U.S.C. §§ 1342(b); 1344(g).

[47] While the Associations herein discuss Section 401 in the context of the NGA's federal approval process for natural gas pipelines, it is important to note that Section 401 certifications are important to a number of other types of essential energy projects.  All types of energy projects can require individual, regional, or nationwide general Section 404 permits that are also subject to state review under Section 401.

[48] 33 U.S.C. § 1341(a).

[49] *See Oregon Natural Desert Assoc. v. Dombeck*, 151 F. 3d. 945 (9th Cir. 1998); *See also Oregon Natural Desert Assoc. v. US Forest Service*, 550 F.3d 778 (9th Cir. 2006).); 33 U.S.C § 1362(7).

triggered when a potential discharge would only enter state, rather than federal waterbodies.  Thus, consistent with the limited circumstances through which a Section 401 review is triggered, a certifying authority can only deny a certification request based on potential point source discharges to WOTUS that can result in possible violations of water quality standards.

With few exceptions, courts have correctly construed this limited delegation as "[r]elinquish[ing] only one element of the otherwise exclusive jurisdiction granted [to FERC]. . . .  It authorizes states to determine and certify only the narrow question of whether there is 'reasonable assurance' that the construction and operation of a proposed project 'will not violate applicable water quality standards.'"[50]  "Congress did not empower the States to reconsider matters unrelated to their water quality standards, which [FERC] has within its exclusive jurisdiction …."[51]  Such second-guessing would "countermand the carefully worded authority of section 401(a)(1)" and "usurp the authority that Congress reserved for FERC."[52]

States exercising authority under CWA Section 401 must do so in a way that is reasonable and adequately explained.[53]  When deciding whether or not to issue a certification, a state must examine "the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'"[54]  Therefore, when a state endeavors to use Section 401 "to hold federal licensing hostage,"[55] or otherwise base its certification decision on policy considerations that cannot realistically be construed as credible concerns over water quality impacts, that determination is impermissible under the CWA and several other statutes through which Congress tasked federal agencies with decision-making authority.

The forgoing discussion focuses on natural gas pipeline permitting under the NGA to illustrate the comprehensive statutory framework within which the Section 401 certification process is conducted.  However, it is by no means the only federal permitting or licensing program to trigger Section 401 certification processes.  Nor is natural gas pipeline permitting the only licensing or licensing process to be misused by some states as a lever to pursue policy objectives unrelated to water quality.  In fact, Section 404 permitting is perhaps the most common trigger for Section 401 reviews, and it impacts each segment of the energy industry and a wide variety of other industries as well.  Therefore, as the agency tasked with implementing the CWA, EPA must ensure that its regulations facilitate functional and efficient Section 401 certification processes.  This means that any potential revisions to EPA's implementing Section 401 must perpetuate Section 401's

---

[50] *Niagara Mohawk Power Corp*. v. *DEC*, 624 N.E.2d 146, 149 (N.Y. 1993).

[51] *Power Auth*. v. *Williams*, 60 N.Y.2d 315, 325 (N.Y. 1983).

[52] *Niagara Mohawk*, 624 N.E.2d at 150.

[53] *National Fuel Gas Supply Corporation v. New York State Dep't. of Envtl. Conservation*, 761 F. Appx. 68, 72 (2d Cir. Feb 5, 2019).

[54] *Appalachian Voices v. State Water Control Bd*., No. 18-1079, (4th Cir. 2019) (*quoting Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).

[55] *Hoopa Valley Tribe* v. *FERC ("Hoopa Valley")*, 913 F. 3d 1099, 1104 (D.C. Cir. 2019).

important but highly circumscribed role for states and other certifying authorities, while prohibiting states and other certifying authorities from arrogating authority Congress exclusively entrusted to the federal government.

> ### b.   Reasonable limits on the Section 401 certification process are consistent with principles of cooperative federalism

While the Associations agree that the CWA is grounded on principles of cooperative federalism[56] and generally oppose federal intrusion in those areas where Congress preserved state primacy, we also recognize that Section 401 represents those circumstances where Congress deemed it necessary to rest primary decision-making authority with federal agencies and/or more closely circumscribe the otherwise broad authority of states.

In CWA Section 401, Congress prescriptively delineated a more narrow and focused role for states and other certifying authorities, so that the jurisdiction that the Act provides to states and other certifying authorities could not overwhelm or subsume the federal government's ability to issue licenses and permits for projects of national importance. Of particular relevance to the Associations' members, these projects of national importance include pipeline projects requiring "Notices to Proceed" from FERC and dredge-and-fill activities in WOTUS that require CWA Section 404 permits from the Army Corps. But Congress also designated federal agencies as the approval authorities for Section 402 industrial and municipal point source discharge permits issued by EPA, Army Corps permits issued under Sections 9 and 10 of the Rivers and Harbors Act ("RHA"), U.S. Coast Guard permits for bridges and causeways under Section 9 of the RHA, hydroelectric projects requiring FERC licenses, and nuclear power plants licensed by the Nuclear Regulatory Commission ("NRC").

Each of these seemingly diverse types of projects or actions require federal permits and/or licenses because Congress expressly and purposely committed these licensing/permitting decisions to the federal government. It did so for these very specific types of projects because of the profound impacts they have on the nation as a whole. These are the types of projects that protect and promote interstate commerce, trade, and national security. Federal decisions made in accordance with these statutory authorities are intended to facilitate policies and goals deemed necessary to the entire nation.

Congress certainly understood that projects authorized pursuant to these statutes would have localized impacts, but it viewed it as inappropriate to allow these projects to be principally steered by parochial interests. Congress uniquely provided these boundaries in Section 401 because, unlike other provisions of the Act, like Sections 402 and 404, that direct federal agencies to cede authority to states and other certifying authorities when certain conditions of delegation are

---

[56] 87 Fed. Reg. at 35,321.

satisfied, Congress recognized that for certain federal projects, federal agencies must share their authority with, rather than cede their authority to, the states and other certifying authorities.

Congress's intent to reasonably limit the scope and duration of Section 401 certifications is consistent with cooperative federalism. States that have misused Section 401 certification authority can wield a disproportionate level of decision-making authority over a wide variety of essential interstate projects or other projects of national importance such as transportation infrastructure, nuclear and hydroelectric power generation facilities, energy distribution infrastructure, and projects requiring dredge-and-fill permits under Section 404. Misapplying Section 401 to allow any state or other certifying authority unilateral veto authority over these projects has adverse impacts, not only on project proponents and federal licensing and permitting authorities, but other states with interests in the project. Allowing a single state or certifying authority to wield such disproportionate influence over interstate projects of national importance is in contravention with the Commerce Clause, which is the primary authority underlying Congress' assertion of federal jurisdiction over certain waterbodies under the Rivers and Harbors Act ("RHA") and those portions of the RHA that would become the modern CWA.[57]

This was certainly the case with Washington State's denial of the Millennium Bulk Terminals – Longview LLC project.[58] The project proponents intended the terminal to receive rail cars of coal mined principally in Montana and Wyoming so that the coal could be exported to overseas markets. Washington State employed various regulatory strategies to extend their certification review over five years before denying the certification request based on grounds having nothing to do with water quality.[59] Having minimal financial interest in facilitating the export of a product that was not produced in the state and policy objections to coal-fired power generation, Washington State used its Section 401 certification authority to deny Montana and Wyoming access to foreign markets. Thus, the exercise of expansive authority under Section 401 by one state harms, rather than serves, other states' rights.

Similar dynamics underlie many instances of state misuse of Section 401 certification authority in pipeline projects. States along the proposed route of a pipeline that would not supply their state have occasionally used their Section 401 certification authority to block projects desperately needed by other states. This acutely harmed New England consumers who pay significantly more

---

[57] *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 181 (2001) (citations omitted); *See also Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824); *See also United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (describing the "channels of interstate commerce" as one of the three areas of congressional authority under the Commerce Clause).

[58] WDEC, In the Matter of Denying Section 401 Water Quality Certification to Millennium Bulk Terminals-Longview, LLC, Order # 15417 (Sept. 26, 2017); *See also Montana v. Washington*, No. 22O152, (motion by Montana and Wyoming for leave to file the bills of complaint denied June 28, 2021. Justice Thomas and Justice Alito indicated they would grant the motion).

[59] *See* Section IV.4.

for their electricity than the U.S. average in part because pipeline project impediments have inhibited access to natural gas supplies from the Marcellus Shale.

The principles of cooperative federalism are also well served by preventing states from evading Section 401 statutory deadlines for review.  ''Congress intended Section 401 to curb a *state's* 'dalliance or unreasonable delay.'''[60]   In the permitting context, extensive delays in the 401 certification process can cause projects that are important to other states to be cancelled altogether.

In sum, it is simply not the case that the principles of cooperative federalism dictate that EPA must interpret its Section 401 regulations to provide states as much authority and autonomy as possible. Doing so would subjugate the interests of one state to the parochial whims of another.  Cooperative federalism in the context of Section 401 requires a balanced approach that conforms as closely as possible to the balance Congress itself struck when enacting Section 401.   As such, the Associations urge EPA to reconsider its proposed revisions and adopt a regulatory approach that preserves the important role of certifying authorities under Section 401, but which prevents certain states from misusing the certification process to unlawfully elevate their own interests over the interests of other states or the nation as a whole.

### c.     The legislative history of the CWA illustrates the reasonable limits Congress intended for the Section 401 certification process

While Congress amended the CWA's predecessor statute (the Federal Water Pollution Control Act of 1948 ("FWPCA"))[61] multiple times, no statutory revision was more central to Congress's transformation of the FWPCA to today's CWA than the 1972 amendments to the FWPCA ("1972 Amendments").[62] Indeed, as Congress noted at the time, the 1972 Amendments represented a "total restructuring" and "complete rewriting" of the existing statutory framework.[63]   The transformative nature of the 1972 Amendments is critical to interpreting Section 401 for many reasons, including the need to distinguish court decisions that were based on EPA regulations predating the 1972 Amendments[64] from those court decisions that more directly interpreted Section 401 of the Act as it appears today.

Prior to the 1972 Amendments, the regulatory framework for the FWPCA, as amended by the Water Quality Act of 1965,[65] was based exclusively on ambient water quality standards that Congress anticipated would be used to develop standards for discharge to the receiving waters. While the predecessor Act regulated only water quality (largely as defined by states) and could only be used to regulate the discharging sources of impairment if water quality standards were not

---

[60] *Hoopa Valley*, 913 F. 3d at 1104–05 (emphasis in original).

[61] Pub. L. No. 80-845, 62 Stat. 1155 (1948).

[62] Pub. L. No. 92-500, 86 Stat. 816 (1972).

[63] *City of Milwaukee* v. *Illinois*, 451 U.S. 304, 317 (1981) (quoting legislative history of 1972 amendments).

[64] *PUD No. 1 of Jefferson Cty. v. Washington Dep't of Ecology*, 511 U.S. 700, 712 (1994).

[65] Pub. L. No. 89-234, 79 Stat. 903 (1965).

being met,[66] practical application of the framework demonstrated its ineffectiveness; between 1948 and 1972, the Act's enforcement framework "resulted in only one prosecution."[67]  This informed Congress's 1972 effort to amend the Act, and was the impetus for Congress's enactment of Section 301, which states, "Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act, the discharge of any pollutant by any person shall be unlawful."[68]

Congress then defined "pollutant" quite broadly to mean "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."[69]  However, Congress much more narrowly defined the "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source," such as a pipe, ditch, or other "discernible, confined and discrete conveyance."[70]  The newly enacted Section 301 therefore made it unlawful for the first time to discharge pollutants into WOTUS from a point source unless the discharge complied with the CWA, including obtaining authorizations pursuant to the Section 402 National Pollutant Discharge Elimination System ("NPDES") permit program or the Section 404 dredge-and-fill permit program.[71]

Because of the 1972 Amendments, the NPDES permitting program now constitutes "[t]he primary means for enforcing these limitations and standards" from point sources.[72] Point source dischargers must now obtain NPDES permits that "place limits on the type and quantity of pollutants that can be released"[73] into WOTUS, and "define[], and facilitate[] compliance with, and enforcement of … a discharger's obligations under the [CWA]."[74]

The 1972 Amendments similarly resulted in the first ever regulation of the discharge of dredged or fill material into WOTUS, including certain wetlands.  Section 404 now requires putative dischargers to obtain a permit before any dredged or fill material may be discharged into WOTUS from activities such as fill for water resource development, infrastructure development, and mining projects.

In addition to fundamentally shifting the Act from its purely "harm-based" regulatory approach to its focus on point source discharges of pollutants to WOTUS, the 1972 Amendments also

---

[66] *See NDRC v. EPA*, 915 F.2d 1314, 1316 (9th Cir. 1990). Thus, a discharger needed no permit to deposit pollutants into a water that had "room to spare" in achieving its water quality standards.

[67] *See* David Drelich, *Restoring the Cornerstone of the Clean Water Act*, 34 COLUM. J. ENVTL. L. 267, 304 (2009).

[68] 33 U.S.C. § 1311(a).

[69] 33 U.S.C. § 1362(6).

[70] 33 U.S.C. § 1362(12), (14).

[71] 33 U.S.C. § 1342, 1344.

[72] *Arkansas et al. v. Oklahoma et al.*, 503 U.S. at 101 (1992).

[73] *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. at 102 (2004).

[74] *EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. at 205 (1976).

preserved a role for states and tribes.  These amendments first authorized states to assume program authority for issuing Section 402 and 404 permits within their borders.[75]  States also became responsible for developing water quality standards for WOTUS within their borders,[76] developing total maximum daily loads ("TMDLs") for waters that are not meeting established water quality standards[77] while at the same time retaining authority to protect and manage waters that are not considered WOTUS.[78]

Most relevant here, however, the 1972 Amendments updated a preexisting state certification requirement (Section 21(b)) to create Section 401.  Similar to Section 401, Congress enacted Section 21(b) to "recognize[ ] the responsibility of Federal agencies to protect water quality whenever their activities affect public waterways."[79]  As Congress noted at the time, "[i]n the past, these [Federal] licenses and permits have been granted without any assurance that the [water quality] standards will be met or even considered."[80]

Because the state certification requirement in Section 21(b) under the FWPCA's water quality-based framework existed before Congress enacted the 1972 Amendments to focus on point source discharges to WOTUS, Section 21(b) required states to certify that "such *activity* will be conducted in a manner which will not violate applicable water quality standards."[81] The 1972 Amendments' changes to Section 21(b) were therefore intended to maintain consistency with the 1972 Amendments' broader focus on, and definition of, *point source discharges to WOTUS*.  In other words, because the predecessor Act regulated only water quality and could only be used to regulate the pollution-contributing sources of impairment if water quality standards were not being met, Congress drafted Section 21(b), and EPA promulgated its 1971 regulations pursuant to Section 21(b),[82] to focus on those *federal activities* that could adversely impact ambient water quality standards.  Once the 1972 Amendments fundamentally transformed the Act to provide authority to directly address discharges of pollutants rather than indirectly address pollutant discharges based on their impacts on water quality, Congress made a corresponding change to Section 21(b) so that it reflected the new prohibition on, and permitting regime for, *discharges*.

