**Exhibit C**

Interstate Natural Gas Association of America ("INGAA") and the American Gas Association ("AGA") Comments on EPA's Proposed CWA Section 401 Water Quality Certification Improvement Rule (Aug. 8, 2023)

Submitted via www.regulations.gov
Docket No. EPA–HQ–OW–2022–0128

August 8, 2022

The Honorable Michael Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Re:   EPA's Proposed CWA Section 401 Water Quality Certification Improvement Rule

The Interstate Natural Gas Association of America ("INGAA") and the American Gas Association ("AGA") respectfully submit these comments in response to the U.S. Environmental Protection Agency's ("EPA" or "Agency") proposal to revise and replace the Clean Water Act ("CWA") Section 401 Certification Rule ("Proposed Rule").[1]

INGAA is a non-profit trade association that advocates for regulatory and legislative positions of importance to the interstate natural gas pipeline industry in the United States. INGAA's 26 member companies transport the vast majority of the nation's natural gas through a network of nearly 200,000 miles of pipelines. The interstate pipeline network serves as an indispensable link between natural gas producers and the American homes and businesses that use the fuel for heating, cooking, generating electricity, and manufacturing a wide variety of U.S. goods, ranging from plastics to paint to medicines and fertilizer.

AGA, founded in 1918, represents more than 200 local energy companies that deliver clean natural gas throughout the United States. There are more than 76 million residential, commercial, and industrial natural gas customers in the United States, of which 95 percent—more than 72 million customers—receive their gas from AGA members. AGA is an advocate for natural gas utility companies and their customers and provides a broad range of programs and services for member natural gas pipelines, marketers, gatherers, international natural gas companies, and industry associates. Today, natural gas meets more than thirty percent of the United States' energy needs. AGA members rely on interstate natural gas pipelines for the natural gas supply they need in order to provide affordable, reliable natural gas distribution service to homes and businesses.

Natural gas plays an important role in American society, both as a foundational fuel and with respect to the nation's ongoing transition to clean energy. INGAA members build pipelines in response to demonstrated public need for the delivery of natural gas, typically requiring

---

[1] Clean Water Act Section 401 Water Quality Certification Improvement Rule, 87 Fed. Reg. 35,318 (June 9, 2022) ("Proposed Rule").

infrastructure that spans multiple state boundaries. The Federal Energy Regulatory Commission ("FERC") must issue a certificate of "public convenience and necessity" based on this demonstrated need before INGAA members may construct and operate a pipeline.[2] This review is complex and comprehensive, often spanning years, and ensures that interstate natural gas pipeline projects *only* proceed if they serve the public interest. In addition, both INGAA and AGA members undertake a wide range of activities to maintain and develop the United States' modern and reliable pipeline system, which complements the growing number of renewable energy resources and displaces higher emitting fuels. These activities often require authorization from the U.S. Army Corps of Engineers ("Army Corps") under CWA Section 404 as well as compliance with multiple federal statutes designed to protect the environment, such as the Clean Air Act and the Endangered Species Act.

Section 401 requires applicants for a federal license or permit anticipated to result in discharges to navigable waters to obtain certification from the relevant state that the discharge will comply with applicable state water quality standards. Review under Section 401 must be efficient and predictable both to ensure that project proponents have the certainty needed to complete these critical infrastructure projects and to afford states the opportunity to manage the quality of their waters without undermining important national objectives. For those interstate natural gas pipelines that cross state lines and therefore require multiple Section 401 certifications, consistent implementation of Section 401 across states is necessary to prevent political local interests from obstructing development of infrastructure that furthers national priorities, such as energy security, and the wider public interest and to keep energy prices from overburdening all Americans and especially lower income communities.

INGAA and AGA support the effective implementation of the CWA and the protection of water quality. Our members frequently apply for Section 401 certifications and continue to be significantly affected by the implementation of Section 401.[3] INGAA and AGA strongly encourage EPA to provide the following clear directions to ensure that implementation of Section 401 protects water quality in a manner consistent with the CWA:[4]

- Consistent application of Section 401 requires a binding, uniform federal definition of "certification request," and, accordingly, certifying authorities should continue to define "certification request" as set forth in Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. 42,210 (July 13, 2020) ("2020 Certification

---

[2] 15 U.S.C. § 717f(c).

[3] INGAA's and AGA's prior comments on how the Section 401 Rule can support the effective implementation of Section 401 are attached for EPA's reference. *See* Attachments 1, 2, 3.

[4] INGAA and AGA urge the EPA not to implement any changes to its Section 401 regulations until Congress passes its anticipated permitting reform legislation. *See* Press Release, *Manchin Supports Inflation Reduction Act of 2022* (July 27, 2022), ("President Biden, Leader Schumer and Speaker Pelosi have committed to advancing a suite of commonsense permitting reforms this fall that will ensure all energy infrastructure, from transmission to pipelines and export facilities, can be efficiently and responsibly built to deliver energy safely around the country and to our allies."), https://tinyurl.com/y4ft4zpw. It would unduly burden project proponents and waste both Agency and industry resources to implement rules based on statutory language that Congress imminently plans to change.

Rule").

- The statutory review period begins upon the certifying authority's receipt of a request for certification, not upon subsequent events like a certifying authority deeming that the request meets its definition of completeness.

- The lead federal agency under the National Environmental Protection Act ("NEPA") determines the "reasonable period of time" and whether that time period has been exceeded.

- The reasonable period of time cannot be extended by the withdrawal and resubmission of a request at the certifying authority's direction.

- The certifying authority's review of a request must focus on a federally-authorized discharge's potential impacts to water quality.

- The lead federal agency has an obligation to make a threshold determination whether the Section 401 action taken was within the scope of Section 401.

