**Exhibit D**

Comments of the National Hydropower Association on EPA's Clean Water Act Section 401 Water Quality Certification Improvement Rule, 87 Fed. Reg. 35,318-81 (June 9, 2022) (Aug. 5, 2023)

**The National Hydropower Association, Inc.**

601 New Jersey Ave. NW, Suite 660, Washington, DC 20001 • Tel 202.682.1700 • Fax 202.682.9478 • www.hydro.org

August 5, 2022

Mr. Michael S. Regan
Administrator
U.S. Environmental Protection Agency
Mail Code 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Re:     Docket ID No. EPA-HQ-OW-2022-0128
        Comments of the National Hydropower Association on EPA's Clean Water Act
        Section 401 Water Quality Certification Improvement Rule, 87 Fed. Reg. 35,318-81
        (June 9, 2022)

Dear Administrator Regan:

The National Hydropower Association (NHA) submits the following comments on EPA's
proposed Clean Water Act Section 401 Water Quality Certification Improvement Rule (the
Proposed Rule).[1]  NHA is joined in these comments by the Northwest Hydroelectric Association
(NWHA).

The Proposed Rule would substantially replace the Section 401 certification rule that EPA
adopted only two years ago (the 2020 Rule).[2]  The 2020 Rule itself replaced rules that had not
been substantially revised since before the 1972 enactment of the Clean Water Act (CWA) and
that were based on a significantly different statute that preceded Section 401.  The long failure to
update the rules allowed the accumulation of many problems related to the interpretation and
application of Section 401, which negatively affected the hydropower industry and its ability to
implement projects needed to address critical environmental and energy issues, including climate
change.

Before adopting the Proposed Rule, EPA should carefully consider the problems that the 2020
Rule was intended to address and whether the Proposed Rule would resurrect those problems,
particularly for the licensing of hydropower projects that will be essential to meet the urgent
need to reduce greenhouse gas emissions.  NHA and NWHA urge EPA to retain the 2020 Rule
without substantial revisions because it effectively addresses the problems that predated it while
adhering closely to the text and purposes of Section 401.  If, however, EPA chooses to move
forward with the Proposed Rule, these comments suggest revisions to reduce the risk of re-
creating or exacerbating the problems resolved by the 2020 Rule.

---

[1] 87 Fed. Reg. 35,318-81 (June 9, 2022).

[2] The 2020 Rule was published in the Federal Register on July 13, 2020, 85 Fed. Reg. 42,210-87, took effect on
September 11, 2020, and is codified at 40 C.F.R. pt. 121.

1

*Introduction*

NHA and NWHA members operate hydropower projects licensed by the Federal Energy Regulatory Commission (FERC) pursuant to the Federal Power Act (FPA).  The FPA gives FERC comprehensive authority to license nonfederal hydropower projects and mandates that FERC's licensing decisions address the protection and enhancement of fish and wildlife and achieve a balance of other public and environmental benefits, such as flood control, water supply, and recreation.  Moreover, to implement national objectives related to the promotion and regulation of hydropower, FERC's licensing authority under the FPA is exclusive, except as limited by the FPA itself or other federal laws.

One such federal law is CWA Section 401.  Through Section 401, states and tribes play a vital role in ensuring that discharges from federally licensed and permitted activities, including hydropower projects licensed by FERC, comply with the CWA and state and tribal water quality requirements.  In the years before the adoption of the 2020 Rule, however, the issues that states sought to address in their certification decisions expanded far beyond the water quality concerns reflected in Section 401.  This expanded scope is inconsistent with Section 401 and is also a substantial intrusion on the exclusive licensing authority that Congress has assigned to FERC.  Indeed, in many instances FERC's role in the licensing of a hydropower project had, as a practical matter, become subordinate to that of the certifying authority.  In addition, the expansive scope of certification decisions and limited state resources often resulted in states inappropriately circumventing Section 401's requirement that certification decisions be made within no more than one year.  This delayed the licensing and permitting decisions of FERC and other federal agencies, often by many years and sometimes even decades.  These delays hindered approvals for new hydropower projects and other clean energy sources, as well as the implementation of environmental measures for existing projects, such as fish passage improvements.

Hydropower is a clean, renewable, and reliable energy source that will play a key role in achieving the President's ambitious climate protection and infrastructure goals.  With licenses for 281 existing hydropower facilities expiring by 2030—representing more than 13 gigawatts of clean energy capacity—workable Section 401 rules will be essential for ensuring that existing as well as new hydropower projects can be timely and efficiently licensed to combat climate change, protect water quality, and achieve other critical national objectives.

*Summary of Comments and Recommendations*

NHA and NWHA's comments on EPA's Notice of Intention to Reconsider and Revise the Clean Water Act Section 401 Certification Rule, 86 Fed. Reg. 29,541-44 (June 2, 2021), urged EPA to retain the 2020 Rule without substantial revisions.  By closely adhering to the text of Section 401 and the cooperative federalism principles that are at its core, the 2020 Rule substantially addresses the Section 401 implementation problems that had accumulated in the previous half century.  The 2020 Rule focuses the certification decision on the discharges to which Section 401 is addressed and better implements Section 401's requirement that certification decisions be made within a reasonable time not to exceed one year.  It ensures the ability of states and tribes to prohibit or impose restrictions on discharges to protect water quality, while also preserving the

ability of federal agencies such as FERC to fulfill through their licensing and permitting decisions the broad, national objectives assigned to them.

The Proposed Rule contains provisions that would undermine Section 401's careful balance of federal and state authority and that are inconsistent with the text of Section 401 and the FERC licensing process. NHA and NWHA are particularly concerned by the Proposed Rule's expansive interpretation of the scope of certification and its requirement that requests for certification be accompanied by a draft license or permit and any other information that the certifying authority might require. EPA should retain the 2020 Rule. If, however, EPA chooses to move forward with the Proposed Rule, these comments propose changes summarized in the following paragraphs. These proposals draw upon the deep experience of NHA's and NWHA's memberships with the certification process in the context of FERC licensing and would ameliorate the adverse effects of the Proposed Rule on the hydropower industry and the clean, reliable energy that it provides.

- *Scope of certification*. The scope of Section 401 certifications should be limited, as in the 2020 Rule, to the discharges that triggered the need for certification, not to "the activity as a whole." In addition, the laws and regulations for which certification of compliance is required should be limited to the CWA sections listed in Section 401; to federal, state, and tribal laws and regulations implementing those sections; and to other state and tribal laws and regulations for point source discharges. But even if the final rule contains an expansive scope of certification, it should, at a minimum, have clear and meaningful limits on that scope, including limiting certification to (1) the activities authorized by the federal license or permit for which the certification is required, (2) the effects of those activities on water quality, and (3) effects on waters of the United States.

- *Request for certification.* Because the statutory term, "request for certification," unambiguously refers to any clearly stated request for certification, and because it initiates the reasonable time within which a certifying authority must act on the request, the 2020 Rule's limited, objective requirements for a certification request should be retained. In particular, the final rule should not authorize certifying authorities to dictate the information that must accompany a request or the manner of its submission and should not require the request to be accompanied by a draft of the federal license or permit and all "existing and readily available data or information related to potential water quality impacts from the proposed project."

- *Reasonable period.* NHA and NWHA support the proposals related to determining and applying the reasonable period to act on certification requests.

- *Certification decisions*. NHA and NWHA agree that a certifying authority may act on a request for certification only by granting the request, granting the request with conditions, denying the request, or expressly waiving certification. They also agree with the preamble to the Proposed Rule that requiring certification that activities "will comply" with applicable requirements does not establish a higher evidentiary burden than "reasonable assurance of compliance." The final rule, however, should require that

statements explaining certification conditions and denials identify the specific federal, state, or tribal law on which the condition or denial is based.

- ***Federal agency review.***  The federal agency review provisions of the 2020 Rule should be retained to ensure that the federal agency can fulfill its statutory obligation to determine whether a certification decision is procedurally valid before denying or issuing a federal license or permit that is subject to Section 401.

- ***Modification and revocation of certification decisions.***  The final rule should make clear that the federal agency may add, modify, or remove license or permit conditions based on the modification of a certification decision only in accordance with the federal agency's applicable license or permit modification procedures.  In addition, the final rule should not prohibit revoking or modifying a denial of certification if the federal agency has not yet denied the federal license or permit application based on the denial, nor should it prohibit modifying a grant of certification into a waiver of certification.  The final rule, however, should prohibit "reopener" and similar certification conditions that purport to allow certifying authorities to unilaterally add or revise certification requirements after the reasonable period to act on a certification request and after the issuance of the federal license or permit.

- ***Enforcement.***  To clarify that the CWA makes no provision for the enforcement of certification conditions other than their incorporation into federal licenses and permits, the final rule should retain the statement in the 2020 Rule that the enforcement of certification conditions is the responsibility of the federal licensing or permitting agency.

- ***Neighboring jurisdictions.***  The final rule should not include provisions of the Proposed Rule to the extent that they would require the federal agency to provide EPA with any information other than the certification or waiver of certification and the federal license or permit application.

**TABLE OF CONTENTS**

1.   BACKGROUND ................................................................................................ 7

     1.1   NHA and NWHA ...................................................................................... 7

     1.2   FERC's Comprehensive Authority to License Nonfederal Hydropower
           Projects ...................................................................................................... 7

     1.3   Section 401 Certification of FERC Hydropower Licenses .................... 8

     1.4   Problems Associated with the Certification of Hydropower Projects That
           Are Addressed by the 2020 Rule ........................................................ 10

     1.5   Hydropower's Role in Achieving Climate Protection and Infrastructure
           Goals ....................................................................................................... 12

2.   OVERVIEW OF THE PURPOSE AND STRUCTURE OF SECTION 401 ........... 13

     2.1   History of Section 401 and EPA's Implementing Rules Before the 2020
           Rule .......................................................................................................... 13

     2.2   Section 401 Does Not Preempt State or Tribal Law or Limit State or
           Tribal Authority Under Other Federal Laws or Other Provisions of the
           CWA .......................................................................................................... 15

     2.3   Section 401 Is a Limited Authorization to States and Tribes to Certify
           and Condition Federal Licenses and Permits for the Protection of Water
           Quality from Discharges ........................................................................ 16

     2.4   Expanding the Scope of Section 401 Beyond the Effects of Discharges
           on Water Quality Would Undermine FERC's Comprehensive Authority
           to Regulate Nonfederal Hydropower Projects ................................... 17

     2.5   The 2020 Rule Is Consistent with the Text and Purpose of Section 401
           and Provides Needed Clarity ................................................................ 18

3.   COMMENTS ON THE PROPOSED RULE ...................................................... 19

     3.1   The Scope of Certification Under Section 401 Is Limited to the
           Compliance of Discharges with Applicable Federal, State, and Tribal
           Water Quality Requirements ................................................................ 19

     3.2   The Statutory Term, "Request for Certification," Is Unambiguous;
           There Is No Legal Basis for Requiring a Request to Include Any
           Information Other Than the Request Itself ........................................ 33

     3.3   The Final Rule Should Not Authorize Certifying Authorities to Dictate
           the Contents of a Request for Certification or the Manner of Its
           Submission .............................................................................................. 34

     3.4   The Final Rule Should Not Require the Request for Certification to
           Include a Draft of the Federal License or Permit ............................. 36

3.5    *The Final Rule Should Not Require That Certification Requests Include "Any Existing and Readily Available Data or Information Related to Potential Water Quality Impacts from the Proposed Project"* .......................... 38

3.6    *If EPA Nonetheless Believes That Additional Information Should Accompany a Request for Certification, the 2020 Rule Could Be Amended to Require Inclusion of the Application for the Federal License or Permit* ................................................ 39

3.7    *NHA and NWHA Support the Proposed Rule's Provisions Related to the Reasonable Period for Acting on Certification Requests* ................................ 39

3.8    *NHA and NWHA Generally Support the Proposed Rule's Provisions Related to Certification Conditions, But the Final Rule Should Require That Certification Conditions and Denials Identify the Specific Federal, State, or Tribal Law on Which the Condition or Denial Is Based* ................... 40

3.9    *The Final Rule Should Retain the 2020 Rule's Federal Agency Review Provisions* ................................................................. 43

3.10  *The Proposed Rule Should Be Revised to Clarify That the Federal Agency May Add, Modify, or Remove License or Permit Conditions Based on Modified Certification Conditions Only in Accordance with the Federal Agency's Applicable License or Permit Modification Procedures* ................................................................. 45

3.11  *The Final Rule Should Not Prohibit Revoking or Modifying a Denial of Certification If the Federal Agency Has Not Yet Denied the Federal License or Permit Application Based on the Denial of Certification* .............. 46

3.12  *The Final Rule Should Not Prohibit Modifying a Grant of Certification into a Waiver of Certification* ......................................... 46

3.13  *The Final Rule Should Prohibit "Reopener" and Similar Certification Conditions That Purport to Allow Certifying Authorities to Unilaterally Add or Revise Certification Requirements After the Reasonable Period for Acting on a Certification Request or After the Issuance of the Federal License or Permit* ................................................ 47

3.14  *To Clarify That the CWA Makes No Provision for the Enforcement of Certification Conditions Other Than Incorporation into Federal Licenses and Permits, the Final Rule Should Retain the Statement in the 2020 Rule That the Enforcement of Certification Conditions Is the Responsibility of the Federal Agency* ................................................ 47

3.15  *The Final Rule's Neighboring Jurisdiction Provisions Should Not Require the Federal Agency to Provide EPA with Any Information Other Than the Certification or Waiver of Certification and the Federal License or Permit Application* ......................................... 49

# 1.   BACKGROUND

## 1.1     NHA and NWHA

NHA is a non-profit national association dedicated to securing hydropower as a clean, carbon-free, renewable, and reliable energy source that serves the nation's environmental and energy objectives.  Its membership consists of more than 300 organizations, including public and investor-owned utilities, independent power producers, equipment manufacturers, and professional organizations that provide legal, environmental, and engineering services to the hydropower industry.  NHA promotes innovation and investment in all waterpower technologies, including conventional hydropower, marine and hydrokinetic power systems, and pumped storage to integrate other clean power sources, such as wind and solar.

NWHA is dedicated to the promotion of the Northwest's waterpower as a clean, efficient energy source while protecting the fisheries and environmental quality that characterize the region. NWHA has 130 members that represent all segments of the hydropower industry: public and private utilities; independent developers and energy producers; manufacturers and distributors; local, state, and regional governments, including water and irrigation districts; consultants; and contractors.

## 1.2     FERC's Comprehensive Authority to License Nonfederal Hydropower Projects

NHA's and NWHA's members own and operate the majority of the nonfederal hydropower projects licensed by FERC.  FERC has jurisdiction over more than 2,500 hydropower projects with a combined capacity of approximately 55,500 megawatts.[3]  Hydropower generates more than 7 percent of all utility-scale electricity generated in the United States and nearly 40 percent of all utility-scale renewable power.[4]

Because of the national importance of hydropower, Congress has through the FPA given FERC the exclusive authority to license nonfederal hydropower projects.  The U.S. Supreme Court has long held that the FPA preempts most state and local regulation of the projects under state law.[5] FERC's authority under the FPA is also comprehensive.  When issuing licenses, FERC may include conditions not only to promote power and water development, but also to protect and promote irrigation, flood control, water supply, public safety, recreation, and the environment.[6] In addition, federal agencies that manage certain types of federal land (referred to by the FPA as

---

[3] Fed. Energy Regul. Comm'n (FERC), Hydropower Primer: A Handbook of Hydropower Basics (Feb. 2017), HydropowerPrimer.pdf (ferc.gov).

[4] U.S. Energy Info. Admin., Hydropower explained (Apr. 8, 2021), https://www.eia.gov/energyexplained/hydropower/.

