**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| STATE OF LOUISIANA,<br>STATE OF ALASKA,<br>STATE OF ARKANSAS,<br>COMMONWEALTH OF KENTUCKY,<br>STATE OF MISSISSIPPI,<br>STATE OF MISSOURI,<br>STATE OF MONTANA,<br>STATE OF OKLAHOMA,<br>STATE OF SOUTH CAROLINA,<br>STATE OF WEST VIRGINIA, and<br>STATE OF WYOMING, and<br>AMERICAN PETROLEUM INSTITUTE,<br>INTERSTATE NATURAL GAS<br>ASSOCIATION OF AMERICA, and<br>NATIONAL HYDROPOWER<br>ASSOCIATION,<br><br>        Plaintiffs,<br><br>   v.<br><br>U.S. ENVIRONMENTAL PROTECTION<br>AGENCY and<br>MICHAEL REGAN, in his official<br>capacity as Administrator of the U.S.<br>Environmental Protection Agency,<br><br>        Defendants. | CIVIL ACTION NO. 2:23-cv-01714<br><br>Judge James D. Cain, Jr.<br><br>Magistrate Judge Thomas P. LeBlanc |

**BRIEF OF STATE AND ASSOCIATION PLAINTIFFS**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# Table of Contents

Table of Authorities ..................................................................................................... iii

Table of Exhibits ........................................................................................................... ix

I.     Introduction ........................................................................................................1

II.    Background ..........................................................................................................2

    A.    Statutory Background .................................................................................2

    B.    *PUD No. 1 of Jefferson County v. Washington Department of Ecology* ...............4

    C.    Regulatory Background ..............................................................................5

        1.    1971 Regulations ............................................................................5

        2.    2020 Water Quality Certification Rule ..........................................6

        3.    2023 Water Quality Certification Rule ..........................................7

III.    Standard of Review ............................................................................................8

IV.    Standing .............................................................................................................9

V.    Argument .........................................................................................................12

    A.    The 2023 Rule Violates the CWA. ...........................................................12

        1.    The Rule imposes an unlawfully broad scope of review that exceeds the CWA and Congressional intent. ...............................12

            a.    The 2023 Rule unlawfully mandates review of more than "discharges." ......................................................12

            b.    The 2023 Rule significantly broadens the definition of "water quality requirements" to extend to non-CWA requirements of State law. ..............................................18

        2.    The 2023 Rule improperly allows for imposition of broad conditions that may bear little relation to water quality. ...........................23

    B.    The 2023 Rule Is Arbitrary and Capricious Because EPA Failed to Sufficiently Explain and Justify Its Decision to Change Course. ..........................26

    C.    The 2023 Rule Is Impermissibly Retroactive. .......................................35

    D.    EPA Failed to Respond Meaningfully to Significant Public Comments. ..............38

VI.    Conclusion .................................................................................................................40

# Table of Authorities

**Page(s)**

## Cases

*AES Sparrows Point LNG, LLC v. Smith,*
    527 F.3d 120 (4th Cir. 2008) ...................................................22

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023)........................................................9, 10, 11

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988)............................................................35, 38

*California v. FERC,*
    495 U.S. 490 (1990)..........................................................23

*Carlson v. Postal Regul. Comm'n,*
    938 F.3d 337 (D.C. Cir. 2019) ...............................................38, 39

*Cent. & S.W. Servs., Inc. v. EPA,*
    220 F.3d 683 (5th Cir. 2000) ...................................................36

*Chamber of Com. of United States v. United States Sec. & Exch. Comm'n,*
    85 F.4th 760 (5th Cir. 2023) ...................................................38, 39

*Chamber of Commerce of the U.S. v. U.S. Dep't of Labor,*
    885 F.3d 360 (5th Cir. 2018) ...............................................9, 10, 27

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012)............................................................27, 34

*City of Milwaukee v. Ill. & Mich.,*
    451 U.S. 304 (1981)................................................................3

*Collins v. Yellen,*
    141 S. Ct. 1761 (2021)..........................................................10

*Conn. Nat. Bank v. Germain,*
    503 U.S. 249 (1992)............................................................13, 36

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.,*
    779 F.3d 258 (5th Cir. 2015) ...................................................9

*In re Crocker,*
    941 F.3d 206 (5th Cir. 2019), *as revised* (Oct. 22, 2019)...................................14

*Data Mktg. P'ship, LP v. United States Dep't of Lab.*,
   45 F.4th 846 (5th Cir. 2022) ................................................................27

*Davidson v. Fairchild Controls Corp.*,
   882 F.3d 180 (5th Cir. 2018) ..................................................................8

*Dep't of Com. v. New York*,
   139 S. Ct. 2551 (2019) ..........................................................................10

*DHS v. Regents of Univ. of Cal.*,
   591 U.S. 1 (2020) ..................................................................................10

*EPA v. California ex. rel. State Water Res. Control Bd.*,
   426 U.S. 200 (1976) ..............................................................................20

*ExxonMobil Pipeline Co. v. DOT*,
   867 F.3d 564 (5th Cir. 2017) ................................................................27

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ................................................................26, 27, 31

*Fernandez-Vargas v. Gonzales*,
   548 U.S. 30 (2006) ..........................................................................35, 36

*Georgetown Univ. Hosp. v. Bowen*,
   821 F.2d 750 (D.C. Cir. 1987), *aff'd* 488 U.S. 204 (1988)..............35, 38

*Germain v. U.S. Bank Nat'l Ass'n*,
   920 F.3d 269 (5th Cir. 2019) ................................................................35

*Greater Bos. Television Corp. v. FCC*,
   444 F.2d 841 (D.C. Cir. 1970) ..............................................................26

*Hoopa Valley Tribe v. FERC*,
   913 F.3d 1099 (D.C. Cir. 2019) ......................................................30, 31

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ........................................................................10, 11

*Immigr. & Naturalization Serv. v. St. Cyr*,
   533 U.S. 289 (2001) ..............................................................................35

*Louisiana v. United States Dep't of Energy*,
   90 F.4th 461 (5th Cir. 2024) ............................................10, 26, 33, 34

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..........................................................9, 10, 11

iv

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990)...............................................................................10

*Magee v. Coca-Cola Refreshments USA, Inc.,*
   833 F.3d 530 (5th Cir. 2016) ...............................................................21

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
   60 F.4th 956 (5th Cir. 2023) ..........................................................39, 40

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983).......................................................................... *passim*

*Nat'l Mining Ass'n v. Dep't of Lab.,*
   292 F.3d 849 (D.C. Cir. 2002)..............................................................38

*Oregon Natural Desert Ass'n v. Dombek,*
   172 F.3d 1092 (9th Cir. 1998) .............................................................20

*Physicians for Soc. Resp. v. Wheeler,*
   956 F.3d 634 (D.C. Cir. 2020)........................................................26, 29

*PUD No. 1 of Jefferson County v. Washington Department of Ecology,*
   511 U.S. 700 (1994)......................................................................... *passim*

*R.J. Reynolds Vapor Co. v. Food & Drug Admin.,*
   65 F.4th 182 (5th Cir. 2023) ................................................................26

*Rubin v. United States,*
   449 U. S. 424 (1981)............................................................................13

*Sackett v. EPA,*
   598 U.S. 651 (2023)...........................................................................1, 3

*Sayles Hydro Assocs. v. Maughan,*
   985 F.2d 451 (9th Cir. 1993) ...............................................................23

*Schneidewind v. ANR Pipeline Co.,*
   485 U.S. 293 (1998).............................................................................22

*Sierra Club v. State Water Control Bd.,*
   898 F.3d 383 (4th Cir. 2018) ...............................................................23

*Sierra Club v. Whitman,*
   285 F.3d 63 (D.C. Cir. 2002)...............................................................38

*Silva Rosa v. Gonzalez,*
   490 F.3d 403 (5th Cir. 2007) ...........................................35, 36, 37, 38

*Smiley v. Citibank*,
    517 U.S. 735 (1996) .................................................................................................34

*Southwest Airlines Co. v. Saxon*,
    596 U.S. 450 (2022) .................................................................................................14

*State v. Biden*,
    10 F.4th 538 (5th Cir. 2021) .....................................................................................9

*Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*,
    37 F.4th 1078 (5th Cir. 2022) ...................................................................10, 11, 12

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) .....................................................................................9

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ...................................................................................................9

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996) .................................................................................................10

*United States v. Am. Trucking Ass'ns, Inc.*,
    310 U.S. 534 (1940) .................................................................................................13

*Util. Air Reg. Group v. EPA*,
    573 U.S. 302 (2014) ...........................................................................................16, 28

*Wages & White Lion Invs., L.L.C. v. Food & Drug Admin.*,
    90 F.4th 357 (5th Cir. 2024) ............................................................................ *passim*

*Wash. State Dep't. of Social and Health Servs. v. Keffeler*,
    537 U.S. 371 (2003) .................................................................................................20

**Constitutions, Statutes and Rules**

U.S. Const. art. III, § 2 ....................................................................................................9

5 U.S.C. § 551(4) ....................................................................................................35, 38

5 U.S.C. § 706(2) ...........................................................................................................10

5 U.S.C. § 706(2)(A) ...................................................................................................9, 26

5 U.S.C. § 706(2)(C) .......................................................................................................9

15 U.S.C. § 717 .............................................................................................................22

16 U.S.C. § 797(e) .........................................................................................................22

33 U.S.C. 1341(a) ................................................................................19

33 U.S.C. 1341(b) ................................................................................19

33 U.S.C. 1341(d) ................................................................................19

33 U.S.C. § 1251(a) ...............................................................................2

33 U.S.C. § 1251(b) ...............................................................................2

33 U.S.C. § 1311 ..............................................................................4, 19

33 U.S.C. § 1311(a), ..............................................................................3

33 U.S.C. § 1311(b) .............................................................................15

33 U.S.C. § 1312 ..............................................................................4, 19

33 U.S.C. § 1313 ..............................................................................4, 19

33 U.S.C. § 1313(d)(1)(A)–(B) ............................................................33

33 U.S.C. § 1316 ..............................................................................4, 19

33 U.S.C. § 1317 ..............................................................................4, 19

33 U.S.C. § 1341 ..............................................................................4, 33

33 U.S.C. § 1341(a) ...............................................................12, 15, 19

33 U.S.C. § 1341(a)(1) ................................................................. *passim*

33 U.S.C. § 1341(a)(3) ..........................................................................17

33 U.S.C. § 1341(d) ..................................................................... *passim*

33 U.S.C. 1362(7) .............................................................................3, 4

33 U.S.C. § 1362(12) .............................................................................4

33 U.S.C. § 1362(12)(A) ........................................................................3

33 U.S.C. § 1362(16) .............................................................................4

Water Quality Improvement Act of 1970, Pub. L. 91-224,
       84 Stat. 91, 108 (Apr. 3, 1970) .................................................3, 5

Fed. R. Civ. P. 56 ..................................................................................8

