# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | |
|---|---|
| STATE OF LOUISIANA, STATE OF ALASKA, STATE OF ARKANSAS, COMMONWEALTH OF KENTUCKY, STATE OF MISSISSIPPI, STATE OF MISSOURI, STATE OF MONTANA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF WEST VIRGINIA, AND STATE OF WYOMING, AMERICAN PETROLEUM INSTITUTE, INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA, and NATIONAL HYDROPOWER ASSOCIATION, <br><br>       Plaintiffs, <br><br>       v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY and MICHAEL REGAN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, <br><br>       Defendants. | Civil No. 2:23-cv-01714 <br><br> Judge James D. Cain, Jr. <br> Magistrate Judge Thomas P. LeBlanc |

**COMBINED BRIEF IN SUPPORT OF STATE INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................................1

II. BACKGROUND...................................................................................................................2

    A. Statutory and Regulatory Background................................................................................2

    B. Difficulties Under the 2020 Rule and Return to Normalcy Under the 2023 Rule.............2

III. ARGUMENT .....................................................................................................................4

    A. The 2023 Rule Complies With the Clean Water Act, Congressional Intent, and Relevant Case Law.............................................................................................................................4

        1. Case law and the language and history of section 401 support the 2023 Rule's restoration of the full scope of section 401 certification review....................................5

        2. The 2023 Rule's requirement that certifications comply with water quality-related state laws is fully consistent with the Clean Water Act and should be upheld............11

        3. Plaintiffs' arguments about Natural Gas Act preemption demonstrate that the 2023 Rule's restoration of state authority is necessary and appropriate...............................14

        4. The 2023 Rule does not allow conditions that do not relate to water quality.............15

    B. EPA Sufficiently Explained and Justified Its Decision to Return to the Section 401 Status Quo That Successfully Governed for Decades Prior to 2020 ...........................................16

IV. CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Ali v. Federal Bureau of Prisons*,
  552 U.S. 214 (2008) ................................................................................................. 12

*American Hospital Ass'n v. Nat'l Labor Relations Bd.*,
  499 U.S. 606 (1991) ................................................................................................. 16

*Atascadero State Hospital v. Scanlon*,
  473 U.S. 234 (1985) ................................................................................................... 9

*Cal. State Water Res. Control Bd. v. FERC*,
  43 F.4th 920 (9th Cir. 2022) ................................................................................... 19

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) ................................................................................................... 5

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) .......................................................................................... 17, 18

*NCDEQ v. FERC*,
  3 F.4th 655 (4th Cir. 2021) ................................................................................. 19-20

*NYSDEC v. FERC*,
  884 F.3d 450 (2nd Cir. 2018) ................................................................................. 20

*Gregory v. Ashcroft*,
  501 U.S. 452 (2002) ................................................................................................... 9

*Harrison v. PPG Industries*,
  446 U.S. 578 (1980) ................................................................................................. 12

*Hoopa Valley Tribe v. FERC*,
  913 F.3d 1099 (D.C. Cir. 2019) ............................................................................. 19

*Loper Bright Enterprises v. Raimondo*,
  144 S. Ct. 2244 (2024) ............................................................................................ 10

*Louisiana World Exposition v. Federal Ins. Co.*,
  858 F.2d 233 (5th Cir. 1988) ................................................................................. 13

*Oregon Natural Desert Ass'n v. Dombek*,
  172 F.3d 1092 (9th Cir. 1998) ............................................................................... 12

*PUD No. 1 of Jefferson County. v. Washington Department of Ecology*,
  511 U.S. 700 (1994) .............................................................................. 5- 7, 10, 11, 16

ii

*S.D. Warren Co. v. Maine Board of Environmental Protection,*
    547 U.S. 370 (2006) ................................................................................. 6, 12, 16

*Turlock Irrigation Dist. v. FERC,*
    36 F.4th 1179 (D.C. Cir. 2022) ........................................................................ 19

*Wages & White Lion Investments, L.L.C. v. Food & Drug Administration,*
    90 F.4th 357 (5th Cir. 2024) ........................................................................... 18

*Will v. Michigan Dep't of State Police,*
    491 U.S. 58 (1989) ............................................................................................ 9

**Statutes**

33 U.S.C. 1341(a)(1) ................................................................................................ 7

33 U.S.C. § 1251(b) .................................................................................................. 1

33 U.S.C. § 1313 .................................................................................................... 11

33 U.S.C. § 1314(f) ................................................................................................ 16

33 U.S.C. § 1341 ...................................................................................................... 1

33 U.S.C. § 1341(a)(3) ........................................................................................... 10

33 U.S.C. § 1341(d) ...................................................................................... 12, 13, 15

33 U.S.C. § 1362(19) .............................................................................................. 15

**Regulations**

40 C.F.R. § 121.1(j) ............................................................................................... 15

40 C.F.R. § 121.3(a) ............................................................................................... 15

40 C.F.R. § 121.7(f) ................................................................................................. 7

86 Fed. Reg. 29,541 (June 2, 2021) ....................................................................... 17

87 Fed. Reg. 35,318 (June 9, 2022) ....................................................................... 17

88 Fed. Reg. 66,558 (Sept. 27, 2023) ................................ 6, 11, 12, 17, 18, 19, 20

**Other Authorities**

H.R. Rep. No. 95-830, 96 ...................................................................................... 11

## I.      INTRODUCTION

The Clean Water Act begins by declaring: "[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, [and] to plan the development and use (including restoration, preservation, and enhancement) of land and water resources . . . ." 33 U.S.C. § 1251(b). Section 401 of the Act, 33 U.S.C. § 1341, is the lynchpin of Congress's efforts to give effect to this policy. At its core, section 401 categorically protects against federal preemption of state water quality authority for projects requiring federal licenses or permits by cementing state authority to review these projects and impose conditions to ensure compliance with water-quality related state laws. For over fifty years, section 401 and its predecessor served those ends well with little fanfare.