More specifically, Congress amended the Section 21(b)(1) requirement that the certifying authority certify "that such *activity* . . . will not violate water quality standards,"[83] to state that the

---

[75] 33 U.S.C. § 1342(b), 1344(g).
[76] 33 U.S.C. § 1313, 1315.
[77] 33 U.S.C. § 1313(d).
[78] *See, e.g.,* 33 U.S.C. § 1251(b), 1251(g), 1370, 1377(a).
[79] S. Rep. No. 91-351, at 3 (1969).
[80] S. Rep. No. 91-351, at 3 (1969).
[81] Public Law 91-224, 21(b)(1), 84 Stat. 91 (1970) (emphasis added).
[82] *See NDRC v. EPA*, 915 F.2d 1314, 1316 (9th Cir. 1990). Thus, a discharger needed no permit to deposit pollutants into a water that had "room to spare" in achieving its water quality standards.
[83] Public Law 91-224 § 21(b)(1) (emphasis added).

21

authority must certify "that any such *discharge* shall comply with the applicable provisions of sections 301, 302, 303, 306, and 307 . . ."[84]   The 1972 Amendments also added an entirely new Section 4(d) which authorized the imposition of certification conditions:

> to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 301 or 302 of this Act, standard of performance under section 306 of this Act, or prohibition, effluent standard, or pretreatment standard under section 307 of this Act, and with any other appropriate requirement of State law set forth in such certification . . .[85]

Thus, the 1972 Amendments maintained Section 21(b)'s focus on water quality impacts but adapted those certification requirements ''to assure consistency with the bill's changed emphasis from water quality standards to effluent limitations based on the elimination of any discharge of pollutants.''[86]   As explained by then-Senator Muskie, the sponsor of the legislation that would become Section 401:

> No polluter will be able to hide behind a Federal license or permit as an excuse for a violation of *water quality standard[s]*. No polluter will be able to make major investments in facilities under a Federal license or permit without providing assurance that the facility will comply with *water quality standards*. No State water pollution control agency will be confronted with a fait accompli by an industry that has built a plant without consideration of *water quality requirements*.[87]

The Senate Report that accompanied the 1972 Amendments likewise explained that Section 401:

> makes clear that any *water quality requirements* established *under State law*, more stringent than those requirements under this Act, also shall through certification become conditions on any Federal license or permit. The purpose of the certification mechanism provided in this law is to assure that Federal licensing or permitting agencies cannot override *State water quality requirements*.[88]

As the foregoing makes clear, Congress intended Section 401 certifications and conditions to focus exclusively on the potential water quality impacts from the point source discharges of proposed federally licensed or permitted projects.  Nothing in the legislative history of Section 401 reflects any intent to consider non-water quality considerations or conditions.

---

[84] 33 U.S.C. § 1341(a) (emphasis added).
[85] 33 U.S.C. § 1341(d).
[86] S. Rep. No. 92–414, at 69 (1971).
[87] 116 Cong. Rec. 8984 (1970) (discussing section 21(b) of the Water Quality Improvement Act of 1970) (emphasis added).
[88] S. Rep. No. 92-414, at 69 (1971) (emphasis added).

Notwithstanding the transformative nature of the 1972 Amendments, EPA did not update its 1971 regulations (implementing Section 21(b)), until promulgation of the 2020 Rule. Thus, for nearly five decades, the Agency's regulations remained out-of-step with Congress's most consequential changes to the CWA—the prohibition on point source discharges to WOTUS "[e]xcept as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of th[e] Act."[89] The persistence of EPA's outdated 1971 implementing regulations is relevant to the Agency's current proposal because a significant portion of the jurisprudence on Section 401, including the 1994 Supreme Court decision in *PUD No. 1 of Jefferson County v. Washington Department of Ecology*,[90] is based on judicial deference to EPA regulations that predate the 1972 Amendments.

The Associations urge EPA to recognize that FWPCA Section 21(b) was enacted prior to the statutory requirement that the federal government consider the potential environmental impacts of its actions. It provided states authority to examine the water quality impacts of federal actions in the absence of any federal obligation to examine their own obligations. Section 401, on the other hand, is informed by the 1969 passage of NEPA, which requires the federal government to consider the potential environmental consequences—water quality-related or otherwise—of its actions. While NEPA does not subsume the Section 401 water quality certification process, it does place Section 401 in a statutory context distinct from that which existed in 1971. The state water quality certification process is not the sole means by which potential environmental impacts of federal actions are identified, scrutinized, mitigated, or avoided. The 1972 Amendments followed the passage of NEPA by a mere two years. Congress understood the important role NEPA would play in examining the impacts of federal actions, including those subject to state certifications under Section 401. Congress continued to view the water quality certification process as important, but it clearly did not intend it to duplicate NEPA's processes in scope, scale, or duration. Thus, Section 401 was intended to be, and should remain, a focused inquiry on very specific types of discharges and a very narrow set of potential impacts.

### d. EPA's proposed regulatory revisions must comply with the Administrative Procedure Act

While agencies are permitted to change policy positions and adopt new regulatory interpretations,[91] any new or changed policy positions remain subject to the same Administrative Procedures Act ("APA") standards[92] under which "a reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[93]

---

[89] 33 U.S.C. § 1311(a).

[90] 511 U.S. 700, 712 ("*PUD No.* 1").

[91] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

[92] *F.C.C. v. Fox Television Stations*, 556 U.S. at 515 ("The [APA] makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action.").

[93] 5 U.S.C. § 706(2)(A).

This standard requires agencies to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[94]  Courts will invalidate agency decisions as "arbitrary and capricious" if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[95]

That said, if a "new policy rests upon factual findings that contradict those which underlay [an agency's] prior policy," the agency "must" provide "a more detailed justification" for its action.[96] In such cases, in order to offer "a satisfactory explanation" for its action, "including a rational connection between the facts found and the choice made,"[97] the agency must give "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy,"[98] At minimum, "the requirement that an agency provide a reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position."[99]

As discussed in the subsections below, the Agency's requisite "awareness" is not apparent with respect to many of the revisions EPA has proposed.  Indeed, while the Agency's proposal reflects EPA's recognition that it is proposing to amend existing regulations, many of EPA's proposed revisions reflect little or no consideration of the improper certification tactics that EPA promulgated the 2020 Rule to address.

Notwithstanding EPA's apparent inability to identify any adverse environmental impacts associated with the regulatory approach outlined in the 2020 Rule and similar inability to identify any clearly beneficial environmental outcomes potentially attributable to its proposed to rescind key provisions of the 2020 Rule, EPA is proposing to remove the 2020 Rule's reasonable restrictions on improper certification procedures and afford certifying authorities wholly unguided discretion to implement those same aspects of the Section 401 certification process that a handful of certification authorities have demonstrated a willingness to manipulate and misconstrue.  And notwithstanding that Congress charged EPA with the authority and obligation to properly implement Section 401 of the CWA, EPA is proposing to refrain from exercising any oversight

---

[94] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, (1962)).
[95] *State Farm*, 463 U.S. at 43.
[96] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. at 515.
[97] *State Farm*, 463 U.S. at 43 (internal quotations omitted).
[98] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. at 515.
[99] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (emphasis in original).

responsibility over certifying authorities procedures or determinations, and to likewise prohibit all federal licensing and permitting authorities from exercising any oversight as well.

Thus, far from providing a "reasoned explanation" or "a more detailed justification" for these proposed changes, EPA's proposal would allow for or even encourage the same Agency-recognized procedural abuses that courts have rejected and the 2020 Rule prohibited. Proposing to needlessly rescind regulatory limits that EPA has recognized as necessary to and effective for the proper implementation of Section 401 does not reflect "a rational connection between the facts found and the choice made."[100]

## IV.   RESPONSES TO EPA'S QUESTIONS FOR CONSIDERATION

### a.   When Section 401 Certification is Required

The Associations support EPA's proposal to retain (with certain non-substantive clarifications) the 2020 Rule's expressly stated recital of EPA's long-standing determination that the need for Section 401 certification arises only when a federally licensed or permitted activity has the potential to result in a discharge *from a point source into a WOTUS.*[101]  We believe this restrained application of Section 401 is commanded by the text and structure of the CWA, consistent with the applicable case law, and in harmony with the Agency's longstanding interpretations.

As explained in Section III(c). above, the same 1972 Amendments through which Section 401 was enacted also shifted the Act's regulatory focus away from ambient standards and toward a prohibition and permitting framework for "the discharge of any pollutant by any person . . ."[102] The 1972 Amendments thus defined the phrase "discharge of any pollutant"[103] as "any addition of any pollutant to *navigable waters from any point source*."[104]

Congress then also further defined "navigable waters" as "the waters of the United States ["WOTUS"], including the territorial seas."[105]  While the precise contours of this definition are the subject of a great deal of debate, Congress clearly intended the definition of WOTUS, and therefore "navigable waters," to refer to a subset of surface waterbodies within the United States. Like the permit requirements in Sections 402 and 404, Section 401 certification requirements are only triggered based on discharges to WOTUS—not potential releases to groundwater, soil, isolated waterbodies, ephemeral flows, or any of the many other categories of waters that are outside of the definition of WOTUS.

---

[100] *State Farm*, 463 U.S. at 43 (1983) (internal quotations omitted).
[101] *See* 87 Fed. Reg. at 35,327-35,329.
[102] 33 U.S.C. § 1311(a).
[103] 33 U.S.C. § 1311(a).
[104] 33 U.S.C. § 1362(12) (emphasis added).
[105] 33 U.S.C. § 1362(7).

While the types of waters that can trigger Section 401 certification are encompassed with the statutory definition of "navigable waters," only a potential "discharge" into those waters will actually trigger Section 401 certification.  As the Supreme Court noted in *S.D. Warren Co. v. Maine Board of Environmental Protection*, the CWA only defines the phrase "discharge of a pollutant,"[106] but for the term "discharge" that is used in Section 401, Congress only noted that it "includes a discharge of a pollutant, and a discharge of pollutants."[107]  The Court therefore interpreted the term "discharge" according to its common usage as "flowing or issuing out," and held that water releases from a dam constituted "discharges" for purposes of triggering Section 401 even if the releases contained no pollutants.[108]

Interpreting "discharge" as "from any point source" accords with *S.D. Warren*, and provides the best reading of that decision.  The CWA defines "point source" as "any discernible, confined and discrete conveyance . . ."[109]  The tailrace that discharged effluent from the dam at issue in *S.D. Warren* is clearly encompassed within this definition of "point source."  Moreover, by defining "discharge" as "flowing or issuing out," the Court strongly implies the need for a "discernible, confined and discrete conveyance."[110]

Defining "discharge" as effluent "flowing or issuing out" of a "point source" is also consistent with the text, structure, and legislative history of the Act.  "Discharge" was first defined (albeit sparsely) in the same 1972 Amendments that created Section 401 and "overhauled the regulation of water quality," such that, according to the Ninth Circuit in *Oregon Natural Desert Association v. Dombeck*, "[d]irect federal regulation now focuses on reducing the level of effluent that flows from point sources."[111]  Thus, wherever it is used in the CWA, the term "discharge" refers to the release of effluent from a point source.[112]  And, as applied to Section 401, if a federally permitted or licensed project or activity does not release effluent through a point source, Section 401 certification is not required.[113]

Importantly, the Ninth Circuit revisited the holding in *Dombeck* after the *S.D. Warren* decision and held that the Supreme Court's decision in *S.D. Warren* supported its prior holding.[114]  The court held that distinguishing point source discharges and nonpoint source pollution is an

---

[106] "Discharge of a pollutant" means "(A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12).

[107] 547 U.S. 370 (2006) ("*S.D. Warren*") (quoting 33 U.S.C. § 1362(16)).

[108] *S.D. Warren*, 547 US at 378.

[109] 33 U.S.C. § 1362(14).

[110] 33 U.S.C. § 1362(14).

[111] *Oregon Natural Desert Association v. Dombeck ("Dombeck")*, 172 F.3d 1092 (9th Cir. 1998).

[112] *Dombeck*, 172 F.3d at 1098.

[113] *Dombeck*, 172 F.3d at 1099.

[114] *Or. Natural Desert Ass'n v. U.S. Forest Service ("ONDR")*, 550 F.3d 778 (9th Cir. 2008).

"organizational paradigm of the Act."[115]  Point source discharges "tended to be more notorious and more easily targeted"[116] and were therefore subjected to the CWA's broad prohibition against "the discharge of any pollutant."[117]  Consequently, the CWA does not regulate nonpoint source pollution through the NPDES permitting program.[118]  The Supreme Court has also recognized the CWA's disparate treatment of these types of pollution.[119]

"Virtually all water, polluted or not, eventually makes its way to navigable water."[120]  But Congress did not structure the CWA to require permits or Section 401 certification for any action that could cause a release into a WOTUS.  Rather, the legislative history of the 1972 Amendments shows that Congress intended that these provisions be triggered by discharges from point sources.  Congress enacted Section 401 "to assure consistency with the bill's changed emphasis from water quality standards to effluent limitations based on the elimination of any discharge of pollutants [which by definition applies only to point sources]."[121]

This organizational paradigm is also revealed in Congress's 1977 addition of Section 303 (state water quality standards) to the list of provisions requiring Section 401 certifications ("1977 Amendment").  The legislative history surrounding the 1977 Amendment cannot be read as expanding the scope of the potential pollution sources subject to the certification requirement under Section 401.  Rather, the history confirms that Section 401 was intended to reach only those sources covered by Section 301 of the CWA.

> The inserting of section 303 into the series of sections listed in section 401 is intended to mean that a federally licensed or permitted activity, including discharge permits under section 402, must be certified to comply with State water quality standards adopted under section 303. The inclusion of section 303 is intended to clarify the requirement of section 401. It is understood that section 303 is required by the provisions of section 301.[122]

Thus, the Associations support the Agency's continued recognition in its proposal that Congress intended that Section 401's certification procedures apply only when a federally licensed or permitted activity has the potential to result in a discharge from a point source into a WOTUS.

---

[115] *Or. Natural Desert Ass'n v. U.S. Forest Service*, 550 F.3d 778, 780 (9th Cir. 2008).

[116] *Or. Natural Desert Ass'n v. U.S. Forest Service*, 550 F.3d 778, 780 (9th Cir. 2008).

[117] 33 U.S.C. § 1311(a).

[118] *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1140 n.4 (10th Cir. 2005).

[119] *County of Maui v. Hawaii Wildlife Fund ("Maui")*, 140 S. Ct. 1462, 1470 (2020).

[120] *Maui*, 140 S. Ct. at 1470.

[121] S. Rep. No. 414, 92d Cong., 1st Sess. 69 (1971).