- The project proponent must consent to any modifications to the water quality certification.

I. **Section 401 Represents a Balanced Approach to Federalism**

Congress sought to address interstate water pollution with a national solution: the CWA "authoriz[es] the EPA to create and manage *a uniform system* of interstate water pollution regulation."[5]  The EPA has previously recognized that uniformity is critical:

> Regulatory consistency across both federal and state governments with respect to issues like timing, waiver, and scope of section 401 reviews and conditions will substantially contribute towards ensuring that section 401 is implemented in an efficient, effective, transparent, and nationally consistent manner and will reduce the likelihood of protracted litigation over these issues.[6]

Within the context of a uniform federal program, CWA Section 401 provides certifying authorities the opportunity to consider the water quality impacts of discharges from federally-authorized projects.  It represents Congress' careful balance of maintaining federal authority over projects in the national interest while recognizing a state's or Tribe's interest in preserving water

---

[5] *Arkansas v. Oklahoma*, 503 U.S. 91, 110 (1992) (emphasis added); *id.* ("[W]e have long recognized that interstate water pollution is controlled by *federal* law.") (emphasis in original).

[6] Updating Regulations on Water Quality Certification, 84 Fed. Reg. 44,080, 44,083-84 (Aug. 22, 2019); *see also id.* at 44,098-99 ("Updating the existing certification regulations to clarify expectations, timelines, and deliverables also increases efficiencies. Some aspects of the existing regulations have been implemented differently by different authorities, likely because the scope and timing of review are not clearly addressed by the EPA's existing certification regulations.").

3

quality. Maintaining this balance is central to the text and purpose of Section 401.

The 2020 Certification Rule was EPA's first update to the Agency's Section 401 regulations in nearly 50 years. The prior regulations were confusing, internally inconsistent, and failed to account both for Congress' changes to the CWA[7] and for the evolution of the scope and complexity of infrastructure projects over the last half century. Worse, they led states to upset the balance of cooperative federalism that Section 401 sought to achieve and to misuse their limited authority over water quality to dictate national energy policy. Under the prior regime, states blocked energy infrastructure projects that were in the public interest of both individual states and the nation as a whole for reasons unrelated to water quality, such as for the project's perceived climate change impacts or general opposition to fossil fuels.[8] Contrary to the plain language of the CWA, states also significantly delayed projects by ignoring the statutory one-year time limit for certification or manipulating the process to exceed this timeframe.[9]

As history demonstrates, prior to the 2020 Certification Rule, the EPA's outdated regulations and inconsistent state practices caused the delay or cancelation of much-needed infrastructure projects, thereby depriving consumers of the projects' benefits, disrupting interstate commerce, and undermining the nation's prosperity and security.

EPA's clear action on Section 401 is necessary to give lead federal agencies and certifying authorities the appropriate direction to implement Section 401 in a manner that aligns with the statute, prevents the misuse of Section 401, and allows for the efficient and predictable review of infrastructure projects, as elaborated below.

## II. EPA Cannot and Should Not Permit Certifying Authorities to Define "Request for Certification"

### A. EPA cannot delegate its duty to administer the CWA to certifying authorities.

The Proposed Rule argues that, "[b]ecause the [CWA] does not expressly define the term 'request for certification,' EPA *and other certifying authorities* are free to do so."[10] EPA further argues "that the reasonable period of time begins to run after a certifying authority receives a certification request as that request is defined either by EPA *or the certifying authority* in accordance with its applicable submission procedures."[11] But the "Administrator of the Environmental Protection Agency *shall* administer th[e] [CWA]" "[e]xcept as otherwise expressly provided."[12] As the Supreme Court "ha[s] long recognized," "interstate water pollution is

---

[7] *See* Proposed Rule at 35,323 (EPA's description of the history of the legislation and rulemaking efforts).

[8] *See* Attachment 1, Attachment B at 2-3 (discussing major energy infrastructure projects for which states expressly or implicitly denied for reasons unrelated to water quality).

[9] *See id.* (discussing major energy infrastructure projects for which states delayed development for over one year).

[10] Proposed Rule at 35,331 (emphasis added).

[11] *Id.* (emphasis added).

[12] 33 U.S.C. § 1251(d) (emphasis added).

4

controlled by federal law" and so "the [CWA's] purpose" is to "authoriz[e] *the EPA* to create and manage a *uniform* system of interstate water pollution regulation."[13] Consistent with Congress' clear directive and purpose, the CWA expressly defines both the circumstances in which certifying authorities would play a role in administering the Act and the specific nature of that role.[14]

The EPA has "recognize[d]" that, "[w]hile . . . states and tribes have broad authority to implement state and tribal law to protect their water quality, [S]ection 401 is a federal regulatory program that contains explicit limitations on when and how states and tribes may exercise this particular authority."[15] Section 401 authorizes certifying authorities to set water quality standards (subject to EPA approval) and certify that "discharge[s] will comply" with those standards,[16] but this authorization cannot be read to extend to each certifying authority the ability to define the words and phrases of the CWA—a *federal* statute. Further, the only "procedures" that Section 401 directs states to "establish" are those "for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications."[17] The lack of an express delegation of this to certifying authorities coupled with Congress' charge that "the [EPA] *shall* administer th[e] [CWA]" "[e]xcept as otherwise expressly provided"[18] means that the EPA alone can define "request for certification."

> B. The Proposed Rule undermines the CWA's policies of minimizing paperwork and interagency decision procedures and preventing needless duplication and delays.