[5] *See* 16 U.S.C. §§ 797(e), 817(1); *California v. FERC*, 495 U.S. 490 (1990); *First Iowa Hydro-Elec. Coop. v. FPC*, 328 U.S. 152 (1946).

[6] *See* 16 U.S.C. § 803(a).

"reservations") may prescribe license conditions for the protection and use of those lands.[7]
FERC also must specifically consider recommendations from the U.S. Fish and Wildlife Service
(USFWS), the National Marine Fisheries Services (NMFS), and state fish and wildlife agencies
for the protection of fish and wildlife,[8] and the USFWS and NMFS may prescribe license
conditions requiring the construction, maintenance, and operation of "fishways."[9]  In deciding
whether to issue a license, FERC must "give equal consideration" to both the "power and
development purposes for which licenses are issued" and "the purposes of energy conservation,
the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related
spawning grounds and habitat), the protection of recreational opportunities, and the preservation
of other aspects of environmental quality."[10]

The FPA authorizes FERC to issue hydropower licenses for a term of up to 50 years.[11]  Because
of the long license term and the many interests and objectives that FERC must consider and
balance, the application process is lengthy and designed both to develop comprehensive
information regarding the project and its effects and to ensure that all interested stakeholders
have an opportunity to present their views.  At least five years before a license expires, an
applicant must submit a notice of intent to apply for a "new" license, and at least two years
before the license expires, it must submit the license application.[12]  If FERC does not issue a new
license to an existing licensee before the license's expiration, FERC must issue an "annual
license" on the same terms and conditions as the existing license until a new license is issued.[13]

### 1.3     Section 401 Certification of FERC Hydropower Licenses

Hydropower projects licensed by FERC typically involve a "discharge[] into . . . navigable
waters," which the CWA defines as "waters of the United States."[14]  Such discharges may
include water flowing over or through a dam or through electric power generating turbines
directly into the same waterbody immediately downstream, as well as water that is diverted from
a waterbody and then returned to the same or a different waterbody after passing through a
turbine.

---

[7] *See id.* §§ 796(2), 797(e); *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 788
(1984).

[8] 16 U.S.C. § 803(j).

[9] *Id.* § 811.

[10] *Id.* § 797(e).

[11] *Id.* §§ 799, 808(e).

[12] *Id.* § 808(b), (c)(1).

[13] *Id.* § 808(a)(1).

[14] 33 U.S.C. § 1362(7), (11).

Because an application for a federal license or permit to conduct any activity that may result in a discharge to waters of the United States requires a certification under Section 401 from the state or tribe that has authority over the area in which the discharge originates,[15] FERC's issuance of a hydropower license—including issuance of a new license upon expiration of an existing license—is almost always subject to Section 401.[16]  License amendment applications that would result in new discharges or certain changes in existing discharges are also subject to Section 401.[17]  In addition to FERC licenses, NHA and NWHA members often must obtain other federal licenses and permits that are subject to Section 401.  For example, disturbing waters of the United States to construct new or modified projects or environmental protection, mitigation, or enhancement measures typically results in a discharge that requires a permit from the U.S. Army Corps of Engineers under CWA Section 404,[18] which is also subject to certification under Section 401.

FERC's hydropower licensing rules include procedures intended to ensure timely and efficient Section 401 certification decisions.[19]  An applicant must consult with the Section 401 certifying authority on information needs and procedures years before the applicant submits a request for certification.[20]  Further, FERC conducts early scoping under the National Environmental Policy Act (NEPA) to identify all issues associated with the project, including cumulative impacts.[21]  The certifying authority may submit comments to FERC that identify information and studies that the certifying authority believes will be needed for its certification decision.[22]  In addition,

---

[15] *Id.* § 1341(a)(1).

[16] The U.S. Supreme Court has held that the term "discharge," as used in Section 401, "means a 'flowing or issuing out,'" and includes water flowing through a dam or turbine "into" waters of the United States downstream.  *See S.D. Warren Co. v. Maine Bd. of Env't Prot.*, 547 U.S. 370, 375-78 (2006) (quoting *Webster's New International Dictionary* 742 (2d ed. 1954)).  For purposes of Section 401, the "discharge" need not also include an addition of a pollutant to waters of the United States, which would be a necessary element of a "discharge" that must be authorized by a National Pollutant Discharge Elimination System (NPDES) permit under CWA Section 402, 33 U.S.C. § 1342, or a "dredged or fill material" permit under CWA Section 404, *id.* § 1344.  *See S.D. Warren Co.*, 547 U.S. at 375-87.

[17] *See Ala. Rivers All. v. FERC*, 325 F.3d 290, 299-300 (D.C. Cir. 2003) (license amendment that would result in an increased discharge was subject to Section 401); *cf. North Carolina v. FERC*, 112 F.3d 1175, 1185-89 (D.C. Cir. 1997) (license amendment that would result in a decreased discharge would not "result in a discharge" and was therefore not subject to Section 401 (quotation simplified)).

[18] 33 U.S.C. § 1344.

[19] The Section 401 certification procedures described here are those under FERC's default "integrated license application process."  18 C.F.R. pt. 5.  Somewhat different procedures apply under FERC's "traditional" and "[a]lternative" licensing procedures, which an applicant must obtain FERC's approval to use.  *See* 18 C.F.R. § 5.1(f).

[20] 18 C.F.R. § 5.1(d).

[21] *See id.* §§ 5.9-5.10.

[22] *See id.* § 5.9(a).

the applicant must prepare and submit a study plan for FERC's approval.[23]  If the certifying authority is dissatisfied with the study plan, it may file a formal notice of dispute with FERC, which FERC must consider before giving final approval of the study plan following the recommendation of a three-person dispute resolution panel.[24]

Once the environmental study plan is established, the license applicant then spends the next few years conducting environmental studies and preparing its license application.[25]  Throughout this study period, the certifying authority can review and comment on study results, advocate for additional studies and information, and comment on the applicant's licensing proposal.[26]  After the license application is complete and filed, FERC then reviews the application for completeness and requires the applicant to prepare any additional environmental studies or information that may be necessary.[27]  Only after this years-long process—after extensive collaboration, environmental study, and review—is the applicant required to submit its certification request to the certifying authority.[28]

### 1.4    *Problems Associated with the Certification of Hydropower Projects That Are Addressed by the 2020 Rule*

States and tribes play an important and valuable role in protecting water quality, and NHA and NWHA support the participation of states and tribes in federal licensing and permitting decisions through Section 401.  Some certifying authorities, however, have misused Section 401 to prohibit, delay, or impose conditions on federally licensed or permitted activities for reasons that have nothing to do with the water quality effects of the discharges addressed by Section 401.  Where federal laws such as the FPA preempt state requirements in order to further national objectives, including developing clean energy sources to respond to climate change, an overly expansive interpretation of Section 401 would undermine these national objectives by diminishing the scope of the exclusive regulatory authorities that Congress has conferred on FERC and other federal agencies.

Before EPA adopted the 2020 Rule, which established clearly defined limits on the scope of certification based on the text of Section 401, some certifying authorities issued certifications

---

[23] *See id.* §§ 5.11-5.14.

[24] *See id.* § 5.14.

[25] The environmental study phase of hydropower licensing is typically two years.  *See id.* § 5.15.

[26] *Id.* §§ 5.15-5.16.

[27] *Id.* § 5.21.

[28] When FERC determines that the license application is complete, that approved studies have been completed, that any deficiencies in the application have been cured, and that no additional information is needed, it will issue a public notice that includes a "[f]inding that the application is ready for environmental analysis." *Id.*; *id.* § 5.22(a)(2). Within 60 days of this notice, the applicant must file with FERC a copy of the certification, the request for certification, or evidence that certification has been waived. *Id.* § 5.23(b)(1). Under FERC's rules, a certifying agency is deemed to have waived certification if it does not act on the request for certification within the maximum of one year allowed by CWA Paragraph 401(a)(1). *Id.*; *id.* § 5.23(b)(2).

with conditions that went far beyond the water quality effects of discharges from hydropower projects.  These conditions included, for example, requirements for recreational facilities, wildlife protection and enhancement measures, vegetation management plans, and fish passage facilities.[29]  Such conditions exceed the scope of Section 401 and are a substantial intrusion on Congress's clearly expressed intention in the FPA that these issues should be addressed exclusively by FERC or through the specific authorities that Congress assigned to USFWS and NMFS to prescribe "fishways" and to other federal agencies to prescribe license conditions to protect federal reservations under their management.[30]

Certifying authorities also have often taken far longer to issue certification decisions than the statutory maximum of one year from their receipt of the certification request—sometimes more than a decade.[31]  Various devices have been used in an attempt to extend the time for making a decision, including deeming a certification request to be "incomplete" in order to prevent the one-year period from starting,[32] asking the applicant to withdraw and resubmit its certification request to start a new one-year period,[33] altering by agreement the date a certification request was deemed received,[34] requiring a state regulatory process that takes longer than a year,[35] requiring a draft request for certification at least one year before a final license application is submitted to FERC,[36] and denying certification "without prejudice" to force the applicant to

---

[29] Examples of such conditions are provided in Section 3.1.3.2 of these comments.

[30] *See* 16 U.S.C. §§ 796(2), 797(e), 803(a), 803(j), 811.  FERC's licensing decisions are also subject to a host of other federal laws, including but not limited to NEPA, 42 U.S.C. §§ 4321-4370m-12; the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544; the Coastal Zone Management Act (CZMA), 16 U.S.C. §§ 1451-1466; and the National Historic Preservation Act (NHPA), 54 U.S.C. §§ 300101-307108; *see, e.g.*, 18 C.F.R. §§ 5.18(b)(3), 5.25.

[31] *See, e.g.*, *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1104 (D.C. Cir. 2019) (no decision on certification more than 12 years after the initial request for certification was received).  Under CWA Subsection 401(a)(1), certification decisions must be made "within a reasonable period of time (which shall not exceed one year) after receipt of [the] request" for certification.  33 U.S.C. § 1341(a)(1).  FERC's rules allow a certifying authority the full one year to act on a certification request before deeming the certifying authority to have waived the certification requirements. 18 C.F.R. § 5.23(b)(2).

[32] *See, e.g.*, *N.Y. State Dep't of Env't Conservation v. FERC*, 884 F.3d 450, 455-56 (2d Cir. 2018) (rejecting certifying authority's argument that the period for acting on a certification request did not begin until the certifying authority deemed the request to be complete).

[33] *See, e.g.*, *Hoopa Valley Tribe*, 913 F.3d at 1103-05 (holding that withdrawing and resubmitting the same certification request did not extend the time for acting on a certification request).

[34] *See, e.g.*, *New York State Dep't of Env't Conservation v. FERC*, 991 F.3d 439, 443 (2d. Cir. 2021) (holding that state could not extend one-year time limit through agreement with applicant).

[35] *Yuba Cnty. Water Agency*, 171 FERC ¶ 61139 at P 62001 (May 21, 2020) (holding that a state regulatory process that often takes over a year does not extend the time for acting on a certification request), *reh'g denied*, 172 FERC ¶ 61080 (July 21, 2020).

[36] Or. Admin. R. 340-048-0020(5).

resubmit its request.[37]  Shortly before the 2020 Rule was adopted, 17 pending FERC hydropower licensing decisions were delayed by the failure of the certifying authority to timely act on a certification request, and eight of these had been delayed for more than 10 years.[38]  These delays prevented FERC from updating existing licenses that were 30 to 50 years old to include new environmental protection measures, and they left project owners in limbo for years regarding the conditions under which their projects would be operated in the future.  For proposed projects, delay could mean that the project was never financed or built.

For certification decisions that are within the appropriate scope of Section 401, certifying authorities have sufficient time to make a fully informed decision within the period allowed by Section 401 and the 2020 Rule.  The FERC regulations described in Section 1.3 of these comments further ensure that sufficient time is available by involving certifying authorities in the licensing process and allowing them to identify and obtain needed information years before a certification request is submitted.  The regulations also do not require an applicant to submit a certification request until 60 days after FERC has determined that the license application is complete (including completion of approved studies) and is "ready for environmental analysis."[39]  These procedures provide ample opportunities for certifying authorities to identify and obtain the information they need to make timely certification decisions.

## 1.5   *Hydropower's Role in Achieving Climate Protection and Infrastructure Goals*

In April 2021, the President announced an aggressive new greenhouse gas reduction target for the United States:  a 50 to 52 percent reduction of economy-wide net greenhouse gas pollution by 2030, based on 2005 greenhouse gas emission levels.[40]  The United States has further set a goal to reach 100 percent carbon-pollution-free electricity by 2035.[41]  The President has

---

[37] Certifying authorities have also attempted to effectively extend their time for making certification decisions by including certification conditions that purport to give them the right to modify or "reopen" certification conditions at any time, including long after the federal license or permit has been issued.

[38] *See* FERC Project Nos. 2086 (Vermilion Valley), 2105 (Upper N. Fork Feather River), 2174 (Portal), 1971 (Hells Canyon), 67 (Big Creek Project 2A), 120 (Big Creek Project 3), 2085 (Mammoth Pool), 2175 (Big Creek Project 1 & 2), 2088 (South Feather), 2106 (McCloud-Pit), 2615 (Brassua), 2079 (Mid-Fork American), 2179 (Merced River), 2467 (Merced Falls), 848 (Trout Creek), 12532 (Pine Creek Mine), 2337 (Prospect Number 3); *see also Hearing on Legislation Addressing Pipeline and Infrastructure Modernization Before the H. Comm. on Energy & Commerce Subcomm. on Energy & Power*, at 8 (May 3, 2017) (testimony of John Katz, FERC Deputy Associate General Counsel ("Over a third of all pending hydropower re-license applications . . . are awaiting these approvals [CWA Section 401 certifications and ESA biological opinions] from other agencies.")), https://docs.house.gov/meetings/IF/IF03/20170503/105916/HHRG-115-IF03-Wstate-KatzJ-20170503.pdf.

[39] *See* 18 C.F.R. §§ 5.22, 5.23(b)(1).

[40] The White House, *Fact Sheet:  President Biden Sets 2030 Greenhouse Gas Pollution Reduction Target Aimed at Creating Good-Paying Union Jobs and Securing U.S. Leadership on Clean Energy Technologies* (Apr. 22, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/22/fact-sheet-president-biden-sets-2030-greenhouse-gas-pollution-reduction-target-aimed-at-creating-good-paying-union-jobs-and-securing-u-s-leadership-on-clean-energy-technologies/.

[41] *Id.*

emphasized that infrastructure investment and the creation of millions of well-paying, middle-class jobs are integral to an effective and equitable climate policy.[42]

The nation's hydropower infrastructure is a critical resource for achieving the Administration's policy goals.  Hydropower is a clean, renewable, and reliable energy source that contributes more than 140,000 well-paying jobs in the United States.[43]  Currently, FERC operating licenses for 281 existing hydropower facilities are scheduled to expire by 2030.[44]  These licenses include 4,700 megawatts of hydropower capacity, which translates into 10 million metric tons of carbon dioxide emissions avoided per year, electricity for 1.8 million homes and 2.2 million cars annually, and an economic value of $733 million per year based on the Social Cost of Carbon.[45]  The licenses also include 9,100 megawatts of pumped storage capacity, which accounts for 38 percent of the nation's total energy storage capacity, which is 400 percent more energy storage capacity than that of all battery installations constructed from 2010 to 2020.[46]

The nation has a vital interest in ensuring that Section 401 certifications do not delay the licensing of hydropower and other clean energy infrastructure projects, or overburden them with license requirements that exceed the scope of the water quality protections that Congress intended.  If EPA decides to move forward with the Proposed Rule, NHA and NWHA propose essential revisions to ensure that the final rule is consistent with Section 401 and to avoid re-creating the problems that plagued Section 401 certification decisions for hydropower projects before adoption of the 2020 Rule.