**Regulations**

40 C.F.R. § 121.1(f) (2023) ............................................................................37

40 C.F.R. § 121.1(j) ...........................................................................8, 18, 29

40 C.F.R. § 121.1(n) ...............................................................................6, 20

40 C.F.R. § 121.3 (2020) ...................................................................6, 20, 27

40 C.F.R. § 121.3(a) .....................................................................7, 13, 28, 37

40 C.F.R. § 121.3(b) .............................................................................8, 23

40 C.F.R. § 121.6(a) ..................................................................................7

40 C.F.R. § 121.7(e)(3) ..............................................................................23

**Federal Register Notices**

36 Fed. Reg. 22,369 (Nov. 25, 1971) ...............................................................5

44 Fed. Reg. 38,854 (June 7, 1979) .................................................................6

85 Fed. Reg. 42,210 (Jul. 13, 2020)......................................................... *passim*

88 Fed. Reg. 66,558 (Sept. 27, 2023) ...................................................... *passim*

**Other**

Antonin Scalia & Bryan A. Garner, Reading Law:
    The Interpretation of Legal Texts ...............................................................14

**Table of Exhibits**

| 1 | Declaration of Amanda Vincent |
|---|---|
| 2 | Declaration of Jennifer Zygmunt |
| 3 | Declaration of Bruce Scott |
| 4 | Declaration of Gene McCabe |
| 5 | Declaration of Shellie Chard |
| 6 | Declaration of Caleb J. Osborne |
| 7 | Third Declaration of Michale Purdie |
| 8 | Second Declaration of Sahara Shrestha |
| 9 | Declaration of Joan Dreskin |
| 10 | Declaration of Robin Rorick |

## I.       Introduction

When Congress passed the Clean Water Act (CWA) in 1972, it faced a difficult balancing act.  It badly needed to implement a more effective federal framework for addressing water pollution.  But it also needed to preserve the traditional roles played by the States in regulating water quality within their borders.  Congress found a workable balance by limiting the CWA's jurisdiction to the regulation of "discharges" of "pollutants" to "waters of the United States" and carefully delineating roles for States to play in the protection of those waters.  As drafted, the CWA is a seminal example of cooperative federalism in action that, "[b]y all accounts . . . has been a great success."  *Sackett v. EPA*, 598 U.S. 651, 658 (2023).

But to preserve the CWA's success and continue to implement Congress's vision in passing it, courts must ensure that the participating State and federal agencies honor the limits Congress placed on their roles.  Just last term, for example, the Supreme Court reined in federal agencies' efforts to expand the geographic scope of their CWA jurisdiction well beyond the limits Congress imposed.  *Id.*  This case is about another threat to the CWA—the effort by EPA to force States to conduct expansive reviews of federal projects under CWA section 401 to evade the jurisdictional limits the Supreme Court confirmed in *Sackett*.

CWA section 401 allows a State to review the discharges authorized by federal permits within its borders to ensure they comply with CWA water-quality standards and other CWA requirements.  Section 401 is powerful—if the State concludes the discharges will not comply with CWA requirements, it can deny the certification and the federal permit cannot issue.  But that power is confined—States are directed to certify compliance with specific CWA provisions and they must act within a reasonable period of time not to exceed one year.

Over time, some States abused their section 401 authority by denying water quality certifications for reasons having no meaningful connection to water quality and using procedural tricks

to avoid acting at all.  In 2020, EPA stepped in to address those problems by promulgating a comprehensive rule that confirmed the limited scope of section 401 and imposed procedural requirements designed to curb abuses.  But just a few months later, a new federal administration abruptly reversed course and promulgated a new rule—the 2023 Clean Water Act Section 401 Water Quality Certification Improvement Rule—that unlawfully and without sufficient justification purports to expand the scope of State certification reviews and opens the door to further abuses.

The 2023 Rule is unlawful for multiple reasons.  Most fundamentally, EPA purports to mandate that States conduct a certification review that vastly exceeds what Congress intended.  Rather than review whether "discharges" to "waters of the United States" (WOTUS) comply with specific CWA requirements, the 2023 Rule directs States to consider whether a permitted activity's non-discharge-related effects on non-CWA-regulated waters violate unspecified provisions of State law.  EPA compounds that fundamental problem by failing to provide the reasoned explanation necessary to justify the 180-degree switch from the careful interpretation of section 401 EPA made in 2020.  And EPA seeks to apply the 2023 Rule retroactively to section 401 applications pending at the time the rule was promulgated, while also failing to meaningfully respond to the comments that brought all these problems and more to light.

Plaintiffs ask this Court to restore the balance Congress struck and vacate the 2023 Rule.

## II.   Background

### A.   Statutory Background

In passing the CWA, Congress sought to preserve the historic role of States in regulating water pollution. Congress sought to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), while also "recogniz[ing], preserv[ing], and protect[ing] the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." *Id*. § 1251(b).  To preserve the State role, Congress only chose to regulate certain waters—

i.e., "navigable waters" defined as WOTUS.  *Id*. § 1362(7); *see also Sackett*, 598 U.S. at 678.  All other waters are free for States to regulate.  And within the jurisdictional scope of the CWA, Congress empowered States to play important roles, including the development of water quality standards and the opportunity to administer permitting programs.

Section 401 is one of those State-empowering provisions.  It requires the certifying authority, described as "the State in which the discharge originates or will originate," the opportunity to evaluate "discharges" authorized by federal permits or licenses to ensure they "will comply with the applicable provisions of sections [301, 302, 303, 306, and 307] of [the CWA]."  33 U.S.C. § 1341(a)(1).  States can review any potential discharges into WOTUS authorized by any federal license for projects within their borders, including within national parks located within a State's boundaries, to ensure those discharges comply with CWA water-quality standards and other requirements.  *Id*.  If a State concludes that the discharges would not comply with the CWA, it can deny certification, and the federal permit or license cannot issue.  *Id.*  Section 401 also empowers States to impose conditions on the "applicant" to ensure compliance with the specified CWA provisions, and those conditions become conditions of the federal permit when issued.  *Id.* § 1341(d).

The certification requirement is powerful, but also carefully limited.  *First*, Congress chose to limit the scope of State review to whether "discharges" would comply with the specified CWA provisions.  That makes sense, because the CWA's central premise was a broad prohibition against "discharge of any pollutant" into WOTUS.  33 U.S.C. §§ 1311(a), 1362(12)(A); *see City of Milwaukee v. Ill. & Mich*., 451 U.S. 304, 317 (1981).  To conform to this new regulatory structure, Congress revised a similar State certification requirement under the Water Quality Improvement Act of 1970, which directed States to certify that the entire "activity" authorized by a federal license would comply with water quality standards.  *See* Water Quality Improvement Act of 1970,

3

Pub. L. 91-224, 84 Stat. 91, 108 (Apr. 3, 1970); 33 U.S.C. § 1341(a)(1) (1970).  As revised, States only certify that "discharges" will comply, and Congress defined "discharges" to include discharges from "point sources" into "waters of the United States."  33 U.S.C. § 1362(7), (12), (16).

*Second*, Congress authorized States to certify compliance only with specific CWA provisions.  And, naturally, these provisions all focus on regulating discharges to WOTUS:  section 301 prohibits the discharge of any pollutant except in compliance with the Act, 33 U.S.C. § 1311; section 302 establishes effluent limitations on point source discharges, *id.* § 1312; section 303 requires the establishment of water quality standards, which are primarily used to establish numeric limits in point source discharge permits, *id.* § 1313; section 306 sets national performance standards for the control of discharges, *id.* § 1316; and section 307 sets toxic pretreatment effluent standards, *id.* § 1317.

*Third*, States must act within a reasonable period of time, not to exceed one year, or the certification requirements are waived.  *Id.* § 1341.  Absent that time limit, States could simply refuse to act on certification requests and hold up important federal projects.

## B.   *PUD No. 1 of Jefferson County v. Washington Department of Ecology*

The Supreme Court has addressed section 401's scope only once.  In *PUD No. 1 of Jefferson County v. Washington Department of Ecology*, 511 U.S. 700 (1994) ("*PUD No. 1*"), the Court considered whether section 401(d) authorized a State to impose a condition on the construction of a hydroelectric dam.  *Id.* at 703.  The State concluded that the discharges necessary to build the dam could affect stream flows to impede designated uses of downstream waters and thus violate State water quality standards.  *Id.* at 708–09.  So, the State imposed a condition pursuant to section 401(d) requiring the applicant to maintain certain stream flows.  *Id.* at 708–10.  The Court held that, under its section 401(d) conditioning authority, "the State may include minimum stream flow requirements in a certification issued pursuant to § 401 . . . insofar as necessary to enforce a

designated use contained in a state water quality standard." *Id.* at 723.  In so holding, the Court explained that because section 401(d) "refers to the compliance of the applicant, not the discharge"—unlike section 401(a)—section 401(d) allows the State to impose conditions "on the project in general" unrelated to specific discharges "to assure compliance with various provisions of the Clean Water Act and with 'any other appropriate requirement of State law.'"  *Id.* at 711–12. The Court then explained that, while the State's section 401(d) conditioning authority "is not unbounded," *id.* at 712, it does extend to conditions "imposed to ensure compliance with the state water quality standards adopted pursuant to § 303 of the [CWA]."  *Id.* at 712–13.

Significantly here, *PUD No. 1*'s holding did not address the scope of the certification review authorized by section 401(a).  So *PUD No. 1*'s holding does not address the scope of review purportedly authorized by the 2023 Rule under section 401(a), which is the core issue in dispute regarding the 2023 Rule's compliance with the CWA in this case.  In dicta, the Court observed that its activity-based interpretation of section 401(d) was consistent with EPA's 1971 regulations interpreting the scope of a State's certification review under section 401(a), to which regulations the Court accorded *Chevron* deference.  *Id.* at 712.  Plaintiffs respectfully submit that this dicta cannot be correct, because 1971 regulations that the Court referenced were promulgated prior to the 1972 CWA amendments, and thus do not reflect Congress' amendment of CWA section 401(a) from "activity" to "discharge."  The Supreme Court should repudiate this aspect of *PUD No. 1* at the first opportunity.

### C.    Regulatory Background

#### 1.    1971 Regulations

EPA first issued regulations relating to water quality certifications in 1971, pursuant to section 21(b) of the Federal Water Pollution Control Act of 1948, as amended, Pub. L. No. 91-224, 84 Stat. 91, 108-10 (1970).  36 Fed. Reg. at 22,369, 22,487 (Nov. 25, 1971) (subsequently

codified at 40 C.F.R. pt. 121); *see also* 85 Fed. Reg. 42,210, 42,211 (Jul. 13, 2020) ("2020 Rule"). Those regulations addressed the old certification provision, not the current version of section 401 Congress adopted in 1972.  EPA recognized the problem, *see* 44 Fed. Reg. 38,854, 32,856 (June 7, 1979) (indicating the need for updated certification rules), but would not revise those regulations to conform to the new statutory language for nearly fifty years.  The mismatch between 1972 statute and the 1971 regulations caused problems—States would deny certification on grounds that did not specifically pertain to water quality concerns and deploy various procedural gimmicks to get around the statute's one-year time limit.  The result was delay or cancellation of critical federal infrastructure projects.

### 2.    2020 Water Quality Certification Rule

In its 2020 Rule, EPA conducted a "holistic analysis of the statutory text, legislative history, and relevant case law," and comprehensively revised the 1971 regulations.  The 2020 Rule more clearly specified the section 401 review process to ensure timely completion, conformed the scope of certification review to the statutory text, and imposed many documentation requirements to ensure States were appropriately tying certification decisions to actual CWA-based water quality concerns.