In 2020, the U.S. Environmental Protection Agency (EPA) upended section 401 practice with a sweeping rule, purporting to strip states of long-held water quality authority in a way that openly defied binding Supreme Court precedent and was contrary to clear statements of congressional intent. The 2020 Rule was a substantive and procedural disaster. Rather than streamlining the section 401 process, the 2020 Rule ground to a halt section 401 certification reviews across the country, and thousands of projects languished in the uncertainty left in the 2020 Rule's wake. EPA has now course-corrected. In 2023, EPA issued Clean Water Act regulations pursuant to section 401, recognizing and restoring the critical role that states play in protecting water quality within their borders, a role that Congress enshrined in the text of the statute over fifty years ago.

Before this Court, Plaintiffs ignore that history and falsely claim the 2020 Rule's chaos as the section 401 status quo. Plaintiffs' motion for summary judgment attacks the 2023 Rule by relying on interpretations that run afoul of the statutory text and Congressional intent of the Clean

Water Act and by urging this Court to adopt the flawed logic of a Supreme Court *dissent* in place of established Supreme Court precedent. This Court should deny that invitation. The 2023 Rule is consistent with the Clean Water Act, Congress's clear intent to preserve state authority in that Act, and binding Supreme Court precedent. Plaintiffs' arguments have no merit and, accordingly, the Court should grant Defendants' summary judgment motions upholding the Rule.

## II.     BACKGROUND

### A.     Statutory and Regulatory Background

To avoid duplication, State Intervenors adopt EPA's brief for background on the Clean Water Act and the procedural history of section 401 rulemaking.

### B.     Difficulties Under the 2020 Rule and Return to Normalcy Under the 2023 Rule

The record reflects that the 2020 Rule caused significant disruption as soon as it became effective. Comments on EPA's proposed revision of the 2020 Rule bear this out. Even federal agencies that issue permits subject to section 401 described the 2020 Rule as causing "much confusion, delay and frustration when trying to implement" and recommended that EPA "entirely eliminat[e] the [2020 Rule] and go back to the old rule." AR 0000008. The National Conference of State Legislatures, a bipartisan organization representing legislative bodies from all states, commonwealths, and territories, noted that the absence of consultation by EPA with those actually knowledgeable about section 401 practice during development of the 2020 Rule "led to ambiguity and confusion with the agency's new Section 401 certification process due to a lack of comprehensive understanding of the actual permitting environment during promulgation of the rule." AR 0000144.

With the exception of Plaintiff states, states and authorized Tribal governments almost universally condemned the 2020 Rule's bungled approach, its attack on state authority, and its

resulting negative impact on their abilities to protect water quality. The Texas Department of Environmental Quality described how the 2020 Rule "brought about the breakdown" of twenty years of cooperation between Texas and the Army Corps of Engineers on permitting processes. AR 0001620. Texas also criticized the 2020 Rule's limits on the scope of certification as "too narrow" and urged EPA to return to the pre-2020 standard whereby states analyzed water quality impacts from "the activity as a whole." AR 0001619. Idaho stated that the 2020 Rule "unlawfully and unnecessarily" limited the scope of section 401 certification with "[n]othing in section 401's text or controlling precedent support[ing] this limit." AR 0000384; *see also* AR 0008652. Florida noted that the 2020 Rule "creates significant additional workload … directly in conflict with the stated streamlining intent of the 2020 Rule." AR0000317. Florida also complained that the limited scope of review of the 2020 Rule was "inefficient and creates conflict, additional workload, and delays which can hinder the effectiveness of state programs."[1] AR 0000319. In North Carolina, the 2020 Rule forced the state to "divert resources away from protecting water quality" due to onerous and unnecessary requirements. Decl. of Stephanie Goss ¶ 7. For each of North Carolina's roughly 1,600 annual section 401 certification requests, and "[a]t each stage of the review process, the 2020 Rule increased the burden on the State often with no appreciable benefit." *Id*. at 8.

The 2020 Rule also caused real on-the-ground harms. In Washington, confusion over alleged "reopener" language related to certification of Army Corps of Engineers "nationwide" permits caused the near collapse of Washington's shellfish industry as delays in issuing certifications under the 2020 Rule caused many to nearly miss the planting season window.

---

[1] Additional examples in the record abound. *See, e.g.,* AR 0000038 (North Dakota urging EPA to "return the state's authority [as intended in the CWA § 401] to address the project as a whole and all potential water quality impacts of the action") (brackets in original); AR 0000260-263 (Indiana criticizing multiple aspects of the 2020 Rule); AR 0008695 (Virginia stating that it "does not support any revision … that would reduce the role of states and their authority to conduct adequate review" of water quality certifications); AR 0009928 (South Dakota concurring in EPA's proposal in the 2023 Rule to "return the scope of certification to the 'project in general' or the 'activity as a whole'").

AR 0002492-2495. Washington was able to salvage the shellfish growing season only by doubling the number of staff working on individual certifications that, prior to the 2020 Rule, were streamlined. *Id.* In California, confusion over whether under the 2020 Rule the state could modify conditions related to an emergency dam safety project caused significant delays in critical repairs. AR 0002473-2479.

These and other issues have dissipated following promulgation of the 2023 Rule, and section 401 practice has returned to the more efficient and effective process that existed for decades prior to 2020. *See, e.g.,* Decl. of Loree' Randall ¶¶ 4-7; Decl. of Eric Oppenheimer ¶¶ 12-16, 19, 21-22, 33; Decl. of Roy A. Jacobson ¶¶ 51-52. Reviews of section 401 certification requests have become more organized and efficient because the 2023 Rule provided clarity on what is required of applicants, strengthened cooperation between federal agencies and certifying states with respect to certification timelines, and removed burdensome procedural hurdles. Randall Decl. ¶¶ 4-5; Oppenheimer Decl. ¶¶ 13-15. For example, California estimates that it has saved more than one hundred hours in staff time in processing certification applications and has regained the streamlined efficiencies under the Army Corps' nationwide permits. Oppenheimer Decl. ¶¶ 17-19.