[122] Conference Report on the 1977 CWA, H. Rep. No. 95-380 (95th Cong. 1st Sess. At 208 (1977). As previously noted, Section 301 applies only to "discharges" from "point sources" of pollution.

b.      **Pre-filing Meeting Requests**

The Associations support EPA's proposed retention of the majority of the pre-filing-meeting procedures that were introduced by the 2020 Rule.[123]   EPA promulgated the requirement that a project proponent submit a pre-filing meeting request to a certifying authority at least 30 days prior to submitting a certification request in order to help certifying authorities conduct reviews "within a reasonable period of time (which shall not exceed one year.)"[124] We continue to view these pre-filing requirements as helpfully facilitating early coordination between certifying authorities and project proponents so that certifying authorities can conduct thorough and efficient Section 401 reviews within statutorily mandated deadlines.   Indeed, the Associations' members' experience with the 2020 Rule's pre-filing meeting requirements have been favorable and largely consistent with similar pre-filing procedures the Army Corps and FERC have utilized for a number of years.[125]

The Associations also generally support EPA's proposal to waive or shorten the requirement that project proponent's request a pre-filing meeting at least 30 days prior to submitting a request for certification,[126] and further support allowing certifying authorities to develop a list of permit and project types that do not require pre-filing meetings or which necessitate less than 30-days advance notice.[127]   However, because there may be extenuating circumstances that are not contemplated by such lists, the Associations support allowing project proponents the ability to request that certifying authorities waive or shorten the 30-day requirement, and we also support requiring certifying authorities to issues decisions on project proponents' requests within five days of receipt of such requests.[128]

Finally, while the Associations do not believe EPA needs to prescribe pre-filing requirements for all certifying authorities, we believe EPA should prohibit certifying authorities from requiring that pre-filing requests contain anything more than the most basic information necessary to identify the project proponent, the proposed project, and the permit or license being sought.   If certifying authorities are free to require voluminous information requirements as part of a pre-filing request, certain certifying authorities could use authority to delay or preclude project proponents from submitting the pre-filing request that starts the proponents' 30-day waiting period before filing their requests for certification.   Thus, any pre-filing meeting request that is reasonably identifiable

---

[123] 87 Fed. Reg. at 35,329–35,3331.

[124] 85 Fed. Reg. at 42,240-42,242.

[125] Outside of the Section 401 context, pre-filing meeting requests are also frequently utilized by the Department of Interior and Bureau of Land Management in expediting permit reviews.  In these contexts, the Associations' members report that the pre-filing coordination process has helped facilitate upfront discussions about projects, and allowed for a more efficient and timely exchange of information.

[126] 87 Fed. Reg. at 35,330.

[127] 87 Fed. Reg. at 35,330.

[128] 87 Fed. Reg. at 35,330.

as such [129] should be sufficient to meet the requirement of section 121.4 and should not be used as a basis to delay the timeframe for a certifying authority's acceptance or receipt of a request for certification.

### c.   <u>Request for Certification</u>

The Associations strongly disagree with, and urge EPA to rescind, its proposal to revise the required elements of a request for certification as well as the Agency's related proposal to redefine when a certification request is received for the purpose of determining the starting point for the temporally limited certification review period that Congress expressly imposed through CWA Section 401.[130]   EPA adopted these provisions in the 2020 Rule to curb widely recognized instances wherein a few certifying authorities sought to toll the start date of their review period by refusing to construe project proponents' submissions as certification requests and manipulating the concept of "receipt."[131]   EPA's proposal would remove all of the 2020 Rule's reasonable restraints on certifying authorities' ability to manipulate CWA Section 401 deadlines and would effectively facilitate the very same impermissible deadline abuses that EPA acknowledges certain certifying authorities employed prior to the Agency's promulgation of the 2020 Rule.

In addition to the impermissibly expanded Section 401 certification review periods that will result from EPA's proposal to allow each certifying authority to alone define what constitutes a "certification request" and establish when they are in "receipt" of it, by proposing to require every certifying authority to make the draft federal permit or license a mandatory element of all "certification requests," EPA is needlessly prolonging the already-protracted federal licensing and permitting process by effectively requiring those processes to proceed sequentially rather than concurrently.   While adverse impacts of these proposed changes are plainly recognizable, the benefits are not.

The mandatory elements of a certification requests that EPA is proposing are different than those promulgated in the 2020 Rule, but no less intrusive on the certifying authorities' autonomy.   The 2020 Rule approach to clarifying the essential elements of a request for certification in no way limited the information or data certifying authorities could request or obtain, and in no way limited certifying authorities' ability to deny certification requests based on project proponents refusal to provide relevant information or failure to provide it in time for sufficient review.   Indeed, EPA's preamble and Economic Analysis do not identify a single instance in which the 2020 Rule's "certification request" provisions caused an adverse environmental or economic impact and they

---

[129] The Associations see an issue with including an exact required phrase (e.g. "A requirement to make a request in writing that includes the statement that it is 'a request for CWA section 401 certification pre-filing meeting'") and instead suggest that a pre-filing meeting request may be made in any form.

[130] 87 Fed. Reg. 35,331-35,337 describing proposed revisions to the required elements of a certification request at 40 C.F.R. § 121.5 and amending the definition of "receipt" at in 40 C.F.R. § 121.1(k).

[131] 85 Fed. Reg. at 42,235-42,236.

struggle to articulate any credible environmental or economic benefit from these proposed revisions.

According to EPA's Economic Analysis, relative to the 1971 Rule, which required that certification requests contain only minimal project descriptions,

> this provision of the proposed rule would have positive environmental benefits since improving consistency of information provided in certification requests via copies of the draft license or permit and other readily available data related to potential water quality impacts from the proposed project would improve the quality of section 401 reviews.[132]

Relative to the 2020 Rule, however, EPA surmised that,

> environmental benefits may be larger relative to the 2020 Rule baseline because certifying authorities would be able to retain their own regulatory requirements for a certification request, which can be tailored to best ensure compliance with applicable water quality requirements, instead of using the prescriptive list required by the 2020 Rule.[133]

In other words, EPA claims its proposed "certification request" provisions will be environmentally beneficial because they are more prescriptive and because they are less prescriptive.  These assertions make no sense, and with respect to EPA's surmised benefits relative to the 2020 Rule baseline, these assertions are factually incorrect – the type and extent of information required in a "request for certification" has absolutely no bearing on the type or extent of information a certifying agency can request as part of their review.  As reflected by this analysis, and further demonstrated by the Associations' discussion in the in the subsections below, EPA has not articulated a "satisfactory explanation,"[134] much less "a more detailed justification"[135] for proposing to revise the 2020 Rule's provisions governing requests for certifications.

### 1.    Proposed Contents of a Request for Certification

EPA proposes to allow each certifying authority to determine whatever they believe should constitute a "request for certifications" with the exception of two types of information that EPA proposes that all certifying authorities must require as part of their definition of a "request for certification:" (1) a copy of the draft license or permit; and (2) any existing and readily available

---

[132] Economic Analysis at 28.
[133] Economic Analysis at 29.
[134] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, (1962)).
[135] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

data or information related to potential water quality impacts from the proposed project.[136]   The Associations have several concerns with this proposed approach.

For one, mandating that this information be a part of every certifying authorities' determination of whether it has received a "request for certification" seemingly contravenes EPA's stated intent that these proposed revision further cooperative federalism and preserve certifying authorities' autonomy.   EPA's proposal also fails to explain why these two categories of information are so essential that, without their inclusion, certifying authorities cannot deem a project proponent's submission a "request for certification."   The Associations do not dispute that this information may be helpful and important to the certifying authority's Section 401 review, but we can find no explanation why the presence or absence of this information within a project proponent's submission is determinative of whether the submission is a "request for certification."   Here again, EPA appears to conflate the universe of information necessary to construe a submission as a "requests for certification" with the far larger universe of information that certifying authorities may request in the course of their review.

### i.      Draft license or Permit

EPA's proposed mandate that every request for certification include a copy of the draft license or permit also needlessly protracts the federal permitting and licensing process.   The role of a certifying authority under Section 401 is not to review federal permits and licenses, it is to review discrete activities with potential discharges to WOTUS.

A certification request that does not contain a draft license or permit does not impose any information deficit on a certifying authority – they can always request more information from project proponents.   And it is in the project proponent's interest to timely provide the certifying authority with all the information that it legitimately needs to issue the certification. If the project proponent does not, the 2020 Rule allows that the certifying authority may deny certification "due to insufficient information" by specifying the water quality data or information that would be needed to issue the certification.[137]

EPA's proposed requirement that every certification request contain a draft license or permit is tantamount to mandating sequential federal and state review processes rather than concurrent reviews because the draft permit does not become available until the end of the federal permit or licensing process.   This is immensely inefficient and contrary to long-standing government policies encouraging concurrent federal and state reviews under NEPA and other statutes to mitigate the precise inefficiencies this proposal seems to mandate.[138]

---

[136] Proposed text of 40 C.F.R. § 121.5(a) at 87 Fed. Reg. at 35,378.

[137] 40 C.F.R. § 121.7(e)(1)(iii), (e)(2)(iii).

[138] *See* https://ceq.doe.gov/docs/get-involved/citizens-guide-to-nepa-2021.pdf; *See also* https://ceq.doe.gov/docs/get-involved/Citizens_Guide_Dec07.pdf.

The Agency suggests that sequential review is more efficient because it helps certifying authorities avoid replicating conditions that the federal agency may already require in the permit or license.[139] This is not a realistic or fact-based assertion. A project proponent's submission of a request for certification is not the final touch point between parties – it is one of the first. Whether through the project proponent or with the federal licensing or permitting authority directly, certifying authorities have ample opportunity to ask questions, receive updates, and coordinate reviews and potential conditions. Indeed, in this proposal as well as in the 2020 Rule and other long-standing guidelines, EPA encourages such coordination.

More specifically and as relevant to many of the Associations members, for interstate natural gas pipelines seeking a certificate of public convenience and necessity under the NGA, a Section 401 certification request is typically filed within 30 days of filing a certificate application with the FERC, which is itself compiling resource reports containing extensive analysis of water quality impacts and other impacts.[140] This means there are ample analytical and technical studies available for the certifying authority's review at the time of the certification request. The certificate of public convenience and necessity that FERC may choose to issue based on this process, however, is not available until the near end of the review process. Thus, even though this FERC process allows certifying authorities to obtain detailed analyses of potential water quality impacts at the time the certification request is submitted or soon after, EPA's proposal would needlessly require every certifying authority to refrain from initiating their review until the draft certificate becomes available at the very end of the process.

EPA's proposal is a problem in search of a solution. There are no reasonable ascertainable benefits to mandating that all certifying authorities require draft licenses or permits before initiating their review. The delays and inefficiencies caused by such an approach, however, are readily foreseeable.

As such, although EPA has not adequately explained why any detailed federal licensing or permitting information must be included within each request for certification or how proposing to impose this mandate on all certifying authorities comports with the Agency's stated interest in promoting cooperative federalism, we believe the Agency's alternative approach of requiring license or permit applications is far less burdensome and time-consuming than requiring actual draft licenses or permits. While license and permit applications are also among the types of information that certifying authorities can request in the course of their certification review and should not be included among the materials required to trigger the initiation of the Section 401 statutory review period, unlike draft permits and licenses, applications are more commonly available at the time project proponents would seek to request certification. Thus, even though license and permit applications remain unnecessary prerequisites for triggering certification review

---

[139] 87 Fed. Reg. at 35,332-35,333.
[140] *See, e.g.,* 18 C.F.R. § 380.12 (Environmental reports for Natural Gas Act applications).

periods, requiring applications in lieu of draft permits or licenses is less likely to needlessly prolong or attenuate the federal licensing/permitting review process.

> ii.  Whether a Project Proponent's Submission Constitutes a "Request for Certification" Should not be left to the Subjective Judgements of Certifying Authorities

EPA's proposed mandate that every request for certification include "any existing and readily available data or information related to potential water quality impacts from the proposed project"[141] is so vague and ambiguous that it will invite certain certifying authorities to subjectively determine that project proponent submissions are not "requests for certification" that initiate the authorities' review period.  Indeed, given the experience of many of the Associations' members with state certifying authorities, it is quite likely certain states will expansively construe what data may be "readily available" and immoderately define what "impacts" are "related" to the proposed project.

Even if the ambiguous requirement that certification requests include "any existing and readily available data or information related to potential water quality impacts from the proposed project"[142] did not allow certifying authorities the opportunity to toll the start of their reviews through subjective determinations that requests are incomplete, the remainder of EPA's proposal surely will.  With the exception of the two mandatory elements described above, EPA proposes to allow each certifying authority to determine whatever else they believe must be included in a certification request that starts the clock on the certifying authority's review.  EPA is proposing no limits, guidelines, or federal oversight role.  In fact, EPA's proposal is intended to rescind those minimal elements the 2020 Rule identified as necessary for a project proponent's submission to be considered a "certification request" that starts the statutory clock for a Section 401 review.  As explained by the Second Circuit:

> [t]he plain language of Section 401 outlines a bright-line rule regarding the beginning of review: the timeline for a state's action regarding a request for certification 'shall not exceed one year' after 'receipt of such request.' It does not specify that this time limit applies only for 'complete' applications. If the statute required 'complete' applications, states could blur this bright-line rule into a subjective standard, dictating that applications are 'complete' only when state agencies decide that they have all the information they need. The state agencies could thus theoretically request supplemental information indefinitely.[143]

The 2020 Rule's definition of "certification request" provides this bright line rule so that all parties are clear about when the review has commenced.  Identification of the specific elements of a

---

[141] Proposed text of 40 C.F.R. § 121.5(a) at 87 Fed. Reg. at 35,378.
[142] Proposed text of 40 C.F.R. § 121.5(a) at 87 Fed. Reg. at 35,378.
[143] *N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d at 455-56.

33

"certification request" eliminates any confusion about whether the project proponent has, in fact, requested a certification and, at the same time, ensures that the certifying authority has the core information necessary to review the request.  This definition also helps certifying authorities by prohibiting project proponents from attempting to prematurely start the statutory clock by submitting requests that lack the basic information necessary for review, but it does not limit what certifying authorities can request be included in a project proponent's initial submission or after the submission.

The Associations recognize that, in most instances, when a certifying authority requests additional information, it is in furtherance of a legitimate review, and not a delay tactic.  For instance, it is likely that some highly complex projects may warrant the submittal of additional information either within or after the original certification request, but the 2020 Rule's definition of "certification request" accommodates those project-specific requests as well.  Under the 2020 Rule's definition of "certification request," certifying authorities remain free to request information relevant to a project's potential water quality effects after the original submittal of the certification request, but doing so does not render the original certification request incomplete or provide a basis to restart the clock on the Section 401 review.

As FERC cautioned more than 30 years ago, "failing to find waiver due to information requests from state agencies could encourage the states to ask applicants to provide additional data in order to give themselves more time to process certification requests, in contravention of Congress' intent."[144]  This concern is no less relevant today.  EPA knows a handful of certifying authorities subjectively defined the required contents of certification requests to prolong their Section 401 review, and EPA surely knows that absent minimal guidelines and oversight, certain certifying authorities will once again misuse their authority.  Yet, EPA is herein proposing to remove even the most modest regulatory limits on certifying authorities' ability to subjectively determine project proponents' submissions are incomplete, and is likewise proposing to cease all federal oversight over these determinations.  Notwithstanding that EPA cannot associate a single adverse environmental outcome with the 2020 Rule's approach, EPA deems it necessary that certifying authorities' certification request determinations be subject to no standards, limits, guidelines, or oversight.  Such is the hallmark of arbitrary and capricious decision-making.

2.  Proposed Definition of "Receipt"

If EPA's proposal to abolish any limit on a certifying authority's discretion to determine what constitutes a request for certification can be construed as opening the door to pre-2020 Section 401 deadline manipulation tactics, the Agency's proposed definition of "receipt" is tantamount to holding the door completely open.  Like EPA's proposal allowing certifying authorities to dictate

---

[144] *McMahan Hydroelectric, LLC*, 168 FERC ¶ 61,185 at P 38, n.44 (2019) (emphasis added). The U.S. Court of Appeals for the Ninth Circuit upheld the FERC's Order No. 464, finding that "the rulemaking was fully consistent with the letter and intent of 401(a)(1) of the CWA . . .." *State ex rel. State Water Res. Control Bd. v. FERC*, 966 F.2d 1541, 1554 (9th Cir. 1992).

when they have received sufficient information to start CWA Section 401's statutory clock, EPA's proposed definition of "receipt" seemingly provides certifying authorities unlimited discretion to control the date on which the certification request was received.