The CWA's "objective . . . is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters,"[19] but the Act did not give EPA free rein in implementing the procedures to achieve this objective. Rather, Congress carefully crafted the CWA to reflect a "national policy that to the maximum extent possible the procedures utilized for implementing this chapter shall encourage the drastic minimization of paperwork and interagency decision procedures, and the best use of available manpower and funds, so as to prevent needless duplication and unnecessary delays at all levels of government."[20] The Proposed Rule would replace the 2020 Certification Rule's uniform federal definition of "request for certification" with a multi-jurisdictional patchwork of different, potentially conflicting requirements, thereby

---

[13] *Arkansas v. Oklahoma*, 503 U.S. at 110 (emphasis added).

[14] *See*, *e.g.*, 33 U.S.C. § 1251(b) ("It is the policy of Congress that the States manage the construction grant program under this chapter and implement the permit programs under sections 1342 and 1344 of this title."); 33 U.S.C. § 1251(e) ("The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.").

[15] Updating Regulations on Water Quality Certification, 84 Fed. Reg. at 44,099.

[16] 33 U.S.C. § 1341(a)(1).

[17] *Id.*

[18] 33 U.S.C. § 1251(d) (emphasis added).

[19] *Id.* at § 1251(a).

[20] *Id.* at § 1251(f).

injecting unnecessary delay and undue burden in the Section 401 process and disregarding the CWA's sound policies.

Efficient, effective, and transparent regulation requires a uniform definition of "request for certification." The EPA modified its regulations implementing Section 401 in 2020 in part because "certification request" is "ambiguous" and "susceptible to different interpretations," "which ha[s] resulted in inefficiencies in the certification process, individual certification decisions that have extended beyond the statutory reasonable period of time, and regulatory uncertainty and litigation."[21] By allowing each state, tribe, and federal certifying authority to define "certification request," EPA reintroduces "different interpretations" of the term and reverts to all the problems arising from multiple interpretations across certifying authorities. The Agency has wholly failed to provide any rational reason for its departure from the current regulation or approach. This approach is arbitrary and capricious.[22]

The Proposed Rule also reintroduces the risk of undue burden on project proponents and unnecessary delay of their projects. Under the Proposed Rule, each certifying authority may establish its own requirements for filing a certification request. This approach affords certifying authorities too much latitude in determining what constitutes a certification request, adds confusion to who the final arbiter is in determining sufficiency of the request, and removes the uniformity and certainty that EPA claims it is attempting to establish. Further, project proponents can no longer submit the same certification request to multiple certifying authorities for a project that crosses state lines but rather must prepare multiple requests containing different information about the same project for each certifying authority. This undue burden on project proponents is plainly inconsistent with the CWA's policies.[23] Certifying authorities also might use the ability "to add requirements to EPA's list or develop their own lists of request requirements"[24] to collect unnecessary information or impose other unduly burdensome requirements on developers. Indeed, certifying authorities might view the lack of any restrictions on their ability to impose filing requirements as an end run around EPA's admonition that "certifying authorities may only consider and address potential water quality effects."[25] Any certifying authority that wishes to delay or block a project for reasons unrelated to water quality could do so under the Proposed Rule by imposing onerous filing requirements that cause delay and uncertainty, even in circumstances where FERC has already deemed the project to be in the public interest.

The Proposed Rule injects these risks and uncertainty and reintroduces these problems into the Section 401 process for little, if any, benefit. State-specific definitions of "request for certification" are not needed to "ensur[e] that adequate information is available to initiate and

---

[21] Updating Regulations on Water Quality Certification, 84 Fed. Reg. at 44,101.

[22] *See infra* note 35.

[23] *See* 33 U.S.C. 1251(f) (announcing national policy of "drastic[ly] minimiz[ing] paperwork").

[24] Proposed Rule at 35,331.

[25] *Id.* at 35,343.

6

inform the certification review process."²⁶ Indeed, "concerns" that Section 401's limitations "will force [state agencies] to render premature decisions" are "misplaced."²⁷ Section 401 already provides certifying authorities recourse if they do not possess "adequate information" to make a decision within a reasonable time: "If a state deems an application incomplete, it can simply deny the application without prejudice."²⁸ Moreover, the CWA "provide[s] for" and "encourage[s]" "[p]ublic participation in the development, revision, and enforcement of any regulation" promulgated under the CWA.²⁹ If certifying authorities have concerns with the 2020 Certification Rule's uniform definition of "request for certification," the solution was to voice those concerns during the development of the definition, not for EPA to provide certifying authorities the ability to define the term themselves. Finally, as the Proposed Rule suggests, the "requirement to request a pre-filing meeting will ensure that certifying authorities have an opportunity, should they desire it, to receive early notification and to discuss the project with the project proponent before the statutory timeframe for review begins."³⁰ This provision—which EPA "inten[ds] . . . to support early engagement and coordination between certifying authorities and project proponents"³¹—provides certifying authorities both an opportunity to discuss any additional information they need from the project proponent and further protection against decisions based on inadequate information.

   C. A definition of "certification request" that includes a draft license or permit is unnecessary and unworkable.

Although the Proposed Rule would permit each certifying authority to establish its own definition of "request for certification," EPA also suggests "requirements it views as necessary for an efficient and consistent certification process," including "submission of the relevant draft Federal license or permit for the proposed project."³² Under the Proposed Rule, "a project proponent would not be able to submit a request for certification *until* a Federal agency develops and provides it with a draft license or permit for the proposed project."³³ The EPA should abandon the requirement to submit a draft license or permit because it is unworkable, will cause delay, and is contrary to the policies underlying the CWA.

Requiring the submission of a draft license or permit creates substantial challenges for project proponents and federal permitting agencies. As an initial matter, many federal agencies—including FERC—do not issue draft licenses or permits for our members' natural gas

---

²⁶ *Id.* at 35,332.