## 2.   OVERVIEW OF THE PURPOSE AND STRUCTURE OF SECTION 401

To provide context for these comments, this section briefly describes the history of Section 401 and EPA's implementing rules, as well as Section 401's purpose and structure.

### 2.1   *History of Section 401 and EPA's Implementing Rules Before the 2020 Rule*

Section 401's certification requirement predates the substantial 1972 amendments to the Federal Water Pollution Control Act (FWPCA), which became the CWA.  Congress originally enacted the certification requirement as part of the Water Quality Improvement Act of 1970.[47]  As enacted in 1970, the predecessor to Section 401 was designated as Sections 21(b)-(d) of the FWPCA.  Before the 2020 Rule, EPA's most recent, and only, Section 401 rule had been

---

[42] *See id.*; The White House, *Fact Sheet:  The American Jobs Plan* (Mar. 31, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/31/fact-sheet-the-american-jobs-plan/.

[43] FERC, Hydropower Primer:  A Handbook of Hydropower Basics at 3.

[44] National Hydropower Association, *13 GWs of Hydropower at Risk*, https://www.hydro.org/wp-content/uploads/2021/07/NHA-Hydro-Relicensing-by-2030-Fact-Sheet.pdf (last accessed Aug. 3, 2022).

[45] *Id.*

[46] *Id.*

[47] Pub. L. No. 91-224, § 103, 84 Stat. 91, 107-10 (1970).

promulgated in 1971 and was based on the provisions of the 1970 predecessor to Section 401.[48]
When Congress enacted the CWA in 1972, it carried over the certification requirement as
Section 401 with several substantial revisions.[49]  Apart from minor revisions in 1977,
Section 401 has remained unchanged since 1972.  Until 2020, however, EPA had not updated its
1971 rules to reflect these statutory revisions.

The 1972 revisions reworded the required certification and, through the new Subsection 401(d),
added express authority to condition certifications.  The certification language was revised as
follows:

> Any applicant for a Federal license or permit to conduct any activity . . . which
> may result in any discharge into the navigable waters ~~of the United States~~, shall
> provide the licensing or permitting agency a certification from the State in which
> the discharge originates or will originate . . . ~~that there is reasonable assurance, as
> determined by the State . . . that such activity will be conducted in a manner
> which will not violate applicable water quality standards~~ that any such discharge
> will comply with the applicable provisions of sections 1311, 1312, 1313, 1316,
> and 1317 of this title.[50]

There are three differences in the wording of the 1970 certification requirement and the current
requirement under Section 401.  First, whereas the 1970 version required certification of the
"activity" for which the federal license or permit was sought, Section 401 now requires
certification only of the "discharge" that results from the activity.  Second, whereas the 1970
version required certification that there is "reasonable assurance" of compliance, Section 401
now requires certification that the discharge "will comply."[51]  Finally, whereas the 1970 version
required certification of compliance with "applicable water quality standards," Section 401 now
requires certification that the discharge will comply with "sections 1311, 1312, 1313, 1316, and
1317 [CWA Sections 301-03, 306-07]."  These CWA sections require point source discharges of
pollutants to comply with instream water quality standards and various pollution control
technology standards, such as "best available technology economically achievable."[52]

The revised certification language reflected the new emphasis in the CWA on controlling and,
where feasible, eliminating point source discharges of pollutants, rather than the previously

---

[48] *See* 36 Fed. Reg. 22,487 (Nov. 25, 1971).

[49] Pub. L. No. 92-500, § 2, 86 Stat. 816, 877 (1972).

[50] *Id.*

[51] But see the discussion below in Section 3.4.3 of these comments, which explains why this change in wording was
not intended to establish a different evidentiary standard for certifications.

[52] *See, e.g.*, 33 U.S.C. §§ 1311(b)(1)(C) (requiring discharge limits to achieve water quality standards, including
standards established pursuant to CWA Section 303(c)), 1313(c), 1311(b)(2) (requiring discharge limits based on
implementing various levels of pollution control technology), 1316(a)(1) (requiring discharge limits for certain new
sources based on implementing "best available demonstrated control technology").

diffuse and ineffective efforts of the FWPCA to achieve water quality standards.[53]  Thus, the required certification is of the "discharge," not the entire "activity" for which a federal license or permit is sought.  Similarly, the certification is that the discharge will comply with CWA Sections 301, 302, 303, 306, and 307,[54] all of which regulate only point source discharges.[55]

The new Subsection 401(d), which expressly authorized certification conditions, also focused on point source discharges.  It authorized conditions as

> necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with any other appropriate requirement of State law set forth in such certification . . . .[56]

Although "other appropriate requirement of State law" is not defined, the CWA sections referenced in Subsection 401(d) all establish or provide for effluent limits on point source discharges.  The phrase "other appropriate requirement[s] of State law," then, could only have been intended by Congress to refer to state requirements for point source discharges that are similar to those in the CWA.

## 2.2   Section 401 Does Not Preempt State or Tribal Law or Limit State or Tribal Authority Under Other Federal Laws or Other Provisions of the CWA

Importantly, neither Section 401 nor any other provision of the CWA preempts or otherwise limits the application of state or tribal law or limits state or tribal authority under other federal

---

[53] The regulatory heart of the CWA is Subsection 301(a), which provides:  "Except as in compliance with this section [1311] and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title [the CWA], the discharge of any pollutant by any person shall be unlawful."  33 U.S.C. § 1311(a).  The CWA defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source."  *Id.* § 1362(12).

[54] 33 U.S.C. §§ 1311-13, 1316-17.

[55] CWA Section 301 requires "effluent limitations for point sources" to implement pollutant discharge control technology requirements set forth in that section, *see* 33 U.S.C. § 1311(b), and as "necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations . . . or any other Federal law or regulation, or required to implement any applicable water quality standard established pursuant to this chapter [the CWA]," *id.* § 1311(b)(1)(C).  CWA Section 302 authorizes EPA to establish effluent limitations for "discharges of pollutants from a point source or group of point sources" as needed to protect water quality.  *See id.* § 1312(a).  CWA Section 303 requires the establishment of water quality standards, *see id.* § 1313, which are implemented through "effluent limitations for point sources" pursuant to CWA Section 301, *see id.* § 1311(b)(1)(A).  CWA Section 306 requires EPA to establish discharge limits for categories of new point source discharges based on "best available demonstrated control technology."  *See id.* § 1316(a)(1), (b).  And CWA Section 307 authorizes EPA to establish point source discharge limits for toxic pollutants.  *See id.* § 1317(a).

[56] 33 U.S.C. § 1341(d).

laws.[57]  Section 401, then, is not the only means by which states and tribes may protect water quality or address other environmental, economic, or social concerns.  Insofar as the CWA is concerned, states and tribes may choose to enact and implement laws that protect water quality more expansively than the CWA or that address any other issue of concern.  States and tribes may also exercise their authorities under other federal environmental laws, such as the Clean Air Act[58] and Coastal Zone Management Act.[59]  In addition, states and tribes may regulate activities through authority delegated to them under CWA provisions other than Section 401, such as the National Pollutant Discharge Elimination System (NPDES) permitting program.[60]  Regardless of how narrowly or expansively Section 401 is interpreted, neither it nor the 2020 Rule limits, in any way, the authority of states and tribes to regulate any activity under state or tribal law, other federal laws, and other provisions of the CWA.

### 2.3    Section 401 Is a Limited Authorization to States and Tribes to Certify and Condition Federal Licenses and Permits for the Protection of Water Quality from Discharges

Section 401 authorizes states and tribes to certify and place conditions on federal licenses and permits for the specific purpose of allowing them to ensure that point source discharges that result from the federally licensed or permitted activities will comply with CWA Sections 301, 302, 303, 306, and 307 and similar requirements of state and tribal law.  But Section 401 is not a regulatory program like the NPDES and dredged and fill material permit programs under CWA Sections 402 and 404, respectively.[61]  This is evident from Section 401's waiver provision. Under Paragraph 401(a)(1), a state or tribe may, in its unfettered discretion, waive certification— and some states and tribes do, either in individual cases or for certain types of projects.[62]  At least insofar as Section 401 is concerned, a state or tribe need not explain its waiver decision, and there is no appeal from the decision.[63]  Nor does the applicant, if there is a waiver, need to obtain a certification from any other entity or provide any further explanation to the federal licensing or permitting agency.

---

[57] *See id.* § 1370.

[58] *See, e.g.*, 42 U.S.C. §§ 7410 (air quality implementation plans), 7661a (Title V air emissions permitting program).

[59] *See, e.g.*, 16 U.S.C. §§ 1455b (coastal zone management programs), 1456(c) (requirements for federal consistency with state coastal zone management programs).

[60] *See* 33 U.S.C. § 1342.

[61] *See id.* §§ 1342, 1344.

[62] *See, e.g.*, Terror Lake Hydroelectric Project, FERC Project No. 2743 (Alaska DEC, June 3, 2015 letter waiving certification).

[63] State or tribal law may restrict a state or tribal certifying authority's discretion to voluntarily waive certification, but nothing in CWA Section 401 constrains that discretion.

Similarly, a certification and any accompanying conditions have no legal effect under the CWA until and unless a federal license or permit is issued and incorporates its conditions.[64]  There is no mechanism under the CWA to give effect to a certification decision independently of the federal license or permit.  If the applicant does not proceed with its federal application, or if the application is denied, the certification and its conditions have no effect.  Certification conditions also have no effect pending the issuance of the federal license or permit.[65]

**2.4    *Expanding the Scope of Section 401 Beyond the Effects of Discharges on Water Quality Would Undermine FERC's Comprehensive Authority to Regulate Nonfederal Hydropower Projects***

Section 401's limited grant of federal authority to states and tribes to certify and condition federal licenses and permits is intended to enable a state or tribe, if it chooses, to ensure for itself that point source discharges from federally licensed or permitted activities meet the point source discharge requirements of the CWA and similar state requirements.  But certification decisions that address issues beyond the specific requirements identified in Section 401 necessarily undercut the scope of the exclusive authority that Congress has delegated to federal agencies to address those issues.  The more broadly the scope of Section 401 is construed, the more limited will be the exclusive authority of the federal agency.

As discussed in Section 1.2, above, one such federal law that preempts state law is the FPA.  Through the FPA, Congress has granted FERC the exclusive authority to license nonfederal hydropower projects.  The FPA sets forth the national interests that FERC must consider and balance in issuing a license.  It also includes limited authorizations to other federal agencies to prescribe license conditions within their specific areas of expertise.[66]  Section 401, although not part of the FPA, is also a limited grant of authority to the states and authorized tribes to prohibit or condition the issuance of a federal license or permit as necessary to ensure compliance with specified sections of the CWA and similar state or tribal requirements.

Care must be taken in construing the scope of Section 401 because that scope directly and inversely affects the scope of the exclusive authority that Congress has granted to federal agencies such as FERC under the FPA.  Section 401 must be interpreted to provide states and tribes with all the authority that Congress intended to grant them, but it is also important not to adopt an expansive interpretation that undermines the exclusive authority that Congress intended to assign to FERC and other federal agencies.  For example, the FPA directs FERC to balance the interests of power development, flood control, irrigation, water supply, fish and wildlife protection, and other national public interests when issuing licenses to hydropower projects.[67]  In arriving at this balance, FERC must consider, but is not required to adopt, the recommendations

---

[64] *See* 33 U.S.C. § 1341(a)(1), (d).

[65] For example, the CWA's enforcement section, Section 309, does not mention Section 401, much less authorize the enforcement of certification conditions.  *Id.* § 1319.

[66] *See* 16 U.S.C. §§ 797(e), 811.

[67] *Id.* § 797(e).

of state fish and wildlife, recreation, and other agencies.[68]  If FERC rejects the recommendations as not in the national public interest, state Section 401 certifying authorities have often made the rejected recommendations conditions of their Section 401 certifications because FERC has no choice but to include those conditions in the license.[69]  An expansive interpretation of the scope of Section 401 can thereby become a mechanism to undermine Congress's express directive in the FPA that FERC has the exclusive authority to balance these competing interests.[70]

## 2.5    The 2020 Rule Is Consistent with the Text and Purpose of Section 401 and Provides Needed Clarity

The 2020 Rule interprets and applies Section 401 in a manner that is faithful to its text and purpose and the cooperative federalism principles that underlie the CWA.  Consistently with Section 401, the 2020 Rule provides states and tribes with broad authority to ensure that discharges from federally licensed or permitted activities are consistent with the water quality requirements of the CWA and similar state and tribal regulations.  But also consistently with Section 401, the rule does not expand the scope of certification authority to issues other than the water quality effects of discharges, which would diminish the scope of the exclusive authority that Congress has assigned to FERC under the FPA to regulate nonfederal hydropower projects.[71]  In addition, the rule's clarification of the proper scope of Section 401 is consistent with the time that Congress has allocated to certifying authorities to act on certification requests.  An expansive interpretation of the scope of Section 401 would be inconsistent with Congress's directive that certification decisions be made within a reasonable time that does not exceed one year.  Congress has made clear that it intends the broader issues associated with the relicensing

---

[68] *Id.* § 803(a), (j).

[69] *See, e.g.*, *PacifiCorp*, 168 FERC ¶ 62,175 at P 51 (2019) (concluding that a state minimum flow recommendation was unjustified but nonetheless incorporating the recommendation into the license because it was also a condition of the state's Section 401 certification).

[70] As FERC explained to Congress before the adoption of the 2020 Rule:  "State water quality certifications now impose a wide array of requirements on projects, without any obligation to take into account the benefits of hydropower or other competing interests, or to concern themselves with whether their requirements duplicate or conflict with those imposed by the Commission or other agencies.  Most troublesome are the conditions controlling minimum instream flows, as these flows have a direct impact on a project's power generation and economic viability."  FERC, Report on Hydroelectric Licensing Policies, Procedures, and Regulations:  Comprehensive Review and Recommendations Pursuant to Section 603 of the Energy Act of 2000 at 16 (May 2001).  And more recently:  "Even after the Commission staff has completed analysis of a hydroelectric project and is ready to take final action on the application, the case may be delayed, sometimes for years, until the issuance of a water quality certification under the Clean Water Act."  *Hearing on Discussion Drafts Addressing Hydropower Regulatory Modernization and FERC Process Coordination under the Natural Gas Act Before the H. Comm. on Energy & Commerce* at 7 (May 13, 2015) (testimony of Ann Miles, Director, FERC Office of Energy Projects).

[71] Again, if the federal licensed or permitted activity is not subject to federal preemption—for example, a U.S. Army Corps of Engineers permit for the discharge of dredged or fill material under CWA Section 404, 33 U.S.C. § 1344—states and tribes have the ability to fully regulate the licensed or permitted activity under state or tribal law, regardless of the extent of their authority to certify or condition the license or permit under Section 401.

of hydropower projects to be addressed comprehensively by FERC under the FPA and other applicable federal statutes.[72]

For these reasons, NHA and NWHA continue to urge EPA to retain the 2020 Rule without substantial modifications.  Retaining the 2020 Rule would help ensure that new and existing hydropower projects and other clean energy sources can be licensed expeditiously and efficiently to achieve the nation's ambitious climate, energy, and water quality objectives.

## 3.   COMMENTS ON THE PROPOSED RULE

To the extent that EPA intends to move forward with the Proposed Rule, NHA and NWHA's comments on the specific provisions of the Proposed Rule are set forth below.  NHA's and NWHA's members have extensive experience with the Section 401 certification process, and these comments are informed by that experience.