EPA concluded that a State's review and action under section 401 is limited to water quality impacts to WOTUS resulting from a potential point source discharge from the proposed federally licensed or permitted project and "other appropriate requirements of State law."  "Water quality requirements" were defined as the universe of federal or state law provisions that certifying authorities may consider under section 401, and "other requirements of State law," was limited to "state and tribal regulatory requirements for point source discharges into waters of the United States."  40 C.F.R. §§ 121.1(n), 121.3 (2020).  The 2020 Rule also clarified the required components of a certification request to trigger a State's "reasonable period of time" for review, so that

the time period would not "exceed one year from receipt" of the certification request.  40 C.F.R. §

121.6(a).

### 3.      2023 Water Quality Certification Rule

Following a change in administration in 2021, EPA immediately sought to undo the im-

portant work the 2020 Rule accomplished.  The result is the 2023 Rule, which Plaintiffs challenge

here.  *See* 88 Fed. Reg. 66,558 (Sept. 27, 2023) ("2023 Rule")*.*

The 2023 Rule mandates that States review much more than "discharges" for compliance

with much more than the CWA provisions Congress specified in section 401.  Under the 2023

Rule, once section 401 is triggered—by a point source discharge into WOTUS or the potential for

a point source discharge into WOTUS—the project proponent must submit a "request for certifi-

cation," as defined under the rule.  88 Fed. Reg. at 66,576.

The 2023 Rule mandates that States evaluate the entire "activity" that is subject to the

federal license or permit to determine whether the activity will comply with "applicable water

quality requirements."  88 Fed. Reg. at 66,662; 40 C.F.R. § 121.3(a).  And that "activity" includes

more than just the specific actions authorized by the permit in question.  Where, for example, a

permit from the U.S. Army Corps of Engineers (Corps) would authorize discharges of dredged or

fill material into WOTUS to construct a pipeline across jurisdictional streams and wetlands, the

2023 Rule would require the certifying State to evaluate not only the effects of the discharges the

Corps permit would authorize, but also the full effects of upland construction and long-term oper-

ation of the pipeline.  Through this expansion, EPA purports to require the certifying authority to

address much more than just adverse water quality impacts associated with the discharge that trig-

gers section 401 review.  *See* 88 Fed. Reg. at 66,600.

The 2023 Rule deviates yet further from the statute by mandating that States evaluate the

"activity" for compliance with laws other than those specifically enumerated in section 401(a).

Specifically, EPA obligates States to certify compliance with "any other [i.e., non-CWA] water quality-related requirement of state or Tribal law."  As defined by EPA in the 2023 Rule, this includes State laws regulating non-point-source discharges, which are excluded from the statute's definition of "discharge," and discharges of either variety into waters outside of federal CWA jurisdiction.  40 C.F.R. § 121.1(j); 88 Fed. Reg. at 66,602, 604.

This same overbroad "activity" standard applies when States identify and impose conditions in a section 401 water quality certification.  EPA declines to "explicitly identify which conditions would be within or outside the scope of section 401 certification," because a "wide variety of conditions could be appropriate . . . ."  88 Fed. Reg. at 66,606.  Such conditions may have only a tenuous connection to the permitted discharge.  For example, EPA would allow imposition of "monitoring, reporting, and adaptive management in response to the *non-discharge related* water quality impacts of the activity . . . ."  88 Fed. Reg. at 66,598 (emphasis added).  The 2023 Rule also requires consideration of aspects of the activity that may occur after permit expiration.  88 Fed. Reg. at 66,600.  The certifying authority may deny certification if it cannot "certify that the activity will comply with water quality requirements."  40 C.F.R. § 121.3(b).

The 2023 Rule became effective on November 27, 2023.  88 Fed. Reg. at 66,655.  Any decision issued by the certifying authority after November 27, 2023, must comply with the requirements of the Rule.  Certification requests received prior to November 27, 2023 but not acted upon by that date, must also comply with the 2023 Rule's requirements.

## III.    Standard of Review

The Court must grant summary judgment "when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Davidson v. Fairchild Controls Corp.*, 882 F.3d 180, 184 (5th Cir. 2018) (citation omitted); Fed. R. Civ. P. 56.

Under the Administrative Procedure Act (APA), the Court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, . . . or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C); *Chamber of Commerce of the U.S. v. U.S. Dep't of Labor*, 885 F.3d 360, 363, 388 (5th Cir. 2018). An agency acts unlawfully when it promulgates a rule that is contrary to how "Congress has directly addressed the precise question at issue." *Texas v. United States*, 809 F.3d 134, 178 (5th Cir. 2015) (citations omitted). An agency acts arbitrarily or capriciously when its rules fail to "be reasonable and reasonably explained," *State v. Biden*, 10 F.4th 538, 552 (5th Cir. 2021) (citation omitted); *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–44 (1983), and when it fails to provide any explanation for a rule, *id.* at 48.

## IV.    Standing

Under Article III, the federal "judicial power" extends to "Cases" and "Controversies," U.S. Const. art. III, § 2, which requires a plaintiff to demonstrate its "standing" to sue in federal court, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), comprises three elements: "(i) that [the plaintiff] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief," *TransUnion*, 594 U.S. at 423. Where a plaintiff is "himself an object of [agency] action," "there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it." *Lujan*, 504 U.S. at 561–62; *accord Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015). Further, harms to the plaintiff's "property or money" are classic forms of injuries in fact, *Biden v.*

*Nebraska*, 143 S. Ct. 2355, 2366 (2023); *see Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021), including when such harms are suffered by a plaintiff-State, *Nebraska*, 143 S. Ct. at 2366.

An "association" has "standing to bring claims on behalf of its members" if it satisfies three elements: (i) that "individual members [of the association] would have standing"; (ii) that "the association seeks to vindicate interests germane to its purpose"; and (iii) that "neither the claim asserted nor the relief requested requires the individual members' participation." *Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022) (*SFA*) (footnote omitted); *accord Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977).  The first two elements are constitutional requirements, while the third element "is a prudential one." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996).

Finally, "a legal dispute [ ] qualif[ies] as a genuine case or controversy" if "at least one plaintiff" has standing.  *Louisiana v. United States Dep't of Energy*, 90 F.4th 461, 467 (5th Cir. 2024); *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019).  The Court has the authority to "set aside" a rule in its entirety as "not in accordance with law," at the behest of any one plaintiff with standing.  5 U.S.C. § 706(2); *see DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1901, 1916 n.7 (2020); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990); *accord Chamber of Commerce of the U.S. v. U.S. Dep't of Labor*, 885 F.3d 360, 363, 388 (5th Cir. 2018).  Thus, where the Court concludes that one plaintiff has standing to seek the relief requested, it need not address the standing of any other plaintiff before it.  *See Nebraska*, 143 S. Ct. at 2365.

Here, the States and the Association Plaintiffs all have standing to bring their claims.

The States have standing to challenge the 2023 Rule because they are "object[s]" of the 2023 Rule, *Lujan*, 504 U.S. at 561–62, and thus suffer a concrete harm directly traceable to the Rule itself and redressable by an order of this Court declaring the 2023 Rule unlawful and setting

it aside.  The 2023 Rule requires the States, as the reviewing authorities of water quality certification requests under section 401, to conduct a much broader scope of review than section 401 itself allows or the prior 2020 Rule mandated.  Ex. 1 ¶ 9; Ex. 2 ¶ 14; Ex. 3 ¶ 4; Ex. 4 ¶ 4; Ex. 5 ¶¶ 13-15; Ex. 6 ¶¶ 11-18.  Specifically, the 2023 Rule directs States to consider impacts to waters of the State under the governing state law and regulations, in addition to impacts to the waters of the United States that triggered the section 401 water quality certification requirement, 88 Fed. Reg. at 66,570, 66,604, and imposes other obligations upon the States throughout the water-quality-certification process.  Further, and independently sufficient, the States have standing to challenge the 2023 Rule because, through the Rule's mandated, broader scope of review and other regulation of the States, the Rule forces States to expend more of their sovereign resources on their section 401 review processes.  *Nebraska*, 143 S. Ct. at 2366; *see* Ex. 1 ¶¶ 8-9; Ex. 3 ¶ 7; Ex. 4 ¶¶ 4, 7; Ex. 5 ¶ 14; Ex. 6 ¶ 19.

The Association Plaintiffs each have standing under the three-part associational-standing test.  *SFA*, 37 F.4th at 1084; *accord Hunt*, 432 U.S. 333, 342–43 (1977).  To begin, the Association Plaintiffs each represent dues-paying members, several of whom would have standing to challenge the 2023 Rule.  *SFA*, 37 F.4th at 1084.  Members of the Association Plaintiffs also have standing to challenge the 2023 Rule because they are "object[s]" of the Rule as section 401 water quality certification requesters, *Lujan*, 504 U.S. at 561–62, and the Rule harms their "property or money" as well.  *Nebraska*, 143 S. Ct. at 2366; *see* Ex. 7 ¶¶ 11-20; Ex. 8 ¶¶ 4-22; Ex. 9 ¶¶ 17-27, Ex. 10 ¶¶ 20-29.  Second, in challenging the 2023 Rule, the Association Plaintiffs seek to vindicate interests germane to their purposes, *SFA*, 37 F.4th at 1084, of securing the economic stability and well-being of the various industries that they represent, because the 2023 Rule directly increases operating costs and regulatory uncertainty of the Association Plaintiffs' members.  Ex. 7 ¶¶ 19-20; Ex.

9 ¶¶ 17-27; Ex. 10 ¶¶ 20-29.  Finally, the Association Plaintiffs' claims and the relief they seek do not require their individual members' participation, *SFA*, 37 F.4th at 1084.  All of Plaintiffs' claims turn solely on legal arguments against the 2023 Rule, and the relief that they seek—a declaration that the 2023 Rule is unlawful and an order setting the rule aside—applies equally to all entities affected by the 2023 Rule, without distinction.

## V.     Argument

### A.     The 2023 Rule Violates the CWA.

Section 401(a) of the CWA provides that the certifying authority, described as "the State in which the discharge originates or will originate," must certify that "any such *discharge* will comply with the applicable provisions of the CWA."  33 U.S.C. § 1341(a) (emphasis added).  Further, section 401(d) empowers States to impose conditions "to assure that any applicant for a Federal license or permit will comply with" the specified CWA provisions.  *Id.* § 1341(d).  By its terms, the CWA directs authorities to focus on and certify that the *discharge* resulting from the proposed federally licensed or permitted project will comply with specified provisions of the CWA.  EPA's 2023 Rule, however, ignores the statutorily defined limits of the CWA and expands the obligations of States to conduct section 401 reviews by requiring States to review the entire "activity" proposed and to look beyond the enumerated CWA sections to assess compliance with "any other water quality-related requirement of state or tribal law."  This broad mandate plainly exceeds the scope of review allowed by section 401(a) and should be found unlawful and set aside.