## III.   ARGUMENT

### A.   The 2023 Rule Complies With the Clean Water Act, Congressional Intent, and Relevant Case Law

Plaintiffs attempt to paint the 2023 Rule as a radical departure from section 401 practice that upended the status quo. But Plaintiffs have it exactly backward. It was the 2020 Rule's unlawful usurpation of state authority that sharply departed from decades of prior practice rooted in the Act's plain language and Congressional intent evident in its legislative history. The 2023 Rule simply returns the states' section 401 authority to that which existed for fifty years prior to 2020—authority that was embraced across four administrations stretching back to the 1980s and

4

confirmed by the United States Supreme Court. Plaintiffs' assertions that the 2023 Rule is unlawful are meritless and should be rejected.

> 1. **Case law and the language and history of section 401 support the 2023 Rule's restoration of the full scope of section 401 certification review**

Plaintiffs' attack on the 2023 Rule largely centers on the Rule's restoration of what EPA, states, and the courts always understood state authority to be under the Clean Water Act: when reviewing the impacts of a proposed project, a certifying state must assure that the project *as a whole*—including construction and subsequent operation—will satisfy state water quality standards, including any limitation, standard, or other requirement under sections 301, 302, 303, 306 and 307 of the Act, and any other appropriate requirement of state law. This scope comports with the text and history of the Act and should be upheld.

a. Plaintiffs incorrectly claim that the plain statutory text limits section 401 review to ensuring only that any individual "discharge" complies with water quality standards. The Supreme Court rejected that interpretation in *PUD No. 1 of Jefferson County. v. Washington Department of Ecology*, 511 U.S. 700 (1994) (*PUD No. 1*). Construing section 401(a) and (d) in concert, and resolving any dissonance between those subsections, the Court concluded that section 401(a)(1)'s reference to discharges simply "identifies the category of activities subject to certification—namely those with discharges." *Id*. at 711-12. The Court then found that section 401(d)'s reference to an applicant's compliance "is most reasonably read as authorizing additional conditions and limitations on the activity as a whole once the threshold condition, the existence of a discharge, is satisfied." [2] *Id.* at 712. The 2023 Rule is consistent with the Supreme Court's interpretation, as it

---

[2] It is worth noting that this conclusion did not rely on deference to the EPA's interpretation pursuant to *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enterprises v. Raimondo, __ U.S. __,* 144 S. Ct. 2244, 2257-58 (2024). The *PUD No. 1* majority only cited *Chevron* after first concluding, on its own reading of the statute, that section 401 focused on the activity as a whole. *PUD No. 1*, 511 U.S. at 711-12.

"best reflects the statutory text, history, and purpose of CWA section 401" and "effectuates Congress's goal of maximizing protection of the nation's waters" by allowing states and Tribes to "ensure that federally licensed or permitted activities do not frustrate attainment of their water quality goals." 88 Fed. Reg. 66,558, 66,593 (Sept. 27, 2023). In contrast, Plaintiffs here, like the applicants in *PUD No. 1*, propose a significantly narrower interpretation of state authority, one that is wholly inconsistent with Congress's intent.

The Supreme Court once again upheld the states' broad authority under section 401 in *S.D. Warren Co. v. Maine Board of Environmental Protection*, 547 U.S. 370 (2006) (*S.D. Warren*). *S.D. Warren* examined whether a discharge of a pollutant is necessary to trigger section 401 review. *Id*. at 373. The Court found that a dam's alteration of river flow by itself is within Congress's understanding of "pollution." *Id*. at 385-86. In doing so, the Court cited a number of impacts flowing from such alterations, including causing "long stretches of the natural river bed to be essentially dry and thus unavailable as habitat," blocking fish passage, eliminating fishing opportunities, and preventing "recreational access to and use of the river." *Id*.  None of these impacts result from any point source discharge—the scope Plaintiffs urge here. Yet the Court found "[c]hanges in the river like these fall within a State's legitimate legislative business, and the Clean Water Act provides for a system that respects the States' concerns." *Id*. at 386. Namely, "[s]tate certifications under § 401 are essential in the scheme to preserve state authority to address the broad range of pollution" created by federally authorized projects. *Id*. It is worth noting that, in interpreting section 401 broadly to further the Act's water quality protective goals, the Court left its prior interpretation of section 401(a) and (d), established in *PUD No. 1*, untouched.

These decisions fully refute Plaintiffs' attack on the 2023 Rule. Plaintiffs' efforts to dodge this Supreme Court precedent are unavailing. Plaintiffs completely ignore *S.D. Warren*. And

Plaintiffs' assertion that *PUD No. 1*'s holding is limited to a state's imposition of conditions under section 401(d), Pls.' Br. at 16 (Dkt. 116-1), is nonsensical. While *PUD No. 1* reviewed the appropriateness of Washington's stream flow condition, the Court itself stated that it was called upon to "determine the scope of [state] authority under § 401," not just the scope of the conditions that a state can impose via a section 401 certification. *PUD No. 1*, 511 U.S. at 710. The Court gave no indication that it intended to limit its holding only to certification conditions, as opposed to the scope of state review of a project.

Indeed, in finding that its holding was consistent with EPA's regulations and longstanding interpretations, the Court noted section 401's requirement that states must find "a reasonable assurance that the *activity* will be conducted in a manner which will not violate applicable water quality standards." *Id*. at 712 (emphasis original). If certification conditions are insufficient to ensure compliance with those standards, a project *must* be denied, as the Supreme Court understood.[3] 33 U.S.C. 1341(a)(1); *see also PUD No. 1*, 511 U.S. at 712. It defies logic to believe that the Court (much less Congress) meant to allow states to view the activity as a whole when conditioning projects but simultaneously deny that same scope of review when determining whether compliance with water quality standards is even possible—with or without conditions. *PUD No. 1* and *S.D. Warren* thus fully support the 2023 Rule's restoration of state authority.

b. The history of section 401 and EPA's long-standing interpretations of its scope similarly support the 2023 Rule and refute Plaintiffs' efforts to curtail state authority. Congress first adopted the state review and certification requirement now in section 401 as section 21(b) of the Water Quality Improvement Act of 1970. Congress's goals for this section were expansive. As noted in the House Report, section 21(b) was created to require state certification of "any activity of any

---

[3] Plaintiffs also agree that denial is the appropriate outcome in such a circumstance. Pls.' Br. at 23. States may, of course, also waive certification altogether. 40 C.F.R. § 121.7(f).