EPA proposes to define "receipt" as "the date that a request for certification, as defined by the certifying authority, is documented as received by a certifying authority in accordance with the certifying authority's applicable submission procedures."[145]  Under this proposed definition, the CWA Section 401's time-limited review period begins, not when the certifying authority receives a fully complete certification request or when the certifying authority has completed its review of the request and determined it is complete, but when the certifying authority chooses to document that it received a certification request.  The documentation that triggers the initiation of the CWA Section 401 review period seemingly refers to the proposed requirement that certifying authorities "send written confirmation of the date of receipt of the request for certification to the project proponent and Federal agency."[146]  But EPA's proposal does not tell certifying authorities when they must "send written confirmation."  Nor does it propose to impose any limits on when certifying authorities may choose to document receipt.  This proposed approach thus impermissibly obscures CWA Section 401's "bright-line rule"[147] for identifying the start of the review period and invites the same misconstrual of the term "receipt" that courts have already rejected.

Section 401 plainly states that:

> [i]f the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a *request for certification,* within a reasonable period of time (which shall not exceed one year) after *receipt* of such request, the certification requirements of this subsection shall be waived with respect to such Federal application.[148]

This provision not only provides the time frame for a certifying authority's review, it instructs that the receipt of the request for certification serves as the starting point for the review period. This is the "bright-line rule"[149] that establishes the starting point for CWA Section 401's time-limited review period, without which the Act's review deadlines would be meaningless.

As the Associations have urged in previous comments to the Agency,[150] the term "receipt" is not ambiguous – it is clear and widely understood through its common usage.  A person is in receipt of something when they receive it,[151] not when a person later confirms they received something. EPA's proposed definition contravenes any commonsense construal of the term "receipt" so that

---

[145] Proposed text of 40 C.F.R. § 121.1(k) at 87 Fed. Reg. at 35,377.

[146] Proposed text of 40 C.F.R. § 121.5(d) at 87 Fed. Reg. at 35,378.

[147] *N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d 450, 455 (2d Cir. 2018).

[148] 33 U.S.C. § 1341(a)(1) (emphasis added).

[149] *N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d 450, 455 (2d Cir. 2018).

[150] 2019 Comments at 33; 2021 Comments at 23.

[151] *See* https://www.dictionary.com/browse/receipt ("We are in receipt of your letter requesting a copy of the report.").

35

the term is wholly divorced from the act of receiving and instead refers to some indeterminable point after a certifying authority receives a certification request, reviews it, documents that it was received, and transmits that confirmation of receipt to the project proponent and federal agency.

If EPA intends its proposed revision to provide clarity, this proposed definition fails to accomplish that goal.  It ascribes a commonly understood term a meaning that is wholly unfamiliar and confusing, and it is inconsistent with longstanding agency practice.

For instance, FERC's longstanding position is that:

> It is much easier and more predictable for the Commission and all parties concerned to determine when an application for water quality certification is actually filed with a state agency and commence the running of the one-year waiver period from that date, instead of the date when an application is accepted for filing in accordance with state law.[152]

And when FERC's interpretation of "receipt" was challenged, FERC reaffirmed validity of its interpretation of Section 401 and declined to adopt a new atextual approach:

> We decline to do so. This was our practice prior to 1991, but it was found to be unduly burdensome because it put the Commission in the frequently difficult posture of trying to ascertain and construe the requirements of many and divergent state statutes and regulations. The existing rule, in contrast, is clear and simple.[153]

Indeed, in numerous interstate natural gas pipeline proceedings, FERC has applied this interpretation that actual receipt of a certification request commences a certifying authority's Section 401 review.[154]  As important, EPA's proposed reshaping of the concept of "receipt" has already been rejected by courts.  And as EPA is aware, those judicial rejections were based on the same efforts to manipulate the starting point for Section 401 review that the Agency's proposal would seemingly once again condone.

For instance, the Second Circuit has already held that Section 401 prohibits a certifying authority from determining that the certification request is not "received" until the state deemed it complete

---

[152] *See Regulations Governing Submittal of Proposed Hydropower License Conditions and other Matters*, Order No. 533, FERC Stats. & Regs. ¶ 30,932 at 30,345-46 (1991).

[153] *Hydroelectric Licensing under the Federal Power Act*, Order No. 2002, FERC Stats. & Regs. ¶ 31,150 at 30,735 (2003).

[154] *See, e.g., Millennium Pipeline Co*., L.L.C., 161 FERC ¶ 61,186 (2017); *Georgia State Crossing Pipeline LP*, 107 FERC ¶ 61,065 at P 7 (2004) (finding that the "clear and unambiguous language in Section 401(a)(1)" required the State to act within one year of receiving the request for Section 401 certification); *AES Sparrow Point LNG, LLC*, 129 FERC ¶ 61,245 at PP 61-63 (2009) (stating that the triggering event was the receipt of the request for a water quality certification).

because such a reading would "allow a state agency not only to dictate when the review process can begin but also to delay it indefinitely."[155]  Certifying authorities and project proponents may not even jointly agree to stipulate that a certifying authorities' "receipt" of a certification request occurred on any day other that the day it was actually received because "however modest and reasonable that extension . . . , allowing the state to dictate the beginning of review by agreement would 'blur th[e] bright-line rule into a subjective standard'"[156]

In another example, the New Jersey Department of Environmental Protection ("NJDEP") deemed as incomplete a certification request for a project proposed by PennEast Pipeline Company, LLC because the project proponent had not provided NJDEP with surveys of the entire pipeline route, including segments that had no rational relationship with potential water quality impacts.[157] Because this data request was irrelevant to the state's review of the proposed project's potential water quality impacts in New Jersey, it can only be construed as a tactic for delay.

Whether or not EPA now disagrees with the approach to certification requests it set forth in the 2020 rule, the Agency must acknowledge that it was expressly intended to address known instances where certifying authorities manipulated the start date of their review period and to conform to the jurisprudence that such manipulations are impermissible under Section 401 of the CWA.  While the Agency is permitted to adopt a new policy position, it must give "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy,"[158] EPA has not done so.  EPA's proposed revisions to the 2020 Rule's certification request provisions largely ignore the improper tactics and judicial holdings on which the 2020 Rule was based.  And in doing so, the Agency's proposal would encourage the same abuses that EPA knows some certifying authorities undertook and that courts have rejected.

### d. <u>Reasonable Period of Time</u>

Section 401 of the CWA stipulates that, in all cases, the requirement that certifying authorities complete their review within a "reasonable period of time" means that certification review can never take longer than one year following receipt of a request for certification.[159] This deadline is explicit, unambiguous, and binding.

---

[155] *N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d at 455-456.

[156] *N.Y. State Dep't of Envtl. Conservation v. Nat's Fuel Gas Supply Corp.*, Slip Op. at No.s 19-1610-ag. 19-1618-ag at p. 17 (quoting *N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d at 455).

[157] Letter from Virginia Kop'Kash, Assistant Comm'r, N.J. Dep't of Envtl. Prot., Re: Freshwater Wetlands Individual Permit Application, DLUR File #0000-17-0007.2 FWW170001,

[158] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. at 515.

[159] 33 U.S.C. § 1341(a)(1) ("If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application.")

The express text of Section 401 plainly states that a certifying authority waives its certification authority over a federal license or permit if the certifying authority "fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request."[160]  Additionally, as explained by the D.C. Circuit, "while a full year is the absolute maximum, it does not preclude a finding of waiver prior to the passage of a full year."[161]

"[T]he purpose of the waiver provision is to prevent a State from indefinitely delaying a federal licensing proceeding by failing to issue a timely water quality certification under Section 401."[162] Given the clarity of the CWA with respect to the one-year deadline and the lack of ambiguity about the intended purpose of this language, the text of the CWA leaves EPA no room to interpret Section 401 as allowing certifying authorities any amount of time in excess of one year.[163]

Notwithstanding the Agency's apparent recognition of the strict and unambiguous time limits Congress imposed on certification reviews under Section 401, the Agency's proposed rule fails to meaningfully acknowledge or sufficiently address the well-known and fully documented tactics that some certifying authorities have employed to impermissibly protract their Section 401 certification reviews and "indefinitely delay[] federal licensing proceeding[s]."[164]

As the agency charged with implementing the CWA,[165] EPA must ensure that its implementing regulations meaningfully address and reasonably preclude certification tactics that are plainly intended to evade, rather than comply with, Section 401's congressionally mandated deadlines.  In promulgating the 2020 Rule, EPA examined and crafted regulatory provisions to address the various ways in which a small minority of states have circumvented or attempted to circumvent certification deadlines.  While EPA is not precluded from varying the measures needed to ensure that certifications are completed within a reasonable period of time (not to exceed one year), the Agency cannot ignore those known tactics that certain certifying authorities have employed to evade deadlines.  As the agency charged with implementing CWA Section 401, EPA must ensure that the Agency's regulations reasonably ensure statutory compliance, rather than perpetuating, or

---

[160] 33 U.S.C. § 1341(a)(1).

[161] *Hoopa Valley*, 913 F. 3d at 1104.

[162] *Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 972 (D.C. Cir. 2011).

[163] Consistent with our comments in Section IV(e), the Associations believe that Congress's establishment of one-year as the outermost limit for Section 401 certifications reveals that Congress understood and expected Section 401 reviews to be narrowly focused on discharges from the federal project, rather than broader or more tangentially related impacts.

[164] *Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 972 (D.C. Cir. 2011).

[165] *See* 33 U.S.C. § 1251(d) ("Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency . . . shall administer this chapter."); *Id*. at 1361(a); *Mayo Found. for Medical Educ. and Res. v. United States*, 562 U.S. 44, 45 (2011); *Hoopa* Valley, 913 F.3d at 1104; *Ala. Rivers Alliance v. FERC*, 325 F.3d 290, 296–97 (D.C. Cir. 2003); *Cal. Trout v. FERC*, 313 F.3d 1131, 1133 (9th Cir. 2002); *Am. Rivers, Inc. v. FERC*, 129 F. 3d 99, 107 (2d Cir. 1997).

as the case may be, reopening loopholes to the strict application of Section 401's explicit deadlines. Accordingly, EPA must, at a minimum, preclude those deadline circumvention tactics that are well-known to the Agency and/or already held to be improper by courts.

### 1.   Certifying authorities should not set their own review deadlines

EPA proposes, under section 121.6(b), that the federal agency and certifying authority may, within 30 days of receipt of a request for certification, jointly agree in writing to a reasonable period of time for the certifying authority to act on the request for certification, provided that the reasonable period of time does not exceed one year from receipt.[166]  If the federal agency and the certifying authority do not timely agree on the length of a reasonable period of time, EPA proposes that the reasonable period of time shall be 60 days.[167]

The Associations agree that a 60-day review is a reasonable default time limit because, while highly complex reviews can require up to a year, certification authorities often review many simpler projects in 30 days or less.  While we view the default 60-day review period as appropriate, proposed section 121.6(c) seemingly guts this reasonable default period by allowing a certifying authority to unilaterally extend the reasonable period of time up to the full one-year statutory limit by simply providing public notice that the extension is necessary.[168] The conditions EPA proposes would permissibly necessitate such an extension (*e.g.*, public notice requirements or force majeure events) would not clearly limit a certifying authority's exercise of this unilateral extension authority because many certifying authorities have discretion to create new public notice requirements and even if that were not the case, the proposal contains no provisions for EPA or the federal agency to oversee or overrule a certifying authority's extension notice even when the notice is plainly spurious.

Thus, since 1971, the obligation to establish a "reasonable period of time" within the statutory one-year period limit has fallen within the exclusive purview of federal licensing and permitting agencies.[169]   So too has the determination of when a certifying authority waives its review authority.[170] Federal agencies have therefore long demonstrated their understanding of the review times necessary for certain types of projects and their ability to establish appropriate and reasonable review timeframes for certifying authorities.  Indeed, while the Associations' members may not have agreed with each federal agencies' assessment of the reasonable period of time

---

[166] 87 Fed. Reg. at 35,378.

[167] 87 Fed. Reg. at 35,378.

[168] 87 Fed. Reg. at 35,378.

[169] *See* Army Corps regulations at 33 CFR § 325.1(b)(ii) (51 Fed. Reg. 41,236) (Nov. 13, 1986)); *see also* FERC Rules at 18 §5.23(b)(1) (68 Fed. Reg. 61,743)(Oct. 30, 2003)); *Constitution Pipeline Company, LLC*, 164 FERC P 61029, 2018 WL 3498274 (2018) ("[T]o the extent that Congress left it to federal licensing and permitting agencies, here the Commission, to determine the reasonable period of time for action by a state certifying agency, bounded on the outside at one year, we have concluded that a period up to one year is reasonable.").

[170] *See Millennium Pipeline Company, L.L.C.*, 860 F.3d at 700-01 (acknowledging that a project proponent can ask the federal agency to determine whether a waiver has occurred).

necessary for review over the past several decades, the Associations are not aware of, nor can EPA's preamble or Economic Analysis identify, any instance in which a federal agency's determination of a certifying authority's reasonable period of time for review caused the authority to certify a project without sufficient review.  As EPA is aware, when certifying authorities believe themselves unable to timely complete a sufficient review, they typically deny certification.

Allowing certifying authorities to set their own review deadlines (within the one-year statutory limit) also unnecessarily complicates multi-jurisdictional reviews, such as those necessary for linear projects like pipelines and transmission lines.  Not only would the proposed collaboration requirements and timelines needlessly prolong the time required to obtain certifications, but allowing each certifying authority to establish their review deadline within the one-year statutory limit would make implementation of the Section 401 certification requirements far less clear and consistent.  As one example, a pipeline that is proposed to cross multiple jurisdictions could be subject to vastly different review deadlines for exactly the same activity (*e.g.*, water crossing or authorization to discharge fill) based on the differing views of certifying authorities in each jurisdiction.  And even if every other certifying authority timely completes their review, important multi-jurisdictional projects will be forced to wait for the single certifying authority that construes its reasonable period of time most expansively.[171]

The interests of clarity and consistency also support retention of the factors EPA's Section 401 regulations required federal agencies to consider when determining the reasonable period of time to act on a certification request.[172]  These factors (*i.e.*, the complexity of the proposed project, the nature of any potential discharge, and the potential need for additional study or evaluation of water quality effects from the discharge),[173] not only facilitate consistency in determining Section 401 review time limits, they ensure that certifying authorities' review timeframes are commensurate with the task at hand – analyzing the potential water quality effects of discharges from the proposed project.  These factors are relevant to assessing the timeframes necessary for certification reviews, and as previously noted, it should remain within the exclusive purview of federal licensing and permitting agencies to consider these factors in determining the reasonable period of time for review.

EPA has not provided a "reasoned explanation," much less a "more detailed justification" for this proposed action.[174]  This proposal would change a provision of EPA's Section 401 regulations that has functioned effectively for many decades and replace it with an approach that will impede clarity, create uncertainty, protracts certification reviews, and allow certifying authorities to manipulate their review deadlines.  For these reasons, the Associations urge EPA to rescind this

---

[171] This is particularly true if EPA finalizes its proposal to allow tribes that have not obtained "treatment as state" status for water quality standards under Section 303(c) to obtain "treatment as state" status specifically for purpose of Section 401 certification.  *See* discussion in Section IV(j).