²⁷ *N.Y. State Dep't of Envtl. Conservation v. FERC* ("*NYSDEC v. FERC I*"), 884 F.3d 450, 455-56 (2d Cir. 2018).

²⁸ *Id.*

²⁹ 33 U.S.C. § 1251(e).

³⁰ Proposed Rule at 35,329.

³¹ *Id.*

³² *Id.* at 35,332.

³³ *Id.* (emphasis in original).

7

infrastructure projects, and it is unclear how they could do so in a manner that is consistent with the CWA's policies. EPA dismisses this significant obstacle by claiming the Agency "is not aware of any regulatory-based reason why Federal licensing or permitting agencies could not manage their internal procedures so that a certifying authority's 'reasonable period of time' did not begin to run until after it had received a copy of the draft license or permit."[34] The EPA proposes not only to depart from its established rules and practice but also to require other federal agencies to change their rules and "internal procedures," which the other agencies developed based on their expertise and an accounting of their available resources. EPA cannot simply say "I don't see why not" and shift the burden to analyze the effects of the EPA's break from precedent. Because the EPA does not (and cannot) justify these significant changes, the Agency should abandon them.[35]

Further, the Proposed Rule requires sequential, rather than concurrent review by the lead federal agency and the certifying authority. This change alone could add up to a year to development timelines for *all* infrastructure projects that require a Section 401 certification. Additionally, the lead agency typically analyzes factors other than water quality when deciding whether to issue a license or permit. FERC, for example, will issue a certificate of public convenience and necessity based on myriad factors, such as whether the project proponent can "financially support the project without relying on subsidization from its existing customers"; whether the project proponent "has made efforts to eliminate or minimize any adverse effects the project might have on the [project proponent's] existing customers, existing pipelines in the market and their captive customers, and landowners and communities affected by the route of the new pipeline facilities"; whether the project's benefits "outweigh the adverse effects on economic interests"; and environmental factors, including the project's effects on soils and geology, cultural resources, land use, visuals, noise levels, air quality, socioeconomics, and environmental justice.[36] FERC does not currently prepare "draft" orders, and doing so presumably would require FERC Staff to collect and analyze a significant amount of data regarding each of these factors. This is an extensive process, and *none of the factors listed have any bearing on water quality*. The EPA's proposed requirement cannot be squared with the "national policy that to the maximum extent possible the procedures utilized for implementing th[e CWA] shall encourage . . . the best use of available manpower and funds, so as to prevent needless duplication and unnecessary delays at all levels of government."[37]

---

[34] *Id.* at 35,333.

[35] *See Nw. Envt. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 690 (9th Cir. 2007) (holding agency determination was arbitrary and capricious where agency departed from precedent and "the record [did] not indicate that that decision was the output of a rational decision-making process"); *La. Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 897-99 (D.C. Cir. 1999) (remanding agency determination where agency failed to explain departure from its own precedent and relied only on its own conclusory statement to rebut contrary evidence in the record); *W.Va. Pub. Servs. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 862-63 (D.C. Cir. 1982) (vacating decision where record did not contain "identifiable factual evidence" sufficient to justify "break with precedent and policy").

[36] *See, e.g.*, *Gas Transmission Nw., LLC*, 180 FERC ¶ 61,056, PP 23, 46 (2022).

[37] 33 U.S.C. § 1251(f).

* * * *

The Proposed Rule would add uncertainty, delay, burden, and risk of abuse to the Section 401 process contrary to the policies underlying the CWA. For the foregoing reasons, the EPA should abandon its proposed changes and instead maintain the definition of "certification request" that the Agency established in 2020.

### III. The Time Period for Review Must Be Reasonable

Section 401 requires action by a certifying authority "within a reasonable period of time (which shall not exceed one year) after receipt of such request."[38] The lead federal agency—not the certifying authority—determines matters of waiver under Section 401, which includes determining when the reasonable period of time for review begins.[39] Upon expiration of the time period, the federal agency's obligation to await the certification is waived and the federal agency may move forward in finalizing its authorization.[40] The reasonable time period for review is fundamental to Section 401's approach to cooperative federalism. It ensures, at Congress' direction, that the state opportunity to consider potential water quality impacts does not frustrate or cause an unreasonable delay to the federal authorization.[41]

#### A. Defining "Receipt" of Request

Section 401 states clearly that the period for a certifying authority's Section 401 review is initiated upon "*receipt* of such request."[42] In some instances, states have sought to delay the "receipt" of the request by deeming requests to be "incomplete." The U.S. Court of Appeals for the Second Circuit squarely rejected this practice. The court recognized that, by creating a "bright-line rule" that the "receipt" of a Section 401 request is the beginning of review,[43] Congress sought to eliminate the potential for states to stall the clock and prevent federal authorization.

EPA's proposal to define the term "receipt" as "the date that a request for certification,

---

[38] 33 U.S.C. § 1341(a)(1).

[39] *See Millennium Pipeline Co. v. Seggos*, 860 F.3d 696, 699 (D.C. Cir. 2017) (project applicants are to present evidence of waiver to federal agency).

[40] 33 U.S.C. § 1341(a)(1) ("If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application.").

[41] *Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 972 (D.C. Cir. 2011) ("[T]he purpose of the waiver provision is to prevent a State from indefinitely delaying a federal licensing proceeding by failing to issue a timely water quality certification under Section 401.").

[42] 33 U.S.C. § 1341(a)(1) (emphasis added).