### 3.1     The Scope of Certification Under Section 401 Is Limited to the Compliance of Discharges with Applicable Federal, State, and Tribal Water Quality Requirements

The Proposed Rule would dramatically and inappropriately expand the 2020 Rule's scope of certification in two ways.  First, as explained in Section 3.1.1 of these comments, it would expand the scope of activities subject to certification from the "discharge" that triggered the need for certification to "the activity as a whole."[73]  Second, as explained in Section 3.1.2, it would expand the legal requirements that may be the basis for certification decisions from the CWA sections specified in Section 401 and "state and tribal regulatory requirements for point source discharges" to "any other water quality-related requirement of state or tribal law."[74]

EPA should not adopt the proposed expansion of the scope of certification.  The proposal is inconsistent with the unambiguous text of Section 401, is not needed to protect water quality, and would diminish FERC's exclusive authority to regulate nonfederal hydropower projects under the FPA.  EPA should adhere to the scope of certification under the 2020 Rule.

If, however, EPA chooses to expand the scope of certification, the final rule should include clear and meaningful limits on that scope.  In particular, the scope of certification should not extend to activities beyond those that would be authorized by the federal license or permit for which certification is required, and certification should be limited to the direct effects of those activities on the quality of waters of the United States.

---

[72] *See* 16 U.S.C. §§ 796(2), 797(e), 803(a), 803(j), 811 (FPA); 16 U.S.C. §§ 1451-1466 (CZMA); 16 U.S.C. §§ 1531-1544 (ESA); 42 U.S.C. §§ 4321-4370m-12 (NEPA); 54 U.S.C. §§ 300101-307108 (NHPA); 18 C.F.R. §§ 5.18(b)(3), 5.25; *California*, 495 U.S. 490; *First Iowa Hydro-Elec. Coop.*, 328 U.S. 152.

[73] *Compare* 40 C.F.R. § 121.3 *with* 87 Fed. Reg. at 35,378 (proposed 40 C.F.R. § 121.3).

[74] *Compare* 40 C.F.R. §§ 121.1(n), 121.3 *with* 87 Fed. Reg. at 35,377-78 (proposed 40 C.F.R. §§ 121.1(m), 121.3).

*3.1.1   The scope of certification is limited to discharges, not the activity as a whole.*

Paragraph 401(a)(1) requires that "[a]ny applicant for a Federal license or permit to conduct any activity . . . which may result in *any discharge into the navigable waters*, shall provide the licensing or permitting agency a certification . . . that *any such discharge* will comply with the applicable provisions of [CWA Sections 301, 302, 303, 306, and 307]."[75]  This language unambiguously limits the scope of certification to any discharge that may result from the federally licensed or permitted activity.  The 2020 Rule adheres to the statutory text by providing, "The scope of a Clean Water Act section 401 certification is limited to assuring that a *discharge* from a Federally licensed or permitted activity will comply with water quality requirements."[76]

Nonetheless, the Proposed Rule would expand the scope of certification to "whether *the activity as a whole* will comply with all applicable water quality requirements."[77]  It would define "activity as a whole" as "any aspect of the project activity with the potential to affect water quality."[78]  The preamble to the Proposed Rule seeks to justify this exceptionally broad scope of certification by arguing that (1) Section 401 is ambiguous with respect to whether certification is limited to discharges and (2) a broad scope is necessary to implement Congress's intent to protect water quality.[79]  Neither of these arguments is correct.  The text of Section 401 is unambiguous in limiting certification to the discharges that may result from a federally licensed or permitted activity.  Moreover, even if the text were ambiguous, a broader scope of certification is not necessary to protect water quality.  Section 401 does not preempt state or tribal authority to protect water quality under state or tribal law, and, in the limited circumstances in which state or tribal authority is preempted by other federal laws, such as the FPA, the federal agency has the comprehensive authority to ensure the protection of water quality and other environmental objectives.  Indeed, the principal effect of the Proposed Rule's expanded scope of certification would be to substantially diminish the scope of FERC's exclusive authority under the FPA to license nonfederal hydropower and other energy projects.

3.1.1.1   Section 401 unambiguously limits certification to discharges.

Notwithstanding the clear language of Paragraph 401(a)(1), the preamble to the Proposed Rule contends that the statute is ambiguous regarding whether the scope of certification is limited to discharges because the word "discharge" does not also appear in Subsection 401(d).  That subsection, which addresses certification conditions, provides:

---

[75] 33 U.S.C. § 1341(a)(1) (emphasis added).

[76] 40 C.F.R. § 121.3 (emphasis added).

[77] 87 Fed. Reg. at 35,378 (proposed 40 C.F.R. § 121.3) (emphasis added).

[78] *Id.* at 35,377 (proposed 40 C.F.R. § 121.(a)).

[79] *See* 87 Fed. Reg. at 35,343-46.

> *Any certification provided under this section* shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any *applicant* for a Federal license or permit *will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title* [CWA Sections 301 and 302], *standard of performance under section 1316 of this title* [CWA Section 306], *or prohibition, effluent standard, or pretreatment standard under section 1317 of this title* [CWA Section 307], and with any other appropriate requirement of State law set forth *in such certification*, and shall become a condition on any Federal license or permit subject to the provisions of this section.[80]

The preamble to the Proposed Rule emphasizes Subsection 401(d)'s reference to requirements necessary to assure that "any applicant . . . will comply."  Because the reference is to the applicant's compliance, rather than the discharge's compliance, the preamble asserts that whether Congress intended to limit the scope of certification to the discharge is ambiguous.[81]  And, given this asserted ambiguity, the preamble opts to interpret Section 401 to require certification of "any aspect of the project activity with the potential to affect water quality," not just the "discharge" for which certification is required by Paragraph 401(a)(1).

Subsection 401(d)'s reference to the applicant's compliance, however, does not create any ambiguity regarding the scope of certification.  The reference indicates only *who* must comply with certification conditions.  It says nothing about *which activities* of the applicant are subject to certification.  By its terms, the subsection applies to conditions for "[a]ny certification provided under this section," which under Paragraph 401(a)(1) is a certification that the "discharge" will comply with the specified sections of the CWA.  In context, the reference to the applicant's compliance can only be a reference to the applicant's compliance with the requirements applicable to the applicant's discharges that are the subject of the certification.

Moreover, the CWA sections for which Subsection 401(d) requires compliance—CWA Sections 301, 302, 306, and 307—regulate only discharges.  Section 301 prohibits "the discharge of any pollutant" without a CWA permit and establishes limits and other requirements for those discharges.[82]  Section 302 requires EPA to establish discharge limits for "a point source or group of point sources" as necessary to ensure that water quality standards are met.[83]  Section 306 provides for the establishment of "standards of performance" for the "discharge of pollutants" from certain new sources.[84]  And Section 307 provides for effluent limitations for toxic pollutants for discharges from "a class or category of point sources," as well as limits on

---

[80] 33 U.S.C. § 1341(d) (emphasis added).

[81] 87 Fed. Reg. at 35,344.

[82] *See* 33 U.S.C. § 1311(a)-(b), (e) ("[e]ffluent limitations established pursuant to this section . . . shall be applied to all point sources of discharge of pollutants"), (f).

[83] *See id.* § 1312(a).

[84] *See id.* § 1316(a)-(b).

discharges into publicly owned sewage treatment plants.[85]  Subsection 401(d) also requires conditions necessary to assure compliance "with any other appropriate requirement of State law," which is not defined in the CWA.  But because the certification requirement in Paragraph 401(a)(1) is expressly limited to discharges, and because the CWA sections listed in Subsection 401(d) regulate only discharges, there is no basis in the text to interpret "appropriate requirement of State law" to refer to any requirements other than those applicable to the discharge being certified.

Other elements of Section 401 are all consistently limited to discharges and do not extend more broadly to the "activity as a whole."  In addition to Paragraph 401(a)(1), which requires certification of the "discharge," Paragraph 401(a)(2) allows a neighboring state or tribe to object to the issuance of the federal license or permit if the "*discharge* will affect the quality of its waters."[86]  Paragraph 401(a)(3) provides that a certification for the construction of a facility fulfills the certification requirement for federal licenses or permits for the operation of the facility unless "there is no longer reasonable assurance that there will be compliance with the applicable provisions of [CWA Sections 301, 302, 303, 306, and 307]."[87]  As discussed above, these CWA sections regulate only discharges.  Similarly, Paragraphs 401(a)(4) and 401(a)(5) provide for the suspension or revocation of the federal license or permit if the facility is operated in violation of these same CWA sections.[88]

Most importantly, Congress's 1972 revisions to the certification requirement changed it from certification that the "*activity* will be conducted in a manner which will not violate applicable *water quality standards*" to certification that the "*discharge* will comply with the applicable

---

[85] *See id.* § 1317(a)-(c).  Paragraph 401(a)(1) also requires certification that the discharge will comply with CWA Section 303, 33 U.S.C. § 1313, which is not listed in Subsection 401(d).  Section 303 requires the establishment of instream water quality standards, but it does not itself require compliance with the standards.  Section 301, however, requires point source discharges to comply with water quality standards established under Section 303.  *See* 33 U.S.C. § 1311(b)(1)(C).  Thus, certification conditions to ensure that discharges comply with Section 301 must necessarily ensure that the discharges comply with water quality standards established under Section 303.

[86] *See id.* § 1341(a)(2) (emphasis added).  Curiously, although the "neighboring jurisdiction" provisions of the Proposed Rule are consistent with Paragraph 401(a)(2) in limiting consideration of the effects on neighboring jurisdictions to the "discharge" from the project or activity, *see* 87 Fed. Reg. at 35,380 (proposed 40 C.F.R. §§ 121.12-121.15), the preamble to the Proposed Rule does not discuss the implications of this paragraph for the scope of certification—even though it does include a relatively detailed discussion of the other Subsection 401(a) paragraphs in this context.

[87] 33 U.S.C. § 1341(a)(3).

[88] *See id.* § 1341(a)(3)-(5).  The preamble to the Proposed Rule argues that these paragraphs support a broader scope of certification because they refer to the compliance of the "construction" and "operation" of the "facility" and "activity" with these sections.  *See* 87 Fed. Reg. at 35,344-45.  But the preamble fails to consider that these sections regulate only discharges.  Moreover, Paragraphs 401(a)(3) through (5) address the continuing accuracy of a certification that is itself expressly limited to discharges.

provisions of [CWA Sections 301, 302, 303, 306, and 307]."[89]  Specifically, the certification language was revised as follows:

> Any applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters ~~of the United States~~, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate . . . ~~that there is reasonable assurance, as determined by the State . . . that such activity will be conducted in a manner which will not violate applicable water quality standards~~ that any such discharge will <u>comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title</u>.

The revised certification language reflected the new emphasis in the CWA on controlling and, where feasible, eliminating point source discharges of pollutants, rather than the previously diffuse and ineffective efforts of the FWPCA to achieve water quality standards.[90]  Not only did Congress expressly limit the certification requirement to the "discharge," rather than the "activity," but the CWA sections for which compliance must be certified regulate only discharges.  In the face of this express change in the certification requirement, it is not reasonable to argue that the scope of certification extends beyond the discharge to the activity as a whole.[91]  That interpretation far exceeds Congress's statutory directive and EPA's authority to interpret Section 401.

3.1.1.2    Expanding the scope of certification from discharges to the activity as a whole is not necessary to protect water quality.

Even if Section 401 did not unambiguously limit the scope of certification to discharges, expanding that scope to the activity as a whole is unnecessary to protect water quality.  It is important to emphasize, as the preamble to the Proposed Rule does not, that nothing in

---

[89] *Contrast* Pub. L. No. 91-224, § 103, 84 Stat. 91, 109 (1970), *with* Pub. L. No. 92-500, § 2, 86 Stat. 816, 877 (1972) (emphases added).

[90] The regulatory heart of the CWA is Subsection 301(a), which provides, "Except as in compliance with this section [1311] and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title [the CWA], the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a).  The CWA defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source."  *Id.* § 1362(12).

[91] In *PUD No. 1 v. Wash Dep't of Ecology*, 511 U.S. 700, 711-12 (1994), the U.S. Supreme Court held that certification conditions could be applied to the "activity as a whole."  In reaching this conclusion, the Court relied on, and deferred to, EPA's 1971 certification rule (40 C.F.R. § 121.2(a)(3) (1993)) and guidance derived from that rule, which required certification that the "activity will be conducted in a manner which will not violate applicable water quality standards."  *See PUD No. 1*, 511 U.S. at 712.  But both the Court majority and the dissent were apparently unaware that Congress had revised the statute in 1972 and that the EPA rule was based on the pre-1972 version of the statute.  Although the preamble to the Proposed Rule characterizes this mistake as one of "minor significance" because EPA is now interpreting Section 401 anew, *see* 87 Fed. Reg. at 35,344 n. 45, the mistake means that the Court's decision cannot be relied on to support the Proposed Rule's broad scope of certification.  Moreover, the Proposed Rule perpetuates the Court's mistake by ignoring and giving no effect to Congress's revision to the statute to expressly limit the scope of certification to discharges.

Section 401 or the CWA limits the authority of states or tribes to protect water quality under their own laws, nor do states or tribes require any authorization under the CWA to protect water quality.  Indeed, CWA Section 510 expressly preserves that authority.[92]  Thus, whatever limits may be placed on the scope of certification under Section 401, those limits do not themselves place any limits on a state's or tribe's ability to regulate an activity to protect water quality under the state's or tribe's own laws.

For example, if EPA issues an NPDES permit to authorize a discharge pursuant to CWA Section 402, the state or tribe may issue a certification under Section 401 that places additional restrictions on the discharge, or the state or tribe may prevent the discharge altogether by denying certification.  But the state or tribe may also, independently of Section 401 and the CWA, regulate or prohibit the discharge, regardless of EPA's issuance of an NPDES permit authorizing it.[93]  Similarly, a state or tribe may, through its authority under Section 401, condition or prohibit the U.S. Army Corps of Engineers' issuance of a CWA Section 404 permit for the discharge of dredged or fill material, but the state or tribe may also independently regulate or prohibit the discharge under its own laws.[94]

The only circumstances in which the scope of certification may influence a state's ability to regulate an activity that affects water quality are those few instances in which some other federal law preempts or restricts the state's regulatory authority over the activity, including hydropower projects licensed by FERC.  But even in those instances, the federal licensing or permitting agency is almost always charged with ensuring protection of water quality after considering the views of the state and other public and private interests.

In the context of FERC hydropower licenses under the FPA, FERC conducts an early scoping process under NEPA to identify all issues associated with the project, including water quality issues.[95]  The license applicant must also prepare and submit a study plan, which FERC must approve after considering the comments and objections of states and other interested parties.[96]  There follows a years-long process of environmental studies during which the state and other interested parties may review and comment on study results, advocate for additional studies and information, and comment on the applicant's licensing proposal.[97]  When FERC finally decides

---

[92] "Except as expressly provided in this chapter [the CWA], nothing in this chapter shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution." 33 U.S.C. § 1370.

[93] *See, e.g.*, 40 C.F.R. § 122.5(c) ("The issuance of a[n NPDES] permit does not authorize any injury to persons or property or invasion of other private rights, or any infringement of State or local law or regulations.").

[94] *See, e.g.*, 33 C.F.R. § 320.4(j) (generally providing for the denial of Corps permits, including Section 404 permits, where the activity that would be authorized is prohibited by other federal, state, or local laws or regulations).

[95] *See* 18 C.F.R. §§ 5.9-5.10.

[96] *See id.* §§ 5.11-5.14.

[97] *Id.* §§ 5.15-5.16.

whether to issue a license, it must "give equal consideration" to both the "power and development purposes for which licenses are issued" and "the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality."[98]  In addition, federal agencies that manage lands on which a hydropower project is located may prescribe license conditions for the protection and use of those lands, including to protect water quality.[99]  FERC must also specifically consider recommendations from the USFWS, NMFS, and state fish and wildlife agencies for the protection of fish and wildlife,[100] and the USFWS and NMFS may prescribe license conditions requiring the construction, maintenance, and operation of "fishways."[101]

Many states understandably seek an expansive scope of certification under Section 401 to overcome federal preemption under other federal laws.  But the appropriate extent of federal preemption is a decision for Congress to make, not EPA.  Where Congress has assigned to FERC comprehensive and exclusive authority to consider and balance national energy and environmental objectives, as it has for nonfederal hydropower projects, EPA must not undermine that congressional decision through an expansive interpretation of the scope of certification that is contrary to the text and purpose of Section 401 and unnecessary to protect water quality.