### 1.     The Rule imposes an unlawfully broad scope of review that exceeds the CWA and Congressional intent.

#### a.     The 2023 Rule unlawfully mandates review of more than "discharges."

Congress has spoken to the scope of the certifying authority's review under section 401(a).  In section 401(a), Congress explicitly provides that the certifying authority, described as "the State

in which the discharge originates or will originate," must certify that "any such discharge will comply with the applicable provisions of sections [301, 302, 303, 306, and 307] of this [Act]."  33 U.S.C. § 1341 (a)(1).  Section 401(a) thus requires authorities to certify that the *discharge* resulting from the proposed federally licensed or permitted project will comply with the CWA.  The 2023 Rule violates the statute because it mandates that States and Tribes review aspects of the federally-licensed activity beyond the section 401 triggering "discharges."  40 C.F.R. § 121.3(a) ("[T]he certifying authority shall evaluate whether the activity will comply with applicable water quality requirements.").  What's more, the 2023 Rule mandates that the certifying authority's evaluation of the activity "include[ ] 'the activity's construction and operation. . . [regardless of] whether the Federal license or permit at issue covers both aspects of the activity.'"  *See* 88 Fed. Reg. at 66,592.

EPA's expansion of the scope of review required under section 401(a) violates the statutory text.  Courts must presume that Congress chose its words intentionally.  "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others.  We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992).  And "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"  *See id.* (*quoting Rubin v. United States,* 449 U. S. 424, 430 (1981)); *see also United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 542 (1940).

Here, the text of section 401(a) is unambiguous.  A State's certification review is complete when it evaluates whether "discharges" satisfy the requirements of the enumerated CWA provisions.  The 2023 Rule mandates that certifying authorities evaluate more than just discharges, so it is contrary to the statute.  The Court's inquiry can end there.  *Conn. Nat. Bank*, 503 U.S. at 254.

13

Both the full text of section 401(a)(1) and the historical context in which it was enacted confirm the plain meaning of the statute's text.  Notably, Congress uses the terms "activity" and "discharge" in the operative sentence of section 401(a)(1), and they plainly mean different things. "Activity" describes the full action authorized by the federal permit, while "discharge" refers only to the point source discharge that may result from the activity.  Congress directs States only to certify that "discharges" will comply with CWA requirements.  Had it intended for States to evaluate the "activity" it would have used that term instead.  *See Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 457-58 (2022) ("'[W]here [a] document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea.'" (quoting A. Scalia & B. Garner, Reading Law 170 (2012))).  That conclusion is all the more compelling because Congress specifically amended section 401(a) in 1972 to narrow the scope of review to "discharges" as opposed to the full "activity" as provided under the 1970 legislation. "When Congress makes a significant change in language when it amends an existing statute, it 'presumptively connotes a change in meaning.'" *In re Crocker*, 941 F.3d 206, 213 (5th Cir. 2019), *as revised* (Oct. 22, 2019) (quoting SCALIA & GARNER at 256).

EPA argues that its "activity-based" approach is consistent with the statutory language and congressional intent, as well as longstanding agency guidance and Supreme Court case law.  88 Fed. Reg. at 66,591.  But EPA's arguments are misplaced.

*First*, EPA claims that the "best reading of the statutory text is that the scope of the certification is the activity subject to the Federal license or permit, not merely its potential point source discharges."  *See id.* at 66,592.  EPA relies on the use of the word "applicant" in section 401(d), *id.* at 66,594, and the provision in section 401(a)(1) that "[i]n the case of any such activity for

which there is not an applicable [water quality requirement,] the State shall so certify. . . ." *Id.* at 66,595.  Neither point is compelling.

In the 1972 CWA amendments, Congress made two major changes affecting the scope of the certification requirement.  Congress changed "activity" to "discharge" in section 401(a), and added section 401(d), which describes effluent limitations, other limitations, and monitoring requirements that may be included as a condition of certification.  As explained above, Congress's use of the term "discharge" in section 401(a) must frame the scope of the certification requirement. In section 401(d), Congress allows conditions to be imposed on the "applicant" for the federal license or permit that requires a water quality certification.  But that does no more than reference the party seeking the certification.  *See also* 33 U.S.C. § 1341(a) (using the term "applicant" to identify the person responsible for obtaining the certification.").  The term "applicant" in section 401(d) can be given full meaning without destroying textual choices Congress made in section 401(a) to expand the regulatory scope of section 401(a), as EPA contends.

Nor does the use of the word "such activity" in a later sentence in section 401(a)(1) expand the operative language of that section as EPA contends.  In that sentence, Congress merely addresses how States should proceed when no express effluent limitations or performance standards exist under CWA sections 301(b), 302, 306, or 307.  33 U.S.C. § 1341(a).  But each of those statutory provisions addresses either limitations or performance standards that regulate discharges. *See* 33 U.S.C. §§ 1311(b) (setting a timetable for setting technology-based limitations on point-source discharges); 1312 (setting procedures for effluent limitations on point-source discharges necessary to attain or maintain water quality standards); 1316 (directing development of new source performance standards governing discharges from certain types of sources); 1317 (mandating development of effluent limitations for toxic pollutants).  Context readily indicates that the use

of "such activity" in that sentence is a reference to "discharges" Congress authorized States to review in the preceding sentence. *Util. Air Reg. Group v. EPA*, 573 U.S. 302, 320 (2014) (recognizing that presumption of consistent usage readily yields to context).

*Second*, EPA argues that its activity-based scope is consistent with the Supreme Court's decision in *PUD No. 1*. 88 Fed. Reg. at 66,594. Here, too, EPA is wrong, because *PUD No. 1*'s holding is irrelevant to the question of the scope of certification review authorized by section 401(a). PUD No. 1's brief discussion of section 401(a) is nonbinding dicta. The actual holding in that case is limited to the scope of the State's authority to impose conditions under *section 401(d)* and does not address the scope of certification review under *section 401(a)*. *See supra* at 4–5.

*Third*, EPA compounds its error by defining the "activity" subject to certification review to include project related actions beyond the jurisdiction of the federal licensing or permitting agency. Specifically, the 2023 Rule requires the certifying authority to "consider water quality-related impacts beyond the discharges," including impacts from operation and maintenance of the project. 88 Fed. Reg. at 66,598. Such analysis, for example for construction of a pipeline project, would allow the certifying authority to consider water quality-related impacts not only from the discharge of dredge or fill material from the construction and placement of the pipeline, which the Corps would regulate, but also "water quality impacts from non-discharge related erosion or sedimentation . . ., as well as later water quality impacts from the operation and maintenance of the pipeline." *See id.* Similarly, under EPA's approach, the "activity" scope for construction of a boat marina would allow the certifying authority to consider not only the discharges of dredged or fill material associated with dredging and placement of fill for the marina, but impacts related to the subsequent operation of the marina, such as increased vessel pollution in the water associated with increased vessel traffic for construction of the dock. *Id.* And "when looking at a hydropower

project," the 2023 Rule's expanded scope of review could allow consideration of a project's impacts on "fish passage or habitat restoration," unrelated to "discharges from the [project's] tailrace or powerhouse." *Id.*

EPA boldly states that "section 401 is not constrained to those activities directly authorized by the Federal license or permit in question." 88 Fed. Reg. at 66,599. EPA reads the statute to allow unfettered review of an "activity," so long as the certifying authority can in some way (perhaps many steps removed) allege undesirable water quality impacts from the proposed project, or its later operation or maintenance. EPA declines to establish just how "indirect or certain the impacts of the activity may be to water quality," leaving that determination in the hands of the certifying authority. EPA thus condones many of the same abuses that occurred before the 2020 Rule, where certifying authorities overstepped their CWA authority to deny or delay water quality certifications for energy infrastructure projects in an attempt to dictate national energy policy.

EPA points to section 401(a)(3), arguing that it allows a certification to address "potential water quality impacts from the subsequent operation even though the operation may be subject to a different Federal license or permit." *See id.* Not so. Section 401(a)(3) has a far more limited objective. It states that "[t]he certification obtained pursuant to paragraph (1) . . . with respect to the construction of any facility *shall fulfill the requirements of this subsection with respect to certification in connection with any other Federal license or permit required for the operation of such facility.*" 33 U.S.C. § 1341(a)(3) (emphasis added). This language does not expand the scope of the section 401(a) review; rather, it simply confirms that the scope of the section 401(a) certification, as defined by that paragraph, "shall fulfill" any additional requirements of operation permits required for the facility.

The plain language of section 401(a) directs authorities to certify that the discharge result-ing from the proposed federally licensed or permitted project will comply with the CWA.  EPA's reading of the statute has no limits, is contrary to basic causation principles, and ignores Congress' clear direction to focus on the "discharge" from the proposed project—not the "activity," including potential impacts from the later operation and maintenance of the project that are multiple steps removed from the discharge authorized by the federal permit or license.[1]  The scope of certification review in the 2023 Rule is unlawful and must be set aside.

>       b.      **The 2023 Rule significantly broadens the definition of "water quality requirements" to extend to non-CWA requirements of State law.**

EPA compounds its error in mandating a certification review of the "activity," instead of the "discharge" as Congress specified, by allowing that review to assess compliance with provi-sions other than those enumerated in section 401(a).  Specifically, under the 2023 Rule, the State must certify that the "activity" complies with "applicable water quality requirements," as condi-tioned, or deny certification.  The 2023 Rule defines "water quality requirements" to include not only the enumerated provisions in section 401(a) and "any Federal and state or Tribal laws or regulations implementing those sections," but also "any *other* water-quality related requirement of state or Tribal law," 40 C.F.R. 121.1(j) (emphasis added), even if those requirements only govern nonpoint source discharges.  88 Fed. Reg. at 66,602.  This is unlawful for many reasons.

To begin, EPA's reading cannot be reconciled with section 401(a)(1)'s text, which is an issue *PUD No. 1* did not address in this context.  Section 401(a)(1) requires a State certification that "discharges" authorized by the federal license "will comply with the applicable provisions of

---

[1] It is telling that EPA relies on legislative history that *predates* the 1972 CWA Amendments, where Con-gress amended section 401(a)'s focus from "activity" to "discharge."  88 Fed. Reg. at 66,599.  Any citations to ear-lier legislative history should carry no weight.

sections 1311, 1312, 1313, 1316, and 1317." 33 U.S.C. § 1341(a)(1).  Section 401(a)(1) makes no reference to any "other appropriate requirement of State law," a term that appears only in section 401(d).  If Congress intended that States evaluate compliance with any non-CWA requirements, it would have included them in section 401(a).  It did not, and that legislative choice must be given effect.  Any resort to the language Congress used in section 401(d) must be rejected.

EPA has no persuasive response.  It asserts that section 401 "is best interpreted in a way that respects the breadth of the Federal and state and Tribal water quality-related provisions," *see* 88 Fed. Reg. at 86,602, but, again, this finds no support in the actual text of section 401(a)(1).  Thus, EPA is wrong to define water quality requirements to include State laws applying to either point and nonpoint sources (in addition to the enumerated provisions in section 401(a)(1) and any Federal, State laws or regulations implementing those provisions).  This definition of "water quality requirements" simply goes too far.  It allows consideration of non-CWA State laws under the CWA and forces States to evaluate those non-CWA laws in the context of section 401.  *See* 33 U.S.C. 1341(a), (b), (d).