7

kind or nature which may result in discharges into the navigable waters." AR 0008379. The House Report went on to declare that federally permitted activities or operations frequently impact water quality and that state water quality certifications were intended "to provide reasonable assurance … that no license or permit will be issued by a Federal agency for any activity that … could in fact become a source of pollution." AR 0024592. In considering the need for the same provision, the Senate Report decried that "[i]n the past, these licenses and permits have been granted without any assurance that [state] standards will be met or even considered." AR 0007543. The certification requirement was thus designed to ensure that all activities authorized by federal permits and impacting water quality would fully comply with state law and that "Federal licensing or permitting agencies [could not] override State water quality requirements." AR 0007484. There is no mistaking intent here: Congress mandated water quality certifications to ensure that the federal government could not override *any* state water quality standard or preempt state authority to ensure that federally approved projects would not become sources of water pollution.

Plaintiffs provide no evidence to support their claim that, when incorporating section 21(b) into the Clean Water Act, Congress intended to constrain states' authority to review federally approved projects within their borders. Although the Clean Water Act recognizes that states may certify "that any such discharge shall comply," rather than certify "that such activity will not violate water quality standards," the legislative history shows that the goals of section 21(b) of the 1970 Act were fully carried forward into section 401 of the Clean Water Act. Congress repeatedly described the changes to section 401 as "minor" (and a severe curtailment of states' water quality certification authority would certainly not have been considered *minor*). *See, e.g.*, AR 0016583. And EPA's then-Administrator, when submitting testimony on the bill, likewise confirmed that section 401 was "essentially the same" as section 21(b). AR 0008604. Even five years later, during

1977 Clean Water Act amendments that made other minor changes to section 401, the Conference Report described section 401 as requiring that a "federally licensed or permitted *activity* … must be certified to comply with State water quality standards," echoing the original language. AR 0007759 (emphasis added). Had Congress intended to radically alter the balance of federal and state power under section 401, such a significant change would appear somewhere in the congressional record. It does not.

Moreover, Plaintiffs' suggestion that this minor modification radically changed section 401's scope and purpose is severely undercut by the standard under which such a modification must be viewed. Where "Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242 (1985)); *see also Gregory v. Ashcroft*, 501 U.S. 452, 461 (2002) ("[The] plain statement rule … acknowledge[s] that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere"). There is no such "unmistakably clear" pronouncement here. *Will*, 491 U.S. at 65.

Finally, the 2023 Rule's restoration of the scope of section 401 review is fully consistent with EPA interpretations going back to the Reagan Administration. As early as 1985, an internal EPA memo rejected precisely the arguments Plaintiffs make here, concluding that section 401 retained its "original scope, that is, allowing state certifications to address any water quality standard violation resulting from an activity for which a certification is required, whether or not the violation is directly caused by a 'discharge' in the narrow sense." AR 0012266.

In 1989, EPA affirmed this conclusion in guidance stating that it is "imperative for a State review to consider all potential water quality impacts of [a] project, both direct and indirect, over

the life of the project." AR 0001997. EPA noted the importance of this aspect of section 401 review because a state's certification of a construction permit or license also operates as certification for any permits or licenses needed for the project's subsequent operation. *Id*. Guidance EPA issued in 2010 also confirmed this scope, this time with the benefit of the Supreme Court's decisions in *PUD No. 1* and *S.D. Warren*. EPA reaffirmed that section 401 review includes the ability to "impose conditions on the project activity in general, and not merely on the discharge, if necessary to assure compliance with the CWA and any other appropriate requirements of state or tribal law." AR 0006832 (citing *PUD No. 1*, 511 U.S. at 711-12). That persuasive and longstanding interpretation is "entitled to very great respect," especially as it remained consistent for decades. *Loper Bright Enterprises v. Raimondo*, __ U.S. __, 144 S. Ct. 2244, 2257-58 (2024) (cleaned up).

c. Plaintiffs' assertion that the "activity" subject to state review does not include a facility's subsequent operation, Pls.' Br. at 16, is contrary to the express statutory language. Section 401(a)(3) provides that a state certification related to the federal permit for construction of a facility may also address impacts from the later operation of that facility, even when that operation will be subject to another federal permit. 33 U.S.C. § 1341(a)(3). Critically, however, the statute removes this benefit to permittees where "changes since the construction license or permit certification was issued" indicate that "construction *or operation*" of the facility will fail to comply with water quality requirements. *Id*. (emphasis added). Notably, Plaintiffs omit this key language from their discussion of the statute. Pls.' Br. at 17.

Reading this language as somehow precluding taking operational water quality impacts into consideration—when the statute explicitly says that changes in operation of the facility may render a 401 certification invalid—would be absurd.

10

2. **The 2023 Rule's requirement that certifications comply with water quality-related state laws is fully consistent with the Clean Water Act and should be upheld**

Plaintiffs allege that EPA erred in the 2023 Rule by re-affirming—as the plain language of section 401 requires—that states must certify compliance with any applicable state law standard related to water quality in addition to water quality standards adopted pursuant to the Clean Water Act. Citing *ejusdem generis*, Plaintiffs claim that the reference to enumerated sections of the Clean Water Act within section 401 limits state regulatory requirements to only those addressing "point source discharges into waters of the United States" (Pls.' Br. at 20), despite the fact that section 401 also requires compliance with "any other appropriate requirement of State law." Plaintiffs are incorrect.