[172] *See* 40 C.F.R. § 121.6(c)(1)-(3).

[173] 40 C.F.R. § 121.6(c)(1)-(3).

[174] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. at 515.

aspect of its proposal so that federal licensing and permitting agencies continue to determine the reasonable period of time for certifying authorities' review, which shall not exceed the one-year statutory limit.   In those instances where a certifying authority disagrees with the federal agency's determination or otherwise requires additional time, federal agencies should have authority to grant an extension of the reasonable period of time (within the one-year limit) if the project proponent agrees with the extension request.

      2.    <u>EPA must retain its regulatory prohibitions on certifying authorities' ability to artificially extend timeframes by stopping and restarting the certification process</u>

EPA is proposing to rescind the 2020 Rule's restrictions on certifying authorities' ability to extend their review periods by compelling project proponents to withdraw and resubmit their certification requests.[175]  Even though EPA is well-aware that this tactic has been utilized by some certifying authorities and deemed impermissible by courts, "EPA is not taking a position on the legality of withdrawing and resubmitting a certification request."[176]

This is not a permissible revision.  The CWA does not allow certifying authorities to stop and restart their review to artificially extend Section 401's statutorily prescribed deadlines.  And as the agency charged with implementing Section 401 of the Act, EPA's regulations must incorporate enforceable procedures that prohibit this manner of evading Section 401's statutory deadlines. Here again, the need for these restrictions is made evident by the actions of a handful of states that have increasingly relied on a "withdrawal and resubmittal" tactic to circumvent statutory deadlines.  Indeed, the D.C. Circuit's decision in *Hoopa Valley Tribe v. FERC* ("Hoopa Valley") demonstrates the need for EPA to enforce regulations to compel compliance with the express Section 401 deadlines.[177]

In *Hoopa Valley*, the D.C. Circuit considered whether California and Oregon could lawfully rely on a "withdrawal-and-resubmission scheme" to avoid the Section 401 deadline for certifying the relicensing of the Klamath Hydroelectric Project.[178]  The project proponent had originally submitted its certification requests to the states in 2006, and pursuant to the states' demand, withdrew and resubmitted the same certification requests annually for more than a decade.   When the D.C. Circuit drafted its decision "*more than a decade later*, the states still ha[d] not rendered certification decisions."[179]   The court bemoaned that:

      it is now commonplace for states to use Section 401 to hold federal licensing hostage. At the time of briefing, twenty-seven of the forty-three licensing

---

[175] 87 Fed. Reg. at 34,341.
[176] 87 Fed. Reg. at 34,341.
[177]  913 F. 3d 1099 (D.C. Cir. 2019).
[178] *Hoopa Valley*, 913 F. 3d at 1103.
[179] *Hoopa Valley*, 913 F. 3d at 1104 (emphasis in original).

applications before FERC were awaiting a state's water quality certification, and four of those had been pending for more than a decade.[180]

While the problem identified by the D.C. Circuit was pernicious, its resolution was remarkably straight-forward.  According to the court, "[d]etermining the effectiveness of such a withdrawal-and-resubmission scheme is an undemanding inquiry because Section 401's text is clear."[181]

> While the statute does not define 'failure to act' or 'refusal to act,' the states' efforts . . . constitute such failure and refusal within the plain meaning of these phrases. Section 401 requires state action within a reasonable period of time, not to exceed one year. California and Oregon's deliberate and contractual idleness defies this requirement. By shelving water quality certifications, the states usurp FERC's control over whether and when a federal license will issue. Thus, if allowed, the withdrawal-and-resubmission scheme could be used to indefinitely delay federal licensing proceedings and undermine FERC's jurisdiction to regulate such matters.[182]

The court explained that "Congress intended Section 401 to curb a state's 'dalliance or unreasonable delay.'  This Court has repeatedly recognized that the waiver provision was created 'to prevent a State from indefinitely delaying a federal licensing proceeding.'"[183]   Therefore, the court "conclude[d] that California and Oregon have waived their Section 401 authority with regard to the Project."[184]

As an outlier, the U.S. Court of Appeals for the Fourth Circuit ("Fourth Circuit") rejected a FERC determination that North Carolina waived its Section 401 authority because the state took longer than one year to review a project proponent's initial certification application and two subsequent applications that were resubmitted after the initial application was withdrawn.[185]   The court held that FERC did not have a sufficient basis to conclude that North Carolina had colluded with the project proponent on the withdrawal and resubmittal of the certification applications to artificially extend the time.  Instead, the court found that the decision to withdraw and resubmit the initial and subsequent applications was made by the project proponent alone and without the direction of, or coordination with, the state.[186]

---

[180] *Hoopa Valley*, 913 F. 3d at 1104 (emphasis in original).
[181] *Hoopa Valley*, 913 F. 3d at 1103.
[182] *Hoopa Valley*, 913 F. 3d at 1105.
[183] *Hoopa Valley*, 913 F. 3d at 1105-6 (internal citations omitted).
[184] *Hoopa Valley*, 913 F. 3d at 1105.
[185] *North Carolina Dep't of Envtl Quality v. FERC*, 2021 WL 2763265 (4th Cir. July 2, 2021).
[186] *North Carolina Dep't of Envtl Quality v. FERC*, 2021 WL 2763265.

The Fourth Circuit's reasoning appears to conflict with holdings in the D.C. Circuit[187] and the Second Circuit,[188] it is also not a particularly sweeping decision because the court made a fact-specific determination that the record did not support FERC's determination that the project proponent's withdrawal and resubmittal of the certification application was coordinated with the state.  More importantly, however, the Fourth Circuit decision in no way justifies EPA's proposed revisions because the 2020 Rule prohibits project proponents from withdrawing and resubmitting certification applications.

The 2020 Rule only prohibited states and other certifying authorities from requesting applications be withdrawn and resubmitted in order to extend the Section 401 review time limit.  Thus, although it remains an outlier to the larger body of Section 401 jurisprudence, the Fourth Circuit's decision is not inconsistent with EPA's current Section 401 regulations.  Therefore, EPA's regulations must continue to stipulate that a certifying authority is not authorized to request the project proponent to withdraw a certification request or to take any other action to modify or restart the established reasonable period of time.

e.    **Scope of Certification**

EPA is proposing to rescind the 2020 Rule's regulatory interpretation of the scope of the review undertaken by, and therefore the types of conditions that can be imposed by, states and other certifying authorities.  The Associations supported the 2020 Rule's interpretation when it was promulgated and we continue to support it because it is in accordance with the text, structure, and history of the Act.  The 2020 Rule's interpretation reasonably reflects Congress' intent that Section 401 reviews and conditions focus on whether federal projects' potential point source discharges to WOTUS will comply with certain enumerated provisions of the CWA.  The 2020 Rule was also necessary to limit certain certifying authorities' well-documented misuse of their certification and conditioning authority to address policy or parochial objectives wholly unrelated to Section 401.

The Associations therefore oppose EPA's proposal because it would once again allow and even encourage certifying authorities to claim certification and conditioning authority far broader than Congress intended.  EPA's proposal will thus deprive project proponents, federal licensing and permitting agencies, and certifying authorities of the clear, consistent, and reasonably predictable Section 401 procedures that are the product of a reasonably restrained and well-supported interpretation of the Act.

The Associations also oppose EPA's proposed interpretation of state and tribal certification and conditioning authority because it is not grounded in the text, structure, or legislative history of the CWA, and Section 401 in particular.  EPA's proposed interpretation also lacks any reasonable

---

[187] *See Hoopa Valley*, 913 F. 3d at 1105.
[188] *See N.Y. State Dep't of Envtl. Conservation v. See Nat's Fuel Gas Supply Corp.*, Slip Op. at No.s 19-1610-ag. 19-1618-ag (2d Cir. March 23, 2021); *See also N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d 450, 455 (2d Cir. 2018).

consideration of the broader federal licensing and permitting context within which a Section 401 certification review is only a small (but important) part.  Indeed, EPA's overbroad interpretation appears predicated on the erroneous notion that Section 401 provides the only means by which states and tribes can address their concerns about the potential environmental impacts of federal projects and that absent an expansive interpretation of Section 401, states and tribes will be left with no ability to engage on the review, permitting, and operation of federally licensed and permitted facilities.  This is neither true nor a permissible construction for proposing to interpret Section 401 in a manner inconsistent with the text, structure, and history of the Act.

Section 401 affords states and tribes distinct and well-circumscribed authority to protect their water quality in the context of federal licensing and permitting processes that otherwise preempt state and tribal authority.  This specialized and limited role is reflected in the procedures, time limits, and subject matter restrictions that Congress applied throughout Section 401.

1.    Discharge v. Activity

"Section 401(a)(1) identifies the category of activities subject to certification—namely, those with discharges".[189]  As noted in Section III above, the Associations agree with EPA that the text, structure, and history of Section 401 demonstrate that Congress intended Section 401 certification to apply only when a federally licensed or permitted activity has the potential to result in a discharge from a point source into a WOTUS.[190]  We strongly disagree, however, with EPA's assertion that Section 401(a)(1) merely describes the prerequisites for, but not the scope of, the Section 401 certification process.

Under Section 401(a)(1), a certifying authority's decision to grant or deny certification must be based on whether the discharge will comply with the applicable provisions of Sections 301, 302, 303, 306, and 307 of the Act:

> Any applicant for a Federal license or permit to conduct any activity . . . which may result in any *discharge* into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the *discharge* originates . . . that any such *discharge* will comply with the applicable provisions of sections 301, 302, 303, 306, and 307 of this title.[191]

Notwithstanding that Section 401(a)(1) explicitly requires that a federal permit/license be withheld unless the applicant provides a state certification that the "*discharge*" will comply with specified water quality requirements, EPA's proposal suggests that Section 401(a)(1) does not limit the

---

[189] *PUD No. 1*, 511 U.S. 700, 711-12.
[190] The preceding section (Section III) already provides the Associations' analysis in support of this interpretation, and we therefore refrain from repeating that discussion here.
[191] 33 U.S.C. § 1341(a)(1) (emphasis added).

44

scope of certifications to discharges.[192]   As such, although EPA characterizes its proposed interpretation as a repudiation of the 2020 Rule,[193] in reality the limited scope of a certifying authority's review under Section 401 is a function of the statutory constraints imposed by Congress – not the 2020 Rule.  More importantly, however, EPA's interpretation directly contravenes the express text of the statute.

The Agency nonetheless attempts to justify its divergence from the statutory text by invoking Section 401(d), which authorizes certifying authorities to include appropriate conditions in the certification described in Section 401(a)(1).  Unlike Section 401(a)(1)'s directive limiting the scope of a certification review to the "*discharge's*" compliance with water quality requirements, Section 401(d) describes the conditions necessary to assure the "*applicant*" will comply with the specified water quality requirements.  Section 401(d)'s requirement that the certification "set forth" conditions and requirements for the *applicant*, and not the *discharge*, makes sense because the certification is not some abstraction; it is a document that a certifying authority gives to a person or entity, and it describes what that person or entity must do to ensure that its discharges comply with water quality requirements.  This is consistent with the 1972 Amendments' "total restructuring" and "complete rewriting" of the CWA.[194]   That 1972 restructuring of the Act generally, and Section 401 in particular, transformed the Act's regulatory regime away from the prior focus indirectly regulating activities through ambient standards toward direct regulation of discharges.

Indeed, it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used."[195]   Thus, viewed holistically, the authority to condition a certification under Section 401(d) supports the certifying authority's Section 401(a)(1) right to grant or deny a certification request. Together, the certification and any conditions form an integrated whole, the overarching purpose of which is to assure point source *discharges* from a federally licensed or permitted project will not violate water quality requirements.

EPA ignores this reasoned well-supported interpretation and instead proposes its own novel and wholly unsound interpretation of these provisions;

> the Agency believes that Congress's use of the words 'applicant', 'activity', and 'discharge' in section 401(a)(1), 'applicant' in section 401(d), and its failure to use the word 'discharge' in section 401(d), create enough ambiguity to support an

---

[192] 87 Fed. Reg. at 35,342.

[193] 87 Fed. Reg. at 35,344.

[194] *City of Milwaukee* v. *Illinois,* 451 U.S. 304, 317 (1981) (quoting legislative history of 1972 amendments).

[195] *Deal v. United States*, 508 U.S. 129, 132 (1993).

interpretation that certifying authority review, and the ability to impose conditions, extends to the project proponent's 'activity as a whole,'[196]

In other words, rather than attempt to interpret how Congress intended these two provisions to operate within Section 401, EPA simply points to the varied terms, and concludes that they "create enough ambiguity to support an interpretation"[197] that EPA prefers.  That interpretation is that certification reviews and conditions may extend to the "activity as a whole,"[198] – a phrase that EPA interprets to mean "any aspect of the project activity with the potential to affect water quality."[199]

This is not a valid interpretation of Section 401 because it is not an interpretation at all.  EPA simply sought out an instance of statutory ambiguity and upon finding one, used that ambiguity as a license to misconstrue Section 401(a)(1) – a provision that unambiguously limits the scope of certification reviews to impacts from "discharges."  In interpreting one of its governing statutes, the Agency's role is not to construe ambiguous terms as opportunities to institute *EPA's* predetermined policy objectives, its role is to genuinely and meaningfully ascertain what *Congress* intended statutory provisions to mean.  EPA did not do that here.

Further, while EPA takes the phase "activity as a whole" from the Supreme Court's 1994 decision in *PUD No. 1*, that decision focused on the permissibility of one type of certification condition in a highly fact-specific circumstance.[200]  Moreover, EPA largely ignores that the Supreme Court expressly explained that the authority described in *PUD No. 1* "is not unbounded."[201]  The Court then determined that a state requirement imposed to "ensure compliance with the state water quality standards adopted pursuant to § 303 of the Clean Water Act" was an "appropriate requirement," but declined to "speculate on what additional state laws, if any, might be incorporated by this language."[202]

As Justices Thomas and Scalia cautioned in their dissent in *PUD 1*, "conditions that have little relation to water quality," if allowed, would significantly "disrupt[] the careful balance between state and federal interests" established under other statutory regimes.[203]  In fact, outside the specific context at issue in the Supreme Court's *PUD No. 1* decision, use of Section 401(d) to regulate "the activity as a whole" is statutorily prohibited in many key respects.

Recall that Section 401 provides states and tribes a narrow and temporally limited exemption from the otherwise exclusive jurisdiction that Congress bestowed on the federal government over certain

---

[196] 87 Fed. Reg. at 35,344.
[197] 87 Fed. Reg. at 35,344.
[198] 87 Fed. Reg. at 35,344.
[199] 87 Fed. Reg. at 35,377.
[200] *PUD No. 1*, 511 U.S. 700, 712.
[201] *PUD No. 1*, 511 U.S. 700, 712.
[202] *PUD No. 1*, 511 U.S. 700, 712.
[203] *PUD No. 1*, 511 U.S. 700, 732-33.

types of projects of national importance such as power generation, energy distribution, and interstate transportation infrastructure.   For instance, FERC's authority under the NGA is exclusive: "Congress occupied the field of matters relating to wholesale sales and transportation of natural gas in interstate commerce."[204]   "FERC's exclusive purview" includes the regulation of "facilities [that] are a critical part of the transportation of natural gas and sale for resale in interstate commerce."[205]   In this "exclusively federal domain," states may not regulate.[206]

The Supreme Court's fact-specific construal of Section 401(d) to allow states and tribes to regulate "the activity as a whole" cannot undo, and therefore must yield to, these larger statutorily mandated fields of preemption.   Whatever additional leeway the Supreme Court may have provided certifying authorities in the *PUD No. 1* decision, it did not and cannot overcome Congress' express directive that certain decisions are exclusively committed to the federal government.