[43] *NYSDEC v. FERC I*, 884 F.3d at 455. Neither can the applicant and the state agree to delay the start of the review period or otherwise extend the review period. *See N.Y. State Dep't of Env't Conservation v. FERC* ("*NYSDEC v. FERC II*"), 991 F.3d 439, 450 (2d Cir. 2021) ("Section 401 prohibits a certifying agency from entering into an agreement or otherwise coordinating with an applicant to alter the beginning of the review period[.]").

*as defined by the certifying authority*, is documented as received" is inconsistent with the statute as interpreted by the courts and opens the door to the very practice that the Second Circuit rejected unequivocally. EPA is mistaken in hoping that certifying authority requirements for complete applications "will not necessarily lead to a 'subjective standard.'" The statutory language is clear and does not depend on hopeful expectations of action by certifying authorities. The decision in *NYSDEC v. FERC I* explains why.

In *NYSDEC v. FERC I*, the New York State Department of Environmental Conservation ("DEC") had deemed a Section 401 request for an interstate natural gas pipeline to be "incomplete" twice before finally denying the request nearly two years after the state's initial receipt of the request.[44] When the DEC issued its Second Notice of Incomplete Application to the applicant, it referred to Section 621.3(a)(4) of Title 6 of the New York State regulations as the basis of its finding that the applicant's request was "incomplete."[45] Section 621.3, both at the time and still today, outlines general requirements for certain permit applications, including Section 401 requests.[46] On these facts, the Second Circuit held that allowing states to determine when requests are "complete" could create a "subjective standard" clearly in violation of the bright line requirements of Section 401.[47] EPA's proposal to allow states to dictate the contents of the Section 401 request, even if "defined in regulation," sanctions the type of "subjective standard" explicitly rejected by the Second Circuit.[48]

Moreover, EPA's references to "completeness" determinations in other permitting programs are misplaced. EPA points to its own permitting requirements for Section 402 NPDES applications and the Army Corps' Section 404 permits as examples where agencies have interpreted the term "application" to mean a "*complete* application."[49] However, in the referenced examples, the *permitting agency* interprets the sufficiency of a *permit application* that it is legally required to act upon, whereas under Section 401, the certifying authority is not tasked with issuing a permit, reviewing a permit application, or even responding at all. Section 401 affords the certifying authority the opportunity to review a "request" seeking to confirm that discharges meet applicable water quality standards. This review is not a permitting process. By granting states the authority to treat such requests as state permit applications, EPA's proposal invites states to stall the statutory clock under Section 401 until a request is deemed "complete" and thus interferes with the federal permit process, which relies on the expeditious completion of the state's review. *Congress* set the clock's start under Section 401, and EPA's proposal should

---

[44] *NYSDEC v. FERC I, 884 F.3d* at 453-54.

[45] *See* Joint Appendix at JA401-02, New York State Department of Environmental Conservation v. FERC, No. 17-3770 (2d. Cir. Dec. 22, 2017).

[46] *See* N.Y. Comp. Codes R. & Regs. tit. 6, § 621.3.

[47] *NYSDEC v. FERC I*, 884 F.3d at 455-56.

[48] *See id.*

[49] Proposed Rule at 35,334.

10

not invite circumvention of the statutory time limit without oversight.[50]

Certifying authorities do not need the authority to dictate the contents of a Section 401 certification request in order to protect their opportunity for meaningful review of proposed discharges. As noted above, if an applicant fails to provide adequate information during the Section 401 review, the certifying authority may under Section 401 deny the request for certification.[51] Moreover, mandatory pre-filing meeting requests, as proposed by EPA, can spotlight needed information and help ensure an adequate record for a certifying authority to conduct its review.[52]

INGAA and AGA respectfully request that EPA either maintain the 2020 Certification Rule's definition of "receipt," or, in the alternative, clarify that a certifying authority's review of whether a request meets its pre-defined requirements is a purely administrative function and does not defer the start of the review clock defined in the statute and confirmed by federal court precedent.

### B.      Setting the "Reasonable" Period of Time

Following the "receipt of the request," certifying authorities have a "reasonable period of time (which shall not exceed one year)" to act on a request before waiver occurs.[53] The lead federal agency determines the reasonable period of time.[54] Although the statute provides a full year as the absolute maximum amount of time, the lead federal agency may determine a reasonable period of time to be less than one year.[55]

EPA's proposal would require the federal agency and the certifying authority to determine the reasonable period of time and, when not in agreement, set a default 60-day time period. However, for the time period and waiver concepts to support cooperative federalism as Congress intended, there must be an appropriate division of authority between the federal agency and the states. Recognizing this, the D.C. Circuit held that the lead federal agency decides matters of waiver under Section 401.[56] Since waiver is tied to the lapse of a reasonable time for review, the federal authority to decide waiver inherently includes setting the reasonable period of time.

---

[50] *NYSDEC v. FERC I,* 884 F.3d at 456 ("If the statute required 'complete' applications, states could blur this bright-line rule into a subjective standard, dictating that applications are 'complete' only when state agencies decide that they have all the information they need. The state agencies could thus theoretically request supplemental information indefinitely.").

[51] *Id.* ("If a state deems an application incomplete, it can simply deny the application without prejudice.").

[52] Proposed Rule at 35,329.

[53] 33 U.S.C. § 1341(a)(1).

[54] *See Millennium Pipeline,* 860 F.3d at 701 (holding that the lead federal agency decides whether waiver has occurred).

[55] *See Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1103-04 (D.C. Cir. 2019).

[56] *Millennium Pipeline*, 860 F.3d at 701.