3.1.2   *The laws and regulations for which certification of compliance is required are limited to the CWA sections listed in Section 401; federal, state, and tribal laws and regulations implementing those sections; and other state and tribal laws and regulations for point source discharges.*

CWA Paragraph 401(a)(1) requires certification of compliance with CWA Sections 301, 302, 303, 306, and 307, and Subsection 401(d) provides for certification conditions "necessary to assure" compliance with these CWA sections and "any other appropriate requirement of State law."[102]  Consistently with these statutory provisions, the 2020 Rule requires certification of compliance with "applicable provisions of §§ 301, 302, 303, 306, and 307 of the Clean Water Act, and state and tribal regulatory requirements for point source discharges into waters of the United States."[103]

By contrast, the Proposed Rule would expand upon the statutory text to require certification of compliance with the listed CWA sections, "any Federal and state or tribal laws or regulations

---

[98] *See* 16 U.S.C. § 797(e).

[99] *See id.* §§ 796(2), 797(e); *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 788 (1984).

[100] 16 U.S.C. § 803(j).

[101] *Id.* § 811.

[102] *See* 33 U.S.C. § 1341(a)(1), (d).

[103] *See* 40 C.F.R. §§ 121.1(n), 121.3.

implementing those sections, *and any other water quality-related requirement of state or tribal law.*"[104]   Moreover, the preamble to the Proposed Rule suggests that it intends "water quality-related" to be interpreted extremely broadly.  Although the preamble notes that "water quality-related" would not encompass certification decisions "based *solely* on potential air quality, traffic, noise, or economic impacts that have *no connection* to water quality,"[105] any connection to water would appear to provide a sufficient nexus under the Proposed Rule.  Such connections could include effects on the designated uses of a waterbody that are not associated with changes in water quality—for example, public access for recreation and changes in water flows that might affect aquatic habitat or recreational or other uses.[106]  Furthermore, the preamble states that, "[i]n the spirit of cooperative federalism, EPA defers to the relevant state or tribe to define which of their state or tribal provisions qualify as appropriate 'State laws' or 'Tribal laws' for purposes of implementing section 401."[107]  This interpretation would leave the scope of certification—and the scope of federal preemption where the state's or tribe's laws would be preempted by other federal laws—largely up to each state or tribe to determine for itself.

The only textual basis for the Proposed Rule's expansive interpretation of certification requirements is Subsection 401(d)'s reference to "any other appropriate requirement of State law."  The statute does not define "appropriate," but the statutory context makes clear that the term includes only those state and tribal requirements applicable to the discharges that are subject to certification—not every requirement that a state or tribe might deem appropriately related to water quality.  As discussed in the preceding section of these comments, the scope of certification extends only to discharges, and the CWA sections listed in Subsection 401(d) regulate only discharges.  In addition, nothing in Section 401 or the CWA limits the authority or ability of states or tribes to protect water quality as they see fit under their own laws and regulations.  Given this narrow focus on discharges, it is inconceivable that Congress intended to substantially repeal FERC's exclusive regulatory authority under the FPA through the phrase "any other appropriate requirement of State law."

### 3.1.3   *Even if EPA chooses to expand the scope of certification beyond the scope specified in the 2020 Rule, the final rule should include clear and meaningful limits on the scope of certification.*

For the preceding reasons, NHA and NWHA strongly believe that the scope of certification set forth in the 2020 Rule should be retained.  But even if EPA concludes that the scope of certification is not limited to discharges and the CWA, state, and tribal statutes and regulations applicable to those discharges, the Proposed Rule does not place any clear or meaningful limits on that scope and, therefore, would far exceed the boundaries of Section 401.  As described in the preamble to the Proposed Rule, a state or tribe could deny or condition certification based on any aspect of the "activity as a whole" and for any reason that the state or tribe deems to have

---

[104] *See* 87 Fed. Reg. at 35,377-78 (proposed 40 C.F.R. §§ 121.1(m), 121.3) (emphasis added).

[105] 87 Fed. Reg. at 35,343 (emphasis added).

[106] *See id.*

[107] 87 Fed. Reg. at 35,349.

any relationship to water quality.  Section 401, however, is not unbounded, and, as a federal statute, its meaning cannot be determined by each state or tribal certifying authority for itself.

If the scope of certification is not limited to discharges and the requirements applicable to those discharges, the final rule should, for clarity and some consistency with Section 401, include at least the following limitations on the scope of certification.

> 3.1.3.1    The scope of certification should be limited to the activities authorized by the federal license or permit for which the certification is required.

Certification decisions and conditions should at least be limited to the activities authorized by the federal license or permit for which certification is required.[108]  This limitation follows directly from the structure of Section 401.  Unlike permits that authorize activities, a Section 401 certification cannot itself authorize any activity.  Rather, it is a certification of compliance with specified legal requirements that is necessary (or must be waived) to issue a federal license or permit.  If the certification is issued with conditions, Subsection 401(d) provides that the conditions "shall become a condition on any Federal license or permit subject to the provisions of this section."[109]  If the federal license or permit is not issued, however, the certification has no legal effect.

Given this tie to federal licenses and permits, the scope of certification can be no broader than the activities authorized by the federal license or permit.  Moreover, a certification denial or certification conditions based on activities other than those authorized by the federal license or permit could not be effectively implemented.  Using the example in the preamble to the Proposed Rule, if certification of an EPA NPDES permit for a discharge from a hydropower facility were to be denied or conditioned based on a feature or activity of the facility other than the discharge, the denial or condition could not be implemented by EPA.[110]  If certification were denied, EPA could not issue the NPDES permit for the discharge, but EPA would not have any authority to address the other aspect of the facility that was the reason for the denial.  Similarly, if a certification condition related to some other aspect of the facility, EPA could not enforce the condition by revoking the permit for the discharge.

Expanding the scope of certification to activities not authorized by the federal license or permit that requires certification would also potentially allow circumvention of Section 401's requirement that certification decisions be made within one year.  For example, suppose that a FERC license for a hydropower project requires the construction of fish passage facilities that will, in turn, involve discharges of dredged or fill material that will require a CWA Section 404 permit from the U.S. Army Corps of Engineers.  A Section 401 certification would have been required for the FERC license and will be required for the Corps' Section 404 permit.  If the scope of certification for the discharge authorized by the Section 404 permit, however, included

---

[108] The preamble to the Proposed Rule specifically requests comment on this issue.  87 Fed. Reg. at 35,346.

[109] 33 U.S.C. § 1341(d).

[110] 87 Fed. Reg. at 35,346.

aspects of the hydropower project other than the discharge authorized by the Section 404 permit, the certification could impose additional requirements on other aspects of the hydropower project long after the one-year period for issuing the original certification and long after the FERC license was issued.  Indeed, if the scope of certification is not limited to the activities authorized by the federal license or permit at issue, there may be no clear limit on what constitutes "the activity as a whole."  Certification denials and conditions could be based on any activity of the "applicant," even those involving wholly separate projects owned or operated by the applicant.

To avoid these unreasonable results and maintain some consistency with Section 401, the final rule should clearly limit the scope of certification to the activities authorized by the federal license or permit for which the certification is required.

>    3.1.3.2    The scope of certification should be limited to the water quality effects of the activities that require certification.

Section 401's requirement that discharges be certified to comply with the CWA is in keeping with the CWA's ultimate "national goal that the discharge of pollutants into the navigable waters be eliminated by 1985."[111]  The CWA's stated "interim goal," however, is "that wherever attainable, . . . *water quality which provides for* the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983."[112]  As the emphasized language shows, the interim objective of the CWA is not to directly protect fish, shellfish, wildlife, and recreation, but to achieve a level of *water quality which provides for* the protection and propagation of fish, shellfish, wildlife, and recreation.  The examples included in the preamble to the Proposed Rule, however, suggest that the scope of certification includes direct protection of these uses of water, rather than protection of water quality sufficient to support these uses.[113]  These examples reflect a scope of certification that exceeds the scope of the CWA, even if Section 401 were not limited to discharges.  The final rule should clearly limit the scope of certification to the water quality effects of the certified activities.

The preamble to the Proposed Rule states:

> [S]ome [certification] conditions that stakeholders have identified as potentially problematic may, in fact, be appropriate as necessary to prevent adverse impacts to a state's or tribe's water quality. Depending on the circumstances, examples of conditions that might be appropriate to include in a state or tribal certification to comply with water quality requirements could be: building and maintaining fish passages (related to protecting designated uses); the construction of public access for fishing (related to protecting recreational/fish consumption designated uses); maintaining

---

[111] 33 U.S.C. § 1251(a)(1).

[112] *Id.* § 1251(a)(2) (emphasis added).

[113] *See* 87 Fed. Reg. at 35,343.

minimum flow rates for visual, auditory, and religious experiences (related to protecting designated uses); compensatory wetland and riparian mitigation (related to protecting designated uses and criteria); temporal restrictions on activities to protect sensitive aquatic species (related to protecting designated uses); pre-construction monitoring and assessment of resources (related to protecting designated uses and criteria); habitat restoration (related to protecting designated uses and criteria); construction of recreation facilities to support designated uses (*e.g.*, whitewater release for kayakers, canoe portages, parking spaces) (related to protecting designated uses); . . . .  For these and other potentially qualifying conditions, EPA believes that it is appropriate for the certifying authority to consider the broadest possible range of water quality effects and that the appropriateness of any given condition will depend on an analysis of all relevant facts.[114]

The problem with these examples is that they are directly concerned with the protection of the uses of water, rather than protecting water quality that provides for the uses.  Neither the goals nor the regulatory requirements of the CWA protect aquatic life and recreation directly.  If fish are absent from a waterbody because of overfishing, or if there is no recreation on or in a waterbody because of a lack of access, there is nothing in the CWA that addresses these problems.  The CWA is concerned instead with restoring and maintaining "water quality which provides for" these uses, so that if other measures eliminate the overfishing and provide access, the quality of the water will be sufficient to support the fish and recreation.[115]  The scope of certification reflected in the preamble examples exceeds the scope of the CWA.[116]

There are many examples of Section 401 certification conditions from the period before EPA's adoption of the 2020 Rule that have little or nothing to do with the water quality effects of certified activities or, in some instances, nothing to do with the certified activities at all.  Among these are conditions requiring the project proponent to:

---

[114] *Id.*

[115] NHA and NWHA recognize that water quality standards established pursuant to CWA Section 303 include designated uses, such as aquatic life and recreation.  *See* 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. §§ 131.3(i), 131.10.  The designated uses, however, serve as the basis for establishing narrative and numeric "water quality criteria that protect the designated use," including "the most sensitive use."  40 C.F.R. § 131.11(a)(1).

[116] Some of the preamble examples omitted from the quote in the text of these comments may be consistent with the protection of water quality.  "[T]ree planting along waterways" may, as the preamble observes, be relevant to shading the water to ensure that certified activities do not warm the water inconsistently with applicable water quality criteria.  *See* 87 Fed. Reg. at 35,343.  And "spill management and stormwater management plans" may be needed to ensure that certified activities do not introduce pollutants into the water to levels that would be inconsistent with applicable water quality criteria.  *See id.*

- Support a feral hog task force and allow state access to the project area to trap and kill feral hogs.[117]

  Other certification conditions addressing similar terrestrial or aquatic wildlife issues unrelated to project effects on water quality have included:

  - Fund annual rearing and planting of resident fish in non-project waterbodies;[118]
  - Make financial contributions to a non-governmental organization for habitat improvements or fish stocking in the project watershed;[119]
  - Develop and implement an invasive species management and monitoring plan;[120]
  - Evaluate amphibian and reptile habitat and develop a species presence monitoring plan;[121]
  - Study the hybridization of trout in the project area, including collecting tissue samples for genetic analysis;[122]
  - Increase the sturgeon population "to levels commensurate with available habitat and levels that would support harvest";[123] and
  - Assess juvenile lamprey habitat and study lamprey distribution, population status, and juvenile out-migration timing.[124]

- Construct and enhance public recreational facilities, including biking and hiking trails, parking, signage, boat access, portage routes, sanitary facilities, and trash receptacles.[125]

---

[117] *Ameren Missouri*, 148 FERC ¶ 62,059 (July 17, 2014).

[118] *City of Seattle, Washington*, 142 FERC ¶ 62,231 (Mar 20, 2013).

[119] *Wisconsin Elec. Power Co.*, 170 FERC ¶ 62,039 (Jan 17, 2020).

[120] *Id.*

[121] *Id.*

[122] *PacifiCorp Energy*, 158 FERC ¶ 62,006 (Jan 5, 2017).

[123] *Pub. Util. Dist. No. 1 of Chelan Cnty., Wash.*, 126 FERC ¶ 61,138 (Feb 19, 2009).

[124] *Portland Gen. Elec. Co.*, 133 FERC ¶ 62,281 (Dec 21, 2010).

[125] *W. Penn Power Co.*, 69 FERC ¶ 62,253 (Dec 27, 1994).

Other certification conditions similarly requiring enhancements to public recreational opportunities and facilities unrelated to project effects on water quality have included:

- Make annual payments for maintaining and enhancing public recreational facilities on non-project lands;[126]
- Pay for improvements and enhancements to a recreation site for improved public boating access;[127]
- Release water to enhance boating opportunities;[128]
- Develop and maintain public websites with information on stream flow rates and reservoir levels;[129]
- Investigate introducing into project waters new fish species for recreational fishing;[130] and
- Pay for annual fish stocking.[131]

- Fund full-time sediment and erosion control specialists for the counties surrounding the project.[132]

Other certification conditions wholly unrelated to project effects on water quality have included:

- Actively manage sediment input into a project's reservoirs from upstream sources;[133]
- Donate or lease to the certifying state parcels of undeveloped, non-project land bordering a river and place restrictive covenants on non-project lands;[134]
- Provide fish samples to the certifying state for testing of contaminants unrelated to the project;[135] and

---

[126] *Duke Energy Carolinas, LLC*, 138 FERC ¶ 62,093 (Feb 8, 2012).

[127] *Portland Gen. Elec. Co.*, 133 FERC ¶ 62,281 (Dec 21, 2010).

[128] *Id.*

[129] *Duke Energy Carolinas, LLC*, 138 FERC ¶ 62,093 (Feb 8, 2012).

[130] *Utah Power & Light Co.*, 40 FERC ¶ 61,139 (Aug 3, 1987); *PacifiCorp*, 86 FERC ¶ 62,054 (Jan 26, 1999).

[131] *Id.*

[132] *Appalachian Power Co.*, 129 FERC ¶ 62,201, at P 64581–82 (Dec 15, 2009).

[133] *Avista Corp.*, 130 FERC ¶ 62,177 (Mar 2, 2010).

[134] *FPL Energy Maine Hydro, LLC*, 106 FERC ¶ 62,021 (Jan 14, 2004).

[135] *Thunder Bay Power Co.*, 85 FERC ¶ 62,160 (Dec 11, 1998); *Thunder Bay Power Co.*, 93 FERC ¶ 62,225 (Dec 22, 2000).

▪ Dredge project areas where sedimentation from upstream
sources is impeding access, including private access.[136]

Again, nothing in Section 401 or the CWA precludes a state from addressing these issues under
state laws.  And even in the hydropower context, where there is FPA preemption of state laws,
most of these requirements would have been within FERC's licensing authority.  But they are all
well beyond the scope of Section 401 and the CWA generally.  Moreover, interpreting
Section 401 expansively to include authority to impose conditions such as these interferes with
the scope of FERC's exclusive licensing authority, allows certifying authorities to place
unreasonable burdens on hydropower projects to address issues unrelated to water quality, and
contributes to delays in the issuance of licenses.