EPA's interpretation of "any other appropriate requirement of State law" goes even further still, unlawfully requiring that States evaluate whether impacts of the proposed activity to non-CWA *waters of the State* comply with non-CWA State laws, 88 Fed. Reg. at 66,604—once again entirely outside of the issues addressed in *PUD No. 1*.  This expansion is contrary to the explicit limitations of the federal CWA.  When a certifying authority reviews a request for certification under section 401 of the Act, it is limited to considering impacts from discharges to CWA-regulated "*navigable waters*" (defined as WOTUS) for purposes of certifying compliance with the CWA.  33 U.S.C. § 1341(a).  But EPA claims that the certifying authority is "not so limited when certifying compliance with requirements of state or Tribal law that otherwise apply to waters of

the State or Tribe beyond navigable waters."  88 Fed. Reg. at 66,604.  This results in a far broader evaluation of waters than is permissible under the CWA.

Entirely separately, even as to the conditioning authority under section 401(d), EPA's expansive reading of the term "any other appropriate requirement of State law" is plainly wrong—for the reasons Justice Thomas explains in his *PUD No. 1* dissent—and thus the Supreme Court should overrule *PUD No. 1*.  As EPA itself recognized in 2020, the term "other appropriate requirements of State law" in section 401(d) must mean "state or tribal regulatory requirements for *point source discharges into waters of the United States*." 40 C.F.R. § 121.1(n), 121.3 (2020) (emphasis added).  This more narrowly focused interpretation of the statutory text is consistent with the statute and the *ejusdem generis* canon.  Where general words follow an enumeration of two or more things, they apply to things of the same general kind or class specifically mentioned. *See Wash. State Dep't. of Social and Health Servs. v. Keffeler*, 537 U.S. 371, 383–85 (2003).  Applying this principle, the general term "appropriate requirement," from section 401(d), follows the enumeration of four specific sections of the CWA that are all focused on discharges.[2]  *See also PUD No. 1*, 511 U.S. at 728 (Thomas, J., dissenting) ("the general reference to 'appropriate' requirements of [S]tate law is most reasonably construed to extend only to provisions that, like the other provisions in the list, impose discharge-related restrictions").  "Any other appropriate requirement of State law" must hew to the intent and focus of section 401(a) on discharges.

---

[2] EPA argues that *ejusdem generis* bears no application here because one of the enumerated sections is section 303, which EPA says is not limited to regulated point source discharges.  88 Fed. Reg. at 66,603.  Section 303 requires the establishment of water quality standards, which are primarily used to establish numeric limits in point source discharge permits.  Thus, section 303 does not regulate nonpoint source pollution. *Oregon Natural Desert Ass'n v. Dombek*, 172 F.3d 1092, 1097 (9th Cir. 1998) ("Water quality standards are established in part to regulate point source pollution.  They provide 'a supplementary basis . . . so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels.'" (quoting *EPA v. California ex. rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 n.12 (1976)).

Instead of applying *ejusdem generis* to constrain the scope of the 401(d) term, "[a]ny other appropriate requirement of State law," EPA relies on the broadest possible reading of each word. EPA says that the word "any" is "capacious in its scope, literally meaning 'all' such state law requirements and not just a limited subset such as point source-related requirements." 88 Fed. Reg. at 66,603. Likewise, it claims the word "other" encompasses more than just the statutory provisions listed in section 401(d), and "appropriate" "is best understood as allowing certifying authorities to consider state or Tribal laws regarding water quality that are not part of the enumerated list of CWA sections. . . ." *See id.* But that's not how statutes are supposed to be interpreted. *See, e.g.*, *Magee v. Coca-Cola Refreshments USA, Inc.*, 833 F.3d 530, 534 (5th Cir. 2016).

Section 401(d) requires the certifying authority to "set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any *applicant* for a Federal license or permit will comply with any applicable" requirements and "with any other appropriate requirement of State law . . . ." 33 U.S.C. § 1341(d). Thus, section 401(d) is focused on the conditions with which an *applicant* must comply to ensure *discharges* comply with the CWA. EPA's interpretation of "any other appropriate requirement of State law" ignores the core focus of section 401(a)—to protect the quality of the navigable waters from point source *discharges*. The enumerated provisions set forth in section 401(a) identify requirements to ensure that *discharges* of pollutants do not degrade water quality. Section 401's reference to the requirement to ensure compliance with "applicable effluent limitations" and "water quality requirements," must be understood to focus on *protection of water quality from discharges*.

*     *     *

The consequences of EPA's broad, unlawful interpretation of "other applicable requirements of state law" are significant. As just one example, by mandating that States consider such

21

requirements and certify compliance with them, the 2023 Rule allows States to import into the CWA non-CWA legal requirements that would otherwise be preempted by the Natural Gas Act (NGA).  The Interstate Natural Gas Association of America (INGAA) members' interstate natural gas pipeline projects are regulated by FERC under the NGA.  Congress enacted the NGA in 1938 to provide a statutory framework for the construction and operation of interstate natural gas pipelines.  15 U.S.C. § 717.  Specifically, under section 7(c) of the NGA, "a natural gas company must obtain from the [FERC], a 'certificate of public convenience and necessity' before it constructs, extends, acquires, or operates any facility for the transportation or sale of natural gas in interstate commerce."  *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 305 (1998).  This review is complex and comprehensive, and it ensures that interstate natural gas pipeline projects proceed only if they serve the public interest.

FERC's authority under the NGA is exclusive, and States may not regulate in this "exclusively federal domain."  *Schneidewind*, 485 U.S. at 305; *AES Sparrows Point LNG, LLC v. Smith*, 527 F.3d 120, 125–26 (4th Cir. 2008).  But the NGA expressly carves out rights reserved to States under the CWA.  The 2023 Rule contravenes this carve-out, however, by mandating consideration of non-CWA State laws (which are preempted by the NGA) under the umbrella of the CWA, and forcing those non-CWA authorities to be evaluated in the section 401 context.  In this manner, States may deny water quality certifications or impose conditions for INGAA member projects based on non-CWA authorities.

The same unfortunate consequences also occur with respect to hydropower projects licensed by FERC under the Federal Power Act (FPA).  FERC licenses under the FPA certain hydropower projects "necessary or convenient . . . for the development, transmission, and utilization of power," 16 U.S.C. § 797(e), and "the FPA establishes a broad and paramount federal regulatory

role" that preempts state regulation, *California v. FERC*, 495 U.S. 490, 498–99 (1990); *accord Sayles Hydro Assocs. v. Maughan*, 985 F.2d 451, 455 (9th Cir. 1993). Yet, the 2023 Rule undermines the FPA's preemptive effect by importing consideration of otherwise preempted state-law requirements via the CWA.

The 2023 Rule's definition of "water quality requirements" exceeds the CWA and extends the State's scope of review beyond water quality impacts from the discharge to jurisdictional waters to encompass impacts to State and Tribal waters and nonpoint source discharges. The definition of "water quality requirements" should be vacated and set aside.

### 2. The 2023 Rule improperly allows for imposition of broad conditions that may bear little relation to water quality.

States may certify a project with or without imposing any additional conditions. *Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 388 (4th Cir. 2018). But a State must "set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with . . . any appropriate requirement of State law." *See* 33 U.S.C. § 1341(d). The CWA instructs that any necessary limitations and requirements identified by a state agency "shall become a condition on" the federal license or permit should it be issued by the federal agency, which serves to make any conditions of the 401 water quality certification requirements of federal law. *See id.* If States cannot "certify that the activity will comply with water quality requirements," 40 C.F.R. § 121.7(e)(3), even as conditioned, they must deny the certification. If a certifying authority denies certification, the Federal license or permit cannot be issued. 33 U.S.C. § 1341(a)(1).

The 2023 Rule exceeds the authority granted by section 401(d), because it applies the same unlawfully broad "activity" standard it uses to define the scope of review of a certification request. 88 Fed. Reg. at 66,605; 40 C.F.R. § 121.3(b) ("[C]onsistent with the scope of review identified in

paragraph (a) . . ., a certifying authority shall include any conditions in a grant of certification necessary to assure that the activity will comply with applicable water quality requirements.").

*PUD No. 1* emphasizes that a State's authority to condition a certification "is not un-bounded," 511 U.S. at 712, and only held, in particular, that section 401(d)'s reference to "any other appropriate requirement of State law" includes "State water quality standards adopted pur-suant to section 303," *id.* at 713.  The 2023 Rule, however, provides great latitude to States in imposing conditions that may have little connection to water quality impacts from the project's discharge beyond what *PUD No. 1* supports.  Although EPA maintains it would be inconsistent with section 401's purpose to deny or condition a water quality certification based on impacts unconnected to water quality, it "has consistently interpreted water quality impacts broadly," 88 Fed. Reg. at 66,601-02, allowing, for example, imposition of "conditions that could include build-ing or maintaining fish passage or habitat restoration related to water quality protection," or mon-itoring "non-discharge-related water quality impacts of the activity, such as temperature, flow, riparian buffer conditions, and species impacts," *id.* at 66,598.  Moreover, the 2023 Rule does not establish any clear limits on the "required degree of causality between the activity and the impact to water quality," *see id.* at 66,592, because EPA "finds it unnecessary to establish in this rulemak-ing how indirect or certain the impacts of the activity may be to water quality."  *See id.* at 66,600.

Indeed, EPA explains that the "activity" scope allows a certifying authority to consider water quality related impacts beyond the discharges.  EPA states that other conditions that may be appropriate to include in a WQC are "monitoring, reporting, and adaptive management in response to the *non-discharge related water quality impacts* of the activity," and "adaptive management conditions," if certain conditions are met in the future.  88 Fed. Reg. at 66,598 (emphasis added), 66,615.  For example, if a certifying authority is concerned about future downstream, climate

change-related impacts on aquatic species due to increased reservoir temperatures during the 50-year lifespan of a hydropower license, EPA says that the certifying authority might develop a condition that would require the project operator to take subsequent, remedial action in response to increased temperatures in the reservoir.  *Id.* at 66,615.  Such conditions might require monitoring, and as necessary, a change in reservoir withdrawal location in the water column, a change in timing of releases, or other modifications.  *Id.*

The 2023 Rule also purports to require the States to consider aspects of the activity that may occur after the federal permit expires, despite the fact that "any certification conditions incorporated into the Federal license or permit" expire upon expiration of the license or permit,  88 Fed. Reg. at 66,600—an issue *PUD No. 1* does not address.  EPA says when "consider[ing] whether to grant or deny certification," certifying agencies are not limited to "considering only those aspects of the activity that will occur before the expiration date of the Federal license or permit."  *See id.* If the certifying authority "determines that no conditions could assure that the activity, including post-expiration aspects of the activity, will comply with water quality requirements, denial of certification would be appropriate."  *See id.*

And by allowing consideration of non-CWA State laws under the umbrella of the CWA and forcing those non-CWA authorities to be evaluated in the section 401 context, States may impose conditions based on non-CWA authorities, and even further, impose those conditions on waters of the State—again, issues that *PUD No. 1* does not opine upon.

The imposition of conditions that may have only a tenuous connection to water quality, are non-discharge-related water quality impacts of the activity, or address post-expiration aspects of the activity exceeds the scope of the CWA and section 401.  This problem occurred under earlier regulations, when some States abused their 401 authority to effectively deny projects based on

non-water quality considerations, such as preferences regarding energy policy.  The same misap-

plications of section 401 will be resurrected under the 2023 Rule's unlawfully broad standard,

unless the Rule is set aside.

### B.   The 2023 Rule Is Arbitrary and Capricious Because EPA Failed to Sufficiently Explain and Justify Its Decision to Change Course.

The APA "demand[s] that [an agency] display awareness that it is changing position."