As discussed in A.1.a, *infra*, on its face Section 401 does not limit a state's review to impacts from point sources. Section 401(a) and (d) require certification of compliance with section 303 of the Act,[4] requiring states to establish water quality standards, investigate which waters fail to meet standards, and then set pollution loads for those waters that cannot be exceeded from any source. *See* 33 U.S.C. § 1313. As EPA points out in the preamble to the 2023 Rule, this requirement goes well beyond regulating point source discharges. 88 Fed. Reg. at 66,663. Yet the Supreme Court has affirmed that "state water quality standards adopted pursuant to § 303 are among the 'other limitations' with which a State may ensure compliance through the § 401 certification process." *PUD No. 1*, 511 U.S. at 713. While the Court declined to "speculate" on the breadth of "any other appropriate requirements of State law," the Court found that "at a minimum" non-point-

---

[4] While section 303 is not referenced expressly in section 401(a), it is incorporated by reference via section 301. *See, e.g., PUD No. 1*, 511 U.S. at 712-13 (citing H.R. Rep. No. 95-830, 96 (Dec. 6, 1977) ("[i]t is understood that section 303 is required by the provisions of section 301")).

source-based water quality standards adopted pursuant to section 303 "are 'appropriate' requirements of state law" under section 401.[5] *Id*.

Moreover, section 401(d) unequivocally allows states to impose any limitations necessary to ensure an applicant's compliance with sections 301 and 302 (effluent limitations), 306 (discharge performance standards), and 307 (toxic and pretreatment effluent standards) of the Clean Water Act *and* with "any other appropriate requirement of State law." 33 U.S.C. § 1341(d). As EPA notes, this is capacious language "literally meaning 'all' such state law requirements and not just a limited subset such as point source-related requirements." 88 Fed. Reg. at 66,603 (citing *Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008); *Harrison v. PPG Industries*, 446 U.S. 578 (1980)). Again, the Supreme Court has interpreted section 401 in a similarly broad manner, concluding that non-point impacts such as blocked fish passage, elimination of recreational opportunities, and habitat loss "fall within a State's legitimate legislative business, and the Clean Water Act provides for a system [section 401] that respects the States' concerns." *S.D. Warren*, 547 U.S. at 385-86. As the Court found, application of state law addressing these impacts via section 401 is, thus, "essential" to Congress's effort to preserve state authority to address pollution, and is "the very reason[] that Congress provided the States with power to enforce 'any other appropriate requirement of State law.'" *Id*. at 386.

Plaintiffs' suggested interpretation—i.e., that the enumerated sections of the Clean Water Act indicate an intent for states to only regulate point source discharges—ignores the text of section 401. The enumerated sections themselves relate to point source discharges. But that is

---

[5] Plaintiffs' claim that the water quality standards adopted under section 303 really only address point-source discharges, Pls.' Br. at 20 n.2, is unavailing. *Oregon Natural Desert Ass'n v. Dombek*, 172 F.3d 1092 (9th Cir. 1998), only addresses whether a project limited *solely to* non-point discharges must seek section 401 certification. *Id*. The 2023 Rule does nothing of the sort. As for Plaintiffs' argument that section 303 is "primarily" used to establish numeric limits for point source discharge permits, Plaintiffs do not (and *cannot*) claim that this is all that section 303 accomplishes.

decidedly not where the statutory language ends. To give effect to section 401(d)'s additional requirement to also ensure compliance with "any other appropriate requirement of State law," this language *must* refer to something other than the Clean Water Act's regulation of point source discharges already referenced. *See* 33 U.S.C. § 1341(d); *see also Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 241 (5th Cir. 1988) (rejecting a statutory reading that would be "completely at odds with the general rule that a court … must endeavor to adopt a construction which gives meaning to all the words of the statute"). Plaintiffs' reading erroneously renders the reference to state law a nullity. *Id.*

Finally, the legislative history of section 401 also refutes Plaintiffs' efforts to restrict the types of state water quality laws relevant to a state's section 401 certification. As noted on pages 7-10 above, Congress expressly preserved state authority over water quality to the fullest extent possible, and consistent with the minimum requirements of the Clean Water Act, including preventing the federal government from pre-empting state water quality concerns. That preservation assures compliance with other state water quality laws—not just those focused on effluent limits from point source discharges. For example, the Conference Report notes that section 401(d), "which requires a certification to set forth effluent limitations, *other limitations*, and monitoring requirements necessary to insure compliance with sections 301, 302, 306, and 307 of this Act, has been *expanded* to also require compliance with any other appropriate requirement of State law which is set forth in the certification." AR 0007916 (emphasis added). This description clashes sharply with Plaintiffs' claim that section 401's reference to state law simply refers to effluent limitations imposed under the Clean Water Act.[6] The plain text of the statute, combined

---

[6] Until 2020, EPA had for decades adhered to this clear legislative intent. Guidance on section 401 from as far back as 1989 confirmed that "[t]he legislative history of [section 401] indicates that the Congress meant for the States to impose whatever conditions on the certification are necessary to ensure that an applicant complies with all State requirements that are related to water quality concerns." AR 0001998.

with unmistakable indications of congressional intent, render only one conclusion: Congress meant what it said. Under section 401, states are empowered to ensure compliance with *all* applicable state water quality laws. The 2023 Rule fully complies with this mandate.

### 3. Plaintiffs' arguments about Natural Gas Act preemption demonstrate that the 2023 Rule's restoration of state authority is necessary and appropriate

Plaintiffs assert that, by requiring the states to perform exactly the level of review applicable for decades prior to the 2020 Rule, the 2023 Rule somehow disrupts the Natural Gas Act and Federal Power Act. Pls.' Br. at 21-23. Not so.