Indeed, even before the 2020 Rule was enacted, many courts had already recognized the need to restrain the types of conditions states can impose through Section 401 to those necessary to protect water quality.[207]   In recent years, FERC has also confirmed that conditions not directly related to the licensee's "activity" are improper under Section 401. In fact, although FERC interprets its governing statutes as compelling it to incorporate all state conditions into federal licenses, FERC has often noted its opinion that conditions "unrelated" to a project's activities are not proper Section 401 limitations.[208]

---

[204] *Schneidewind* at 305.

[205] *Schneidewind* at 308.

[206] *Schneidewind* at 305; *See, e.g., N. Natural Gas Co. v.  Iowa Utils. Bd.*, 377 F.3d 817, 819–20, 822–24 (8th Cir. 2004) (NGA preempted state-law environmental provisions); *E. End Prop. Co. No. 1, LLC* v. *Kessel*, 851 N.Y.S.2d 565, 571 (N.Y. App. Div. 2007) (similar); *No Tanks Inc.* v. *Pub. Utils. Comm'n*, 697 A.2d 1313, 1315 (Me. 1997) (similar).

[207] *Am. Rivers v. FERC*, 129 F.3d 99, 107 (2d Cir. 1997) ("Section 401(d), reasonably read in light of its purpose, restricts conditions that states can impose to those affecting water quality in one manner or another."); *e.g., Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 754 (4th Cir. 2019) (upholding certification conditions when they "deal[t] with project-related activities"); *Miners Advocacy Council, Inc. v. State, Dep't of Envtl. Conserv.*, 778 P.2d 1126, 1138 (Alaska 1989); *Town of Arcadia Lakes v. S.C. Dep't of Health & Envtl. Control*, 745 S.E.2d 385, 389 (S.C. Ct. App. 2013) (upholding conditions that address "impacts to adjacent water bodies or wetlands resulting from the activity"); *Port of Seattle v. Pollution Control Hearings Bd.*, 90 P.3d 659, 681 (Wash. 2004) (invalidating section 401 certification conditions that did not did not relate to the licensee's activity).

[208] *See, e.g.*, Order Issuing New License, Portland Gen. Elec. Co., Project No. 2195- 011, 133 FERC 62281, at 64620 57, 2010 WL 11404139 (FERC Dec. 21, 2010); Order Issuing New License, Pub. Utility Dist. No. 1 of Snohomish Cty., Wash., Project No. 2157-188, 136 FERC 62188, at 64488 92, 2011 WL 13045891 (FERC Sept. 2, 2011); Order Issuing New License, Pub. Utility Dist. No. 1 of Douglas Cty., Wash., Project No. 2149-152, 141 FERC 62104, at 64270 53, 2012 WL 12372998 (FERC Nov. 9, 2012); *See also Mitchell Cty. Conservation Bd.*, Project No. 11530-000—Iowa, 77 FERC 6202, 64458 n.4 (FERC Dec. 27, 1996) (refusing to require a hydropower licensee to spend project revenues on improvements at county parks "unrelated to the project").

2.   <u>Water Quality Requirements</u>

EPA proposes to substantially expand the scope of certification reviews and conditions by defining "water quality requirements" to include:

> any limitation, standard, or other requirement under the provisions enumerated in section 401(a)(1), any Federal and state laws or regulations implementing the enumerated provisions, and any other water-quality related requirement of state or tribal law regardless of whether they apply to point or nonpoint source discharges.[209]

As discussed above, this proposed definition conflicts with the text, structure, and history of the Act, which reflect that Section 401 certification procedures are triggered by Section 401(a)(1) only when a federally licensed or permitted activity has the potential to result in a discharge from a point source into a WOTUS.  Moreover, as relevant here, this proposed definition expands the scope of water quality requirements well beyond what Congress intended.

While the phrase "water quality requirements," which appears throughout Section 401, is not defined in the statute, it has a readily ascertainable meaning that is far more limited than the definition EPA proposed.  Under Section 401(a)(1), a certifying authority's decision to grant or deny certification must be based on whether the discharge will comply with the applicable provisions of Sections 301, 302, 303, 306, and 307 of the Act:

> Any applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates . . . that any such discharge will comply with the applicable provisions of sections 301, 302, 303, 306, and 307 of this title.[210]

Thus, although the phrase "water quality requirements" is undefined, the enumerated provisions of the CWA (*i.e.*, Sections 301, 302, 303, 306, and 307) *are* specified within Section 401 and the requirements of those sections are a prerequisite to, and therefore delineate the scope of, the Section 401 certification.  Undefined or not, the meaning of "water quality requirements" is clear.  "Water quality requirements" refer to the federal, state, or tribal requirements adopted pursuant to authority under Sections 301, 302, 303, 306, and 307.  While EPA could interpret "water quality requirements" more narrowly, the Agency is plainly precluded from defining the term such that its scope is more comprehensive than the limited scope of the Section 401 review.

The phrase "any other appropriate requirement" in Section 401(d) does not change Section 401's statutorily mandated limits on the scope of certification.  For one, Section 401(a)(1) delineates the

---

[209] 87 Fed. Reg. at 35,347.
[210] 33 U.S.C. § 1341(a)(1).

scope of the Section 401 certification review; not Section 401(d).  Further, while the CWA does not define what constitutes "any other appropriate requirement of state law," the Agency's interpretation of the phrase must heed the Supreme Court's admonition in *PUD No. 1* that, "[a]lthough § 401(d) authorizes the State to place restrictions on the activity as a whole, that authority is not unbounded."[211]  The Court went on to determine that a state requirement imposed to "ensure compliance with the state water quality standards adopted pursuant to § 303 of the Clean Water Act" was one such "appropriate requirement," but declined to "speculate on what additional state laws, if any, might be incorporated by this language."[212]

EPA must therefore discern the scope Congress intended through use of the phrase "any other appropriate requirement" by looking to the specific provisions of the CWA that Congress expressly identified in Section 401.  An agency, just like a court, must exhaust the tools of statutory interpretation before finding statutory text ambiguous,[213] and the agency's interpretation is only reasonable if it is within the bounds of the ambiguity. Using context to discern the meaning of specific terms falls "[u]nder the familiar interpretive canon *noscitur a sociis*, 'a word is known by the company it keeps.'"[214]  "While 'not an inescapable rule,' this canon 'is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.'"[215]

For example, in *Gustafson v. Alloyd Co.*, the Supreme Court considered a statute that defined the word "prospectus" as a "prospectus, notice, circular, advertisement, letter, or communication."[216] The Court held that although the word "communication" could in the abstract mean any type of communication, "it is apparent that the list refers to documents of wide dissemination," inclusion "of the term 'communication' in that list suggests that it too refers to a public communication."[217]

Without question, the phrase "any other appropriate requirement" is capable of many different meanings in the abstract, and some states have latched onto this phrase in attempts to greatly expand the conditions they can extract through the Section 401 certification process.  For instance, the 2020 Rule cited to state certifications with conditions requiring "biking and hiking trails to be constructed, one-time and recurring payments to state agencies for improvements or enhancements that are unrelated to the proposed federally licensed or permitted project, and public access for fishing and other activities along waters of the United States."[218]   Comments in opposition to changing the 2020 Rule that EPA at the pre-proposal stage likewise provided examples of

---

[211] *PUD No. 1*, 511 U.S. 700, 712.

[212] *PUD No. 1*, 511 U.S. 700, 712.

[213] *Cf. Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-15 (2019).

[214] *McDonnell v. United States ("McDonnell")*, 136 S. Ct. 2355 at 2368 (2015) (quoting *Jarecki v. G.D. Searle & Co. ("Jarecki")*, 367 U.S. 303, 307 (1961).

[215] *McDonnell*, 136 S. Ct. 2355 at 2368-69 (quoting *Jarecki.*, 367 U.S. at 307.

[216] *Gustafson v. Alloyd Co.*, 513 U.S. 561, 573-574 (1995).

[217] *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575.

[218] 85 Fed. Reg. at 42,257.

inappropriate certification requirements some certifying authorities required prior to the 2020 Rule.[219]

The conditions Maryland sought to impose on the license for Exelon Generation Co., LLC's Conowingo dam and hydroelectric project presents another particularly egregious example of this practice.[220]  Even though the project does not discharge phosphorus or nitrogen, "[a]s the cost of such a federal license, Maryland insists that the Conowingo Project remove the phosphorus and nitrogen that flow downriver from New York, Pennsylvania, and Maryland. In lieu of cleaning the Susquehanna, Maryland would accept $172 million from Exelon each year for the next 50 years."[221]

In context, when employing the traditional tools of statutory interpretation, such requirements are clearly unlawful. The interpretive canon *noscitur a sociis* shows that the CWA cannot reasonably be interpreted to make allowance for such requirements.  The phrase "any other appropriate requirement" "follows an enumeration of four specific sections of the CWA that are all focused on the protection of water quality from point source discharges to waters of the United States."[222] Indeed, Section 401 in its entirety is replete with references to requirements deemed necessary to ensure compliance with "applicable effluent limitations" and "water quality requirements." Given the overall focus of Section 401, the phrase "any other appropriate requirement" must be interpreted to include only those EPA-approved provisions of state or tribal law that implement the Section 402 and 404 permit programs or otherwise control point source discharges to WOTUS.

EPA, in the 2020 Rule, reached a similar conclusion using the related *ejusdem generis* canon. Under this principle, where general words follow an enumeration of two or more things, they apply only to things of the same general kind or class specifically mentioned.[223] This canon also informed Justice Thomas's dissent in *PUD No. 1,* therefore the 2020 Rule mirrored Justices Thomas and Scalia's conclusion that "the general reference to 'appropriate' requirements of state law is most reasonably construed to extend only to provisions that, like other provisions in the list, impose discharge-related restrictions."[224]

---

[219] *See* comments from the National Hydropower Association at 22 (certification requirement to support feral pig task force); *See also* comments from the Cross-cutting Issues Group at 6 (certification requirements to maintain boat ramp and undertake a "Gravel Recruitment Study" of habitat unrelated to water quality); *See also* comments from the Interstate Natural Gas Association of America and the American Gas Association at 9 (Certification requirements for the odorization of gas and to mitigate legacy contamination).

[220] *Exelon Generation Co. v. Grumbles*, 380 F. Supp. 3.d 1 (D.D.C. 2019).

[221] *Exelon Generation Co. v. Grumbles*, 380 F. Supp. 3.d at 3.

[222] Sections 301, 302, and 306 impose effluent limits on new and existing sources, Section 303 governs water quality standards and implementation plans, and Section 307 addresses pretreatment standards for effluents.

[223] *See Wash. State Dept. of Social and Health Services v. Keffeler*, 537 U.S. 371, 383–85 (2003).

[224] *PUD No. 1,* 511 U.S. at 728 (Thomas, J., dissenting).

As previously noted, this interpretation also accords with the legislative history of the 1977 Amendments that added Section 303, which governs state water quality standards and implementation plans, to Section 401's enumerated list of CWA provisions.  According to the Conference Report for the 1977 Amendments:

> The inserting of section 303 into the series of sections listed in section 401 is intended to mean that a federally licensed or permitted activity, including discharge permits under section 402, must be certified to comply with State water quality standards adopted under section 303. The inclusion of section 303 is intended to clarify the requirement of section 401. It is understood that section 303 is required by the provisions of section 301.[225]

As relevant here, Section 303 is the provision through which EPA approves state standards - standards which, like those promulgated under Section 301, do "not . . . regulate nonpoint source pollution'' and  therefore, do "not sweep nonpoint sources into the scope of [section 401]."[226] Thus, the text, structure, and history of Section 401 requires the Agency to interpret Section 401(d) and the phrase "any other appropriate requirement" to include only those EPA-approved provisions of state or tribal law that implement the Section 402 and 404 permit programs or otherwise control point source discharges to WOTUS.

In addition to the above-referenced statutory and jurisprudential limits on the scope of states' Section 401 review and conditioning authority, we urge the Agency to consider the practical consequences of eliminating such limits.  As noted throughout these comments, a handful of states have attempted to expand their Section 401 authority to block or constrain projects for reasons that have nothing to do with the protection of water quality.  By broadly construing the scope of their certification authority beyond what Congress allowed in CWA Section 401, some states improperly demand project proponents develop and/or submit documentation wholly unrelated to water quality, such as environmental assessments of impacts to other environmental media, demonstrations of the need for the project, alternative route analyses, and analyses of air impacts, traffic impacts, and other reviews already undertaken by FERC or other federal agencies pursuant to the NEPA, the ESA, the NGA, and other statutes.[227]  Indeed, the State of New York has routinely denied water quality certifications on grounds outside of water quality, expressing concern for the potential climate change impacts of projects and purported lack of assessment of such impacts.[228]

This implausibly broad construction of the scope of state review is perhaps most clearly exemplified in the Millennium Bulk Terminals – Longview LLC project in Washington State.[229]

---

[225] H. Rep. No. 95-380 (95th Cong. 1st Sess. (1977).

[226] *Or. Natural Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1093–94 (9th Cir. 1998).

[227] *Hoopa Valley*, 913 F.3d 1099, 1103-04; *Millennium Pipeline Co. v. Seggos*, 860 F.3d 696 (D.C. Cir. 2017).

[228] https://elibrary.ferc.gov/idmws/common/OpenNat.asp?fileID=14670874.

[229] WDEC, In the Matter of Denying Section 401 Water Quality Certification to Millennium Bulk Terminals-Longview, LLC, Order # 15417 (Sept. 26, 2017); *See also Montana v. Washington*, No 22o152, (Montana motion for

In the course of Washington State's 5-year review of the project, the state compiled an EIS that expressly concluded that the terminal would not result in significant adverse effects on water quality, aquatic life, or designated uses; and that any potential water quality impacts could be fully mitigated.  And yet, even after concluding that the project would not adversely impact water quality, Washington State denied the certification request based on concerns about capacity of the interstate rail system, the impact of trains operating anywhere in that system, and impacts of the project on the overall capacity of the Federal Columbia River Navigation Channel to accommodate additional vessels at state ports.

To state the obvious, no aspect of the CWA's text, structure, or purpose can be construed to suggest that Congress envisioned Section 401 to authorize certifications based on impacts wholly unrelated to water quality.  In many cases, Congress required that these impacts be assessed under different statutes.[230] Further, while Section 401 provided states and other certifying authorities a limited role in reviewing the prospective impacts of proposed federally licensed or permitted projects, states and other certifying authorities may have other authority to regulate the operation of those projects. As previously noted, states can, and often are, delegated permitting and enforcement authority under CWA Section 402 and 404, under the Clean Air Act, and through other federal statutes as well.  The more limited role for states and other certifying authorities under Section 401 does not diminish states' jurisdiction under these statutory provisions.  To the contrary, these other statutory provisions demonstrate that certification reviews are not the proper mechanism for addressing the potential environmental impacts that some states have misconstrued Section 401 to encompass.