Notwithstanding the federal agency's authority to determine the reasonable period of time, certifying authorities and project proponents both bring practical insight to the review process. Accordingly, INGAA and AGA encourage EPA to create a process where the lead federal permitting agency alone may establish the reasonable period of time but may do so in consultation with both the certifying authority <u>and</u> the project proponent.  INGAA and AGA otherwise support the 60-day default time period.  However, if EPA finalizes a regulation that allows certifying authorities to dictate the contents of the request, EPA should clarify that there should be no situation where the reasonable period of time should exceed 60 days. Otherwise, EPA would be allowing the certifying authorities to evade the one-year limit on review by delaying the start of the clock, intentionally failing to avail themselves of opportunities to study water quality impacts during the federal permitting review, and then expecting the maximum statutory time for review to be appended at the end of the federal permit process.

C. Withdrawal and Resubmission of Requests for Certification

The U.S. Court of Appeals for the District of Columbia Circuit has invalidated the practice of withdrawing and refiling the same Section 401 request in a coordinated attempt to restart the review period for the same project.[57]  Given the D.C. Circuit's clear holding on this practice, it is not appropriate for EPA to decline to "tak[e] a position on the legality of withdrawing and resubmitting a certification request."[58]  EPA's Section 401 regulations must respect the statutorily imposed time limits found within Section 401.  Congress was clear that a certifying authority's role is temporally limited to a reasonable period of time, not to exceed one year, from the date of receipt of the certification request.  EPA's regulations should be equally clear that certifying authorities cannot require or request a project applicant to withdraw and resubmit a certification request for the purpose of restarting the reasonable period of time.[59]

IV. **A Certifying Authority's Scope of Review and Its Conditioning Authority Are Different and Specific, and Neither Is Unbounded**

Section 401 provides certifying authorities the opportunity to certify whether a proposed discharge will comply with applicable water quality provisions.  Differences between the language of Section 401(a)(1), which focuses on confirming that the "discharge" will comply with water quality requirements, and Section 401(d), which refers to ensuring that the "applicant" will comply, have caused some to question the scope of the project that falls within the certifying

---

[57] *Hoopa Valley*, 913 F.3d at 1104 (holding that the withdrawal and resubmission scheme "serves to circumvent a congressionally granted authority").  *See also Turlock Irrigation Dist. v. FERC*, 36 F.4th 1179, 1182 (D.C. Cir. 2022) (upholding *Hoopa* and confirming that a state's inaction on request results in waiver regardless of the withdrawal and resubmission).

[58] Proposed Rule at 35,341.

[59] In contrast, a project proponent may at any time withdraw its request for certification by the certifying authority, for example, if it no longer intends to develop the proposed project as described in its original certification request. In such instances, there is no coordinated attempt to restart the review period or extend the review period beyond the one-year maximum set forth in Section 401.

authority's Section 401 review.

EPA proposes to address this issue by specifying that Section 401(a)(1)'s limitation on "discharge" merely provides the "trigger" for Section 401 review. Once that review is triggered, EPA proposes that the certifying authority is authorized to consider, certify, and condition the "activity as a whole." INGAA and AGA disagree with this interpretation, which is not supported by the statute, precedent, or practical application of Section 401. Instead, EPA must affirm that the purpose and focus of Section 401 is to assure that discharges from federally-permitted activities will comply with applicable water quality requirements, an analysis that does not include matters unrelated to water quality or consideration of other environmental impacts from the applicant's entire activity. The final rule should confirm, consistent with Section 401, that a certifying authority's review is properly focused on reviewing the water quality impacts from the potential discharge associated with a proposed project.

Prior to 1972, the certification provisions focused the certifying authority's review on whether the "activity" would violate water quality standards.[60] In the 1972 amendments to the statute, Congress revised this language to focus certifying authorities on the impact of the proposed "discharge."[61] At the same time, Section 401(d) was added to allow certifying authorities to condition certifications to assure compliance from the "applicant." An interpretation that the scope of review under Section 401(a)(1) and Section 401(d) is the "activity as a whole" is inconsistent with the statutory language of both sections.

First and foremost, Section 401(a) does not merely set the trigger for review—it is the most expansive provision in the entire code section, and it is the only part of Section 401 that addresses the scope of the certifying authority's review. The language of Section 401(a)(1) makes clear that the scope of the certification decision is whether the "discharge" will comply with the applicable enumerated provisions of the CWA.[62] In the 1972 amendments, Congress deliberately added the term "discharge" in multiple places, and there is no basis in either the text or the legislative history to authorize EPA to revise this term out of the statute.

Second, Section 401(d) does not address the scope of the certifying authority's review, which is focused on *whether* the discharge will comply with the enumerated water quality standards. Instead, Section 401(d) addresses *how* to assure that the discharge complies—namely through conditions included in the issued water quality certification and incorporated into the federal permit governing the applicant. Referring to the "applicant" in this context is necessary and appropriate, since the focus of Section 401(d) is on conditions incorporated into the

---

[60] *See* Pub. L. No. 91–224, 21(b)(1), 84 Stat. 108 (1970).

[61] *See* 33 U.S.C. § 1341(a)(1) ("Any applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate . . . that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title.") (emphases added).

[62] *Id*. ("that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title").

applicant's federal permit.  It is not reasonable to read Section 401(d)'s reference to "applicant" as indirectly revising the clear and repeated specificity of Section 401(a)(1) with respect to discharges.