For these reasons, the final rule should clearly provide that the scope of certification is limited to
the water quality effects of the certified activities.

      3.1.3.3    The scope of certification should be limited to the water quality effects of the
certified activities on waters of the United States.

The CWA protects only "navigable waters," which it defines as "waters of the United States."[137]
CWA Paragraph 401(a)(1) requires certification only for a "discharge into the navigable
waters."[138]  CWA Subsection 301(a) requires permits for, and only imposes requirements on,
discharges to "navigable waters."[139]  CWA Subsection 303(c) requires that states establish water
quality standards only for "navigable waters."[140]  Accordingly, the scope of certification should
be limited to certified activities that affect the quality of waters of the United States.

The Proposed Rule would extend the scope of certification to "any . . . water quality-related
requirement of state or tribal law," and the preamble to the Proposed Rule makes clear that this
would include state or tribal laws applicable to waters other than waters of the United States.[141]
The only textual basis that the preamble gives for including other waters is that
Subsection 401(d) includes "any other appropriate requirement of State law" within the scope of
certification.  As discussed above, however, "appropriate" in this context can only mean state or
tribal requirements applicable to discharges to waters of the United States.  But even if the scope
of certification extends to activities other than discharges, no provision of the CWA applies to
waters other than waters of the United States, and it would be unreasonable to assume that

---

[136] *Duke Energy Corp.*, 87 FERC ¶ 62,182 (May 12, 1999).

[137] 33 U.S.C. § 1362(7).

[138] *Id.* § 1341(a)(1).

[139] *See id.* §§ 1311(a), 1362(12).

[140] *Id.* § 1313(c).

[141] *See* 87 Fed. Reg. at 35,348, 35,377-78 (proposed 40 C.F.R. §§ 121.1(m), 121.3).

Congress implicitly intended that Section 401, and only Section 401, would apply to other waters.[142]

### 3.2    The Statutory Term, "Request for Certification," Is Unambiguous; There Is No Legal Basis for Requiring a Request to Include Any Information Other Than the Request Itself

CWA Paragraph 401(a)(1) provides that, if the certifying authority "fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements . . . shall be waived."[143]  This demonstrates that Congress intended certifying authorities to act promptly on certification requests so as not to delay the issuance of federal licenses and permits.  It also sets forth a clear, objective deadline for acting on requests—no more than one year after receipt of a "request."  As described by the United States Court of Appeals for the Second Circuit:

> The plain language of Section 401 outlines a bright-line rule regarding the beginning of review: the timeline for a state's action regarding a request for certification "shall not exceed one year" after "receipt of such request." It does not specify that this time limit applies only for "complete" applications. If the statute required "complete" applications, states could blur this bright-line rule into a subjective standard, dictating that applications are "complete" only when state agencies decide that they have all the information they need.[144]

In response to concerns that a request for certification might not include all the information needed to certify compliance, the court noted that, if that were the case, the certifying authority could comply with the statute by denying certification for insufficient information.[145]  The applicant has a strong incentive to avoid such a denial by timely submitting the necessary information.  But delaying the start of the period to act on a certification request until all the information that might be needed has been submitted would allow certifying authorities to indefinitely delay acting on the request and would be inconsistent with the "bright-line rule" established by the statute.

The 2020 Rule is generally faithful to the statute by requiring a certification request to include only basic, objective information, such as the identity of the applicant, a description of the federal license or permit and discharge for which certification is sought, and a "description of any methods and means proposed to monitor the discharge and the equipment or measures

---

[142] Again, the CWA, including Section 401, does not preclude a state or tribe from protecting state or tribal waters under state or tribal law.

[143] 33 U.S.C. § 1341(a)(1).

[144] *N.Y. State Dep't of Env't Conservation v. FERC*, 884 F.3d 450, 455-56 (2d Cir. 2018).

[145] *See id.*

planned to treat, control, or manage the discharge."[146]  By contrast, the Proposed Rule is inconsistent with the statute and would undermine the requirement for prompt action on certification requests by, among other things, vaguely and broadly defining the minimum information that must be included in a request, giving the certifying authority unfettered discretion to dictate what additional information must be included in a request, and prohibiting a request until the federal licensing or permitting agency has issued a draft license or permit.

For consistency with Section 401 and to avoid delaying certification decisions, the final rule should not require that a request for certification include any information not already required by the 2020 Rule.  If, however, EPA chooses to require additional information, submission of the license or permit application should be sufficient, as suggested in the preamble to the Proposed Rule.[147]  The application would typically include all or most of the information likely to be needed to act on the request for certification, and the requirement to include it with the request would generally not delay submission of the request.

NHA and NWHA's comments on the specific provisions of the Proposed Rule related to the request for certification are set forth in Sections 3.3, 3.4, and 3.5 of these comments.

### 3.3 The Final Rule Should Not Authorize Certifying Authorities to Dictate the Contents of a Request for Certification or the Manner of Its Submission

The Proposed Rule provides that "[t]he reasonable period of time [for acting on a certification request] shall begin upon receipt of a request for certification," and it would define "receipt" as "the date that a request for certification, as defined by the certifying authority, is documented as received by a certifying authority's applicable submission procedures."[148]  The proposal would give the certifying authority unfettered discretion to define what constitutes a request for certification, and thereby to determine when the reasonable period begins.

The CWA is unambiguous in providing that the period for acting on a certification request begins on the certifying authority's "receipt of such request."[149]  Moreover, the statute does not state or imply that a "request for certification" must be accompanied by any information beyond the request itself.  The plain meaning of "request" is to "ask for," and a "request for certification" is simply to "ask for certification."[150]  Although asking for certification without providing

---

[146] *See* 40 C.F.R. § 121.5(b)-(c).  Even the 2020 Rule, however, deviates from the statute to some extent by requiring the request to include some supporting information beyond the request itself.

[147] *See* 87 Fed. Reg. at 35,336.  Although NHA and NWHA could support the preamble's suggested alternative approach insofar as it would require including the federal license or permit application in the request for certification, NHA and NWHA do not support the other elements of the alternative approach for the reasons described in the text of these comments.

[148] 87 Fed. Reg. at 35,377-78 (proposed 40 C.F.R. §§ 121.1(k), 121.6(a)).

[149] 33 U.S.C. § 1341(a)(1).

[150] *See, e.g.*, *The American Heritage Dictionary of the English Language* 1533 (3d ed. 1992) (defining "request" as "[t]he act of asking" and "[s]omething asked for").

sufficient information to enable the certifying authority to certify compliance with applicable requirements is likely to lead to denial of the request, it is the applicant's responsibility under Paragraph 401(a)(1) to obtain the certification.[151]  The statute does not authorize EPA to specify what information must be included in the request, much less authorize EPA to allow certifying authorities to do so.[152]

Allowing a certifying authority to specify the required contents of a request for certification would also allow it to extend the deadline for acting on it well beyond the statutory maximum of one year.  For example, the certifying authority could describe the required information vaguely or subjectively (*e.g.*, "[a]n exhibit that identifies and describes other requirements of state law applicable to the activity that have any relationship to water quality,"[153] "[a]ny other information the Department determines is necessary,"[154] "adverse impacts of any projects implemented by the applicant within the last five years or planned for implementation by the applicant within the next five years that are in any way related to the proposed activity or that may impact the same receiving water"[155]), which would enable it to deem the request to be insufficient until it was satisfied that it had all the information that it needed.  The certifying authority could also effectively extend the statutory period by requiring the request to include information that is not available when the applicant wishes to submit the request (*e.g.*, an environmental impact statement prepared or approved by the certifying authority[156] or a permit or other approval for the proposed project by another government agency[157]) or by requiring the applicant to submit information in advance of the request for certification (*e.g.*, a draft certification request [158]).  These and similar provisions would be inconsistent with Paragraph 401(a)(1) and frustrate Congress's intent that certification requests be acted on within no more than one year so as not to unduly delay the issuance of federal licenses and permits.

---

[151] *See* 33 U.S.C. § 1341(a)(1) ("Any applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates . . . that any such discharge will comply with the applicable provisions of sections [301, 302, 303, 306, and 307 of the CWA].").

[152] By contrast, Congress authorized a certifying authority to "establish procedures for public notice" of certification requests and "to the extent it deems appropriate, procedures for public hearings" on the request.  33 U.S.C. § 1341(a)(1).  Congress did not provide any similar authority to specify the contents of a certification request or to require that a request be accompanied by any information apart from the request itself.

[153] Or. Admin. R. 340-048-0020(2)(j).

[154] Md. Code Regs. 26.08.02.10.B(1)(g).

[155] Cal. Code of Regs., tit. 23, § 3856(h)(8).

[156] Cal. Code of Regs., tit. 23, § 3856(f) ("[T]he certifying agency shall be provided with and have ample time to properly review a final copy of valid [California Environmental Quality Act] documentation before taking a certification action.")

[157] Or. Admin R. 340-048-0020(4) ("The application is deemed complete when the local planning jurisdiction provides comments to the department, when 60 days have elapsed[.]).

[158] Or. Admin. R. 340-048-0020(5) ("[T]he applicant must submit to the department a draft application for certification no later than one year before the applicant files a final application with [FERC.]").

The final rule should revise the proposed definition of "receipt" to remove the ability of the certifying authority to define a request for certification and to specify the procedures for submitting a request.  For consistency with the plain language of Paragraph 401(a)(1), "receipt" should be defined in the final rule as "the date that a request for certification is received by the certifying authority."

### 3.4    The Final Rule Should Not Require the Request for Certification to Include a Draft of the Federal License or Permit

The Proposed Rule would require a request for certification to "include a copy of the draft license or permit (unless legally precluded from obtaining a copy of the draft license or permit)."[159]  Notwithstanding this qualifier, the preamble to the Proposed Rule suggests that federal licensing and permitting agencies that do not currently make a draft license or permit available to the applicant, or that require submission of a certification request before a draft license or permit has been prepared, would be required to amend their policies or regulations as necessary to allow the applicant to submit the draft with the certification request.[160]  The stated purpose of the proposal is to ensure that the certifying authority has the benefit of the federal agency's preliminary analysis of "the water quality-related conditions and limitations" that may be needed for the proposed activities.[161]

The proposed requirement is fundamentally inconsistent with the purpose and structure of Section 401.  Section 401 requires the applicant for a federal license or permit to provide the federal agency with a certification as part of the licensing or permitting process.  Section 401 allows states and tribes to weigh in on the water quality effects of a discharge that may result from the federally licensed or permitted project.  It is not intended to supplant or second-guess the licensing or permitting process after the federal agency has completed its review.  Rather, Section 401 is intended to allow states and tribes to help craft the license or permit.  It makes no sense to require a federal agency to provide a copy of a draft license or permit to the certifying authority before the certifying authority even begins its review of the certification request.  Under the statute, it is the certification that informs the development and issuance of the federal license or permit, not the other way around.

The proposed requirement also would be inconsistent with the congressional objective of ensuring that the certification requirement does not unduly delay or interfere with the federal licensing or permitting process.[162]  The processes for issuing many federal licenses and permits

---

[159] 87 Fed. Reg. at 35,378 (proposed 40 C.F.R. § 121.5(a)).

[160] *See id.* at 35,333 ("The Agency [EPA] is not aware of any regulatory-based reason why Federal licensing or permitting agencies could not manage their internal procedures so that a certifying authority's 'reasonable period of time' did not begin to run until after it had received a copy of the draft license or permit.").

[161] *See id.*

[162] *See Hoopa Valley Tribe*, 913 F.3d at 1104 ("Congress intended Section 401 to curb a state's dalliance or unreasonable delay."  (internal quotation marks omitted)).

do not include preparation of a draft license or permit, including FERC's hydropower licensing process under the FPA. These processes would need to be revised—some substantially—to accommodate the proposed requirement. For example, FERC's hydropower licensing process requires the applicant to submit a request for certification no later than 60 days after FERC determines that the license application is "ready for environmental analysis."[163] In order to accommodate the proposed requirement to include a draft license with the certification request, FERC would need to amend its process to delay the deadline for submission of the certification request until FERC could develop a draft license based on all the project information included in the license application following FERC's elaborate, years-long license application and study process.[164] Because developing a draft license would require far longer than 60 days after FERC determines that the application is ready for environmental analysis, the applicant's submission of its certification request would be substantially delayed compared to the current process, which would cause a corresponding delay in the issuance of the license.[165] Clearly, Congress did not intend for there to be up to a one-year state review process after a federal agency has completed its evaluation and developed a draft license or permit.

The proposed requirement to include a draft license or permit in the request for certification also raises several questions related to differences between the final license or permit and the draft provided to the certifying authority—questions that the Proposed Rule does not address and that the preamble to the Proposed Rule does not discuss. For example, if the federal agency wishes to deviate from the draft, must a revised draft be submitted with a new request for certification? One of the principal justifications provided in the preamble for including a draft license or permit in the request for certification is to enable the certifying authority to rely on the draft license or permit conditions in lieu of including those conditions in the certification.[166] If the final license or permit omits the conditions or revises them, can the certifying authority revoke its certification on the ground that it detrimentally relied on the draft? To avoid such detrimental reliance, a certifying authority might include a certification condition that automatically voids or revokes the certification in the event that the final license or permit differs from the draft

---

[163] *See* 18 C.F.R. §§ 5.22(a)(2), 5.23(b)(1).

[164] *See generally* 18 C.F.R. part 5. This process is summarized in Section 1.3 of these comments.

[165] This delay would be unlikely to be offset by any reduction in the time for the certifying authority to act on the certification request. Under FERC's rules, the certifying authority has the full year allowed by CWA Paragraph 401(a)(1) to act on a request for certification. Consistently with the Proposed Rule, FERC could modify its rules to reduce this period to 60 days, *see* 87 Fed. Reg. at 35,378 (proposed 40 C.F.R. § 121.6(c)), but it is unreasonable to believe that certifying authorities would be able to reduce the time required to act on a certification request for a FERC hydropower license from one year to 60 days simply because a draft license is included in the certification request. Because of the lengthy license application and study process required by FERC's rules, in which the certifying authority is encouraged to participate to ensure that its information needs are met, *see* 18 C.F.R. §§ 5.1(d), 5.9-5.16, the certifying authority will already have a wealth of information to support the certification request by the time the license application is complete. FERC's opinion on that information, in the form of a draft license, would not sufficiently aid the certifying authority to justify the delay in submitting the certification request. If FERC were to amend its rules to give the certifying authority only 60 days to act on a certification request instead of the current one year, the result would almost certainly be a flood of certification denials for lack of sufficient time to act on the requests.

[166] *See* 87 Fed. Reg. at 35,333.

provided to it.  That would substantially interfere with the federal licensing or permitting process by discouraging the federal agency from issuing a final license or permit that deviates from the draft and, if it does deviate from the draft, by delaying the issuance of the license or permit until the applicant could request and obtain a new certification.  On the other hand, if the certifying authority cannot be certain that the draft license or permit conditions will be included in the final license or permit, it may include them as certification conditions, which would largely defeat the purpose of including the draft in the request for certification.  It would also discourage the federal agency from including conditions in the draft about which it was not certain for fear that it would be forced to include them in the final license or permit through incorporation in the certification.

Because the proposal to require the request for certification to include a draft license or permit is inconsistent with Paragraph 401(a)(1), would substantially delay and interfere with federal licensing and permitting processes, would provide little or no assistance to certifying authorities, and would raise many practical and legal complications that have not been considered in the preamble to the Proposed Rule, the requirement should be omitted from the final rule.