*Wages & White Lion Invs., L.L.C. v. Food & Drug Admin.*, 90 F.4th 357, 381 (5th Cir. 2024)

(citation omitted); *Physicians for Soc. Resp. v. Wheeler, 956 F.3d 634, 644* (D.C. Cir. 2020) ("It

is axiomatic that the APA requires an agency to explain its basis for a decision.").  "An agency

may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the

books." *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 469 (5th Cir. 2024) (citing *FCC v. Fox

Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *Wages & White Lion Invs.*, 90 F.4th at 381

(citation omitted).  Thus, "[a]n agency changing its course must supply a reasoned analysis indi-

cating that prior policies and standards are being deliberately changed, not casually ignored." *Id.*

(quoting *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)); *Motor Ve-

hicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42 (1983).  Relatedly,

the APA requires an agency to provide a "detailed justification" for its change in course when "its

new policy rests upon factual findings that contradict those which underlay its prior policy; or

when its prior policy has engendered serious reliance interests that must be taken into account."

*Wages & White Lion Invs.*, 90 F.4th at 381 (citation omitted); *accord R.J. Reynolds Vapor Co. v.

Food & Drug Admin.*, 65 F.4th 182, 189 (5th Cir. 2023); *Fox Television Stations, Inc.*, 556 U.S.

at 515.  Failure to provide such justification is arbitrary and capricious in violation of the APA.

*Wages & White Lion Invs.*, 90 F.4th at 381; 5 U.S.C. § 706(2)(A).  And even when an agency does

acknowledge a change in course, it cannot simply move the administrative goalpost without notice,

*Wages & White Lion Invs.*, 90 F.4th at 384–85, as the APA prohibits precisely this "kind of unfair surprise." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (citation omitted) ("[A]gencies should provide regulated parties fair warning of the conduct [a regulation] prohibits or requires." (citation and alteration omitted)); *see also ExxonMobil Pipeline Co. v. DOT*, 867 F.3d 564, 580 (5th Cir. 2017).

Here, EPA failed to provide a reasoned explanation for its sudden change of course in the 2023 Rule, which repealed the 2020 Rule and put in place a fundamentally different section 401 certification process that sharply deviated from the 2020 Rule in multiple respects. Each of these unjustified changes in the 2023 Rule violate the APA, as explained below, particularly in light of the "serious reliance interests" at play. *Wages & White Lion Invs.*, 90 F.4th at 381; *Fox Television Stations, Inc.*, 556 U.S. at 515. Because these expansive changes are integral to the operation of the 2023 Rule, EPA's failure to provide a reasoned analysis justifying this change of course renders unlawful the rulemaking as a whole. *Chamber of Com. of Am. v. United States Dep't of Lab.*, 885 F.3d 360, 388 (5th Cir. 2018) ("[T]his comprehensive regulatory package is plainly not amenable to severance."). As a result, the Court is required to vacate the 2023 Rule in full. *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) ("The default rule is that vacatur is the appropriate remedy.").

*First*, EPA failed to provide a reasoned explanation for abandoning the 2020 Rule's interpretation of the scope of certification review under section 401. *See Wages & White Lion Invs.*, 90 F.4th at 381; *State Farm*, 463 U.S. at 42. Under the 2020 Rule, "[t]he scope of a . . . section 401 certification [wa]s limited to assuring that a discharge . . . will comply with water quality requirements," 40 C.F.R. § 121.3 (2020), thus precluding States from imposing "certification conditions that address water quality impacts from any aspect of the construction or operation of the

27

activity as a whole," 85 Fed. Reg. at 42,232.  The 2020 Rule's focus on the "discharge," rather than the "activity," *id.*, aligned with the statutory language of the CWA, 33 U.S.C. § 1341(a)(1), thus preventing the "expan[sion]" of "section 401 regulatory authority" beyond what Congress intended, 85 Fed. Reg. at 42,232.  Yet, EPA discarded this important limitation in the 2023 Rule, significantly expanding the regulatory scope of section 401 certification review to "the *activity* subject to the Federal license or permit, not merely its potential point source *discharges*," 88 Fed. Reg. at 66,592 (emphases added), without providing the "reasoned analysis" for this change that the APA requires, *Wages & White Lion Invs.*, 90 F.4th at 381; *State Farm*, 463 U.S. at 42.  Under the 2023 Rule, "[t]he certifying authority's evaluation" may now encompass all "water quality-related impacts from the activity subject to the Federal license or permit, including the activity's construction and operation," 40 C.F.R. § 121.3(a) (2023)—a drastic shift from the narrower certification review scope of the 2020 Rule, *see* 85 Fed. Reg. at 42,232, as EPA now construes "water quality impacts" to include "all of the potential effects of a proposed activity on water quality—direct and indirect, short and long term, upstream and downstream, construction and operation," 40 C.F.R. § 121.3(a) (2023).

EPA's attempts to justify this sudden and unprecedented expansion in scope do not satisfy the APA's reasoned-explanation requirement.  In the 2023 Rule, EPA asserts it is "adopt[ing] the full activity scope of review included in the proposed rule," 88 Fed. Reg. at 66,596, without explaining why it now interprets the relevant statutory language in an entirely different manner than it did just a few years ago.  *Id.* at 66,596–98.  EPA points to the Supreme Court's decision in *PUD No. 1* for support, 88 Fed. Reg. at 66,596, but that decision's brief discussion of an activity-based approach for section 401 review was merely dicta, *see supra* at 5.  *PUD No. 1* did not involve consideration of a comprehensive interpretation of section 401's scope of certification review and

thus cannot excuse EPA from the duty to explain its flip-flop from the comprehensive interpretation the agency provided in 2020. *See Wages & White Lion Invs.*, 90 F.4th at 381.

*Second*, EPA failed to provide a reasoned explanation in the 2023 Rule for changing course to allow a certifying authority to impose conditions that the permitting agency does not have authority to impose. In the 2020 Rule, EPA limited the additional conditions that certifying authorities could include in their certifications, *see* 85 Fed. Reg. at 42,230–31, in light of section 401(d)'s provision that any certification condition "shall become a condition on any Federal license or permit subject to the provisions of this section," 33 U.S.C. § 1341(d). But in the 2023 Rule, EPA removed this limitation, as its new definition of "water quality requirements" includes not only "any limitation, standard, or other requirement under sections 301, 302, 303, 306, and 307 of the Clean Water Act, any Federal and state or Tribal laws or regulations implementing those sections," but also "*any other water quality-related requirement of state or Tribal law.*"  88 Fed. Reg. at 66,653 (emphasis added); 40 C.F.R. § 121.1(j) (2023). While EPA notes commenters' concern "that the term 'water quality-related requirements of state or Tribal law' was too broad and would allow certifying authorities to include conditions unrelated or weakly related to water quality," EPA fails to acknowledge the significance of this language for regulated parties seeking certification and again characterizes its change of course as simply aligning with the CWA's requirements. 85 Fed. Reg. at 66,602. Instead of providing a "reasoned analysis" explaining this change, as the APA mandates, *Wages & White Lion Invs.*, 90 F.4th at 381; *State Farm*, 463 U.S. at 42; *Physicians for Soc. Resp.*, 956 F.3d at 644, EPA simply states that its expanded definition of "water quality requirements" is "the best interpretation considering the text of section 401," which "definition is also supported by the purpose, and legislative history of the statute."  88 Fed. Reg. at 66,602. That ipse dixit is insufficient to explain so dramatic a change.

*Third*, the 2023 Rule eliminated the 2020 Rule's prohibition on certifying authorities evading CWA's one-year review deadline, 85 Fed. Reg. at 42,235–36; *see* 33 U.S.C. § 1341(a)(1), without addressing the underlying problem or providing any "reasoned analysis" that could justify this change.  *See* 88 Fed. Reg. at 66,590–91, 66,607–12.  The 2020 Rule prohibited schemes to evade the one-year deadline, including the so-called withdraw/resubmit scheme that previously allowed certifying agencies to indefinitely delay the review process by requiring applicants to withdraw and resubmit certification requests, *see* 88 Fed. Reg. at 66,590, and the deny-without-prejudice scheme that previously allowed certifying authorities to deny certification "without prejudice" to force the applicant to resubmit its request and reset the one-year deadline, *see* 88 Fed. Reg. at 66,608.

To begin, in removing the 2020 Rule's provision prohibiting the withdraw/resubmit scheme, 88 Fed. Reg. at 66,590, the 2023 Rule acknowledges that this practice has historically been used to unreasonably delay the Section 401 and federal permitting process and indefinitely extend the one-year deadline, *id.* at 66,590–91.  Yet, EPA bizarrely decides "to take no position on the legality of withdrawing and resubmitting a request for certification" in the 2023 Rule, instead leaving it to the discretion of states and federal agencies to determine if withdraw/resubmit is reasonable.  *Id.*  Indeed, EPA all but concedes that it is refusing to explain this change, stating that the 2023 Rule "resets EPA's interpretive position to *silent and neutral* on withdrawal and resubmittal," and deferring to certifying authorities, other agencies, and judicial review to sort out any disagreements over the issue.  88 Fed. Reg. at 66,591.  Noting that "the 2020 Rule relied on a broad reading of the D.C. Circuit's decision in *Hoopa Valley Tribe*," *id.* at 66,590 (citing *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099 (D.C. Cir. 2019)), EPA claims that interceding court decisions have created a patchwork of law on the question and further asserts that nothing in "the text

of section 401 nor *Hoopa Valley Tribe* categorically precludes withdrawal and resubmission." *Id.* at 66,590–91.  Neither of these assertions satisfy the APA because EPA offers no justification or analysis explaining its sudden rejection of its previous position.  *Wages & White Lion Invs.*, 90 F.4th at 381; *State Farm*, 463 U.S. at 42.

As for the other various deadline-evasion schemes, EPA fails to even acknowledge its change in position.  For example, EPA adopts a passive position on the deny-without-prejudice scheme in the 2023 Rule, stating that "EPA's removal of regulatory text regarding the effects of a denial of certification has no impact on denials without prejudice" and "EPA continues to interpret section 401 as allowing denials without prejudice."  88 Fed. Reg. at 66,608.  Yet, in the 2020 Rule, EPA made clear "that a certifying authority must act on a section 401 certification within a rea-sonable period of time, which shall not exceed one year, and that there is no tolling provision to stop the clock at any time."  85 Fed. Reg. at 42,235–36.  EPA cannot now reverse its efforts "to address some of the delays and confusion" associated with the section 401 certification review process, such as the deny-without-prejudice scheme, *id.* at 42,236; *contra* 88 Fed. Reg. at 66,607–12, without first "display[ing] awareness that it is changing position" and "supply[ing] a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored," *Wages & White Lion Invs.*, 90 F.4th at 381.