The fact that state authority to regulate water quality impacts would otherwise be preempted for certain federally approved projects is the exact reason Congress enacted section 401. Without that authority, states would be powerless to regulate these projects' water quality impacts. Thus, as noted above, section 401 and its predecessor were enacted after the Natural Gas Act and the Federal Power Act to ensure that "no Federal agency shall issue a license or permit for any activity which may affect water quality" until the state certifies compliance with its water quality standards. AR 0007543. This is without regard to what activity federal law is authorizing. Indeed, the Senate Report for 1970 amendments to the Federal Water Pollution Control Act (creating what would become section 401) specifically referenced Atomic Energy Act preemption and decried the fact that "[i]n the past, these licenses and permits have been granted without any assurance that [state water quality] standards will be met or even considered." *Id.*; *see also* AR 0007484 (Senate Committee on Public Works report on the Clean Water Act noting that, with regard to section 401, "the Committee continues the authority of the State or interstate agency to act to deny a permit and thereby prevent a Federal license or permit from issuing to a discharge source" and "[s]hould such an affirmative denial occur no license or permit could be issued by

14

such Federal agencies as the Atomic Energy Commission, Federal Power Commission, or the Corps of Engineers").

Notably, Plaintiffs also fail to explain how compliance with state standards pursuant to section 401 will disrupt either the Natural Gas Act or Federal Power Act processes. Despite the fact that, for decades prior to 2020, states routinely applied the full range of their water quality laws via section 401 certifications, Plaintiffs fail to identify a single case demonstrating this practice as offensive to either statute. While Congress can shield certain actions from state sovereign authority, Congress also has the authority to create carve-outs from that preemption. It has done so here when it mandated in the Clean Water Act that all federally licensed or permitted activities comply with "any other appropriate requirement of State law." 33 U.S.C. § 1341(d). Plaintiffs' reference to other statutes' alleged preemptory effects are unconvincing.

### 4.    The 2023 Rule does not allow conditions that do not relate to water quality

Plaintiffs are also incorrect in claiming that the 2023 Rule allows states to impose conditions unrelated to water quality. Pls.' Br. at 23-26. The 2023 Rule provides that "[w]ater quality requirements" means limitations imposed under the Clean Water Act "and any other *water quality-related* requirement of state or Tribal law," 40 C.F.R. § 121.1(j) (emphasis added), and expressly limits a state's evaluation to "the water quality-related impacts from the activity." 40 C.F.R. § 121.3(a). It does not allow the denial or conditioning of a project on non-water quality-related grounds.

What Plaintiffs appear to actually take issue with is the fact that impacts to water quality occur under far more scenarios than simply dumping pollutants from a point source into a body of water. But the Clean Water Act is not so narrowly drawn. The Act broadly defines pollution as any "man-made or man induced alteration of the chemical, physical, biological, and radiological integrity of water." 33 U.S.C. § 1362(19). The Act also expressly recognizes that water "pollution"

may result from "changes in the movement, flow, or circulation of any navigable water" 33 U.S.C. § 1314(f). This broad scope of pollution in the Act expressly demonstrates Congress's concern with the physical and biological integrity of water. This breadth was confirmed by the Supreme Court when it recognized that all manner of water quality harms can flow from a project, including those that go well beyond impacts from point-source discharges. *See S.D. Warren*, 547 U.S. at 385-86 (describing blocking fish passage, impacting habitat, and reducing recreational access as "within a State's legitimate legislative business" for which section 401 provides "a system that respects the States' concerns" over such impacts); *PUD No. 1*, 511 U.S. at 714-15 (affirming a minimum stream flow condition necessary to protect fish habitat).

Moreover, Plaintiffs' claims of state abuses, Pls.' Br. at 25-26, are exaggerated and unsupported. States issue thousands of section 401 certifications every year, yet Plaintiffs point to zero instances of abuse. And Plaintiffs remain free to bring as-applied challenges to conditions they contend are not related to water quality. But the mere chance that some state in the future may attempt to apply the 2023 Rule more broadly than allowed does not provide a basis to facially invalidate EPA's and the Supreme Court's longstanding, persuasive construction of the Clean Water Act to allow states to evaluate the full scope of water quality impacts that will flow from federally licensed or permitted projects within their borders. *See, e.g.*, *American Hospital Ass'n v. Nat'l Labor Relations Bd.*, 499 U.S. 606, 619 (1991) ("[t]he fact that petitioner can point to a hypothetical case in which the rule might lead to an arbitrary result does not render the rule 'arbitrary or capricious'").

**B.    EPA Sufficiently Explained and Justified Its Decision to Return to the Section 401 Status Quo That Successfully Governed for Decades Prior to 2020**

Despite EPA's lengthy rulemaking process and hundreds of pages of thorough explanation and analysis, Plaintiffs now claim that EPA failed to provide adequate justification for fixing the

significant problems experienced under the 2020 Rule and returning section 401 practice to the scope that Congress patently intended and that the courts have repeatedly confirmed. Plaintiffs' arguments fail.

"Agencies are free to change their existing policies as long as they provide a reasonable explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Doing so only requires an agency to "at least display awareness that it is changing position and show that there are good reasons for the new policy." *Id*. (cleaned up). Agencies "must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id*. at 221-22.

The 2023 Rule more than satisfies this standard. In its June 2021 notice of intent to reconsider and revise, EPA outlined significant implementation problems and legal concerns that had arisen under the 2020 Rule and sought feedback on how the 2020 Rule could be modified. 86 Fed. Reg. 29,541 (June 2, 2021). In particular, EPA identified "substantial concerns with a number of provisions of the 401 Certification Rule that relate to cooperative federalism principles and CWA Section 401's goal of ensuring that states are empowered to protect their water quality." *Id.* at 29,542. Following extensive public feedback on the notice of intent to reconsider, EPA proposed its draft rule for public comment a year later. 87 Fed. Reg. 35,318 (June 9, 2022). EPA included a lengthy preamble acknowledging every point of departure from the 2020 Rule and explaining *in detail* its justification for each change. And, after considering public comment, EPA published the final rule in September 2023, again giving detailed reasoning for each provision and providing an explanation of where it agreed and disagreed with commenters. 88 Fed. Reg. 66,558.