### f.   Certification Decisions

Since the Agency first promulgated its Section 401 implementing regulations in 1971, EPA has recognized that the CWA only allows a certifying authority to make one of four certification decisions on a request for certification: (1) grant certification; (2) grant certification with conditions; (3) deny certification; or (4) expressly waive certifications.  As such, the Associations support the proposal's continued recognition of these four types of certification decisions in proposed Section 121.7.[231]

The Associations also support EPA's interpretation of the Section 401(a)(1) requirement that certifying authorities "act on a request for certification" within a reasonable time not to exceed one year.[232]  We agree that a certifying authority must make one of the four certification decisions

---

leave to file the bills of complaint are denied June 28, 20921. Justice Thomas and Justice Alito indicated they would grant the motion.

[230] For example, NEPA requires review of multi-media effects, while other statures address impacts to air (Clean Air Act), land (Resource Conservation and Recovery Act), wildlife (Endangered Species Act), and cultural resources (National Historic Preservation Act).

[231] 87 Fed. Reg. at 35,378.

[232] 87 Fed. Reg. at 35,350.

listed above in order to "act on a certification request" under Section 401(a)(1).[233]  This aspect of EPA's proposal is consistent with the Agency's long-standing interpretation of Section 401(a)(1),[234] and in accord with the prevailing body of case law interpreting this provision.[235]

As noted in the preamble to EPA's proposal, the Fourth Circuit seemingly construed the phrase "to act on a certification request" as potentially encompassing any "significant and meaningful action" that a certifying authority make undertake within the reasonable period of time,[236] but the opinion's discussion of this issue is not central to the holding of the case and should be construed as dicta.  Moreover, this broad and subjective reading of the term "act" provides no reasonable and readily identifiable limit on the types of actions that a certifying authority can take to avoid waiving its requirement "to act on a certification request within a reasonable period of time, which shall not exceed one year."[237]  Under the Fourth Circuit's reading, the clear and objective end point for certification reviews that EPA and circuits have long recognized would be muddied into a highly subjective standard that leave both project proponents and certifying authorities grasping to discern whether certification actions were sufficiently "significant" or "meaningful" to avoid waiver.  EPA is correctly proposing to decline such a subjective atextual standard.

1. <u>EPA should not rescind modest requirements that certifying authorities explain and document their certification decisions</u>

EPA is proposing to rescind the Agency's regulatory requirement that certifying authorities' denials of certification requests include citation to the specific water quality requirements with which the proposed project would not comply and, if the denial is based on insufficient information from the project proponent, that certification denials identify the missing information.[238]  Similarly with respect to approvals with conditions, EPA is proposing to eliminate the requirement that certifying authorities cite the statutory or regulatory provision that necessitated imposition of the condition.[239]

These modest documentation requirements are completely reasonable, fully justified by certain certifying authorities' misuse of Section 401 procedures, and hardly burdensome.  On the contrary, EPA's proposed rescission of these modest but important provisions is wholly unreasonable and,

---

[233] 87 Fed. Reg. at 35,350.
[234] Clean Water Act Section 401 Water Quality Certification: A Water Quality Protection Tool for States and Tribes (May 2010) at 11.
[235] *See Hoopa Valley*, 913 F.3d at 1101–02; *See also Alcoa Power Generating, Inc. v. FERC,* 643 F.3d 963, 972 (D.C. Cir. 2011); *See also NYDEC*, 884 F.3d at 455–56.
[236] *NCDEQ*, 3 F.4th at 670.
[237] CWA Section 401(a)(1).
[238] 87 Fed. Reg. at 35,352.
[239] 87 Fed. Reg. at 35,352.

given federal agencies obligation to conduct facial reviews of certifying authorities' procedures and decisions, completely unjustified.[240]

EPA can associate no credible adverse environment impacts with the existing documentation requirements, and therefore cannot credibly claim any environmental benefits from rescinding these requirements.[241]   EPA's sole justification for this aspect of its proposal is that it will "decrease the informational burden"[242] that a handful of certifying authorities described in pre-proposal comments.[243]   Not only does this justification impermissibly ignore known instances of improper certification decisions and scores of pre-proposal comments advising on the importance of these provisions in preventing improper certification decisions,[244] EPA's justification defies common sense.   Indeed, the very basic documentation that certifying authorities are required to provide under EPA's current Section 401 implementing regulations cannot credibly be viewed as burdensome or an intrusion on a state or tribe's authority under Section 401.

For instance, it is hardly unreasonable to require a certifying authority to identify the basis for denying a certification request.   EPA's Section 401 regulations merely require the certifying authority to identify and cite to the water quality requirements that the proposed project will violate, and explain why the certifying authority believes that this violation will occur.[245]   A certifying authority that has denied a certification request will surely have this information readily available, and the most minimal standards of governance and administrative procedure affirms that when the government makes such a decision, it should provide some reasoned explanation of why it made that decision.

Similarly, if the certifying authority denies a certification request because the applicant failed to include information that the certifying authority deemed important, EPA's Section 401 regulations require the certifying authority to merely identify what necessary information was omitted.[246]   Unless the certifying authority's denial is based on the applicant's failure to provide information wholly unrelated to the proposed project's discharge or potential impacts to water quality requirements,[247] this documentation requirement presents no burden at all.

EPA's nominal documentation standards for certification conditions are quite reasonable as well.   Certifying authorities that impose conditions on certification need only explain why the conditions are necessary to assure that discharges from the project comply with an identified federal, state, or

---

[240] *See* discussion in Section IV(h).

[241] *See* Economic Analysis at 38.

[242] *See* Economic Analysis at 38.

[243] 87 Fed. Reg. at 35,352.

[244] *See National Women's Law Center v. OMB*, 358 F. Supp. 3d 66, 91 (D.D.C. 2019) ("an agency cannot rely on some comments while ignoring comments advocating a different position").

[245] 40 C.F.R. § 121.7.

[246] 40 C.F.R. § 121.7(e)(1)(iii); 40 C.F.R. § 121.7(e)(2)(iii).

[247] *See e.g., .N. Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d 450, 455-56 (2nd Cir. 2018).

local requirement.[248]  The Associations cannot envision and instance wherein a certifying authority required adherence to a certification condition within the scope of Section 401 review, but was unable to readily articulate a rationale for that condition.  Here again, to the extent this basic documentation requirement is burdensome at all, it is only in relation to those certifying authorities that misuse their Section 401 certification authority to impose conditions wholly unrelated to discharges or water quality requirements.[249]

Further, at the same time the Agency is proposing to remove any requirement that a certifying authority cite the federal, state, or local standard that necessitated the required certification conditions, EPA is proposing that certifying authorities explain why conditions are necessary to assure that "the activity as a whole" will comply with water quality requirements.[250]   EPA never explains why requiring certifying authorities to draft an explanation meeting this vague and undefined standard presents any less of an informational burden on certifying authorities, or whether a term used in a court decision alone provides sufficient clarity to a certifying authority reviewing potential water quality impacts from a proposed project.  Indeed, it makes little sense for EPA to leave each certifying authority to divine what the Supreme Court meant by "activity as a whole," and it is particularly unreasonable to require this assessment in lieu of EPA's current requirement to cite water quality standard because the Supreme Court in *PUD No. 1* was describing a bounded review of a project's discharges on specific water quality standards.[251]

EPA's proposal to require certifying authorities to parse a Supreme Court opinion on potential water quality standards rather than retaining the existing requirement to merely cite the standards is not "rationally connected"[252]  to the Agency's stated intent to decrease the informational burden on certifying authorities.  For this reason as well as the additional reasons we have previously set forth, the Associations respectfully urge EPA to refrain from finalizing its proposed changes to 40 C.F.R. § 121.7.

2.    <u>EPA cannot prohibit federal agency review and oversight over certification decisions</u>

The Associations also oppose EPA's proposal to eliminate any federal agency oversight over the substance of certification decisions or certifying authorities' compliance with statutory and regulatory requirements applicable to certification decisions.[253]  The instances of certifying authorities' misuse of Section 401 certification and conditioning authority cited throughout these comments illustrates why federal licensing and permitting agencies must reasonably review the

---

[248] 40 C.F.R. § 121.7(d)(1); 40 C.F.R. § 121.7(d)(2).

[249] *See e.g., Exelon Generation Co. v. Grumbles*, 380 F. Supp. 3.d 1 (D.D.C. 2019).

[250] *See* proposed 40 C.F.R. § 121.7(d)(3) at 87 Fed. Reg. At 35,378.

[251] *PUD No. 1*, 511 U.S. at 712.  *See* Section IV(e) for a more detailed discussion of *PUD No. 1*.

[252] *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (1983) (internal quotations omitted).

[253] 87 Fed. Reg. at 35,355 – 35,357.

validity of certifications and conditions.[254]  Such review is authorized under Section 401(a)(1), which makes clear that a federal agency must withhold the issuance of a federal license or permit until the applicant obtains the applicable water quality certifications and that, upon denial, a federal agency may not grant the license or permit.[255]

Federal agency review is also consistent with court decisions that have held that federal licensing and permitting agencies not only have the *authority* to determine whether certifying agencies have complied with Section 401 requirements, they have the *obligation* to make these determinations.[256] For instance, in *City of Tacoma, Washington* v. *FERC*, the D.C. Circuit explained that,

> [i]f the question regarding the state's section 401 certification is not the application of state water quality standards, but compliance with the terms of section 401, then [the federal agency] must address it. This conclusion is evident from the plain language of section 401: 'No license or permit shall be granted until the certification required by this section has been obtained or has been waived.'[257]

The court went on to explain that even though the federal licensing or permitting agency did not need to "inquire into every nuance of the state law proceeding . . . it [did] require [the federal agency] to at least confirm that the state has facially satisfied the express requirements of section 401."[258]

EPA's current regulations implementing Section 401 strike the proper balance between federal agencies' obligation to conduct a limited review of the basic validity of Section 401 certifications/conditions and the need to refrain from delving into the nuances of state or tribal law, or second-guessing the imposition of each condition.[259]  Under EPA's Section 401 regulations,

---

[254] *See* 40 C.F.R. § 121.7; 40 C.F.R. § 121.9.

[255] *See* 33 U.S.C. § 1341(a)(1) ("No license or permit shall be granted until the certification required by this section has been *obtained* or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.") (emphasis added). As explained in the preceding subsection, retaining certifying authorities' minimal obligations explain and document their certification decisions is essential to federal agencies' Section 401(a)(1) obligation that federal agencies to conduct a facial review over certification decisions.

[256] *See City of Tacoma v. FERC*, 460 F.3d 53, 67–68 (D.C. Cir. 2006); *Keating v. FERC*, 927 F.2d 616, 622–623, 625 (D.C. Cir. 1991);  *See also Hoopa Valley*, 913 F.3d at 1105 ("had FERC properly interpreted Section 401 and found waiver when it first manifested more than a decade ago, decommissioning of the Project might very well be underway''); *See also Airport Communities Coalition v. Graves,* 280 F. Supp. 2d 1207, 1217 (W.D. Wash. 2003) (holding that the Army Corps had discretion not to incorporate untimely certification conditions); See also *Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 971-972 (D.C. Cir. 2011) (the question of whether a certifying authority acted on a request for certification within the statutory one-year period is part of the inquiry into whether the certification complied with Section 401).

[257] *City of Tacoma v. FERC*, 460 F.3d 53, 67-68 (D.C. Cir. 2006) (citing 33 U.S.C. § 1341(a)(1)).

[258] *City of Tacoma v. FERC*, 460 F.3d at 68.

[259] *See Am. Rivers, Inc. v. FERC*, 129 F. 3d 99, 107 (2d Cir. 1997).

federal licensing and permitting agencies are obligated to make a facial determination of the certifying authorities' observance of minimal procedural requirements, but are not permitted to delve into the substance and nuance of certification decisions or conditions.

EPA's regulations do not allow federal agencies to usurp the authority Congress provided to certifying authorities or to substitute the agencies' judgement for those of certifying authorities. On the contrary, EPA's regulations facilitate cooperation between federal agencies and certifying authorities, and help certifying authorities identify and rectify procedural errors.[260]

This is the type of cooperative federalism that Congress intended to guide EPA's implementation of the CWA.  Principles of cooperative federalism do not demand, and are not furthered by, broadly ceding all federal oversight over state certification actions.  The Associations therefore urge EPA to retain its current regulations, which allow for facial federal agency review of certification decisions without impermissibly intruding on the autonomy of certifying authorities.

**g.**   **Modifications**

EPA is proposing to allow certifying authorities and federal agencies the authority to jointly agree to modify a pre-existing certification (with or without conditions) at any point in the future.[261] EPA's preamble also suggests that certifying authorities may impose "adaptive management" conditions in certification approvals that could preserve for the certifying authorities broad authority to impose new conditions or amend existing conditions at any point in the future.[262]  The preamble further advises that such "adaptive management" conditions would not constitute "modifications," and therefore certifying authorities would be free to changes "adaptive management" conditions at any point in the future without any need for federal agencies' approval or project proponents' consent.[263]

None of these proposed modification provisions are permissible under the Act.  Section 401 of the CWA simply does not allow certifying authorities to modify previously issued certifications or to include "reopeners" in certification conditions in the manner EPA describes.[264]  Congress drafted Section 401 to provide certifying authorities only two narrow and time-limited mechanisms for amending or rescinding previously issued certifications.

Under Section 401(a)(3), a certification that a state or other authority grants for the construction of a facility is deemed to fulfill the certification requirements for the licensing or permitting

---

[260] We note, however, that Section 401 provides federal agencies no discretion to interpret Section 401 as allowing certifying authorities any amount of time in excess of one year. As such, no matter how minor or trivial, certifying authorities cannot make corrections after one year has elapsed.

[261] Proposed text of  40 C.F.R. § 121.9 at 87 Fed. Reg. at 33,378.

[262] 87 Fed. Reg. at 35,362.

[263] 87 Fed. Reg. at 35,362.

[264] 87 Fed. Reg. at 35,361-35,363.

necessary for subsequent operation of the facility if, within 60 days of receiving an application for an operating license or permit, the certifying agency notifies the federal agency "that there is no longer reasonable assurance that there will be compliance with the applicable provisions of" the CWA "because of changes since the construction license or permit certification was issued in (A) the construction or operation of the facility, (B) the characteristics of the waters into which such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements."[265]

Under Section 401(a)(4), "[p]rior to the initial operation of any federally licensed or permitted facility or activity" certifying authorities are authorized to ''review the manner in which the facility or activity shall be operated . . . '' for purposes of assuring that water quality requirements will not be violated.[266]  If the certifying authority finds that "such federally licensed or permitted facility or activity will violate . . . water quality requirements such Federal agency may, after public hearing, suspend such license or permit."[267]

These two provisions of Section 401 represent the full extent of certifying authorities ability to modify or add conditions to previously granted certifications.  EPA acknowledges that no other provisions of Section 401 reference the potential addition or modification of certifying conditions or even mention any role for certifying authorities' post-certification.[268]  However, the statutory silence that EPA views as providing the Agency authority to allow post-certification modifications, in reality, creates a "negative implication" that modification measures unmentioned in Section 401 are precluded.[269]  Indeed, given the express and proscriptive provisions for post-certification authority that Congress provided in Sections 401(a)(3) and 401(a)(4), there is simply no reason "to believe that Congress, by any remaining ambiguity, intended to undertake the regulation" of a subject "never mentioned in the statute," such as an additional authorization for certifying authorities to modify certifications for any reason or any timeframe.[270]

EPA's proposed interpretation is all the more implausible in light of Section 401's express and unambiguous time limits for certification reviews, and the highly circumscribed role of Section 401 certifying authorities within a much broader licensing or permitting process.  Because the Section 401 certification process is only part of a more comprehensive and protracted federal licensing or permitting process, timely issuance of certifications can be integral to the overall viability of essential energy and infrastructure projects.  Depending on the extent of a delay in

---

[265] 33 U.S.C. § 1341(a)(3).
[266] 33 U.S.C. §1341(a)(4).
[267] 33 U.S.C. §1341(a)(4).
[268] 87 Fed. Reg. at 35,361.
[269] *Shook v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 132 F.3d 775, 782 (D.C. Cir. 1998) ("the mention of one thing implies the exclusion of another") (*quoting Halverson v. Slater*, 129 F.3d 180, 185 (D.C.Cir.1997)).
[270] *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 469 (D.C. Cir. 2005).

obtaining the requisite certifications and authorizations or the level of uncertainty about the schedule or outcome for those processes, many important projects can be cancelled altogether.