Third, nowhere in Section 401(d) does the statute authorize a certifying authority to set conditions on the "activity as a whole" or even the "activity."  EPA purports to premise its "activity as a whole" interpretation of Section 401 on the Supreme Court's decision in *PUD No. 1 of Jefferson County* and *City of Tacoma v. Washington Dep't of Ecology ("PUD")*.[63]  *PUD* notes the incongruity in the text of Section 401; however, it does not substantively support EPA's proposed approach that the "activity as a whole" governs a certifying authority's decision to grant or deny a certification and impose conditions.  Instead, as decided by the majority of the justices in *PUD*:

> Section 401(a)(1) identifies the category of activities subject to certification— namely, those with discharges.  And § 401(d) is most reasonably read as authorizing additional conditions and limitations on the activity as a whole once the threshold condition, the existence of a discharge, is satisfied.[64]

Here the Court is *distinguishing* Section 401(a)(1) and Section 401(d), explaining that Section 401(a)(1) addresses the scope of the certification while Section 401(d) addresses the scope of conditions.  EPA errs in seeking to extend the scope of review to encompass all of the activity from which discharges arise: this proposed interpretation *conflates* the two provisions and superimposes Section 401(d) on Section 401(a)(1), without any basis in the text. Such a construction is suspect and inconsistent with leading principles of statutory interpretation applied by the Supreme Court.[65]

Fourth, the certifying authority's review and conditioning authority under Section 401(d) is limited.[66]  In *PUD*, the Supreme Court confirmed that the state's authority under Section 401(d) "is not unbounded."[67]  Moreover, the Supreme Court did *not* support applying Section 401(d) conditions beyond what is required to comply with water quality standards: rather, the Supreme Court held that "state water quality standards adopted pursuant to § 303 are among the 'other limitations' with which a State may ensure compliance through the § 401 certification process."[68]

---

[63] *PUD No. 1 of Jefferson County* and *City of Tacoma v. Wash. Dep't of Ecology* ("*PUD*"), 511 U.S. 700 (1994).

[64] *Id.* at 711-12.

[65] *See*, *e.g.*, *Chevron, U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837, 843 n.9 (1984) (applying "traditional tools of statutory construction" to discern Congressional intent); *Corley v. U.S.*, 556 U.S. 303, 314 (2009) (rejecting federal agency's interpretation "at odds with one of the most basic interpretive canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant'") (internal quotation marks and citation omitted); *Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1037 (2019) ("we 'generally presum[e] that statutes do not contain surplusage'") (internal citation omitted).

[66] *PUD* at 712.

[67] *Id.*

[68] *Id.* at 713.

14

To find otherwise—namely, to accept EPA's proposal of unbounded state authority to review and condition the entirety of a federally authorized project—rewrites Congress's balanced legislative language of 1972 and effectively places certifying authorities in control of interstate projects, including those that are determined by federal agencies to be in the public interest, like interstate natural gas pipelines. EPA should not assume that Congress hid such vast state power within Section 401(d) of the CWA. It is neither wise policy nor sound legal thinking. As the Supreme Court recently held, "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'"[69]

EPA's sweeping interpretation also faces practical challenges that EPA itself identifies. For example, EPA requests comment "whether and how the Federal licensing or permitting agency could effectively implement a certification with conditions addressed to impacts from the 'activity as a whole' if it has authority over only a small part of a larger project."[70] How, indeed. Through its sweeping interpretation, EPA would create a situation where the scope of the certifying authority's Section 401 review is broader than the scope of the federal authorization that triggered the review. This impracticable (and likely unlawful) result belies EPA's interpretation.

These are not idle concerns. In 2019, INGAA and AGA members submitted examples of certifying authorities impermissibly expanding their Section 401 authority by placing conditions unrelated to water quality in Section 401 certifications. Moreover, certifying authorities are requiring submission of information unrelated to water quality as part of the Section 401 certification process, which exceeds the limits of Section 401 even if the certifying authority does not impose conditions based on that information. For example, one AGA member applied for a Section 401 certification and New York State Environmental Conservation Law Article 24 Freshwater Wetlands permit in 2020, and, following the permit comment period, DEC advised the member that an air emissions analysis was required in order for the permitting review to continue. Specifically, the DEC requested a Climate Leadership Community Protection Act ("CLCPA")[71] emissions analysis, allowing the DEC to determine whether issuing the water quality permit and certification would be consistent or interfere with the attainment of statewide greenhouse gas emission limits. This additional, undue burden is inconsistent with the CWA's policy and highlights the continued risk of certain certifying authorities impermissibly expanding the scope of their Section 401 authority.

INGAA and AGA respectfully and urgently request that EPA reaffirm that the purpose and focus of Section 401 is to ensure that discharges from federally-permitted activities can meet

---

[69] *West Virginia v. EPA*, 597 U.S. ___ (2022).

[70] Proposed Rule at 35,346.

[71] The CLCPA became effective in New York State in January 2020 and is codified in New York Environmental Conservation Law Section 75. Among other requirements, the CLCPA directs state agencies to determine if the decisions they make, including issuing permits, are inconsistent with or will interfere with the attainment of statewide greenhouse gas emission limits. The analysis includes upstream, downstream, and indirect emissions and mitigation thereof.

15

applicable water quality standards. As such, a certifying authority's review should be focused on reviewing the water quality impacts of the federally-authorized discharge. On the basis of its review, the certifying authority may identify such conditions that are necessary for the discharge to achieve compliance with water quality standards, and the lead federal agency will incorporate those conditions into the federal license or permit.