### 3.5   The Final Rule Should Not Require That Certification Requests Include "Any Existing and Readily Available Data or Information Related to Potential Water Quality Impacts from the Proposed Project"

The Proposed Rule would require that all certification requests include "any existing and readily available data or information related to potential water quality impacts from the proposed project."[167]  This requirement should not be included in the final rule because it is inconsistent with Paragraph 401(a)(1) and would delay, not expedite, action on certification requests.

For the reasons discussed in the preceding sections of these comments, Paragraph 401(a)(1) does not state or imply that a "request for certification" must include any information beyond the request itself.  The proposal to require that a request include existing and readily available data or information is inconsistent with the statute and should be removed from the final rule for that reason alone.[168]

The proposed requirement would also serve only to delay action on a certification request.  It is in the applicant's interest to provide the certifying authority with all readily available information concerning the water quality effects of the activities that require certification so that the certifying authority can timely issue the requested certification.  There is no need to require that the request include the information in order to benefit the applicant.  There is also no need to require the information to protect the interests of the certifying authority.  If the certifying authority actually has insufficient information, it can deny the request for certification and thereby force the applicant to submit a new request.  The practical effect of requiring the information to be included in the request, however, is to invite disputes regarding whether the

---

[167] *See id.* at 35,378 (proposed 40 C.F.R. § 121.5(a)).

[168] The proposed requirement also exceeds the scope of Section 401 insofar as it would require information related to the potential water quality effects from the proposed project, rather than being limited to the water quality effects of the discharges for which certification is required.

request is complete and has thereby initiated the period within which the certifying authority must act on the request.  These disputes delay action on certification requests and create a risk to the certifying authority of unintentionally waiving certification.[169]

The better approach would be to retain the 2020 Rule's clear and objective definition of a certification request, which establishes a clear and transparent deadline for the certifying authority to act on the request.  Having a clear deadline benefits the applicant and the federal agency by establishing clear expectations for timely action on the request and benefits the certifying authority by reducing the risk of an inadvertent waiver of certification and by encouraging the applicant to timely respond to information requests.

### 3.6    If EPA Nonetheless Believes That Additional Information Should Accompany a Request for Certification, the 2020 Rule Could Be Amended to Require Inclusion of the Application for the Federal License or Permit

The 2020 Rule's definition of a certification request is consistent with Paragraph 401(a)(1) and establishes a clear and transparent deadline for action on certification requests.  Nonetheless, if EPA believes that additional information should be included in certification requests, the 2020 Rule could be amended to require inclusion of the application for a federal license or permit.  Requiring inclusion of the application would ensure that the certifying authority has the information that the applicant has submitted to the federal licensing or permitting agency.  In the case of hydropower license applications to FERC, this includes extensive information on the water quality effects of the project that is developed through an elaborate and lengthy process that includes the certifying authority.[170]  Requiring inclusion of the federal license or permit application would also provide a clear and objective standard for evaluating the sufficiency of the request because there should be little room for disputing what must be included—it would simply be the application submitted to the federal agency.  Requiring submission of the application would also be consistent with Paragraph 401(a)(1)'s assumption that a request for certification will be submitted only in conjunction with an application for a federal license or permit.

### 3.7    NHA and NWHA Support the Proposed Rule's Provisions Related to the Reasonable Period for Acting on Certification Requests

CWA Paragraph 401(a)(1) requires the certifying authority "to act on a request for certification within a reasonable period of time (which shall not exceed one year) after receipt of such request."[171]  Although NHA and NWHA have the concerns described in the preceding section regarding how the Proposed Rule defines the request for certification and the receipt of a request,

---

[169] *See N.Y. State Dep't of Env't Conservation*, 884 F.3d at 455-56 ("If the statute required 'complete' applications, states could blur this bright-line rule [regarding the commencement of the one-year period] into a subjective standard, dictating that applications are 'complete' only when state agencies decide that they have all the information they need.  The state agencies could thus theoretically request supplemental information indefinitely.").

[170] *See generally* 18 C.F.R. part 5.  This process is summarized in section 1.3 of these comments.

[171] 33 U.S.C. § 1341(a)(1).

which initiate the reasonable period, NHA and NWHA otherwise support the Proposed Rule's provisions related to determining and applying the "reasonable period of time."

The Proposed Rule would establish 60 days as the default reasonable period.[172]  The certifying authority could unilaterally extend this period up to the statutory maximum of one year as "necessary to accommodate the certifying authority's public notice requirements or force majeure events (including, but not limited to, government closure or natural disasters)."[173]  The certifying authority and the federal licensing or permitting agency may also agree in writing to extend the reasonable period up to the statutory maximum of one year for any reason.[174]

The proposed provisions are consistent with the statute.  For many federal licenses or permits, including FPA hydropower licenses issued by FERC, 60 days will often be insufficient, but the proposal would allow the certifying authority and the federal agency to agree to a longer period up to the maximum of one year.

### 3.8    NHA and NWHA Generally Support the Proposed Rule's Provisions Related to Certification Conditions, But the Final Rule Should Require That Certification Conditions and Denials Identify the Specific Federal, State, or Tribal Law on Which the Condition or Denial Is Based

The Proposed Rule provides that a certifying authority may act on a certification request in only one of four ways:  granting certification, granting certification with conditions, denying certification, or expressly waiving certification.[175]  These actions must be within the scope of certification and occur within the reasonable period.[176]  In addition, certifications must include "[a] statement that the activity as a whole will comply with water quality requirements"; certification conditions must be accompanied by "[a] statement explaining why each of the . . . conditions is necessary to assure that the activity as a whole will comply with water quality requirements"; and certification denials must include "[a] statement explaining why the certifying authority cannot certify that the activity as a whole will comply with water quality requirements."[177]

Although NHA and NWHA disagree with the Proposed Rule's interpretation of the scope of certification, as explained in Section 3.1 of these comments, NHA agrees that a certifying authority may act on a certification request in only the four ways specified, and that, in doing so,

---

[172] 87 Fed. Reg. at 35,378 (proposed 40 C.F.R. § 121.6(c)).

[173] *See id.*

[174] *See id.* at 35,378 (proposed 40 C.F.R. § 121.6(b), (d)).  If the agreement to extend the reasonable period occurs more than 30 days after the request for certification, the project proponent must first be consulted.  *Id.* (proposed 40 C.F.R. § 121.6(d)).

[175] 87 Fed. Reg. at 35,378 (proposed 40 C.F.R. § 121.7(a)).

[176] *Id.* (proposed 40 C.F.R. § 121.7(b)).

[177] *Id.* (proposed 40 C.F.R. § 121.7(c)(2), (d)(3), (e)(2)).

the certifying authority must act within the scope of certification and within the reasonable period.  NHA and NWHA also accept the clarification in the preamble to the Proposed Rule that the phrase "will comply" is not intended to establish a more stringent evidentiary burden than the former requirement for "reasonable assurance" of compliance.  For consistency with Section 401, however, the final rule should retain the 2020 Rule's requirement that statements explaining certification conditions and denials identify the specific federal, state, or tribal law on which the condition or denial is based.

### 3.8.1   *NHA and NWHA agree with the Proposed Rule that a certifying authority may act on a request for certification only by granting the request, granting the request with conditions, denying the request, or expressly waiving certification.*

Paragraph 401(a)(1) requires a certifying authority "to act on a request for certification, within a reasonable period of time (which shall not exceed one year)."[178]  NHA and NWHA agree with the Proposed Rule that a certifying authority may "act on a request for certification" only by granting or denying the request, expressly waiving certification pursuant to Paragraph 401(a)(1), or granting the request with conditions pursuant to Subsection 401(d).  As explained in the preamble to the Proposed Rule, any action by the certifying authority short of a *final action* to grant, grant with conditions, or deny the request or expressly waive certification would be inconsistent with Paragraph 401(a)(1) and the clear congressional intent expressed in that paragraph to prevent certifying authorities from delaying federal licensing or permitting processes through inaction.[179]

### 3.8.2   *The final rule should retain the 2020 Rule's requirement that statements explaining certification conditions and denials identify the specific federal, state, or tribal law on which the condition or denial is based.*

The Proposed Rule would require certifications with conditions to be accompanied by "[a] statement explaining why each of the . . . conditions is necessary," and it would require certification denials to be accompanied by "[a] statement explaining why the certifying authority cannot certify" compliance.[180]  It would remove the requirements of the 2020 Rule, however, that a certification condition be accompanied by "[a] citation to federal, state, or tribal law that authorizes the condition" and that a certification denial be accompanied by identification of "[t]he specific water quality requirements" that are the basis of the denial.[181]  The Proposed Rule would also remove the requirement of the 2020 Rule that a certification denial based on insufficient information "must describe the specific water quality data or information, if any, that

---

[178] 33 U.S.C. § 1341(a)(1).

[179] *See* 87 Fed. Reg. at 35,350 (rejecting dicta in *North Carolina Department of Environmental Quality v. FERC*, 3 F. 4th 655, 676 (4th Cir. 2021), that suggests that a certifying authority might "act" on a request for certification within the meaning of Paragraph 401(a)(1) by taking "significant and meaningful action" short of final action on the request).

[180] 87 Fed. Reg. at 35,378 (proposed 40 C.F.R. § 121.7(d)(3), (e)(2)).

[181] *See* 40 C.F.R. § 121.7(d)(1)(ii), (d)(2)(ii), (e)(1)(i), (e)(2)(i).

would be needed to assure" compliance.[182]  These requirements of the 2020 Rule should be retained in the final rule.

Paragraph 401(a)(1) requires certification of compliance with CWA Sections 301, 302, 303, 306, and 307, and Subsection 401(d) authorizes certification conditions as "necessary to assure" compliance with these sections and "any other appropriate requirement of State law *set forth in such certification.*"[183]  Because Subsection 401(d) expressly provides that any requirement of state law on which a certification condition is based must be "set forth in" the certification, the final rule should retain the 2020 Rule requirement that certifications with conditions include "[a] citation to federal, state, or tribal law that authorizes the condition."  This requirement imposes little or no burden on a certifying authority because presumably it knows the specific legal requirement for which a certification condition is necessary to assure compliance.  It also benefits both the certifying authority and the applicant in the context of administrative or judicial review of the condition by clearly identifying its legal basis.  And it benefits the federal licensing or permitting agency by helping it to understand the source of the condition when it implements or enforces it as a condition of the license or permit.

Although Paragraph 401(a)(1) does not expressly require certification denials to identify the specific legal basis for the denial or the information that would be needed to certify compliance if the denial is based on insufficient information, these elements of the 2020 Rule should be retained for the practical benefits that it provides to certifying authorities and applicants.  In particular, this information would help applicants to modify their proposals or to obtain the information needed to submit a successful request for certification.

### 3.8.3   *The final rule should retain 40 C.F.R. § 121.6(e).*

The Proposed Rule would eliminate the prohibition on certifying authorities requesting project proponents to withdraw a certification request or take any other action to extend the review beyond one year.  Removing this provision would violate the clear intent and language of the CWA.  Paragraph 401(a)(1) is clear that certifying authorities must take one of the four options available to them "within a reasonable period of time (which shall not exceed one year) after receipt of such request."  There is significant history of certifying authorities taking actions to delay the ruling beyond one year.[184]  Retaining the existing language is an important safeguard to ensure that the review period does not extend beyond the one year specified in the CWA.

---

[182] *See id.* § 121.7(e)(1)(iii), (e)(2)(iii).

[183] 33 U.S.C. § 1341(a)(1), (d) (emphasis added).

[184] *See* footnote 38.

*3.8.4   NHA accepts the clarification in the preamble to the Proposed Rule that certification that an activity "will comply" with applicable requirements does not require absolute certainty of compliance.*

As does the 2020 Rule, the Proposed Rule requires a grant of certification to include a statement that the certified activity "will comply" with applicable requirements.[185]  EPA's 1971 certification rule required certification of "reasonable assurance" of compliance, based on the language of the pre-CWA certification statute.  Although the CWA in Paragraph 401(a)(1) now uses the phrase "will comply," instead of "reasonable assurance" of compliance, NHA and NWHA are concerned that the omission of the phrase "reasonable assurance" from the rule might be interpreted to establish an impossibly high evidentiary burden for certifications, particularly for FERC hydropower licenses, which have a term of up to 50 years.

There is no indication that, when Congress enacted the current version of Paragraph 401(a)(1) in 1972, it intended to establish a higher evidentiary burden for certifications by omitting the phrase "reasonable assurance."  Indeed, the omission appears to have been inadvertent and non-substantive because the phrase is still found in other paragraphs of Subsection 401(a), including most notably Paragraph 401(a)(3), which provides that a certification fulfills the requirements of future federal licenses and permits unless the certifying authority notifies the federal agency "that there is *no longer reasonable assurance* that there will be compliance with the applicable provisions of [CWA Sections 301, 302, 303, 306, and 307]."[186]  This wording is identical to that used in Paragraph 401(a)(1) except for the phrase "reasonable assurance."  The phrase's omission from Paragraph 401(a)(1) was clearly inadvertent because it would make no sense to provide in Paragraph 401(a)(3) that a certification ceases to be effective if the certifying authority finds that there is "no longer reasonable assurance" of compliance if that were not the original standard for the certification.

Nonetheless, NHA and NWHA accept the clarification in the preamble to the Proposed Rule that the phrase "will comply" in Paragraph 401(a)(1) and in the Proposed Rule is not intended to "provide absolute certainty that applicants for a Federal license or permit will never violate water quality standards" or to prevent "certifying authorities from relying on modeling information" or other "informed projection[s] of potential impacts."[187]  With this clarification, there is no practical difference between the phrases "reasonable assurance of compliance" and "will comply."

### *3.9   The Final Rule Should Retain the 2020 Rule's Federal Agency Review Provisions*

The Proposed Rule would limit the federal licensing or permitting agency's review of a certification decision to evaluating whether (1) the decision is a grant, grant with conditions,

---

[185] 87 Fed. Reg. at 35,378 (proposed 40 C.F.R. § 121.7(c)(2)); *cf.* 40 C.F.R. § 121.7(c) ("Any grant of certification . . . shall include a statement that the discharge from the proposed project will comply with water quality requirements.").

[186] 33 U.S.C. § 1341(a)(3) (emphasis added).

[187] 87 Fed. Reg. at 35,352.

denial, or waiver of certification; (2) the proper certifying authority issued the decision; (3) the certifying authority provided public notice of the request for certification; and (4) the decision was issued within the reasonable time allowed.[188]  The federal agency would be required to notify the certifying authority if its decision is deficient for reasons (1) and (3), and the reasonable period of time would be extended as needed to cure the deficiency, up to the statutory maximum of one year.[189]  Only if the federal agency determines that a certification decision was not made within the reasonable period of time would certification be waived.[190]  The provisions of the 2020 Rule allowing the federal agency to determine that the certifying authority had waived certification or certification conditions by failing to provide the required explanation for a certification denial or condition would be removed.[191]

The provisions of the 2020 Rule that allow the federal agency to evaluate whether certification denials and conditions include the required explanatory statements, and if not, to determine that certification or the certification condition has been waived, should be retained.[192]  Federal agencies have an obligation to determine whether the procedural requirements for certification have been met,[193] and federal agency review for compliance with these requirements is essential for enforcing them.  Otherwise, certifying authorities would have little incentive, and perhaps a disincentive, to provide the statements.

With respect to whether certifying authorities should be given an opportunity to respond to and cure any procedural deficiencies, NHA and NWHA have no concern in principle with providing such an opportunity.  NHA and NWHA, however, do have practical concerns.  Corrections must be made within the reasonable period allowed for certification decisions, and corrections should be allowed only for errors made in good faith.  The opportunity to correct should not provide an

---

[188] 87 Fed. Reg. at 35,378-79 (proposed 40 C.F.R. § 121.9(a)).

[189] *Id.* at 35,378-79 (proposed 40 C.F.R. § 121.9(b)).