*Fourth*, EPA fails to explain why the facts and concerns underlying provisions in the 2020 Rule are no longer relevant, despite removing or fundamentally altering these provisions in the 2023 Rule.  The 2023 Rule necessarily depends upon "factual findings that contradict those which underlay its prior policy" in multiple respects, *Wages & White Lion Invs.*, 90 F.4th at 381 (quoting *Fox Television Stations*, 556 U.S. at 515), but EPA does not explain how changed circumstances or new data justifies the changes.  To begin, the 2023 Rule's preamble asserts *without any support*

31

that the 2020 Rule was not protective of the environment.  88 Fed. Reg. at 66,559–60.  And as discussed above, *supra* at 7–9, the 2023 Rule also substantially expanded the scope and require-ments for section 401 certification, 88 Fed. Reg. at 66,591–96, 66,601–06, without any analysis or new data show why this significantly more burdensome certification request process was necessary to protect the environment, *see Wages & White Lion Invs.*, 90 F.4th at 381.  Conversely, EPA eliminated the written certification decision and the federal agency review requirements in the 2023 Rule, 88 Fed. Reg. at 66,610–14, 66,616–19, without providing any analysis or data to show that the removal of these checks from the certification review process will not harm the environ-ment or derail the review process, *see Wages & White Lion Invs.*, 90 F.4th at 381.

*Fifth*, in the 2023 Rule, EPA deviated from a longstanding jurisdictional position that al-lowed certain States to act as certifying authorities for federal lands within their borders, without acknowledging the change or considering existing state roles in issuing certifications.  The 2023 Rule declares that EPA now has new unilateral 401 certification authority over millions of acres in States like Wyoming, *see* 88 Fed. Reg. at 66,625 (finding that section 401 "directs the Admin-istrator to issue certification for lands of exclusive jurisdiction"); *see also id.* at 66,627 n.87 (listing sixteen National Parks for which EPA now claims to be the exclusive certifying authority, includ-ing Yellowstone), all without considering that at least one State has traditionally issued 401 certi-fications in the relevant areas, evaluating the engendered reliance interests that its seizure of new jurisdiction impaired, or even acknowledging EPA's change of policy here.  For decades, Wyo-ming has issued 401 certifications for activities within Yellowstone National Park, including under the 2020 Rule, Ex. 2 ¶¶ 7–12, 16–17; *see* AR0008804-06, because the 2020 Rule did not transfer that certification authority to EPA, despite noting that "EPA will act as the certifying authority [for] lands of exclusive federal jurisdiction," 85 Fed. Reg. at 42,219 & n.47 (mentioning only

Denali National Park as an example of lands of exclusive federal jurisdiction.  But in the 2023 Rule, EPA changed course without explanation, specifically claiming certification authority for activities in Yellowstone National Park, 88 Fed. Reg. at 66,627 & n.87, while ignoring both the relevant law and Wyoming's decades-long experience issuing section 401 certifications for activities in Yellowstone, 88 Fed. Reg. at 66,625-27; Ex. 2 ¶¶ 7–12, 16–17; *see* AR0008804-06.

The 2023 Rule unilaterally displaced the State 401 certification process across millions of acres in Wyoming without acknowledging the change and without recognizing the state's historic role in issuing certifications within its boundaries.  *See* 33 U.S.C. § 1313(d)(1)(A)–(B) (requiring a state to promulgate water quality standards for all waters within the boundaries of the State, including within national parks located within a state's boundaries); *see also id.* § 1341(a)(1) (requiring, for discharges originating within a State's boundaries, that the State must certify that the proposed discharge will comply with the State's water quality standards promulgated pursuant to section 303).  This unexplained departure from the agency's longstanding prior policy is categorically arbitrary and capricious.  *See Louisiana*, 90 F.4th at 469; *accord Wages & White Lion Invs.*, 90 F.4th at 381.  EPA's only response is that its new policy does not "remove[ ] authority from states" because States do not have such authority under section 401 in the first place, 88 Fed. Reg. at 66,625, and that section 401 directs the Administrator to issue certifications in areas with "exclusive Federal jurisdiction" when the terms do not appear in the CWA or EPA's own regulations, *id.; see also* 33 U.S.C. § 1341.  EPA's finding that "section 401 directs the Administrator to issue certifications in lands of exclusive Federal jurisdiction" is likewise arbitrary and capricious because it did not consider relevant factors and Wyoming's longstanding and existing practice of issuing 401 certifications in Yellowstone National Park.  *See Louisiana,* 90 F.4th at 474–75

(finding agency rule was arbitrary and capricious for not considering relevant factors); *see also id.* at 477 (stating courts cannot "affirm agency action on the basis of 'conclusory' statements").

*Finally*, and more generally, the 2023 Rule entirely fails to account for the "serious reliance interests" affected by EPA's unexplained changes from the 2020 Rule, contrary to EPA's claim that the Rule is "well-informed by stakeholder input," 88 Fed. Reg. at 66,559. Indeed, the practical effect of these changes is that both the universe of activities subject to certification review and the extent of conditions that certifying authorities may require are now much more expansive, greatly increasing the burden of such review on regulated parties. The APA requires EPA to "provide regulated parties [with] fair warning of the conduct" that the agency's regulations "prohibit[ ] or require[ ]," *Christopher*, 567 U.S. at 157; *accord Wages & White Lion Invs.*, 90 F.4th at 384–85, but EPA abdicates that responsibility in the 2023 Rule. EPA appears to suggest that regulated parties received the requisite "fair warning" of the fundamentally altered certification review process in the 2023 Rule, because this process is now "consistent with the plain language of section 401(a)(1) and legislative history of the CWA," 88 Fed. Reg. at 66,570, 66,602–03, as well as "the spirit of cooperative federalism," *id.* at 66,565, 66,590, 66,593, and relevant precedent, *id.* at 66,565, 66,569, 66,591. But EPA mistakes its obligation. Where, as here, regulated parties have legitimately relied on EPA's prior interpretations, *Christopher*, 567 U.S. at 156–57; *Smiley v. Citibank*, 517 U.S. 735, 742 (1996), the APA requires EPA to explain *why* it has fundamentally changed course and give notice to regulated parties of any new or revised requirements governing their conduct. *Wages & White Lion Invs.*, 90 F.4th at 381, 384–85. Lacking this analysis and notice, the 2023 Rule is thus the definition of an "unfair surprise" that penalizes a party for "good-faith reliance" on an agency's prior positions. *Id.*

### C.    The 2023 Rule Is Impermissibly Retroactive.

The law treats with great skepticism an agency's attempt to apply a regulation retroactively, as "[r]etroactivity is not favored." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006).  A regulation has retroactive effect when it "attaches new legal consequences to events completed before its enactment"; "takes away or impairs vested rights"; or "creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Germain v. U.S. Bank Nat'l Ass'n*, 920 F.3d 269, 274–75 (5th Cir. 2019) (citations omitted; emphasis omitted); *accord Immigr. & Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 321 (2001) (superseded by statute on other grounds). An agency may not promulgate a retroactive regulation unless specifically "authorize[d]" by statute to engage in "retroactive rulemaking" in "express [statutory] terms." *Bowen*, 488 U.S. at 208; *see Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 757 (D.C. Cir. 1987), *aff'd* 488 U.S. 204 (1988) (APA does not authorize retroactive rulemaking); 5 U.S.C. § 551(4) ("rule" has "future effect").  Finally, submission of an application in reliance on a preexisting legal regime is outcome determinative of whether a new law altering that regime is impermissibly retroactive. *Silva Rosa v. Gonzales*, 490 F.3d 403, 408 (5th Cir. 2007).

The Fifth Circuit's decision in *Silva Rosa* is instructive on this submission-of-application consideration.  There, the Fifth Circuit denied a claim that the Illegal Immigration Reform and Immigration Responsibility Act of 1996 (IIRIRA), which eliminated the availability of adjustment-of-status relief for certain immigrants subject to removal, was impermissibly retroactive as to a plaintiff who had not yet filed "an adjustment of status application." *Id.* at 407–10.  Without the filing of such an application, the plaintiff could not have "settled expectations" that the pre-IIRIRA regime would apply to himself, so application of the new regime to the plaintiff was not "impermissibly . . . retroactive[ ]." *Id.*  In so holding, the Fifth Circuit explained that "the

application suffices as a completed transaction," after which point the statute "cannot impermissibly apply to these applications retroactively." *Id.* at 408 (citation omitted). Here, the 2023 Rule is impermissibly retroactive, as it applies retroactively to pending section 401 certification requests submitted after the effective date of the 2020 Rule but before the effective date of the 2023 Rule—including many such requests submitted by members of Association Plaintiff NHA, Ex. 8—although EPA does not have retroactive rulemaking authority under the CWA.

To begin, the 2023 Rule applies retroactively to those pending section 401 certification requests submitted after the effective date of the 2020 Rule but before the effective date of the 2023 Rule. EPA provided that the 2023 Rule applies whenever "a certifying authority [has] received a request for certification, *prior to the effective date of this final rule*, and the certifying authority has not acted on the request for certification as of the effective date." 88 Fed. Reg. at 66,655 (emphasis added). "[A]ny decision issued by the certifying authority" with respect to such pending certification requests "after the effective date of this final rule must comply with the requirements in the final rule (*e.g.,* scope of certification)." *Id.* This specific language in the 2023 Rule's preamble demonstrates EPA's "final and binding interpretation" on the application of that rule to these requests. *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 689 n.2 (5th Cir. 2000).

The 2023 Rule's retroactive application to these pending certification requests is retroactive in the "disfavored sense." *Fernandez-Vargas*, 548 U.S. at 37. Applying the 2023 Rule to requests submitted after the 2020 Rule but before the 2023 Rule would "take[ ] away or impair[ ] vested rights" of these project applicants, or "create[ ] a new obligation, impose[ ] a new duty, or attach[ ] a new disability, in respect to transactions or considerations already past." *Germain*, 920 F.3d at 274–75. That is, retroactive application of the 2023 Rule to these pending requests would impermissibly alter the legal regime under which requesters like members of Association Plaintiff

36

NHA prepared and "actually submit[ted]" their "application[s]" for section 401 certifications, un-lawfully disrupting their "settled expectations" that the prior, 2020 Rule would govern such appli-cations. *Silva Rosa*, 490 F.3d at 408. Specifically, retroactive application of the 2023 Rule to these requests would impermissibly upset settled expectations in three respects. First, the 2023 Rule requires review of the project applicants' entire "*activity* subject to the Federal license or permit, not merely its potential point source *discharges*" that would have been subject to review under the 2020 Rule. 88 Fed. Reg. at 66,592 (emphases added); *see also* 40 C.F.R. § 121.3(a) (2023). Second, the 2023 Rule purports to expand the States' section 401 certification authority to "any discharge into waters of the United States," encompassing both point source discharges and nonpoint source discharges, 40 C.F.R. § 121.1(f) (2023), rather than only "a discharge from a point source into a water of the United States" under the 2020 Rule, 40 C.F.R. § 121.1(f) (2020). And third, the 2023 Rule broadens the scope of the "water quality requirements" that reviewing authorities must consider and conditions they may impose—including requirements related to State and Tribal waters—thus greatly expanding the criteria for certification and allowing States to impose far more conditions on the section 401 certification than under the 2020 Rule. 88 Fed. Reg. at 66,598; *see* AR0008836-37; Ex. 8 Ex. C ¶¶ 12–15, 22–25, 32–35.

The Fifth Circuit's *Silva Rosa* is on point here. Project applicants who submitted their water-quality-certification requests after the effective date of the 2020 Rule but before the effective date of the 2023 Rule, including members of the Association Plaintiffs, have vested rights in the application of the 2020 Rule just like the hypothetical immigrants discussed in *Silva Rosa* who "actually submit[ted] an application for adjustment of status before IIRIRA." *Silva Rosa*, 490 F.3d at 408. This renders these project applicants' water quality certification requests "'completed

transaction[s]'" and gives them "settled expectations" that prohibit application of the 2023 Rule "to these applications retroactively." *Id.* at 408.