Plaintiffs' invocation of "serious reliance interests" in the 2020 Rule, Pls.' Br. at 26, is absurd. The 2023 Rule *returned* "longstanding" policies; it did not eliminate any. The 2020 Rule

took effect in September 2020, was vacated in October 2021, reinstated in April 2022, and repealed in November 2023. All told, the 2020 Rule was in effect for roughly 20 months. Given the brief period the 2020 Rule was in effect—combined with the fact that the 2023 Rule merely returned section 401 practice to that which governed for fifty years—Plaintiffs cannot credibly contend that any reliance interests in "longstanding" policies are implicated here, much less "serious" ones. *See Encino Motorcars*, 579 U.S. at 222 (describing reliance on a rule in existence from for thirty-three years).

Further, Plaintiffs' heavy reliance on *Wages & White Lion Investments, L.L.C. v. Food & Drug Administration*, 90 F.4th 357 (5th Cir. 2024) (*White Lion*), is misplaced. In *White Lion*, the Food and Drug Administration failed to acknowledge it was changing positions *at all*, and made those changes in direct contravention to voluminous guidance it had issued "over years and reiterated in numerous different ways." *Id*. at 383. That stands in stark contrast to the 2023 Rule, where EPA repeatedly acknowledged and fully explained its departures from the 2020 Rule. Moreover, as discussed above, the 2023 Rule realigned section 401 implementing regulations to be consistent with Supreme Court precedent and EPA's decades-long interpretation of section 401, reinforced by memoranda and guidance issued by the agency from the 1980s to the 2010s. If anything, it is the 2020 Rule's whiplash from case law and longstanding EPA policy—under the guise of a "holistic" analysis that bucked binding authority and plain indications of legislative intent—that runs afoul of *White Lion*. *See id*. Indeed, it is beyond dispute that, as EPA accurately noted in the preamble to the final Rule, the 2020 Rule "rejected nearly 50 years of Agency practice and over 25 years of Supreme Court precedent." 88 Fed. Reg. at 66,559.

Additionally, Plaintiffs are incorrect that the 2023 Rule depends upon "factual findings" contradicting its prior policy. Pls.' Br. at 31. All of the provisions Plaintiffs take issue with in the

2023 Rule are legal—not factual—in nature. It is thus not surprising that EPA's analysis on these points, both in the 2020 Rule and in the 2023 Rule, largely rests on legal analyses, not factual ones. There are no "factual" explanations necessary for EPA to revert those portions of a rule that actively disdained, and refused to follow, binding Supreme Court precedent and decades of agency policy. And, unlike the 2020 Rule's basing a radical departure from prior practice on nothing more than open defiance of Supreme Court precedent and plain indications of congressional intent, the 2023 Rule's explanation of the relevant legal authorities is firmly rooted in established law.

Finally, Plaintiffs incorrectly assert that EPA's decision to stay "silent and neutral" as to whether a voluntary withdrawal of an application resets the timeline for certification, Pls.' Br. at 30-31, means that EPA failed to explain its reasons for removing restrictions that the 2020 Rule placed on this practice. To the contrary, EPA in the preamble to the 2023 Rule explained in detail the state of flux that existed with regard to withdrawal and resubmittal of certification requests. 88 Fed. Reg. at 66,590-91. EPA noted that the D.C. Circuit's decision in *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099 (D.C. Cir. 2019), while not foreclosing submission of a new request, determined that a formal "decade-long 'scheme' to subvert the one-year" limit ran afoul of the statute. *Id.* at 66,590-91. EPA used *Hoopa* to emphasize its careful consideration of why certifying authorities must make decisions on a "case-by-case basis" to fairly consider the varied factual situations that might give rise to withdrawal and resubmission of a request for certification. *Id.* at 66,590.

EPA then discussed three other circuit court decisions that "acknowledged the possibility that withdrawal and resubmittal of a request for certification may be a viable mechanism for addressing complex certification situations."[7] *Id.* at 66,591 (citing *NCDEQ v. FERC*, 3 F.4th 655

---

[7] EPA went on to discuss another D.C. Circuit case, *Turlock Irrigation Dist. v. FERC*, 36 F.4th 1179 (D.C. Cir. 2022), that significantly limited *Hoopa Valley*. *See* 88 Fed. Reg. at 66,617.

(4th Cir. 2021); *NYSDEC v. FERC*, 884 F.3d 450, 456 (2nd Cir. 2018); *Cal. State Water Res. Control Bd. v. FERC*, 43 F.4th 920 (9th Cir. 2022)). Because of the "dynamic case law" on the topic, EPA left it to "certifying authorities, Federal agencies … and/or possibly project proponents take the lead in deciding whether and when it is reasonable to allow withdrawal and resubmittal of requests for certification." 88 Fed. Reg. at 66,591. EPA's explanation that it intends to let courts (and the involved parties) decide unsettled matters of law fully satisfies the requirement that EPA show its reasoning and properly respects the role of courts in interpreting the law. Plaintiffs' arguments otherwise fail.

## IV.    CONCLUSION

State Intervenors respectfully request that this Court deny Plaintiffs' motion and grant summary judgment in favor of Defendants. EPA's 2023 section 401 rule fixed significant flaws—both legal and practical—evident in the 2020 Rule. The 2023 Rule is fully consistent with the Clean Water Act and Administrative Procedure Act requirements, realigns section 401 practice with binding Supreme Court precedent, and re-effectuates Congress's mandate to maintain state authority to protect water quality. Defendants are entitled to summary judgment upholding the 2023 Rule.

RESPECTFULLY SUBMITTED this 30th day of July 2024.