Congress clearly understood the significant adverse impacts that delay and uncertainty could have on nationally important energy and infrastructure projects, such that it required states' exercise of Section 401 certification authority to be highly circumscribed and completed within "a reasonable period of time (which shall not exceed one year) . . ."[271]  Thus, although Congress afforded states and other certifying authorities an opportunity to review the potential water quality impacts of federally licensed and permitted projects, it crafted Section 401 to ensure that this carve-out from areas otherwise exclusively committed to the federal government was well-defined and precisely time-limited.

Allowing a certifying authority to revisit and modify an existing certification or to include "reopener" conditions that resurrect the certifying authority's Section 401 project review authority would render meaningless the express time limits Congress imposed in Section 401(a)(1).  Only Congress can change the time limits in Section 401(a)(1).  EPA has no discretion to extend these limits in any way, and neither do federal licensing and permitting agencies or certifying authorities. In this respect, Congress was explicit and clear – the certification review processes cannot extend beyond one year.

While the Associations acknowledge that a handful of state certifying authorities submitted preproposal comments expressing an interest in indefinitely retaining authority to regulate federally licensed and permitted projects through the ongoing addition and modification of Section 401 conditions,[272] that is not the authority Congress provided in Section 401.  Nor is it an authority that EPA can lawfully confer through its regulations implementing Section 401.  As such, the Associations respectfully urge EPA to refrain from finalizing its statutorily prohibited proposed modification provisions.[273]

### h.    Enforcement and Inspections

Federal licensing and permitting agencies have exclusive jurisdiction to enforce certification conditions under Section 401.  Section 401(a)(1) prescribes a temporally limited review role for

---

[271] 33 U.S.C. § 1341(a)(1).

[272] *See* Economic Analysis at 45-46.

[273] Certifying authorities that wish to engage on a federally licensed or permitted project outside of the Section 401 review period likely have many other opportunities.  Indeed, the Section 401 review process is often only one small part of a larger and more comprehensive framework for reviewing the need for, and impacts of, federally authorized projects.  Additionally, many certifying authorities have a continuing ability to ensure that discharges from federally licensed projects are sufficiently protective of water quality standards by exercising permitting authority delegated under the CWA.

certifying authorities.  Once the certification review process has been completed or been waived, exclusive jurisdiction reverts back to the federal licensing and permitting agencies.

While EPA may conceivably opt against clarifying and confirming within the Agency's implementing regulations that federal agencies "shall be responsible for" enforcing certification provisions placed in the federal license or permit,[274] EPA must fully explain and justify its proposal to rescind this clarification.[275]  EPA has not done so.  The Agency merely concludes, without support or explanation, that stating that federal agencies "shall be responsible for" enforcing certification provisions placed in the federal license or permit "introduces ambiguity" regarding state authority under provisions wholly unrelated to Section 401.[276]

On the other hand, EPA's proposal to interpret Section 401 to authorize certifying authorities to inspect federally licensed or permitted facilities at any time and for any purpose is plainly precluded by Section 401(a)(4) and in direct contravention of the statutorily mandated time limits Congress prescribed in Section 401.

Section 401(a)(4) instructs that "[p]rior to the initial operation of any federally licensed or permitted facility or activity" certifying authorities are authorized to ''review the manner in which the facility or activity shall be operated . . .'' for purposes of assuring that water quality requirements will not be violated.[277]  If the certifying authority finds that "such federally licensed or permitted facility or activity will violate . . . water quality requirements such Federal agency may, after public hearing, suspend such license or permit."[278]

Section 401(a)(4) thus describes the full extent of a state's post-certification inspection authority under Section 401.[279]  Certifying authorities have a time-limited opportunity to conduct a pre-operational inspection of facilities for purposes of ascertaining compliance with water quality requirements.  Far from authorizing inspections at any time or opening the door to a certifying authority's enforcement of certification conditions, Section 401(a)(4) only allows the certifying authorities to notify the permitting or licensing agency.  Section 401(a)(4) then expressly describes the federal agencies' discretion to determine whether to bring an enforcement action pursuant to the certifying authority's recommendation.

Similarly, Section 401 does not allow citizen suits to enforce certification conditions because EPA itself lacks authority to enforce certification conditions under Section 401.  EPA enforcement

---

[274] 87 Fed. Reg. at 35,364.

[275] *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. at 515.

[276] 87 Fed. Reg. at 35,364.

[277] 33 U.S.C. §1341(a)(4).

[278] 33 U.S.C. §1341(a)(4).

[279] Some states have state or federally delegated authority to inspect federal facilities for environmental compliance, but Section 401(a)(4) provides the only inspection authority available to states as certifying authorities under Section 401.

authority under the CWA comes from Section 309, which extends the Agency authority to bring actions for violations of Sections 301, 302, 306, 307, 308, 318, and 405, but not Section 401.[280] The CWA also allows for citizen suits, but only when the Agency fails or refuses to act.[281]  Indeed, the Associations believe it is implausible that Congress would grant private citizens greater enforcement authority than EPA.  Rather, citizen suit authority under the Act is "meant to supplement rather than supplant governmental action."[282]  Thus, EPA's lack of jurisdiction to enforce certification conditions means private citizens lack this authority as well.

While the Associations' recognize the Agency's interest in being solicitous of certifying authorities' interests and requests, EPA cannot through it implementing regulations extend certifying authorities' expansive jurisdiction that is expressly prohibited by the CWA.  As such, the Associations respectfully urge EPA to refrain from finalizing its statutorily prohibited proposed enforcement and inspection provisions.

### i.    Neighboring jurisdictions

The Associations support EPA's proposal to largely retain the 2020 Rule's necessary updates to the Agency's regulations implementing Section 401(a)(2).  Overall, these updates helped to increase the clarity and predictability of the procedural requirements Congress set forth in Section 401(a)(2).

The Associations' members have not reported any current issues or concerns regarding the Agency's present regulatory procedures for determining whether a federally licensed or permitted activity has the potential to result in a discharge that "may affect" water quality in neighboring jurisdictions.  The Associations also did not view the 2020 Rule's changes to 40 C.F.R. § 121.12(b) as rendering EPA's role "wholly discretionary," as EPA indicated in the preamble to this proposal.[283]  Instead, we viewed this citation to agency discretion as reflecting Section 401(a)(2)'s requirement that the effect of a discharge on a downstream jurisdiction's water quality be "determined by the Administrator."[284]

EPA's determination of whether a discharge "may affect" the water quality of another jurisdiction involves some discretion, but the Agency's discretion is not unbounded.[285]  Section 401 provides a "meaningful standard against which to judge the agency's exercise of discretion."[286]  Under

---

[280] 33 U.S.C. § 1319(a)(3).

[281] See Askins v. Ohio Dep't of Agric., 809 F.3d 868, 873 (6th Cir. 2016) (suggesting citizens are "backup" to the EPA and states, which are the primary enforcers); S.F. Baykeeper v. Cargill Salt Div., 481 F.3d 700, 706 (9th Cir. 2007) (citizens may sue "when the responsible agencies fail or refuse to do so").

[282] Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 60-61 (1987).

[283] 87 Fed. Reg. at 35,367.

[284] 33 U.S.C. § 1341(a)(2).

[285] See Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.("Weyerhaeuser"), 139 S. Ct. 361, (2018).

[286] Weyerhaeuser Co., 139 S. Ct. at 370 (citation and quotation marks omitted).

Section 401(a)(2), EPA renders a determination about the likelihood that a potential upstream discharge will violate a water quality standard in a downstream jurisdiction.  When making that determination, the Agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[287]  And courts can invalidate EPA's determination if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[288]

Although Section 401 provides judicially manageable standards that prescribe the considerations that must inform the Agency's "may affect" determination, the Associations believe it makes sense to include those considerations in EPA's proposed regulatory revisions,[289]  and that those considerations be drawn directly from the text, structure, and history of Section 401.  As such, the Agency's rules should explain that the potential "discharge" under Section 401(a)(2) refers to effluent flowing or issuing from a point source to a WOTUS.  Additionally, the phrase "the quality of the waters of any other State"[290] must be interpreted consistent with the 401 Certification Rule's definition of "water quality requirements" so that the Agency's "may affect" determination is based on the likelihood that a discharge will cause a downstream violation of federal, state, or tribal requirements adopted pursuant to authority under Sections 301, 302, 303, 306, and 307. Further, because Congress's authority to enact the CWA, and Section 401(a)(2) in particular, derives from its power to regulate the "channels of interstate commerce" under the Commerce Clause,[291] the downstream "waters" that EPA must analyze must be limited to WOTUS, properly construed.

EPA's regulations should also include additional considerations that reflect the multi-jurisdictional nature of the Section 401(a)(2) "may affect" determination.  For instance, the Agency's regulations for the "may effect" determination, federal agency review, and the hearing process should all reflect enhanced considerations of the volumes of effluent, the size, flow, and current water quality

---

[287] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, (1962)).

[288] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[289] *See* request for comment at 87 Fed. Reg. at 35,364.

[290] 33 U.S.C. § 1341(a)(2).

[291] *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824); *See also United States v. Lopez*, 514 U.S. 549, 558–59 (1995) (describing the ''channels of interstate commerce'' as one of three areas of congressional authority under the Commerce Clause); *See also Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172 (2001). (term ''navigable'' indicates ''what Congress had in mind as its authority for enacting the Clean Water Act: Its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made.'' Nothing in the legislative history of the Act provides any indication that ''Congress intended to exert anything more than its commerce power over navigation.'' (*Id.* at 168 n.3)).

of the WOTUS, the distance between the potential discharge and the neighboring jurisdiction, and the impacts of other existing and anticipated discharges to the WOTUS. These additional considerations will help avoid triggering the Section 401(a)(2) notification and coordination procedures based on more speculative assertions of downstream impacts, and will help ensure that the ultimate federal agency decision under Section 401(a)(2) likewise remains focused on non-speculative water quality impacts from upstream point source discharges to WOTUS.

Finally, while the Associations take no issue with EPA's proposal to amend the timing and scope of the Section 401(a)(2) procedures for notifications, objections, and hearings, we believe that EPA should include provisions to ensure that the overall Section 401(a)(2) process does not unduly protract the federal licensing and permitting process. In particular, we urge EPA to amend its proposed revisions to require licensing and permitting agencies to render their post-hearing decisions in a timely manner.

### j.    Obtaining "Treatment as State" for Section 401

The Associations agree that EPA should facilitate the participation of tribes in CWA decisions, and that EPA's implementing regulations should provide tribes a reasonable pathway for obtaining "treatment as a state" ("TAS") for various programs under the Act.   We do not agree, however, with EPA's proposal to adopt streamlined procedures for tribes to obtain TAS status for the sole purpose of serving as certification authority under Section 401(a)(1) or to participate as a neighboring jurisdiction under Section 401(a)(2).[292]

Under EPA's current regulations, tribes may participate as certifying authorities under Section 401(a)(1) or neighboring jurisdictions under Section 401(a)(2) if they have obtained TAS status for the Section 303(c) program under which states and tribes with TAS status may develop, and EPA may approve, water quality standards under Section 303(c) of the CWA.[293]  This approach, which long predates the 2020 Rule, is logical as it provides Section 401 authority to those tribes that have developed water quality standards relevant to the certification process.

On the other hand, EPA's proposal to provide Section 401 TAS status to tribes that have no federally approved water quality standards and have not even initiated the process to obtain federal approval makes little sense. Congress provided Section 401 as a highly circumscribed mechanism for states and tribes to ensure that discharges federally licensed or permitted projects adequately protect their water quality. At minimum, it is reasonable for EPA to continue to provide Section 401 TAS status only on those tribes that have established criteria based on appropriate technical scientific data and analyses, designated water uses and requirements consistent with the CWA and

---

[292] 87 Fed. Reg. 35,370 – 35,373.
[293] *See* 40 C.F.R. Part 131; TAS provision as 40 C.F.R. § 131.8.

sound scientific rationales, and adopted plans and compliance schedules to achieve water quality goals.[294]

## V.    CONCLUSION

The Associations appreciate the opportunity to provide comments on EPA's proposal to revise the Agency's regulations implementing Section 401 of the CWA.   We supported the revisions promulgated in the 2020 Rule because they provided needed clarity and certainty regarding the role of states and other certifying authorities under Section 401.   These reforms and regulatory updates were long overdue, and given the misuse of Section 401 certification procedures by some states, were necessary.

The 2020 Rule's revisions were appropriately tailored to address those aspects of Section 401 that are most often misconstrued and/or misused by states and other certification authorities while respectfully adhering to the principles of cooperative federalism that Congress required in the CWA and other statutes.  The Associations therefore urge EPA to refrain from finalizing many of the substantial revisions that the Agency has herein proposed.  We do not believe these revisions are necessary, sufficiently explained, or rationally justified by EPA's rulemaking record.

Should the Agency proceed with revisions to its Section 401 regulations, the Associations urge EPA to do so in a way that meaningfully considers the detailed interpretive guidelines that we provided in these comments. As noted therein, EPA is obliged to implement the Act in accordance with its text and structure, as well as the discernable intent of Congress.

Congress, through Section 401, expressly assigned an important project review role for states and tribes, but it did so in the context of multiple statutes unambiguously preserving exclusive federal jurisdiction over certain projects and multiple other statutes subjecting those projects to environmental reviews beyond the limited scope of Section 401.  Therefore, as the agency tasked with implementing the CWA, EPA must ensure that its implementing regulations perpetuate Section 401's important but highly circumscribed role for states, while prohibiting states from arrogating authority Congress exclusively entrusted to the federal government.

---

[294] *See*  40 C.F.R. § 131.5(a)(1)-(5).

Thank you for your consideration of our comments.  Please do not hesitate to reach out to us if we can be of further assistance on this important issue.

Tamara S. Maddox
Regulatory & Legal Affairs Manager
Alaska Oil & Gas Association

Robin Rorick
Vice President, Midstream
American Petroleum Institute

Brook A. Simmons
President
The Petroleum Alliance of
Oklahoma

Wendy Kirchoff
Vice President, Regulatory Policy
American Exploration & Production
Council

Stuart Saulters
Vice President of Government
Relations
American Public Gas
Association

Robert Benedict
Vice President, Petrochemicals
& Midstream
American Fuel & Petrochemical
Manufacturers

Daniel Naatz
Executive Vice President
Independent Petroleum Association
of America