**V.    Federal Agencies Have an Obligation to Confirm Section 401 Actions**

Section 401(a)(1) makes clear that a federal agency must withhold the issuance of a federal license or permit authorizing activities that discharge to navigable water until the applicant obtains the applicable water quality certifications and that, upon denial, a federal agency may not grant the license or permit.[72] By making the issuance of a federal license or permit contingent on obtaining a certification, the statute requires the federal agency to make a threshold determination whether or not the water quality certification has been obtained, waived, or denied.[73]

To support federal agencies in this responsibility, EPA has proposed four factors by which federal agencies should review certification actions:

> (1) whether the decision clearly indicates the nature of the decision (i.e., is it a grant, grant with conditions, denial, or express waiver), (2) whether the proper certifying authority issued the decision, (3) whether public notice was provided, and (4) whether the decision was issued within the reasonable period of time.[74]

INGAA and AGA appreciate that EPA proposes to provide direction to federal agencies on this review. However, we encourage EPA to clarify that these four factors serve the specific responsibility of the federal permitting agency to ensure that the Section 401 action taken was within the scope of Section 401—the review of a federally-authorized discharge for potential impacts to water quality. To that end, EPA should add a fifth factor: "whether the decision, including the proposed conditions, addresses compliance with the certifying authority's water quality standards." This factor does not invite the federal permitting agency to second-guess whether a condition is best suited to achieve such compliance; it only ensures that conditions are not imported into a federal permit via Section 401 if they do not address the certifying authority's water quality standards, which is the central point of Section 401 and is consistent with the

---

[72] *See* 33 U.S.C. § 1341(a)(1) ("No license or permit shall be granted until the certification required by this section has been *obtained* or has been *waived* as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.") (emphasis added). Federal agencies may issue "conditional" licenses or permits, but such licenses or permits cannot authorize "activities . . . that may result in [a] discharge [into navigable waters] prior to the state approval." *Del. Riverkeeper Network v. FERC*, 857 F.3d 388, 399 (D.C. Cir. 2017).

[73] *See City of Tacoma v. FERC*, 460 F.3d 53, 68 (D.C. Cir. 2006) (federal agencies have "an obligation to determine that the specific certification required by Section 401 has been obtained") (internal citations omitted).

[74] Proposed Rule at 35,354.

Supreme Court's holding in *PUD*.

Finally, EPA should retain rather than remove the existing requirement that a certifying authority must document, through citation and explanation, the basis for certification conditions (and likewise for the reasons a certification is denied, including specifying any information needed to assure compliance with water quality requirements).[75] Doing so provides appropriate transparency to the public and the permit applicant and helps ensure that the federal permitting agency can fulfill its duty in reviewing the certification action without second-guessing the certifying authority's substantive determinations.

### VI. EPA Should Require the Project Proponent's Consent to Any Proposed Modifications of a Water Quality Certification

The Proposed Rule "reintroduce[s] a certification modifications provision," but "the [EPA] is . . . not proposing to require that the project proponent agree to the modification."[76] INGAA and AGA share the desire for "flexibility to adapt to changing circumstances" that some project proponents expressed to the EPA during the Agency's pre-proposal outreach,[77] but the authority to modify certificates without project proponent consent will undermine the regulatory certainty that Congress sought to promote through Section 401.

The EPA rightfully recognizes that "[c]onstraining certifying authorities from fundamentally changing their certification action . . . through a modification process recognizes reliance interests and promotes regulatory certainty" and that "changing the fundamental nature of the certification action . . . may be inconsistent with the Congressional admonition to act on a certification request within the statutory reasonable period of time."[78] However, the Agency defines "modification" so broadly as to remove any meaningful "[c]onstrain[t] on certifying authorities."[79] The Proposed Rule defines "modification" as "a change to an element or portion of a certification or its conditions; it does not mean the wholesale reversal of a certification decision."[80] By defining "modification" to include any change short of a wholesale reversal, the EPA affords certifying authorities with the ability to impose a *de facto* denial through onerous changes well after the project proponent acted in reasonable reliance on the initial certification.

This flaw is not fatal to the EPA's efforts to reintroduce a certification modification provision; a requirement that the project proponent consent to any modification can guard against certifying authorities "flip-flopping" on their initial decision. The EPA's requirement that "a Federal agency and certifying authority agree in writing that the certification should be

---

[75] *See* 40 C.F.R. §121.7.

[76] *Id.* at 35,361-62.

[77] *Id.* at 35,361.

[78] *Id.* at 35,362.

[79] *Id.*

[80] *Id.* at 35,361-62.

modified" is an important safeguard.[81] But only the project proponent will have unique insight into how belated modifications affect the viability of the project and whether those modifications are a wholesale reversal of the certifying authority's initial decision in all but name. The EPA should not dismiss this insight or the project proponent's reliance interest on the initial certification by affording the proponent only "some part in the modification process."[82] Instead, the EPA should require the project proponent's consent to any modification. If the EPA does not require the project proponent's consent, the Agency at least should clarify that the certifying authority cannot modify its certification after the issuance of the federal license or permit that prompted the request for certification.[83]

### VII. Conclusion

INGAA and AGA appreciate the opportunity to engage in this process and your consideration of these comments. We welcome additional dialogue and discussion.

Joan Dreskin
Sr. Vice President and General Counsel
Interstate Natural Gas Association of America
25 Massachusetts Ave. NW, Suite 500N
Washington, DC 20001
202.216.5928
jdreskin@ingaa.org

Pamela Lacey
Chief Regulatory Counsel
American Gas Association
400 N. Capitol St., NW
Washington, DC 20001
202.824.7340
placey@aga.org

Christopher Smith
Regulatory Counsel
csmith@ingaa.org

---

[81] *Id.* at 35,362.

[82] *Id.*

[83] *See Airport Cmtys. Coal. v. Graves*, 280 F.Supp.2d 1207, 1215 (W.D. Wash. 2003) ("the plain language of the statute . . . reflects clear congressional intent that federal agencies only be bound by state certification conditions issued within one year after notice"); *City of Shoreacres v. Tex. Com. of Env't Quality*, 166 S.W.3d 825, 834-35 (Tex. Ct. App. 2005) ("states are not authorized under the Clean Water Act to unilaterally revoke, modify, or amend a state water quality certification after the certification process for a federal permit is complete").