[190] *Id.* at 35,378-79 (proposed 40 C.F.R. § 121.9(c)).  If a certification decision is deficient because it is not a grant, grant with conditions, denial, or waiver of certification, or because the required public notice was not provided, NHA and NWHA interpret the Proposed Rule to allow the federal agency to determine that certification was waived if the deficiency was not cured within the statutory maximum of one year after receipt of the request for certification.  On the other hand, if a certification decision is deficient because it was not issued by the proper certifying authority, and no certification had been requested or obtained from the proper certifying authority, then the federal agency could not issue the license or permit until certification was requested and obtained from, or waived by, the proper certifying authority.

[191] *See* 40 C.F.R. § 121.9(a)(2)(iii), (b).

[192] As discussed in Section 3.4 of these comments, the final rule should retain the 2020 Rule's somewhat broader requirements for explanatory statements, but federal agency review to determine whether the statements have been provided should also be retained, regardless of the extent of the explanation required.

[193] *See City of Tacoma v. FERC*, 460 F.3d 53, 67-69 (D.C. Cir. 2006) (holding that FERC was required to verify that a certification was issued following public notice and comment, as required by CWA Paragraph 401(a)(1)); *see also Jackson Cnty., N.C. v. FERC*, 589 F.3d 1284, 1289 (D.C. Cir. 2009) (same); *Keating v. FERC*, 927 F.2d 616, 624-25 (D.C. Cir. 1991) (holding that FERC had the authority to determine the continuing validity of a certification pursuant to CWA Paragraph 401(a)(3)).

incentive to ignore procedural requirements in the initial certification decision or to obtain more time to act on a certification request.

**3.10**   ***The Proposed Rule Should Be Revised to Clarify That the Federal Agency May Add, Modify, or Remove License or Permit Conditions Based on Modified Certification Conditions Only in Accordance with the Federal Agency's Applicable License or Permit Modification Procedures***

The Proposed Rule provides that a grant of certification with or without conditions may be modified with the agreement of both the certifying authority and the federal agency.[194]  NHA and NWHA support allowing the certifying authority and the federal agency to agree on modifications to certification conditions,[195] but any modification to the federal license or permit as a result of such an agreement should only be in accordance with the federal agency's applicable license or permit modification procedures.

CWA Subsection 401(d) provides that a certification condition "shall become a condition on any Federal license or permit subject to" certification.[196]  Because certification conditions are conditions of the federal license or permit, any subsequent change in those conditions based on an agreement between the certifying authority and the federal agency—regardless of whether it is an addition, deletion, or revision—would necessarily be a modification of the federal license or permit itself.  The Proposed Rule should be revised to make clear that the federal agency's agreement to the modification must be in accordance with the federal agency's applicable license or permit modification procedures.  Section 401 does not authorize EPA to give federal agencies the authority to agree to license or permit modifications without following the applicable legal requirements for such modifications.[197]

Requiring the federal agency to follow its applicable license or permit modification process would also resolve two other NHA and NWHA concerns with the Proposed Rule's modification provision.  First, it would define the process for obtaining the federal agency's agreement to the modification and would ensure that that process is transparent and includes any applicable processes for the participation of the licensee or permittee, as well as other interested stakeholders.  Second, it would ensure that the federal agency agrees to the specific modification, including its wording.  Because Section 401 does not authorize the certifying authority to unilaterally add, remove, or revise certification conditions once the certification is issued, the

---

[194] 87 Fed. Reg. at 35,379 (proposed 40 C.F.R. § 121.10(b)).

[195] Case law supports allowing modification of certification conditions with the approval of both the certifying authority and the federal agency.  *See, e.g.*, *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1219 (9th Cir. 2008); *Airport Communities Coal. v. Graves*, 280 F. Supp. 2d 1207, 1214-17 (W.D. Wash. 2003).

[196] 33 U.S.C. § 1341(d).

[197] For example, the FPA provides that FERC hydropower licenses "may be altered . . . only upon mutual agreement between the licensee and the Commission [FERC] after thirty days' public notice."  16 U.S.C. § 799.

federal agency must agree to the specific revisions made by the certifying authority, not simply the "portions of the certification" that may be modified.[198]

### 3.11   The Final Rule Should Not Prohibit Revoking or Modifying a Denial of Certification If the Federal Agency Has Not Yet Denied the Federal License or Permit Application Based on the Denial of Certification

The Proposed Rule would prohibit the certifying authority from revoking or modifying a denial of certification.[199]  No such prohibition, however, is required by or can be inferred from Section 401, and the only justifications for the prohibition mentioned in the preamble to the Proposed Rule are "reliance interests and regulatory certainty" and a concern that a change in the "fundamental nature of the certification action" may be inconsistent with the requirement to act on a certification request within a reasonable time.[200]  These justifications, however, do not apply if the federal agency has not yet denied the license or permit application based on denial of the request for certification.  In that circumstance, there has been no detrimental reliance on the denial of certification, and the federal agency's licensing or permitting process has not been delayed.  Moreover, the proposed prohibition could prevent meaningful administrative or judicial review of a certifying authority's initial denial of certification.  The final rule should omit the proposed prohibition or limit its application to circumstances in which the federal agency has denied the license or permit application based on the denial of certification.

### 3.12   The Final Rule Should Not Prohibit Modifying a Grant of Certification into a Waiver of Certification

The Proposed Rule would prohibit the certifying authority from waiving certification after an initial decision to grant certification with or without conditions.[201]  Under Paragraph 401(a)(1), however, a certifying authority may waive certification for any reason, and a waiver and a grant of certification both allow the federal agency to issue the license or permit.  The only circumstance in which converting a certification into a waiver might create detrimental reliance is that in which the federal agency has issued the license or permit with the conditions of the certification.  But even in that circumstance, the waiver would allow the federal agency to retain, remove, or revise the conditions in accordance with its license or permit modification procedures.  The final rule should omit the proposed prohibition.

---

[198] If, as proposed, a federal agency need only agree to the "portions of the certification" that may be modified, it might be reluctant to give its consent without knowing the precise modification to be made.  Moreover, there would inevitably be disputes regarding whether any particular modification was within the scope of the federal agency's consent.  These problems could be avoided by having the federal agency adopt modified certification conditions as a license or permit modification in accordance with the federal agency's applicable license or permit modification requirements.

[199] 87 Fed. Reg. at 35,379 (proposed 40 C.F.R. § 121.10(a)(1)).

[200] *See id.* at 35,362.

[201] *Id.* at 35,379 (proposed 40 C.F.R. § 121.10(a)(2)).

### 3.13   The Final Rule Should Prohibit "Reopener" and Similar Certification Conditions That Purport to Allow Certifying Authorities to Unilaterally Add or Revise Certification Requirements After the Reasonable Period for Acting on a Certification Request or After the Issuance of the Federal License or Permit

Certifications often include "reopener" and similar conditions that purport to authorize the certifying authority to make unilateral changes in certification requirements, frequently at the complete discretion of the certifying authority and without any limitations.  These conditions can take a variety of forms:  relatively narrow provisions purporting to authorize the certifying authority to add requirements related to specific issues, all-encompassing provisions purporting to authorize new or revised conditions on any topic,[202] provisions authorizing revocation of certification,[203] and provisions limiting certification to a stated term that may be less than the term of the federal license or permit.

Such conditions are plainly inconsistent with Section 401 because they would allow certifying authorities to make certification decisions after the maximum one-year period allowed by the statute and after the federal license or permit had been issued.  They would also transform Section 401's limited grant of authority to states to certify federal license and permit applications into an ongoing regulatory role.  Such an ongoing regulatory role would be particularly problematic in the context of a FERC hydropower license because the FPA assigns exclusive regulatory authority to FERC.[204]  The final rule should expressly prohibit "reopener" and similar certification conditions that purport to authorize the certifying authority to unilaterally modify certification conditions after the end of the reasonable period or after the federal license or permit has been issued.[205]

### 3.14   To Clarify That the CWA Makes No Provision for the Enforcement of Certification Conditions Other Than Incorporation into Federal Licenses and Permits, the Final Rule Should Retain the Statement in the 2020 Rule That the Enforcement of Certification Conditions Is the Responsibility of the Federal Agency

The Proposed Rule contains no provisions related to the enforcement of certification conditions[206] and would remove the statement in the 2020 Rule that "[t]he Federal agency shall be responsible for enforcing certification conditions that are incorporated into a

---

[202] Or. Admin. R. 340-048-0050 (purporting to allow certification revocation or modification for "changes in conditions regarding the activity or affected waterways").

[203] *See, e.g.*, Cal. Code of Regs., tit. 23, § 3860(a) ("Every certification action is subject to modification or revocation upon administrative or judicial review[.]").

[204] *See* 16 U.S.C. §§ 797(e), 817(1); *California*, 495 U.S. 490; *First Iowa Hydro-Elec. Coop.*, 328 U.S. 152.

[205] Reopener conditions should be distinguished from adaptive management conditions.  The former are open-ended provisions that would allow fundamental changes in certification requirements; the latter are narrow, structured mechanisms for adjusting specific certification requirements to changing conditions and new information.  NHA and NWHA have no concerns, in principle, with appropriately defined and structured adaptive management conditions.

[206] *See* 87 Fed. Reg. at 35,364.

federal license or permit."[207]  The final rule should retain the enforcement statement in the 2020 Rule to clarify that there is no provision in the CWA for enforcement of certification conditions other than through the requirement to incorporate the conditions into federal licenses and permits subject to the certification requirement.

Section 401 does not establish a permit requirement, such as the NPDES permit requirement established by CWA Section 402 or the dredged and fill material permit requirement established by CWA Section 404.[208]  Rather, Section 401 is a *certification* requirement for federal licenses and permits.  Absent a required certification or waiver of certification, the federal license or permit may not be issued,[209] and any condition on a certification must be incorporated into the federal license or permit.[210]

There is no provision in the CWA for enforcing certification conditions other than through their required incorporation into federal licenses and permits that are subject to the certification requirement, where they may be enforced in the same manner and to the same extent as other license and permit conditions.  For example, there is no mention whatsoever of Section 401 in the CWA's enforcement section, Section 309.[211]  And while the CWA's citizen suit provision, Section 505, does authorize citizens (which include states) to enforce the requirement *to obtain* a certification, it does not authorize the enforcement of certification *conditions*.[212]  Indeed, if certification conditions were directly enforceable under the CWA, there would have been no reason for Congress to

---

[207] 40 C.F.R. § 121.11(c).

[208] *Compare* 33 U.S.C. § 1341 *with id.* §§ 1342, 1344.

[209] *Id.* § 1341(a)(1).

[210] *Id.* § 1341(d).

[211] *See id.* § 1319.

[212] *See id.* § 1365(a)(1), (f)(6).  *Contra Deschutes River All. v. Portland Gen. Elec.*, 249 F. Supp. 3d 1182 (D. Or. 2017) (certification conditions may be enforced through CWA citizen suits), *reversed on other grounds and dismissed*; *Pub. Emps. for Env't Resp. v. Bright*, No. 3:18-cv-13-TAV-HBG, 2021 WL 1220928 (E.D. Tenn. Mar. 31, 2021) (same).  CWA Section 505(a)(1) authorizes a citizen suit "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under [the CWA]."  33 U.S.C. § 1365(a)(1).  For purposes of a citizen suit, the CWA defines an "effluent standard or limitation" to include "certification under section 1341 of this title [CWA section 401]."  *Id.*, § 1365(f)(6).  Although this provision authorizes enforcement of the requirement for "certification under section [401]," *see, e.g.*, *Or. Nat. Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1095 (9th Cir. 1998) (holding that a citizen suit could be used to challenge the U.S. Forest Service's issuance of a permit without an allegedly required Section 401 certification), it makes no reference to the enforcement of certification *conditions*. By contrast, the citizen suit provision authorizes enforcement of "a permit *or condition* of a permit issued under [CWA] section [402] [NPDES permits]."  33 U.S.C. § 1365(f)(7) (emphasis added).  Similarly, although the requirement to *obtain* a CWA Section 404 permit from the U.S. Army Corps of Engineers is enforceable in a citizen suit, the *conditions* of a Section 404 permit are not because the citizen suit provision makes no mention of these conditions.  *See Atchafalaya Basinkeeper v. Chustz*, 682 F.3d 356 (5th Cir. 2012); *see also Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, 118 F. Supp. 2d 1115 (D. Or. 2000).  Had Congress intended to authorize citizen enforcement of both the certification requirement and the conditions of a certification, it would have referred to the enforcement of certification conditions in Section 505.

require their incorporation into federal licenses and permits.  Furthermore, expanding enforcement authority beyond the conditions of the federal license or permit into which they are incorporated would undermine the authority of the federal agency to enforce the conditions of its own licenses or permits and could lead to duplicative or inconsistent enforcement actions and conditions.  On the other hand, neither Section 401 nor any other provision of the CWA precludes a state or tribe from enforcing certification conditions pursuant to state or tribal law except as the state or tribal law may be preempted by some other federal law.[213]

To clarify that certification conditions are to be enforced through their required incorporation into federal licenses and permits, and in the same manner and to the same extent as other federal license or permit conditions, the final rule should retain the 2020 Rule's enforcement provisions.

### 3.15   The Final Rule's Neighboring Jurisdiction Provisions Should Not Require the Federal Agency to Provide EPA with Any Information Other Than the Certification or Waiver of Certification and the Federal License or Permit Application

In conjunction with the "neighboring jurisdiction" provisions of CWA Paragraph 401(a)(2), the Proposed Rule would require the federal licensing or permitting agency to notify EPA within five days of receiving a Section 401 certification or waiver.[214]  The notice would be required to include a "general description of the proposed project," including but not limited to "the nature of any discharge and size or scope of activity."[215]  The federal agency would also be required to provide EPA, "in a timely manner," any "supplemental information" that EPA deems necessary.[216]  Moreover, the Proposed Rule directs the federal agency to obtain the supplemental information from the project proponent.[217]  These requirements should not be included in the final rule because they exceed EPA's authority under Paragraph 401(a)(2) and could place burdensome obligations on both the federal agency and the license or permit applicant.

Paragraph 401(a)(2) requires the federal licensing or permitting agency, "[u]pon receipt of . . . [the] application and certification," to "immediately notify EPA "of such application and certification."[218]  The only other obligations of the federal licensing or permitting agency under this paragraph are to hold a hearing on any objection to the license or permit filed by the neighboring jurisdiction and to condition the license or permit as "necessary to insure" that the

---

[213] *See* 33 U.S.C. § 1370.

[214] 87 Fed. Reg. at 35,380 (proposed 40 C.F.R. § 121.12(a)).

[215] *See id.* at 35,380 (proposed 40 C.F.R. § 121.12(a)(2)).

[216] *See id.* at 35,380 (proposed 40 C.F.R. § 121.12(b)).

[217] *Id.* (proposed 40 C.F.R. § 121.12(a)(2)).

[218] 33 U.S.C. § 1341(a)(2).

discharge complies "with applicable water quality requirements."[219]  There is no obligation for the federal agency to provide EPA with any information other than the certification and license or permit application, and there is no obligation of any sort for the applicant under Paragraph 401(a)(2).

The proposal to require information from the federal agency (other than the certification or waiver and license or permit application) and the applicant should not be included in the final rule because it exceeds the requirements of Paragraph 401(a)(2) and could place burdensome obligations on both the federal agency and the applicant.  As proposed, the rule would require the federal agency and the applicant to provide EPA, within a very short time, with any information that EPA believes is needed "to make a determination about potential neighboring jurisdiction effects."  If the final rule retains a supplemental information requirement, it should be limited to existing information that is readily available to the federal agency and applicant.

Thank you very much for considering these comments.  NHA and NWHA would welcome the opportunity to discuss these issues further with EPA.

Sincerely,

*/s/ Michael Purdie_____*

Michael Purdie
Director of Regulatory Affairs and Markets

---

[219] *See id.*