Finally, EPA has no statutory authority to promulgate retroactive rules, thus the 2023 Rule's retroactive effect is unlawful. *Bowen*, 488 U.S. at 208; *accord Nat'l Mining Ass'n v. Dep't of Lab.*, 292 F.3d 849, 860 (D.C. Cir. 2002). Congress did not "authorize[ ]" the EPA to engage in any "retroactive rulemaking" with "express terms" in the CWA. *Bowen*, 488 U.S. at 208; *see Sierra Club v. Whitman*, 285 F.3d 63, 68 (D.C. Cir. 2002). And EPA does not possess retroactive rulemaking authority under the APA either. *Georgetown Univ. Hosp.*, 821 F.2d at 757; 5 U.S.C. § 551(4). So, EPA cannot apply the 2023 Rule retroactively to pending section 401 certification requests submitted to the States after effective date of the 2020 Rule, but before the effective date of the 2023 Rule. *Bowen*, 488 U.S. at 208; *accord Georgetown Univ. Hosp.*, 821 F.2d at 757; *Sierra Club*, 285 F.3d at 68.

Plaintiffs understand that, in denying their preliminary-injunction motion, this Court concluded that Plaintiffs were unlikely to succeed on the merits of their impermissibly-retroactive argument. Dkt.91 at 12–16. However, Plaintiffs respectfully submit that this Court's merits determination was incorrect. Indeed, this Court's decision did not address the Fifth Circuit's *Silva Rosa* decision, although this was Plaintiffs' lead Fifth Circuit authority for their impermissibly-retroactive argument, *see generally* Dkt. 91 at 12–16.

### D.    EPA Failed to Respond Meaningfully to Significant Public Comments.

An agency must "consider all relevant factors raised by the public comments and provide a response to significant points within." *Chamber of Com. of United States v. United States Sec. & Exch. Comm'n*, 85 F.4th 760, 774 (5th Cir. 2023). "Comments the agency must respond to include those that 'can be thought to challenge a fundamental premise underlying the proposed agency decision,'" *id.* (quoting *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir.

2019)), "or include points that if true and adopted would require a change in an agency's proposed rule,'" *id.* (quoting *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023)).  The agency's response must be sufficient to allow the court to see "why the agency reacted to [the issues raised] as it did." *Carlson*, 938 F.3d at 344.  There are at least five significant issues to which EPA did not provide a sufficient response.

*First*, EPA failed to address meaningfully the American Petroleum Institute's concern that the proposed rule would not prohibit certifying authorities from using the withdraw and resubmit tactic to extend their statutory review period.  AR0010047.  EPA responded that it was not addressing the issue because it "is not confident that it can create regulatory 'bright lines' that adequately and fairly address each situation." 88 Fed. Reg. at 66,590.  But EPA does not explain what options it considered or why it cannot at least provide some guidance for these case-by-case decisions.

*Second*, EPA failed to respond adequately to INGAA's concern that a federal licensing or permitting agency with authority over only a small part of the project would be unable to implement a certification with conditions addressed to impacts from the "activity as a whole."  EPA responded by pointing only to Federal agencies' experience "delineating the 'activity' based on the facts of each situation." 88 Fed. Reg. at 35,346.  That response does not address how an agency can implement conditions that go beyond the scope of its authority.  EPA argues that the bounds of the permitting authority does not dictate the scope of certification under section 401.  AR0015262.  That response evades the issue that the "activity as a whole" interpretation is inconsistent with the requirement that certification conditions become part of the license or permit.

*Third*, EPA failed to respond to INGAA's concern that the absence of a requirement that a project proponent consent to modification would allow the certifying authority to "flip-flop" on its

initial decision. EPA's response is that it is not "prevent[ing] engagement with the project propo-

nent" concerning modification.  AR0015346.  Again, EPA does not address the real issue that the

2023 Rule relieves the certifying authority of any obligation to notify the project proponent or

obtain its consent and could thus flip flop on its decision.

*Fourth*, EPA's finding regarding areas of "exclusive Federal jurisdiction" contravened its

notice-and-comment obligations. The 2023 Rule failed to acknowledge that States have long is-

sued 401 certifications within National Parks.  Ex. 2 ¶¶ 7–12, 16–17; *see* AR0008804-06.  Instead,

EPA ignored Wyoming's comments about existing state jurisdiction and concluded that its novel

"exclusive Federal jurisdiction" would not remove authority from States that did not have that

authority in the first instance.  88 Fed. Reg. at 66,625.

*Finally*, EPA failed to meaningfully engage with NHA's comments.  *See* AR0008837–68.

In particular, NHA addressed EPA's numerous and unjustified changes of position from the 2020

Rule, AR0008843–46, AR0008854–47, AR0008858–63, AR0008865–67, but EPA dismissed

these comments without sufficiently addressing them in the final 2023 Rule, 88 Fed. Reg. at

66,567–72, 66,575–77, 66,596–97, 66,602–06; AR0015121–22, AR0015137–39, AR0015143,

AR0015165–72, AR0015310–12, AR0015354–58.

Plaintiffs raised significant issues that EPA did not address.  That makes the final rule

arbitrary and capricious.  *See Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce,* 60 F.4th 956,

973 (5th Cir. 2023) (finding comments raised a significant issue and the agency violated the APA

when it did not adequately respond).

## VI.    Conclusion

To remedy EPA's violations of law in adopting the 2023 Rule, the Court should declare

that the Rule violates the CWA and the APA, vacate and set aside the Rule, and enjoin EPA from

enforcing or applying the Rule.

Dated: May 30, 2024

Respectfully submitted,

LIZ MURRILL
  ATTORNEY GENERAL OF LOUISIANA

/s/ Tracy L. Short
Tracy L. Short (La. #23940)
  *Assistant Chief Deputy Attorney General*
Kelsey L. Smith (*pro hac vice*)
  *Deputy Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
(225) 326-6766
(225) 428-7432
shortt@ag.louisiana.gov
smithkel@ag.louisiana.gov
*Counsel for State of Louisiana*

TREG R. TAYLOR
  ATTORNEY GENERAL OF ALASKA

/s/ Cameron Jimmo
Cameron Jimmo (*pro hac vice*)
  *Senior Assistant Attorney General*
ALASKA DEPARTMENT OF LAW
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
(907) 269-6457
cameron.jimmo@alaska.gov
*Counsel for State of Alaska*

AUSTIN KNUDSEN
  ATTORNEY GENERAL OF MONTANA

/s/ Christian B. Corrigan
Christian B. Corrigan (*pro hac vice*)
  *Solicitor General*
Peter M. Torstensen, Jr. (*pro hac vice*)
  *Deputy Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov
*Counsel for State of Montana*

TIM GRIFFIN
  ARKANSAS ATTORNEY GENERAL

/s/ Michael A. Cantrell
Michael A. Cantrell (*pro hac vice*)
  *Assistant Solicitor General*
OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2401
Michael.Cantrell@ArkansasAG.gov
*Counsel for the State of Arkansas*

RUSSELL COLEMAN
ATTORNEY GENERAL OF KENTUCKY

/s/ Lindsey Keiser
Lindsey Keiser (*pro hac vice*)
  *Assistant Attorney General*
KENTUCKY OFFICE OF THE ATTORNEY
GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky  40601
(502) 696-5517
Lindsey.Keiser@ky.gov
*Counsel for the Commonwealth of Kentucky*

LYNN FITCH
  ATTORNEY GENERAL OF MISSISSIPPI

/s/ Justin Matheny
Justin L. Matheny (*pro hac vice*)
  *Deputy Solicitor General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205
Justin.Matheny@ago.ms.gov
*Counsel for State of Mississippi*

GENTNER DRUMMOND
  ATTORNEY GENERAL OF OKLAHOMA

/s/Garry M. Gaskins, II
Garry M. Gaskins, II (*pro hac vice*)
  *Solicitor General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Garry.Gaskins@oag.ok.gov
*Counsel for State of Oklahoma*

ALAN WILSON
  ATTORNEY GENERAL OF SOUTH CAROLINA

/s/ Thomas T. Hydrick
Thomas T. Hydrick (*pro hac vice*)
  *Assistant Deputy Solicitor General*
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov
*Counsel for the State of South Carolina*

PATRICK MORRISEY
  ATTORNEY GENERAL OF WEST VIRGINIA

s/ Michael R. Williams
Michael R. Williams (*pro hac vice*)
  *Principal Deputy Solicitor General*
OFFICE OF THE WEST VIRGINIA AT-
TORNEY GENERAL
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Michael.R.Williams@wvago.gov
*Counsel for State of West Virginia*

ANDREW BAILEY
  ATTORNEY GENERAL OF MISSOURI

/s/ Josh Divine
Josh Divine (*pro hac vice*)
  *Solicitor General*
MISSOURI ATTORNEY
  GENERAL'S OFFICE
207 West High St.
Jefferson City, MO 65101
(573) 751-8870
Josh.Divine@ago.mo.gov
*Counsel for State of Missouri*

BRIDGET HILL
  ATTORNEY GENERAL OF WYOMING

s/ Abigail Boudewyns
Abigail Boudewyns (*pro hac vice*)
  *Senior Assistant Attorney General*
Travis Jordan (*pro hac vice*)
  *Senior Assistant Attorney General*
WYOMING ATTORNEY
  GENERAL'S OFFICE
109 State Capitol
200 West 24th Street
Cheyenne, WY 82002
(307) 777-6946
abigail.boudewyns@wyo.gov
travis.jordan@wyo.gov
*Counsel for State of Wyoming*

/s/ Jeremy T. Grabill
Jeremy T. Grabill (Bar #34924)
Margaret Manning (Bar #39268)
PHELPS DUNBAR LLP
Canal Place, 365 Canal Street, Suite 2000
New Orleans, LA 70130
(504) 566-1311
jeremy.grabill@phelps.com
margaret.manning@phelps.com
*Counsel for American Petroleum Institute, Interstate Natural Gas Association of America, and National Hydropower Association*

/s/ George P. Sibley, III
George P. (Trey) Sibley, III (*pro hac vice*)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
(804) 788-8262
gsibley@hunton.com

Deidre G. Duncan (*pro hac vice*)
Karma B. Brown (*pro hac vice*)
Erica Peterson (*pro hac vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1500
dduncan@hunton.com
kbbrown@hunton.com
epeterson@hunton.com
*Counsel for American Petroleum Institute and Interstate Natural Gas Association of America*

Misha Tseytlin (*pro hac vice*)
Kevin M. LeRoy (*pro hac vice*)
TROUTMAN PEPPER HAMILTON SANDERS LLP
227 W. Monroe Street, Suite 3900
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com

Charles R. Sensiba (*pro hac vice*)
TROUTMAN PEPPER HAMILTON SANDERS LLP
401 Ninth Street, NW, Suite 1000
Washington, DC 20004
(202) 274-2850
charles.sensiba@troutman.com

*Counsel for National Hydropower Association*

**<u>CERTIFICATE OF SERVICE</u>**

I do hereby certify that on this 30th day of May, 2024, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all participating counsel of record.

<u>/s/ George P. (Trey) Sibley, III</u>