MOST AND ASSOCIATES

*s/ William Most*
WILLIAM MOST (La. Bar No. 36914)
HOPE PHELPS (La. Bar No. 37259)
DAVID LANSER (La. Bar No. 37764)
201 St. Charles Ave., Ste. 2500, # 9685
New Orleans, LA 70170
(504) 509-5023
williammost@gmail.com

**FOR THE STATE OF WASHINGTON**

ROBERT W. FERGUSON
Attorney General

*s/ Kelly T. Wood*
KELLY T. WOOD*
Senior Counsel
ALEXANDRIA K. DOOLITTLE*
Assistant Attorney General
Washington State Attorney General's Office
P.O. Box 40117
Olympia, WA  98504-0117
Telephone: 360-586-6769
Kelly.Wood@atg.wa.gov
Alex.Doolittle@atg.wa.gov


* *Pro Hac Vice*

**FOR THE STATE OF NEW YORK**

LETITIA JAMES
Attorney General

*s/ Meredith G. Lee-Clark*
MEREDITH G. LEE-CLARK*
Assistant Attorney General
Office of the Attorney General
The Capitol
Albany, New York 12224
(518) 776-2401
meredith.lee-clark@ag.ny.gov


**Pro Hac Vice*

**FOR THE STATE OF CALIFORNIA**

ROB BONTA
Attorney General of California

*s/ Tatiana K. Gaur*
TATIANA K. GAUR*
BRYANT B. CANNON*
CATHERINE M. WIEMAN
Deputy Attorneys General
California Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
213-269-6329
Tatiana.Gaur@doj.ca.gov

**Pro Hac Vice*

**FOR THE STATE OF COLORADO**

PHILLIP J. WEISER
Attorney General

*s/ Carrie Noteboom*
CARRIE NOTEBOOM*
Assistant Deputy Attorney General
Natural Resources and Environment Section
1300 Broadway, 7th Floor
Denver, CO 80203
720.508.6285
carrie.noteboom@coag.gov

*Pro Hac Vice*

**FOR THE STATE OF ILLINOIS**

KWAME RAOUL
Attorney General

*s/ Jason E. James*
Jason E. James*
Assistant Attorney General
Illinois Attorney General's Office
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(872) 276-3583
jason.james@ilag.gov

*Pro Hac Vice*

**FOR THE STATE OF CONNECTICUT**

WILLIAM TONG
Attorney General

*s/ Jill Lacedonia*
Jill Lacedonia*
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250
Jill.Lacedonia@ct.gov

*Pro Hac Vice*

**FOR THE STATE OF MAINE**

AARON FREY
Attorney General

*s/ Jack Dafoe*
JACK DAFOE*
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, Maine 04333-0006
(207) 626-8800
jack.dafoe@maine.gov

*Pro Hac Vice*

**FOR THE STATE OF MARYLAND**

ANTHONY G. BROWN
Attorney General

*s/ Steven J. Goldstein*
STEVEN J. GOLDSTEIN*
Special Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
410-576-6414
sgoldstein@oag.state.md.us

*Pro Hac Vice*


**FOR THE PEOPLE OF THE STATE OF MICHIGAN**

*s/ Elizabeth Morrisseau*
ELIZABETH MORRISSEAU*
Assistant Attorney General
Environment, Natural Resources, and
Agriculture Division
6th Floor G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
MorrisseauE@michigan.gov

*Pro Hac Vice*


**FOR THE COMMONWEALTH OF MASSACHUSETTS**

ANDREA JOY CAMPBELL
Attorney General

TURNER SMITH*
Deputy Chief and Assistant Attorney General

*s/ Matthew Ireland*
MATTHEW IRELAND*
Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Fl.
Boston, MA 02108

*Pro Hac Vice*


**FOR THE STATE OF MINNESOTA**

KEITH ELLISON
Attorney General

*s/ Peter N. Surdo*
PETER N. SURDO
Special Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street
Town Square Tower Suite 1400
Saint Paul, Minnesota 55101
651.757.1061 (o)
Peter.Surdo@ag.state.mn.us

*Pro Hac Vice* pending

23

**FOR THE STATE OF NEW MEXICO**

RAÚL TORREZ
Attorney General

*s/ William Grantham*
WILLIAM GRANTHAM*
Assistant Attorney General
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 717-3520
wgrantham@nmag.gov

*Pro Hac Vice*

**FOR THE STATE OF OREGON**

ELLEN F. ROSENBLUM
Attorney General

*s/ Diane Lloyd*
DIANE LLOYD*
Sr. Assistant Attorney General
PAUL GARRAHAN*
Attorney-in-Charge, Natural Resources
Section
Oregon Department of Justice
100 SW Market Street
Portland, OR  97201
971-673-1880
diane.lloyd@doj.state.or.us
paul.garrahan@doj.state.or.us

*Pro Hac Vice*

**FOR THE STATE OF NORTH CAROLINA**

JOSHUA H. STEIN
Attorney General

*s/ Taylor H. Crabtree*
TAYLOR H. CRABTREE*
Assistant Attorney General
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6400
tcrabtree@ncdoj.gov
*Pro Hac Vice*

**FOR THE COMMONWEALTH OF PENNSYLVANIA**

MICHELLE A. HENRY
Attorney General

*s/ Ann R. Johnston*
ANN R. JOHNSTON*
Assistant Chief Deputy Attorney General
Office of the Attorney General
Civil Environmental Enforcement Unit
Strawberry Square
14th Floor
Harrisburg, PA 17120
717-497-3678
ajohnston@attorneygeneral.gov

*Pro Hac Vice*

24

**FOR THE STATE OF RHODE ISLAND**

PETER F. NERONHA
Attorney General

*s/ Alison Hoffman Carney*
ALISON HOFFMAN CARNEY*
Assistant Attorney General
Chief, Environment and Energy Unit
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 ext 2116
acarney@riag.ri.gov

*Pro Hac Vice*

**FOR THE STATE OF VERMONT**

CHARITY R. CLARK
Attorney General

*s/ Laura B. Murphy*
LAURA B. MURPHY*
Assistant Attorney General
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
802-828-1059
laura.murphy@vermont.gov

*Pro Hac Vice*

**FOR THE DISTRICT OF COLUMBIA**

BRIAN L. SCWHALB
Attorney General

*s/ Brian Caldwell*
BRIAN CALDWELL*
Senior Assistant Attorney General
Office of the Attorney General for the
District of Columbia
400 Sixth Street, N.W., 10th Floor
Washington, D.C. 20001
202-727-6211
Brian.Caldwell@dc.gov

*Pro Hac Vice*

i